UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIANA BONACASA, VINCENT BONACASA, RAQUEL BONACASA, BARBARA ROSENDAHL, JEFFREY MUNCY, GILBERT RUSSELL, ABIGAIL RUSSELL, SARAH RUSSELL, NOEMI RUSSELL, BENJAMIN RUSSELL, NATHANAEL RUSSELL, DEBBIE WILLIAMS, and CHELSEA MANGANO <br><br> Plaintiffs, <br><br> -against- <br><br> STANDARD CHARTERED PLC and STANDARD CHARTERED BANK <br><br> Defendants. | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**PRELIMINARY STATEMENT**

1.      In January 2013, U.S. Government officials met with senior officials of Defendants Standard Chartered PLC ("SC PLC") and Standard Chartered Bank ("SCB," and collectively with SC PLC, "Standard Chartered") at their New York branch in Manhattan.  The U.S. Government urged Standard Chartered to stop aiding and abetting terrorist attacks directed against U.S. service members in Afghanistan through the provision of financial services to the manufacturer of precursor chemicals being used in those attacks.

2.      Among other things, the U.S. officials produced maps, photos of the precursor chemicals, and data and other evidence tying the chemicals to thousands of American casualties. The U.S. officials also provided information regarding the foreign exchange and export finance services Standard Chartered was providing to facilitate these activities and asked the bank to stop providing financial services that enabled terrorist attacks against Americans.

3.      Standard Chartered refused, with one U.S. Government official later describing Standard Chartered's response to U.S. Government entreaties as "utterly useless."

4.      After the January 2013 meeting, Standard Chartered continued to provide financial services that enabled the manufacture and transportation of precursor chemicals for explosive devices used by terrorist organizations to kill American service members.  It continued providing such financial services despite being directly informed by the U.S Government that it was playing a key role in the provision of bomb-making materials to terrorists in Afghanistan and despite being explicitly warned that the deaths of American service members were a foreseeable consequence of its conduct.

## NATURE OF THE ACTION

5.      This is an action under the Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(a) and (d), brought on behalf of the families of Americans killed by explosive devices in a series of terrorist attacks in Afghanistan beginning in 2013.  The attacks were perpetrated by members of an al-Qaeda-led network largely composed of Taliban and Haqqani Network terrorists that formed a syndicate of terrorist organizations (the "al-Qaeda Terror Syndicate," or the "Syndicate").[1]

6.      During the relevant period (2013 – 2016), Standard Chartered aided and abetted terrorist attacks by knowingly providing financial and banking services to the Fatima Group ("Fatima"), a Pakistani company upon which the al-Qaeda Terror Syndicate relied almost entirely for materials to make explosive devices such as improvised explosive devices ("IEDs"), suicide bombs, and other homemade explosive devices (collectively, "Explosive Device(s)").

---

[1]      The "Syndicate" included al-Qaeda, the Taliban, the Haqqani Network (within the Taliban), Lashkar e Taiba ("LeT" or "LT"), Jaish e Mohammed ("JeM"), and the Tehrik-i-Taliban Pakistan ("Pakistani Taliban").

7.    Standard Chartered provided banking services to Fatima knowing that those services enabled Fatima to supply the al-Qaeda Terror Syndicate with the precursors it used to manufacture the Explosive Devices that killed and maimed large numbers of American service members in Afghanistan.  In so doing, Standard Chartered knowingly and wantonly sacrificed American lives to increase its own profits.

8.    Throughout the relevant period, Standard Chartered knew that when U.S. forces were stationed in Afghanistan and Iraq, U.S. officials declared IEDs to be "the most significant threat" to U.S. troops there, with IEDs being the means by which thousands of Americans were murdered in these countries.

9.    Standard Chartered knew that, for the manufacture of Explosive Devices, the al-Qaeda Terror Syndicate depended significantly on the fertilizer supplied by two Pakistan-based manufacturing plants owned, controlled, and operated by Fatima: Fatima Fertilizer Limited ("Fatima Fertilizer") and Pakarab Fertilizers Limited ("Pakarab").

10.    Fatima manufactured the explosives precursor, Calcium Ammonium Nitrate ("CAN"), which is the key ingredient in a majority of IEDs and other homemade explosives ("HMEs").  CAN is legally produced and sold in Pakistan, almost exclusively by Fatima.

11.    During the relevant period, Fatima produced hundreds of thousands of metric tons of CAN each year.  A 110-pound bag of CAN produces 82 pounds of explosives, enough to destroy an armored vehicle.

12.    The danger posed by CAN-based explosives caused Afghanistan to ban the import, production, transportation, use, sale, and storage of CAN in 2010, and caused Pakistan to adopt a policy of preventing CAN manufactured in Pakistan from being transported into Afghanistan. Nevertheless, Fatima still manufactured CAN at its two plants in Pakistan throughout the relevant

period and refused to undertake simple—even compensated—steps that would have made CAN harder to smuggle or less explosive, even though it knew its CAN was being used to kill and maim thousands of U.S. military personnel and further knew that its continued refusal to take such steps created a foreseeable risk that more U.S. military personnel would be killed or injured by Explosive Devices made from its CAN.

13.     The U.S. Government, through the Defense Department's Joint Improvised Explosive Device Defeat Organization ("JIEDDO"), reported in 2011 that "an unending supply" of CAN was being illegally transported across the Pakistan-Afghanistan border and then used to produce Explosive Devices that kill U.S. citizens in Afghanistan.

14.     U.S. officials estimated that, by 2009, CAN was being used in 80% of the IED attacks committed against U.S. and NATO forces in Afghanistan.

15.     This essentially unlimited supply of CAN was crucial to the al-Qaeda Terror Syndicate's campaign against U.S. troops and Afghan civilians in Afghanistan.

16.     U.S. officials determined that the threat to U.S. troops presented by Explosive Devices could not be eliminated without significantly reducing, if not outright eliminating, the flow of CAN manufactured in Pakistan into Afghanistan.

17.     To reduce the flow of CAN from Pakistan into Afghanistan, U.S. officials met with Fatima management in 2011 to notify Fatima that its CAN fertilizer was being used to manufacture Explosive Devices that were killing U.S. citizens, including U.S. military personnel, and innocent civilians in Afghanistan.  U.S. officials asked Fatima to take simple and inexpensive measures, such as adding colorants to the material, to make CAN more easily identifiable at the Pakistan/Afghanistan border, and to aid the United States in investigating and neutralizing the supply chain of illegally smuggled CAN.  U.S. officials also suggested ways in which Fatima could

manufacture fertilizer that was effectively unusable as an explosives precursor.  The company, however, refused to take these basic steps—even after the United States offered to pay for any costs associated with instituting them.

18.     After Fatima intentionally rejected U.S. efforts to reduce the al-Qaeda Terror Syndicate's ability to commit terrorist attacks against U.S. military personnel using CAN-based Explosive Devices, U.S. officials decided to brief Fatima's key banker, Standard Chartered, about Fatima's key role in the process.

19.     In January 2013, U.S. officials, including U.S. Army Lt. General Michael D. Barbero, the head of JIEDDO, met in person with senior executives at SCB's New York office. At this meeting, U.S. officials told Standard Chartered in clear terms that its client Fatima was the primary supplier of precursors used by the al-Qaeda Terror Syndicate to create deadly Explosive Devices and that the al-Qaeda Terror Syndicate was using those Explosive Devices to kill U.S. personnel and Afghan civilians.

20.     U.S. officials further informed the Standard Chartered executives of Fatima's repeated refusals to take basic measures to stem the flow of CAN into Afghanistan.

21.     Standard Chartered executives were further presented with evidence of Fatima's direct involvement in supplying CAN to the al-Qaeda Terror Syndicate, complete with maps of Fatima plants and pictures of bags of fertilizer seized by U.S. and Afghanistan officials at the Pakistan-Afghanistan border and elsewhere.

22.     At the January 2013 meeting, U.S. officials presented Standard Chartered executives with clear data and statistics regarding the staggering number of American casualties caused by attacks involving CAN-based Explosive Devices, including the numbers of Americans who had been killed or suffered loss of limbs because of such attacks.

23.     At the January 2013 meeting, U.S. officials also explained to Standard Chartered executives that Standard Chartered's provision of financial and banking services to Fatima was enabling Fatima to supply CAN to the al-Qaeda Terror Syndicate.

24.     Therefore, at least as early as January 2013, Standard Chartered had actual knowledge that (1) the al-Qaeda Terror Syndicate was using CAN to make Explosive Devices that were killing and wounding thousands of U.S. citizens, and other innocent civilians in Afghanistan; (2) the al-Qaeda Terror Syndicate was making the Explosive Devices using CAN manufactured primarily at Fatima's plants in Pakistan; (3) Fatima had previously been informed by the U.S. Government that its CAN was being used to make Explosive Devices and was being transported across the Pakistan-Afghanistan border in violation of Afghan law; (4) Fatima was intentionally refusing to undertake any effort that would have reduced the flow of its CAN into Afghanistan, thereby solidifying Fatima's role as the primary supplier of explosive precursor components to the al-Qaeda Terror Syndicate; and (5) Standard Chartered's provision of financial services (including in New York) was substantially assisting Fatima by enabling it to manufacture and then supply CAN to the al-Qaeda Terror Syndicate, which was then using it kill and maim U.S. citizens.

25.     After the January 2013 meeting, Standard Chartered continued to provide Fatima with financial services.  Those financial services enabled Fatima to continue manufacturing precursors used by the al-Qaeda Terror Syndicate to make Explosive Devices to kill American service members.  Standard Chartered continued providing financial assistance to Fatima despite being directly informed by the U.S Government that it was playing a key role in the provision of bomb-making materials to the al-Qaeda Terror Syndicate and being explicitly warned that the deaths of American service members were a foreseeable risk of continuing to provide financial services to Fatima.

**THE PARTIES**

26.     Plaintiffs are survivors and/or heirs of U.S. nationals killed in Afghanistan, comprising family members of U.S. nationals killed by CAN-based Explosive Devices in terrorist attacks that were planned and authorized by al-Qaeda, and committed by the al-Qaeda Terror Syndicate.

27.     The Plaintiff family members and the details of each attack are described in Part IV, *infra*.

28.     Defendant Standard Chartered PLC ("SC PLC") is a large, international bank with more than 1,700 branches operating in over 60 countries.  SC PLC's principal place of business is London, England.

29.     Defendant Standard Chartered Bank ("SCB") is a wholly-owned subsidiary of SC PLC.  SCB's principal place of business is London, England.

30.     SCB has been licensed by the New York Department of Financial Services to operate a foreign bank branch in the State of New York since 1976.  The main corporate office of SCB in the United States is 1095 Avenue of the Americas, New York, New York 10036.  SCB's New York branch is referred to in this Complaint as the NY Branch.

31.     Among other financial and banking services, SCB uses the NY Branch to conduct U.S. dollar clearing operations.  The NY Branch processes approximately $195 billion per day on the Clearing House Interbank Payments System ("CHIPS").  During the relevant period, the overwhelming majority of SCB's transactions were denominated in U.S. dollars and therefore cleared and settled in New York through the NY Branch.

32.     As of March 31, 2012, the NY Branch held $40.8 billion in total assets.  Today, the NY Branch holds more than $55.6 billion in total assets.

33.     Non-party co-conspirator Standard Chartered (Pakistan) Ltd. ("SCB Pakistan") is a wholly-owned subsidiary of SCB.  The main corporate office of SCB Pakistan is in Karachi, Pakistan.  SCB Pakistan claims to be the "the oldest and largest international bank in Pakistan," and it currently operates forty-one branches in ten Pakistani cities.  SCB Pakistan conducted U.S. dollar clearing transactions through the NY Branch.

34.     SCB Pakistan acted in concert with, and for the purpose of furthering the objectives of, SC PLC and SCB.

35.     As stated above, "Standard Chartered" refers to SC PLC and SCB, collectively.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338.

37.     SC PLC and SCB are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k).

38.     As explained below, Standard Chartered's substantial assistance to Fatima was facilitated by (a) the NY Branch because of its central role in providing dollar clearing, foreign exchange, and trade financing services for Standard Chartered's global operations and (b) SCB Pakistan because of the banking and financial services it provided to Fatima in Pakistan.

39.     Standard Chartered entered the United States voluntarily and has maintained a branch in New York for decades.

40.     Standard Chartered has also purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including processing financial transactions through the NY Branch for Fatima's benefit, knowing those transactions were enabling the al-Qaeda Terror Syndicate to carry out terrorist attacks that killed or injured U.S. citizens in Afghanistan, thereby injuring Plaintiffs.

41.     In fact, as discussed above and as further described below, in 2013, the U.S. Government specifically met with senior officials of Standard Chartered at the NY Branch in this district to inform them that the financial services they were providing to Fatima were endangering the lives of U.S. service members in Afghanistan.

42.     In addition, as discussed below, Standard Chartered, through its New York and Dubai branches, also facilitated many substantial transfers during the relevant period for the Altaf Khanani Money Laundering Organization ("Khanani MLO"), which funded the Taliban and other terrorist organizations belonging to the al-Qaeda Terror Syndicate.

43.     Venue in this district is proper pursuant to 18 U.S.C. § 2334(a) because Standard Chartered has an agent here, the NY Branch.

44.     Venue in this district is also proper pursuant to 28 U.S.C. § 1391 because a material and substantial part of Standard Chartered's activity, including activity involving SCB Pakistan occurred within the district.

## FACTUAL ALLEGATIONS

### I.     The al-Qaeda Terror Syndicate.

45.     After the U.S. military dislodged the Taliban-controlled government of Afghanistan in 2001, terrorists began attacking and killing U.S. service members, contractors, and other innocent civilians in Afghanistan in order to influence the policy and conduct of both the United States and the newly-installed Afghan government, and eventually drive the United States and its allies out of Afghanistan.

46.     These terrorist attacks were committed by the "al-Qaeda Terror Syndicate," the previously-described syndicate of terrorist organizations across Afghanistan and Pakistan working in coordination with each other.

47.     The al-Qaeda Terror Syndicate was created in furtherance of Osama bin Laden's plan to unite the major terrorist groups in Pakistan and Afghanistan into a coordinated network that could more effectively launch attacks on U.S. forces and their allies.

48.     As indicated above, the al-Qaeda Terror Syndicate included, among other terrorist organizations, al-Qaeda, the Taliban, the Pakistani Taliban, the Haqqani Network, and other affiliated organizations.

49.     These terrorist organizations were so closely affiliated and aligned that individual terrorists moved back and forth from organization to organization within the Syndicate with such frequency and fluidity that, during the relevant period, the terrorist organizations were no longer truly distinct.

50.     Throughout the relevant period, al-Qaeda led the al-Qaeda Terror Syndicate.  It planned and reviewed, approved, authorized, and often directly committed terrorist attacks carried out by members of the al-Qaeda Terror Syndicate.  It also provided (and provides) members of the al-Qaeda Terror Syndicate with training, supervision, resources, and technical know-how to increase the capacity of each Syndicate participant and the effectiveness and lethality of each terrorist attack.

51.     The al-Qaeda Terror Syndicate regularly and frequently committed terrorist attacks against U.S. citizens, including U.S. military personnel, contractors, and others, since the U.S military invaded Afghanistan following the September 11, 2001, terrorist attacks.

**A.  Al-Qaeda.**

52.     Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan.  For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on driving the United States out of the Middle East.  Osama bin Laden declared

war on the United States in a published fatwa (religious decree) in 1996, and in 1998 he declared a global jihad calling on all Muslims to kill Americans.

53.     The U.S. State Department designated al-Qaeda as a Foreign Terrorist Organization ("FTO")[2] on October 8, 1999.  It has remained so-designated through the present.

54.     After the al-Qaeda-led attacks on September 11, 2001, the United States demanded that the Taliban turn over bin Laden, but the Taliban refused.  A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.  Thereafter, bin Laden and his Syndicate allies reconstituted their efforts in support of the Taliban's terrorist activity in Afghanistan.

55.     In late 2001 or early 2002, al-Qaeda and bin Laden also established bomb-making factories in the Federally Administered Tribal Areas ("FATA") of Pakistan where the Taliban, and eventually other members of the al-Qaeda Terror Syndicate, could manufacture Explosive Devices to deploy in Afghanistan.  In addition, as described below, al-Qaeda trained Taliban and other al-Qaeda Terror Syndicate operatives on how to make, deploy, and detonate bombs of all types, including CAN-based IEDs and other Explosive Devices.

56.     Al-Qaeda committed its terrorist attacks, and provided support for other members of the al-Qaeda Terror Syndicate to commit terrorist attacks, for the purpose of influencing the conduct and policies of the United States, Afghanistan, and other countries.

---

[2]     FTOs are organizations that the United States has determined engage in terrorist activity that threatens the security of U.S. nationals or the national security of the United States.  18 U.S.C. § 2339B(a)(1) imposes criminal liability on "[w]hoever knowingly provides material support," with the "knowledge that the organization is a designated terrorist organization [FTO]," that the organization has "engaged or engages in terrorist activity," as defined in section 212(a)(3)(B) of the Immigration and Nationality Act, or that the organization has "engaged or engages in terrorism" as defined in the Foreign Relations Authorization Act ("FRAA"), Fiscal Years 1988 and 1989.

**B. Afghan Taliban (or "Taliban").**

57.     The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters (holy warriors) who had expelled the Soviet Union from Afghanistan.

58.     By the mid-1990s, the Taliban had become the de facto government of Afghanistan after overthrowing the former Afghan government and taking control of almost ninety percent of the country.

59.     The Taliban used its de facto control over Afghanistan to provide material support to al-Qaeda's global terrorist activities.  Among other things, the Taliban gave al-Qaeda safe haven and a base of operations.  The Taliban's provision of material support to al-Qaeda helped al-Qaeda grow into a global terrorist organization and enabled al-Qaeda to plan and commit terrorist attacks against the United States and its nationals.

60.     In 1999, President Clinton sanctioned the Taliban as a terrorist threat.  Executive Order 13129 expressly found the Taliban's support for al-Qaeda was "an unusual and extraordinary threat to the national security and foreign policy of the United States."

61.     Al-Qaeda used the base of operations and material support provided by the Taliban to plan, train for, and commit the September 11, 2001, terrorist attacks.

62.     After the September 11, 2001, terrorist attacks, the Taliban continued providing bin Laden and al-Qaeda safe haven.  Among other things, bin Laden remained in Afghanistan under the Taliban's protection.  The Taliban refused demands for it to turn bin Laden over to the United States and denied that al-Qaeda and bin Laden had been involved in the September 11, 2001, terrorist attacks.

63.     In October 2001, the United States military launched Operation Enduring Freedom to remove the Taliban from power and deny al-Qaeda safe haven in Afghanistan.  By the end of

2001, the Taliban had been ousted from power and al-Qaeda no longer found safe haven in Afghanistan.

64.     After the initiation of Operation Enduring Freedom in October 2001, the Taliban implemented a campaign of terrorism throughout Afghanistan, committing terrorist attacks against members of the U.S. military and U.S. citizens there.  It also committed terrorist attacks against Afghans perceived to be providing support to the United States and against innocent Afghan civilians.  After a new government of Afghanistan stood up law enforcement units and a military, the Taliban also committed terrorist attacks against Afghan police and military units.

65.     At times, the Taliban used children to commit its attacks.  Other times, the Taliban used humanitarian aid workers to draw U.S. military, contractors, and others to areas where it would detonate bombs killing U.S. citizens.  The Taliban regularly targeted teachers, children, and doctors.  The Taliban also kidnapped and tortured people helping the United States.

66.     The Taliban committed its terrorist attacks to influence the conduct and policies of the United States, Afghanistan, and other countries.

67.     In July 2002, President George W. Bush designated the Taliban as a Specially Designated Global Terrorist ("SDGT").  The designation authorized the United States to take additional steps to address the Taliban's grave acts of terrorism and its continuing threats of terrorist attacks against U.S. nationals or the United States.[3]  The Taliban has remained so-designated through the present.

---

[3]     The United States Department of the Treasury designates SDGTs pursuant to Executive Order 13224 of September 23, 2001.  *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a)") (referring to entities listed in the Annex of the Executive Order).  This designation allows the United States to block property and prohibit transactions with the designated entity.  While every designation is accompanied by a specific set of factual findings as to the entity's actions, Executive Order 13224 itself makes a finding of a "need . . . for further

68.     In 2007, Congress designated the Taliban as "a terrorist organization" for the purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act."  The United States continues to treat the Taliban as a Foreign Terrorist Organization "for immigration purposes."

69.     By 2009, the United States had stationed more than sixty thousand military personnel, together with thousands more contractors, in Afghanistan to prevent the Taliban from returning to power; to stop further terrorist attacks against U.S. citizens, including military personnel and contractors; and to stop terrorist attacks against the Afghan military, law enforcement, and innocent civilians.

70.     The Taliban has long had a close working relationship with al-Qaeda.  After Operation Enduring Freedom began in October 2001, the Taliban's relationship developed into an integrated synergism that dissolved the lines between the two organizations.  Leaders in al-Qaeda were often leaders in the Taliban, and vice versa.  Terrorists associated with al-Qaeda were often also associated with the Taliban, and vice versa.  In Afghanistan, the Taliban and al-Qaeda effectively functioned as a single organization, and terrorists often acted without distinguishing between the two.

71.     The Taliban became an integral part of the al-Qaeda Terror Syndicate.

72.     Al-Qaeda used the Taliban to enhance the al-Qaeda Terror Syndicate's ability to commit terrorist attacks in Afghanistan.

73.     Among other things, al-Qaeda facilitated the Taliban's terrorist activities in the following ways:

---

consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism."  *See* 31 C.F.R. § 594.310.  The Taliban was officially added to the list of SDGTs in Executive Order 13268 on July 2, 2002.

- Al-Qaeda taught Taliban operatives how to manufacture CAN-based IEDs and how to detonate them using remote devices like cell phones.

- Al-Qaeda regularly trained Taliban operatives on new bomb-making techniques and technologies so that the Taliban could construct increasingly sophisticated, and increasingly lethal, CAN-based IEDs and other Explosive Devices.

- Al-Qaeda also trained Taliban operatives on new techniques and technologies in an effort to overcome countermeasures deployed by the U.S. and its allies.

- Al-Qaeda made a number of its bomb-making sites available to Taliban operatives.

- Al-Qaeda invited Taliban operatives to Iraq where its operatives instructed the Taliban on how to make specialized Explosive Devices, including Explosively Formed Penetrators ("EFPs"), armor-penetrating "shaped" IEDs.

- Al-Qaeda planned, authorized, approved, and supported attacks, and supplied resources to Taliban operatives who committed terrorist attacks in Afghanistan.

- Al-Qaeda provided religious guidance and authorization to Taliban operatives to commit attacks, including suicide bombings.

- Al-Qaeda recruited personnel to actually commit or participate in cells that committed terrorist attacks in Afghanistan, including attacks involving the emplacement of IEDs.

74.     Taliban operatives and other al-Qaeda Terror Syndicate operatives then committed thousands of terrorist attacks using Explosive Devices created with CAN manufactured by Fatima and illegally transported into Afghanistan with Fatima's and Standard Chartered's knowledge.

**C. Pakistani Taliban.**

75.     The Pakistani Taliban, known as Tehrik-i-Taliban Pakistan, is a member of the al-Qaeda Terror Syndicate.

15

76.     The Pakistani Taliban was created in 2007 by Baitullah Mehsud.  It was formed from loosely affiliated groups of Taliban supporters and sympathizers in the Federally Administered Tribal Areas of Pakistan, many of whom were former mujahideen who, like al-Qaeda's leadership, had fought the occupying Soviet military in Afghanistan.

77.     The Pakistani Taliban initially provided safe haven and protection for al-Qaeda in the tribal areas.  Later, it formed its own group to carry out a radical terrorist agenda in Pakistan and Afghanistan.

78.     The Pakistani Taliban has also provided material support for terrorist attacks by providing monetary compensation to the families of suicide bombers and treating injured terrorists.

79.     The U.S. State Department designated the Pakistani Taliban as an FTO on September 1, 2010.  It has remained so-designated through the present.

80.     When the State Department designated the Pakistani Taliban, it specifically noted the Pakistani Taliban's "symbiotic relationship" with al-Qaeda and further stated that the organization "draws ideological guidance from al-Qa'ida, while al-Qa'ida relies on [the Pakistani Taliban] for safe haven in the Pashtun areas along the Afghan-Pakistani border.  This mutual cooperation gives [the Pakistani Taliban] access to both al-Qa'ida's global terrorist network and the operational experience of its members.  Given the proximity of the two groups and the nature of their relationship, [the Pakistani Taliban] is a force multiplier for al-Qa'ida."[4]

81.     The Pakistani Taliban committed its terrorist attacks to influence the conduct and policies of the United States, Afghanistan, and other countries.

---

[4]     U.S. Dep't of State, *Designations of Tehrik-e Taliban Pakistan and Two Senior Leaders* (Sept. 1, 2010), incorporated herein by reference.

### D. Haqqani Network.

82.     The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s.  It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani.

83.     The Haqqani Network is part of the al-Qaeda Terror Syndicate.

84.     In the mid-1990s, the Haqqani Network began supplying weapons to the Taliban to support the Taliban's effort to overthrow Afghanistan's government.

85.     In or around 1995, the Haqqani Network swore allegiance to the Taliban and has operated as part of the Taliban ever since.  The Haqqani Network's founder, Jalaluddin Haqqani, was the Taliban's Minister of Tribal Affairs until the U.S. invasion in 2001.

86.     In 2008, the U.S. State Department designated Sirajuddin Haqqani as an SDGT for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."

87.     In 2010 and 2011, the U.S. Department of the Treasury ("Treasury Department") designated three other members of the Haqqani family as SDGTs.

88.     The U.S. State Department designated the Haqqani Network itself as an FTO on September 19, 2012.  Because of its repeated acts of international terrorism and its continual threat to the security of U.S. nationals and the security and foreign policy of the United States, the Haqqani Network has remained so-designated through the present.

89.     By February 2014, fourteen leaders of the Haqqani Network had been designated as SDGTs.

90.     The Haqqani Network is integrated into, and is part of, the Taliban.  For example:

- After September 11, 2001, Jalaluddin Haqqani planned many of the Taliban's attacks on U.S. military forces and contractors and became known as the "chief of the Taliban army."

- Since 2010, Sirajuddin Haqqani has been a member of the Taliban's governing council.

- Since 2015, Sirajuddin Haqqani has been the Deputy Emir of the Taliban.  Deputy Emir is second in command in the Taliban's leadership hierarchy.

- Preceding the collapse of the Afghan government and the evacuation of U.S. forces from Afghanistan in 2021, Sirajuddin Haqqani oversaw the day-to-day military operations for the Taliban.

- The Haqqani Network was the first to use suicide bombings in Afghanistan, a method it learned under al-Qaeda's guidance.

91.    The Haqqani Network is also closely affiliated with, and integrated into, al-Qaeda. Among other things:

- Bin Laden established an al-Qaeda training camp during the 1980s in an area of Afghanistan controlled by the Haqqani Network.

- The Haqqani Network provided sanctuary to bin Laden after he fled Afghanistan in the FATA following the terrorist attacks on September 11, 2001.

- The Haqqani Network also occasionally served as media spokesmen for al-Qaeda and bin Laden.

- A member of the Haqqani Network sits on al-Qaeda's military council.

92.    As a result of these interrelationships with the Taliban and al-Qaeda, during the relevant period there was no meaningful distinction between the terrorist activities of the Haqqani Network, the Taliban, and al-Qaeda in Afghanistan.

93.    The Haqqani Network committed its terrorist attacks to influence the conduct and policies of the United States, Afghanistan, and other countries.

18

II.  **Fatima Knowingly Supplied Substantial Amounts of Explosives Precursors to Terrorists and Terrorist Organizations**

A. **Fatima Manufactures CAN in Pakistan.**

94.  Between its two fertilizer manufacturing plants, Fatima has the capacity to produce 870,000 metric tons of CAN per year.

95.  Eighty-five tons of CAN yield more than 2,500 Explosive Devices.

B. **The Al-Qaeda Terror Syndicate Used CAN to Create Explosive Devices.**

96.  CAN can be used as an agricultural fertilizer.  However, it was not widely used to support agriculture in either Pakistan or Afghanistan.  Other fertilizers were less expensive, more widely used, and more suitable to the terrain and agricultural profile of the region.

97.  Because of its chemical properties, CAN is well suited to the manufacturing process for developing Explosive Devices.

98.  A 2009 briefing from the Director of Intelligence for the International Security Assistance Force, Afghanistan (*i.e.*, the U.S.-led coalition forces in Afghanistan) reported that "CAN fertiliser accounts for as little as five percent of all legitimate fertilizer use in Afghan Theater of Operations; banning would have a minimal effect on Agriculture."

99.  Al-Qaeda developed a technique for making Explosive Devices using CAN and taught those techniques to the Taliban, the Haqqani Network, and other members of the al-Qaeda Terror Syndicate.

100.  Al-Qaeda operated factories that made bombs using CAN and made those factories available to members of the al-Qaeda Terror Syndicate.

101.  The vast majority of Explosive Devices that were deployed by the al-Qaeda Terror Syndicate in Afghanistan were made using CAN manufactured by Fatima in Pakistan.

102.    U.S. military authorities reported that, as of 2011, more than 80 percent of the IEDs used against Coalition forces in Afghanistan were CAN-based, with these IEDs causing 90 percent of the causalities suffered by U.S. forces in Afghanistan.

**C.  Afghanistan Banned the Sale, Use, and Production of Calcium Ammonium Nitrate in 2010.**

103.    In 2010, Afghanistan banned the importation, production, transportation, use, sale, and storage of CAN because of the danger CAN-based explosives created in Afghanistan and because other effective non-explosive fertilizers were available ("Afghanistan CAN Ban").

104.    Afghanistan's ban was part of an effort to stop, or at least greatly reduce, the number of Explosive Devices deployed in Afghanistan by the al-Qaeda Terror Syndicate.

105.    Fatima knew about the Afghanistan CAN Ban beginning in 2010 when the ban was implemented and also knew that the Afghanistan CAN Ban was intended to stop, or at least greatly reduce, the importation into Afghanistan of CAN it manufactured in Pakistan.

**D.  Pakistan Adopted a Policy to Stop Calcium Ammonium Nitrate from Crossing into Afghanistan in 2011.**

106.    In 2011, Pakistan adopted a policy to stop CAN being smuggled into Afghanistan as part of its own counter-IED strategy ("Pakistan Counter-IED Strategy").

107.    Through this strategy, Pakistan intended to prevent the smuggling of CAN and other precursors out of the country, build Pakistan's counter-IED capacity through enhanced training, launch a counter-IED public awareness campaign, and strengthen its legislative framework on terrorism and explosives.

108.    Fatima knew about Pakistan's public Counter-IED Strategy beginning in 2011 when the strategy was adopted and knew that the Pakistan Counter-IED Strategy's stated purpose was to stop or greatly reduce the exportation into Afghanistan of CAN it manufactured in Pakistan. However, Fatima also knew that Pakistan's government was not committed to preventing the

export of explosives precursors into Afghanistan and therefore made no effort itself to reduce the flow of its CAN into Afghanistan.

**E.  CAN Manufactured by Fatima in Pakistan Was Used to Create Explosive Devices in Afghanistan.**

109.    Despite the Afghanistan CAN Ban and the Pakistan Counter-IED Strategy, the al-Qaeda Terror Syndicate continued to smuggle an exponentially increasing supply of CAN manufactured by Fatima into Afghanistan from Pakistan for the express purpose of making Explosive Devices.

110.    The amount of ammonium-nitrate-based fertilizer seized by U.S. military personnel in Afghanistan increased from 30 tons in 2009 to 440 tons in 2012.

111.    Between 2011 and 2016, the al-Qaeda Terror Network sourced tens of thousands of tons of the CAN it used to create Explosive Devices from Fatima's two fertilizer plants in Pakistan.

112.    In 2012, almost two hundred tons of CAN were used in the IEDs that were detonated in Afghanistan.

113.    Fatima also knew the al-Qaeda Terror Syndicate was using the CAN to create Explosive Devices.

114.    Fatima knew that the Explosive Devices it created using CAN were being deployed in Afghanistan to kill and maim U.S. service members.

**F.  Terrorist Organizations Used Explosive Devices Made with CAN to Kill U.S. Persons**

115.    In 2008, there were over 4,100 reported "IED events" in Afghanistan, encompassing IEDs that were exploded, uncovered, or defused.

116.    In a 2010 hearing before the U.S. Senate Foreign Relations Committee, Near Eastern and South and Central Asian Affairs Subcommittee, Homeland Security Investigations

Deputy Assistant Director John P. Woods stated that IEDs represent "the single greatest threat to coalition forces in Afghanistan."

117.    At the same 2010 hearing, Senator Robert P. Casey, Jr. stated that over 6,000 Explosive Devices were discovered in Afghanistan alone.  The vast majority of them used CAN as the main explosive ingredient.

118.    In November 2011, Lt. General Barbero, Director of JIEDDO, stated that "[t]he IED is the most significant threat to our troops in Iraq and Afghanistan," with such Explosive Devices "increasingly comprised of fertilizer-based homemade explosives as their primary explosive component with ammonium nitrate as the most common explosive."

119.    From 2009 to 2012, the number of Explosive Device events in Afghanistan dramatically increased, with 9,300 reported in 2009, 16,800 reported in 2011, and nearly 14,500 reported in 2012.

120.    As of 2011, Explosive Devices were the "greatest source of casualties" in Iraq and Afghanistan, with there being "400 to 500 IED events per month in Iraq, and more than 1,500 events per month in Afghanistan."

121.    From 2010 to 2011, the number of "IED incidents [in Afghanistan] against dismounted troops [] increased 98 percent," which caused "significant traumas – amputations, traumatic brain injuries – to U.S., Coalition, and Afghan Security Forces" as well as "many more innocent civilians."  Lt. Gen. Barbero described this "significant growth of homemade explosives in Afghanistan" as the "greatest concern" for troops stationed in the region.

122.    In 2012, Explosive Devices resulted in 1,874 U.S. casualties in Afghanistan.

123.    Al-Qaeda and the Haqqani Network relied on fertilizer manufactured by Fatima in order to make the bombs, "dubbed… 'Buffalo killers' because they can destroy a heavily armored

22

Buffalo mine-protected truck [also known as an 'MRAP']. Barbero has estimated that the majority of [IED]s in Afghanistan are made from [CAN]."

124.    Afghan insurgents, according to the U.S. Government, "rel[ied] on fertilizer bombs," with Fatima CAN fertilizer being "the low-cost choice for [IED] makers in Afghanistan."

125.    Fatima knowingly produced and supplied several thousand tons of its CAN fertilizer to insurgents annually, who then turned it into "inexpensive explosives" that were used in Afghanistan. About "90 percent of casualties in Afghanistan" came "from ammonium nitrate explosive" devices made from Fatima CAN fertilizer.[5]

**G. Fatima Refused to Take Actions to Reduce or Mitigate Its Involvement in the Production of IEDs and Killing of U.S. Persons.**

126.    The U.S. Government has stated that "[s]topping the HME supply chain is essential to reduce the effects of IEDs on coalition forces, government personnel, contractors and civilians in Afghanistan and Pakistan." In 2011, Lt. General Barbero stated that "[t]he Afghanistan IED threat cannot be defeated without addressing the flow of CAN-26 and the vast majority of IED components—including commercial explosives, radio-control triggers and HME precursors."

127.    Almost all of the CAN used in the al-Qaeda Terror Syndicate's IEDs was produced at Fatima's two fertilizer plants. Fatima sold CAN to entities it knew were fronts for the Taliban and the Haqqani Network and knew were involved in making Explosive Devices for use in terrorist attacks committed by the al-Qaeda Terror Syndicate.

128.    In August 2011, Lt. General Barbero called Fawad Mukhtar, Fatima's chairman, to discuss its role in supplying terrorists with fertilizer.

---

[5]    Asian News International, *US Look to Crackdown Source of Pakistani Fertilizer CAN Explosive* (Jan. 11, 2012), 2012 WLNR 665399.

129.    In a subsequent meeting that year at Lt. General Barbero's office in Arlington, Virginia, he informed Mukhtar that the fertilizer from his plants was responsible for most of the U.S. deaths in Afghanistan.

130.    Despite initially agreeing to add colorants to its CAN production to help U.S. officials better track and identify CAN at the Pakistan-Afghanistan border, a measure U.S. officials described as "essential in minimizing the smuggling of CAN into Afghanistan," Fatima officials never followed through on this commitment.  Fatima officials publicly claimed that its "[b]ags containing ammonium nitrate . . . now have different coloring," and Arif Habib, a Fatima official, claimed that the company had "already stopped supply to dealers in Khyber-Pakhtunkhwa to address US concerns."

131.    But the reality was that Fatima never added any dyes.  After allowing U.S. officials to tour one of the plants in 2011, Fatima executives cut off contact, saying all future communications with the company had to be conducted through Pakistan's Foreign Ministry.

132.    In 2012, after its executives again met with U.S. officials, Fatima rejected yet another U.S. request to add dyes to its fertilizer.

133.    Fatima stated that "it declined to dye its fertilizer on the advice of the Pakistan government," and further stated that it was "not going to do it because it would single [them] out . . . as being the source of the material."

134.    Despite the United States offering "to pay Pakistan's factories to include a dye in their CAN-26" in order to "make it easier for security forces to distinguish the dangerous fertilizer from more inert types," and despite Fatima saying that "it was prepared to introduce this initiative in December 2011," Fatima never introduced such an initiative.

135.    Indeed, as of May 2013, the Pentagon was still requesting that "the Fatima Group dye its normally white calcium ammonium nitrate yellow or pink, so it can easily be distinguished from legitimate substances like soap powder at the border" and/or "research new fertilizer formulations that would make it harder for insurgents to turn the product into explosives."

136.    Fatima continued to make empty promises from 2013 onward, first claiming in March 2013 that it would "continue to coordinate closely with Lt. Gen Barbero," that it had "found a new formula to replace the Calcium Ammonium Nitrate (CAN) fertilizer," and that it was "testing [its] new product formulation."

137.    However, Fatima continued to manufacture CAN as before and did so knowing that it was being regularly smuggled into Afghanistan by the al-Qaeda Terror Syndicate to manufacture IEDs and other Explosive Devices used to kill and maim U.S. service members.  Fatima knew that, generally, its CAN was not being used as fertilizer for agricultural purposes.

III.    **Standard Chartered Knowingly Provided Material Support to Terrorists and Terrorist Organizations by Enabling and Enhancing Fatima's Ability to Supply CAN to Terrorists In Afghanistan.**

138.    Standard Chartered provided Fatima with financial services that it knew enabled Fatima to manufacture CAN and did so knowing that CAN manufactured by Fatima was being smuggled into Afghanistan by the al-Qaeda Terror Syndicate to manufacture Explosive Devices used to kill and maim U.S. service members.

139.    Standard Chartered, including SCB Pakistan, provided financial services to Fatima as early as 2001.

140.    Fatima has identified both SCB and SCB Pakistan as its bankers in its financial reports.  Fatima has additionally identified SCB as one of the "MAJOR BANKERS OF THE COMPANY."

141.    On September 1, 2011, the *Associated Press* published an article detailing Fatima's role in facilitating the Syndicate's use of CAN fertilizer to create Explosive Devices.  The *AP* noted that the "main ingredient in most of the homemade bombs" responsible for the death of American troops "is fertilizer produced by a single company in Pakistan," with one plant alone producing enough CAN "fertilizer for at least 140,000 bombs" in a single year.  Two-hundred fifty Americans died from such bombs in 2010.

142.    Thus, sixteen months before U.S. officials briefed Standard Chartered officials and requested the cessation of its provision of financial services to Fatima, it was already widely known that Fatima was providing the chemical precursors for the bombs killing American service members in Afghanistan.

143.    On May 5, 2012, the *Khaama Press Agency* (Afghanistan's largest online news service prior to the U.S. evacuation in 2021) reported that Lt. Gen. Michael Barbero, identified as the "Pentagon's top counter-IED official," stated that 70% of the IEDs used in Afghanistan were made from a common agricultural fertilizer produced in Pakistan by two factories and that "the Fatima Group, which owns and operates the two factories, has not been cooperative."

144.    On August 19, 2012, *The Washington Post* reported that "[a]lmost all of the ammonium nitrate used in the Taliban's bombs comes from two big fertilizer plants in Pakistan, both owned by the Fatima Group, based in Lahore.  The production and sale of ammonium nitrate is legal in Pakistan, but it is banned in Afghanistan because of the IEDs."

145.    The article further noted that after allowing U.S. officials to tour one of the plants in 2011, Fatima executives cut off contact, saying all future communications with the company had to be conducted through Pakistan's Ministry of Foreign Affairs.

146.    The article then quoted an unnamed U.S. official:  "There is an ISI link in this. They put the clamps on us," referring to Pakistan's powerful Inter-Services Intelligence agency ("ISI").

147.    On December 13, 2012, Lt. General Barbero testified before the U.S. Senate Foreign Relations Committee, Near Eastern and South and Central Asian Affairs Subcommittee, where he stated:

> As you know, despite a countrywide ban on the importation of ammonium nitrate-based fertilizers by the government of Afghanistan, fertilizer-based explosives still remain our greatest counter-IED challenge in Afghanistan…
>
> CAN is produced by two factories in Pakistan owned and operated by the Fatima Group.  While CAN is produced in other regional countries, I've seen no evidence to indicate that CAN used for IEDs in Afghanistan comes from any other country in any significant amounts.

**A.  Standard Chartered Was Generally Aware of Its Role in Fatima's Unlawful Provision of Explosives Precursors to the Al-Qaeda Terror Syndicate.**

148.    In January 2013, Lt. General Barbero and other U.S. officials met with Standard Chartered's senior executives at SCB's New York office to "warn that the Pakistani fertilizer firm was helping to supply the Taliban with materials used in the manufacture of deadly homemade bombs."

149.    During this January 2013 meeting, U.S. officials:

> (i.)    Informed Standard Chartered executives that Fatima supplied vast quantities of the CAN fertilizer which was a vital ingredient in the CAN fertilizer bombs that accounted for approximately 80% of all IEDs used against American service members in Afghanistan.
>
> (ii.)    Presented Standard Chartered executives with "a map of Fatima plants, pictures of evidence, with bags of fertilizer seized."  Additionally, Lt. General Barbero informed the Standard Chartered executives that Fatima had "been unresponsive" to U.S. efforts to curtail the supply of fertilizer to terrorists, and had, in fact, "repeatedly refused to cooperate with coalition authorities."

(iii.)   Briefed Standard Chartered executives about the casualty statistics, and specifically showed them statistics regarding "casualties from IEDs . . . category 1 – death or loss of limb." Lt. General Barbero further informed the Standard Chartered executives about the "number of casualties to US and coalition troops."

(iv.)   Presented photos of evidence derived from terrorist detentions in Afghanistan.  These photos showed bags of Fatima CAN fertilizer that had been seized from Taliban (including Haqqani Network) terrorists.

(v.)   Informed Standard Chartered executives that Standard Chartered, including SCB's NY Branch and SCB Pakistan, provided foreign exchange and export finance services to Fatima.

(vi.)   Urged Standard Chartered to stop providing financial services to Fatima to assist American efforts attempting to reduce IED and other Explosive Devices attacks against American and British service members in Afghanistan.

(vii.)   Requested Standard Chartered change its practices and end relationships, specifically with Fatima, that enable terrorist attacks against Americans.

150.   Even after this meeting, Standard Chartered was "utterly useless" in aiding U.S. efforts to slow the flow of CAN to Afghanistan.  In fact, Standard Chartered continued to provide significant financial services to Fatima, even though Standard Chartered knew that its financial services played a key role in enabling the al-Qaeda Terror Syndicate's IED campaign against U.S. service members in Afghanistan.

**B. Standard Chartered Knowingly Provided Substantial Assistance to Enhance Fatima's Production of CAN After the January 2013 Meeting.**

151.   The production of CAN constituted a major part of Fatima's banking needs.

152.   In 2013, CAN constituted 31% of Fatima's annual revenues of 33.5 billion Pakistani Rupees ($183 million USD), and was Fatima's best-selling product by volume, at 437,000 tons.

153.   In addition to its daily banking business for Fatima, Standard Chartered, including SCB Pakistan, provided vital and substantial project financing, investment, and loans for Fatima. The NY Branch also provided vital U.S. dollar clearing services to Fatima.

154.   For example, because Fatima reached its maximum production capacity for CAN in 2013 (*i.e.*, 100% of capacity, up from prior years), Fatima approached SCB to finance projects to remove production bottlenecks—specifically, the purchase of a Waste Gas Boiler and Cold Box Purifier.

155.   SCB agreed, and provided a $22 million USD loan to Fatima, specially structured on terms favorable to Fatima, extending Fatima's repayment terms to last seven years, instead of the five-year loan term that is customary in Pakistan.

156.   SCB Pakistan also provided Fatima with loans worth well over a billion Rupees (amounting to millions of USD) during the relevant period.

157.   In 2016, SCB Pakistan invested 1 billion rupees in a Fatima *sukuk* (a Sharia-compliant investment device).

**C. Standard Chartered's Disregard for U.S. Government Warnings Was Part of a Documented Pattern of Contempt for U.S. Counter-Terrorism Sanctions and Anti-Money Laundering Laws and Regulations.**

158.   Standard Chartered has a long, sordid history of knowingly providing assistance to money launderers, sanctions-evaders and terrorism financers.

159.   That history encompasses nearly all of its global operations, including those in the United States, Africa, the Middle East, Central Asia, and India.

160.   On September 21, 2012, SCB, SCB's NY Branch, and the New York State's Department of Financial Services ("DFS") executed a Consent Order resolving charges that, from at least 2001 through 2007, the SCB NY Branch provided Eurodollar clearing and settlement services to Iranian customers subject to U.S. economic sanctions, with respect to approximately

59,000 transactions totaling approximately $250 billion, through the SCB NY Branch. According to DFS, these transfers resulted from the bank's "programmatic[]" "misconduct," which lasted for "nearly a decade."

161.     DFS concluded that Standard Chartered "operated as a rogue institution" that "left the U.S. financial system vulnerable to terrorists."

162.     A few months after Standard Chartered entered into the Consent Order with DFS, the U.S. Department of Justice announced that Standard Chartered had agreed to forfeit $227 million to the Justice Department for conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), and that the forfeiture was part of Deferred Prosecution Agreements ("DPAs") Standard Chartered entered into with the Justice Department and the New York County District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. Standard Chartered also entered into settlement agreements with the Treasury Department's Office of Foreign Assets Control ("OFAC") and the Board of Governors of the Federal Reserve System (the "Federal Reserve"), as well as with DFS.

163.     On August 19, 2014, DFS announced an order regarding SCB and SCB's NY Branch's failures to remediate AML/CFT compliance problems as required in Standard Chartered's 2012 settlement with DFS, and Standard Chartered agreed to pay an additional $300 million penalty and take other remedial steps.

164.     In 2019, Standard Chartered agreed to forfeiture of another $240 million, a fine of $480 million, and to the amendment and extension of its DPA with the Justice Department for an additional two years for conspiring to violate IEEPA.

165.     Standard Chartered also agreed to pay the New York County District Attorney's Office an additional financial penalty of $292,210,160.

166.     Under the amended DPA with the District Attorney's Office, Standard Chartered admitted that it violated New York State law by, among other things, falsifying the records of New York financial institutions.

167.     Standard Chartered has also entered into separate settlement agreements with OFAC, the Federal Reserve, DFS, and the United Kingdom's Financial Conduct Authority ("FCA") under which Standard Chartered agreed to pay additional penalties totaling more than $477 million for related misconduct.

168.     Standard Chartered's efforts to reduce its involvement in "dirty money" transactions have been illusory.  SCB retained Promontory Financial Group to purportedly act as an independent auditor and reduce the risk of terrorist finance.  However, SCB directed Promontory to withhold key information from regulators in order to avoid further scrutiny.

### D. Standard Chartered's Disregard for Anti-Money Laundering and Counter-Terrorism Financing Regulations Was Not Limited to the United States.

169.     Standard Chartered's pattern of illegal conduct has not been limited to the NY Branch or sanctions evasion.

170.     For example, over the past twenty years, Standard Chartered has been fined by regulators in India, Japan, Singapore, and Kenya for money laundering.

171.     In South Africa, Standard Chartered was fined for its weak anti-money laundering measures.

172.     In Switzerland, Standard Chartered paid a $6.337 million fine for assisting tax evasion.

173.     In Angola, Standard Chartered was implicated in a multi-billion-dollar bribery scandal.

174.    Reflective of Standard Chartered's corporate culture, Standard Chartered Asia CEO Jaspal Bindra complained in an interview to *Reuters* in 2014: "We are supposed to police that our counterparties and clients are not money laundering, and if when we are policing, we have a lapse, we don't get treated like a policeman who's had a lapse, we are treated like a criminal."

**E.  Standard Chartered's Pattern of Illegal Conduct Included Giving SDGTs Access to Its Computer Systems and Failing to File SARs for Groups Engaged in Money Laundering and Terrorist Financing.**

175.    Standard Chartered's pattern of illegal conduct includes intentionally providing financial and banking services to entities it knows the United States has designated as SDGTs.  For example, SCB continued to facilitate foreign exchange transactions for Iran's Bank Saderat *after* it knew that it had been designated an SDGT for its role in transferring funds for Hezbollah and other terrorist organizations.  SCB, among other things, granted Bank Saderat independent access to its computer systems so that Bank Saderat could initiate U.S. dollar foreign exchange transactions through its NY Branch.

176.    Standard Chartered's pattern of illegal conduct also includes covering up its provision of financial and banking services to transnational criminal organizations ("TCOs")[6] that were engaged in money laundering and financing terrorism.  For example, Standard Chartered provided financial services to the Khanani MLO, a transnational criminal organization that facilitated the illicit movement of an estimated $14 billion to $16 billion dollars *per year* through the global financial system.  The Khanani MLO was known to fund the illicit activities of clients

---

[6]     TCOs are organizations that the United States has determined engage in transnational criminal activities that threaten the security of U.S. nationals or the national security of the United States by, among other things, destabilizing international political and economic systems, weakening democratic institutions, degrading the rule of law, and undermining economic markets. TCOs also facilitate the violent activities of other dangerous persons and organizations.  Executive Order 13581.

that included drug traffickers, organized crime, and terrorist organization like al-Qaeda, the Taliban, Lashkar-e-Tayyiba, Dawood Ibrahim, and Jaish-e-Mohammed.  Four of those terrorist organizations are part of the al-Qaeda Terror Syndicate.

177.    Standard Chartered held accounts for at least two front companies that were part of the Khanani MLO, processed a number of suspicious transactions involving those front companies, and failed to report the suspicious transactions contemporaneously to the appropriate government authorities.   A number of the suspicious transactions involved "one fertilizer company"— presumably Fatima—and certain unidentifiable businesses in China, Dubai, and Pakistan.  Another set of suspicious transactions involved Pakistani companies, including a suspicious payment to an unidentified entity in the UAE that Standard Chartered flagged because of its reference to the "purchase of seismic explosives."

178.    In sum, Standard Chartered has a long and sordid history of assisting its customers' criminal conduct even when it knows that acts of terrorism are a foreseeable risk of the illegal enterprises it assists.

## IV.   THE ACTS OF INTERNATIONAL TERRORISM THAT RESULTED IN THE DEATHS OF PLAINTIFFS' FAMILY MEMBERS

### THE DECEMBER 21, 2015 ATTACK – BAGRAM AIR BASE

**The Bonacasa Family**

179.    Louis Bonacasa was a citizen of the United States and domiciled in the State of New York when he was killed in Afghanistan by an Explosive Device.

180.    On December 21, 2015, Louis Bonacasa, then 31, was serving in the U.S. military in Afghanistan conducting human intelligence operations near Bagram Air Base when an al-Qaeda Terror Syndicate suicide bomber positioned his explosives-laden motorcycle approximately 15 feet from Bonacasa and his patrol.

181.    Louis Bonacasa moved in between the motorcycle and his team members in an attempt to shield them.

182.    The suicide bomber detonated the explosives, killing Louis Bonacasa.  The attack was committed in furtherance of the al-Qaeda Terror Syndicate's joint campaign of terrorism targeting American service members.

183.    Plaintiff Diana Bonacasa is a citizen of the United States and domiciled in the State of New York.  She is the mother of Louis Bonacasa.

184.    Plaintiff Vincent Bonacasa is a citizen of the United States and domiciled in the State of New York.  He is the father of Louis Bonacasa.

185.    Plaintiff Raquel Bonacasa is a citizen of the United States and domiciled in the State of New York.  She is the sister of Louis Bonacasa.

186.    As a result of the attack, and the death of Louis Bonacasa, Plaintiffs Diana Bonacasa, Vincent Bonacasa, and Raquel Bonacasa have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**The Cinco Family**

187.    Michael Cinco was a citizen of the United States and domiciled in the State of Texas when he was killed in Afghanistan by an Explosive Device.

188.    On December 21, 2015, Michael Cinco, then 28, was serving in the U.S. military in Afghanistan engaged in the human intelligence operations near Bagram Air Base discussed above.

189.    Michael Cinco was killed when an al-Qaeda Terror Syndicate suicide bomber detonated an Explosive Device.  The attack was committed in furtherance of the al-Qaeda Terror Syndicate's joint campaign of terrorism targeting American service members.

190.    Plaintiff Barbara Rosendahl is a citizen of the United States and domiciled in the State of Texas.  She is the mother of Michael Cinco.

191.    As a result of the attack, and the death of Michael Cinco, Plaintiff Barbara Rosendahl has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice, and counsel.

## **THE JULY 2, 2013, ATTACK – KABUL**

**The Muncy Family**

192.    Kurt Muncy was a citizen of the United States and domiciled in the State of Ohio when he was killed in Afghanistan by an Explosive Device.

193.    He was serving as a civilian contractor – specifically, an International Police Monitor – for DynCorp International at Camp Pinnacle in Kabul, Afghanistan, where he was assisting the NATO Training Mission-Afghanistan/Combined Security Transition Command-Afghanistan by providing training and mentoring services for the Afghanistan Ministry of Interior and Afghan National Police.

194.    On July 2, 2013, Kurt Muncy, then 42, was at Camp Pinnacle when an IED emplaced by members of the al-Qaeda Terror Syndicate killed him.  The attack was committed in furtherance of the Syndicate's joint campaign of terrorism targeting American service members.

195.    Plaintiff Jeffrey Muncy is a citizen of the United States and domiciled in the State of Ohio.  He is the brother of Kurt Muncy.

196.    As a result of the attack, and the death of Kurt Muncy, Plaintiff Jeffrey Muncy has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice, and counsel.

## THE JULY 23, 2013, ATTACK – SOLTAN KHEYL

### The Russell Family

197.    Jonam Russell was a citizen of the United States and domiciled in the State of Arizona when he was killed in Afghanistan by an Explosive Device.

198.    On July 23, 2013, Jonam Russell, then 25, was serving in the U.S. military in Afghanistan accompanying an Afghan army unit on a foot patrol when an al-Qaeda Terror Syndicate suicide bomber detonated an Explosive Device, killing him.  The attack was committed in furtherance of the al-Qaeda Terror Syndicate's joint campaign of terrorism targeting American service members.

199.    Plaintiff Gilbert Russell is a citizen of the United States and domiciled in the State of Arizona.  He is the father of Jonam Russell.

200.    Plaintiff Abigail Russell is a citizen of the United States and domiciled in the State of Arizona.  She is the sister of Jonam Russell.

201.    Plaintiff Sarah Russell is a citizen of the United States and domiciled in the State of Arizona.  She is the sister of Jonam Russell.

202.    Plaintiff Noemi Russell is a citizen of the United States and domiciled in the State of Arizona.  She is the sister of Jonam Russell.

203.    Plaintiff Benjamin Russell is a citizen of the United States and domiciled in the State of Arizona.  He is the brother of Jonam Russell.

204.     Plaintiff Nathanael Russell is a citizen of the United States and domiciled in the State of Arizona.  He is the brother of Jonam Russell.

205.     As a result of the attack, and the death of Jonam Russell, Plaintiffs Gilbert Russell, Abigail Russell, Sarah Russell, Noemi Russell, Benjamin Russell, and Nathanael Russell have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

## THE JULY 24, 2014 ATTACK – MIRUGOL KALAY

### The Williams Family

206.     Keith Williams was a citizen of the United States and domiciled in the State of California when he was killed in Afghanistan by an Explosive Device.

207.     On July 24, 2014, Keith Williams, then 19, was serving in the U.S. military in Afghanistan when his vehicle drove over a roadside IED emplaced by members of the al-Qaeda Terror Syndicate, killing him.  The attack was committed in furtherance of the al-Qaeda Terror Syndicate's joint campaign of terrorism targeting American service members.

208.     Plaintiff Debbie Williams is a citizen of the United States and domiciled in the State of California.  She is the mother of Keith Williams.

209.     Plaintiff Chelsea Mangano is a citizen of the United States and domiciled in the State of California.  She is the sister of Keith Williams.

210.     As a result of the attack, and the death of Keith Williams, Plaintiffs Debbie Williams and Chelsea Mangano have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**CLAIM FOR RELIEF**
**VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**(JASTA LIABILITY)**

211.  Plaintiffs incorporate all of their factual allegations above as if fully set forth herein.

212.  The terrorist attacks that killed Plaintiffs' family members were acts of international terrorism committed by the al-Qaeda Terror Syndicate.

213.  The terrorist attacks were activities that involved violent acts or acts dangerous to human life that violated the criminal laws of the United States and many States or would have violated those laws had they been committed within the jurisdiction of the United States or of the States.

214.  The terrorist attacks appeared to be intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the United States, Afghanistan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the United States, Afghanistan, and other Coalition governments by mass destruction, assassination, and kidnapping.

215.  The terrorist attacks occurred outside the territorial jurisdiction of the United States.

216.  Standard Chartered knowingly provided substantial assistance to Fatima and was generally aware of its role in Fatima's overall illegal enterprise – supplying CAN fertilizer to the al-Qaeda Terror Syndicate for use in Explosive Devices targeting Americans in Afghanistan – and that the terrorist attacks that killed Plaintiffs' family members were a reasonably foreseeable consequence of that assistance.

217.  The al-Qaeda Terror Syndicate attacks that killed Plaintiffs' family members were committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

218. Plaintiffs are family members of U.S. nationals who were murdered by reason of the acts of international terrorism committed by the al-Qaeda Terror Syndicate.

219. The al-Qaeda Terror Syndicate attacks that killed Plaintiffs' family members were a reasonably foreseeable risk of Standard Chartered's substantial assistance to Fatima, including the provision of financial and banking services.

220. Plaintiffs suffered economic and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

221. As a result of Standard Chartered's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

222. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

223. Plaintiffs request that the Court:

(a) Enter judgment against Defendants finding them liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b) Award Plaintiffs compensatory damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c) Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d) Award Plaintiffs prejudgment interest; and

(e) Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  April 22, 2022

Respectfully submitted,

JENNER & BLOCK LLP


By:   s/ *Lee S. Wolosky*

Lee S. Wolosky
Andrew J. Lichtman
Thomas J. Bullock
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 891-1628
Fax: (212) 891-1699
lwolosky@jenner.com
alichtman@jenner.com
tbullock@jenner.com

Doug A. Mitchell
Jenner & Block LLP
1099 New York Ave NW # 900,
Washington, DC 20001
Telephone:  (202) 639-6090
dmitchell@jenner.com

OSEN LLC


By:   s/ *Gary M. Osen*
Gary M. Osen
Ari Ungar
Michael J. Radine
Osen LLC
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
Telephone:  (201) 265-6400
Fax:  (201) 265-0303
gosen@osenlaw.com
aungar@osenlaw.com
mradine@osenlaw.com

*Attorneys for Plaintiffs*