**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DIANA BONACASA, *et al*.,

            Plaintiffs,

            -v.-

STANDARD CHARTERED PLC and
STANDARD CHARTERED BANK,

            Defendants.

---

No. 1:22-CV-03320 (ER) (OTW)


# STANDARD CHARTERED DEFENDANTS'
# <u>MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS</u>


Andrew J. Finn (finna@sullcrom.com)
Bradley P. Smith (smithbr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

*Attorneys for Standard Chartered Bank*
*and Standard Chartered PLC*

August 3, 2022

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ..................................................................................................4

      A.     Defendants ...............................................................................4

      B.     Non-Party Fatima.....................................................................5

      C.     The Attacks ..............................................................................8

ARGUMENT .......................................................................................................9

I.     The Complaint Fails to Allege a Plausible Basis for Personal Jurisdiction over Either Defendant. ................................................................................ 9

II.    The Complaint Also Fails to State Any Plausible Aiding and Abetting Claim................ 12

      A.     The Complaint Fails to Allege That Defendants Aided Anyone Who Committed the Alleged Terrorist Attacks That Caused Plaintiffs' Injuries. .........13

      B.     The Complaint Does Not Plausibly Allege That SCB Was Aware It Was Playing a Role in Unlawful Activity by Providing Routine Banking Services to Fatima in Pakistan................................................................14

      C.     The Complaint Fails to Plead That Either Defendant Knowingly and Substantially Assisted Acts of Terror. ................................................16

      D.     The Complaint Does Not Plead That Defendants Proximately Caused Plaintiffs' Injuries. ................................................................20

CONCLUSION...................................................................................................22

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

*Aetna Cas. & Sur. Co.* v. *Leahey Const. Co.*,
  219 F.3d 519 (6th Cir. 2000) ...................................................20

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)...........................................................12

*Bank of Am. Corp.* v. *City of Miami, Fla.*,
  137 S. Ct. 1296 (2017)......................................................20

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)...........................................................12

*Brown* v. *Nat'l Bank of Pakistan*,
  2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022)........................10, 12, 14

*Cenage Learning, Inc.* v. *Buckeye Books*,
  531 F. Supp. 2d 596 (S.D.N.Y. 2008)................................10

*Chambers* v. *Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)................................................4

*Charles Schwab Corp.* v. *Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)................................................10

*Contant* v. *Bank of Am. Corp.*,
  385 F. Supp. 3d 284 (S.D.N.Y. 2019)................................9

*Freeman* v. *HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) ................................20

*Gordian Grp., LLC* v. *Syringa Expl., Inc.*,
  168 F. Supp. 3d 575 (S.D.N.Y. 2016)...............................11

*Halberstam* v. *Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ..............................3, 13, 19

*Holmes* v. *Sec. Inv. Prot. Corp.*,
  503 U.S. 258 (1992)........................................................4, 20

*Honickman* v. *BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) .......................................... *passim*

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*,
    113 F.3d 1484 (8th Cir. 1997) ............................................................................20

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)................................................................2, 13, 14

*Keren Kayemeth Leisrael-Jewish Nat'l Fund* v. *Educ.for a Just Peace in the Middle E.*,
    530 F. Supp. 3d 8 (D.D.C. 2021) ......................................................................14

*Knight* v. *Standard Chartered Bank*,
    531 F. Supp. 3d 755 (S.D.N.Y. 2021)...............................................................11

*Laborers Loc. 17 Health & Benefit Fund* v. *Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999)..............................................................................21

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
    572 U.S. 118 (2014).......................................................................................4, 20

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)...........................................................................9, 10

*Linde* v. *Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)..........................................................................14, 17

*Miller* v. *Arab Bank, PLC*,
    372 F. Supp. 3d. 33 (E.D.N.Y. 2019) ...............................................................10

*Penguin Grp. (USA) Inc.* v. *Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010)..................................................................................9

*Pension Benefit Guar. Corp.* v. *Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2013)..............................................................................13

*Rothstein* v. *UBS AG*,
    708 F.3d 82 (2d Cir. 2013)........................................................................4, 13, 20

*Rush* v. *Savchuk*,
    444 U.S. 320 (1980)...........................................................................................10

*Siegel* v. *HSBC Holdings, PLC*,
    2018 WL 501610 (S.D.N.Y. Jan. 19, 2018) .....................................................11

*Siegel* v. *HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)............................................................3, 17, 18, 19

# TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Singer* v. *Bank of Palestine*,
   2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) .........................................................................12

*Strauss* v. *Credit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) .......................................................................................10

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 659 (2d Cir. 2013) ....................................................................................................9

*Weiss* v. *Nat'l Westminister Bank, PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ..................................................................................10

*Weiss* v. *Nat'l Westminster Bank, PLC*,
   993 F.3d 144 (2d Cir. 2021) .....................................................................................................2

*Wultz* v. *Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) ..........................................................................................16

## Statutes & Rules

18 U.S.C. § 2333 .......................................................................................................... *passim*

15 C.F.R. § 744.16 ...............................................................................................................6

N.Y. C.P.L.R. § 302 ............................................................................................................9

**PRELIMINARY STATEMENT**

This is a case brought under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and specifically the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), which creates a private right of action for those injured by an act of international terrorism that was "committed, planned, or authorized by" a foreign terrorist organization ("FTO"), as designated by the U.S. government, against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." The Complaint alleges that Defendant Standard Chartered Bank ("SCB") and a non-party affiliate, Standard Chartered Pakistan Ltd. ("SCB Pakistan"), provided ordinary banking services to a multinational fertilizer company in Pakistan, and contends that by doing so SCB and SCB's parent, Defendant Standard Chartered PLC ("SC PLC," together with SCB, "Defendants") somehow aided and abetted terrorist attacks and attackers in Afghanistan who misused fertilizer to build improvised explosive devices ("IEDs").

The attacks alleged in the Complaint are abhorrent and rightfully condemned. But the Complaint does not state any viable claim under the ATA or JASTA.

As an initial matter, the Complaint does not allege sufficient facts to establish a prima facie basis for exercising personal jurisdiction over either SCB or SC PLC. SC PLC is a bank holding company based in the U.K. that has no U.S. presence and provided none of the alleged "financial services" at issue in the Complaint. The "financial services" allegedly provided by SCB, a U.K.-based bank, and non-party SCB Pakistan, to a Pakistan-based multinational fertilizer company do not form a sufficient basis to establish personal jurisdiction over SCB either. The fact that SCB maintains a New York branch that provides U.S. dollar clearing services is not a valid basis to exercise general or specific personal jurisdiction over the alleged conduct.

Moreover, Plaintiffs have not alleged supporting facts involving SCB's New York branch, and Plaintiffs' allegation about a single meeting held in New York does not provide a basis to exercise specific jurisdiction.   Accordingly, the Complaint should be dismissed for lack of personal jurisdiction with respect to both Defendants.

The Complaint also should be dismissed because it does not state a valid aiding and abetting claim.  Four independent reasons provide a basis for dismissal.  *First*, the Complaint does not plead facts to show that Defendants aided "the person who committed" the attacks that caused Plaintiffs' injuries, which is a fundamental element of an aiding and abetting claim.  18 U.S.C. § 2333(d)(2); *see also Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021).  There is no allegation that SCB or SC PLC assisted anyone who committed attacks in Afghanistan that harmed Plaintiffs.  Nor does the Complaint allege that SCB's or non-party SCB Pakistan's customer—the Pakistan-based fertilizer company—was a mere terrorist intermediary or front such that providing ordinary banking services to that company could be deemed the equivalent of assisting terrorists in Afghanistan.  *See Kaplan* v. *Lebanese Canadian Bank, SAL*, 999 F.3d 842, 865 (2d Cir. 2021) (defendant bank serviced customers that "were part of Hizbollah").  At most, Plaintiffs allege that SCB and/or SCB Pakistan provided routine banking services to the Pakistan-based fertilizer company called Fatima Group ("Fatima"), which is not "aiding" the "person who committed" the at-issue attacks.  18 U.S.C. § 2333(d)(2).

*Second*, Plaintiffs have not alleged facts to show that either Defendant was "generally aware" it played a role in an overall "illegal" activity when SCB or non-party SCB Pakistan provided financial services to Fatima.  *Honickman*, 6 F.4th at 494.  This, too, is a necessary element of an aiding and abetting claim.  *Weiss* v. *Nat'l Westminster Bank, PLC*, 993 F.3d 144, 165 (2d Cir. 2021).  To establish general awareness, courts require facts showing that

the bank was both aware of its customer's "connections" with a terrorist group, and that the customer was "closely intertwined" with the terrorist group's "violent terrorist activities" such that the defendant understood "its role in unlawful activities." *Honickman*, 6 F.4th at 501. Here, beyond manufacturing a legitimate agriculture product (CAN fertilizer), an allegedly small percentage of which somehow made it into the hands of terrorists to be misused to build IEDs, there is no alleged connection between Fatima and terrorists, let alone a closely intertwined connection. In fact, the Complaint does not even allege nonconclusory facts that Fatima sold its CAN fertilizer directly to terrorists or terrorist fronts. Moreover, an alleged 2013 meeting between Defendants and U.S. officials concerning terrorist misuse of Fatima-manufactured fertilizer does not establish that by providing lawful and routine banking services to Fatima, SCB was aware it was playing any "role" in the violent IED-making activities of terrorists in Afghanistan.

*Third*, the Complaint does not adequately allege that Defendants substantially assisted the attacks at issue by SCB and non-party SCB Pakistan providing banking services to Fatima. There are no allegations that any banking service provided by non-party SCB Pakistan or SCB assisted any of the alleged attacks. Rather, the Complaint alleges conduct by terrorists "several steps removed" from anything either Defendant allegedly did, which is insufficient as a matter of law to establish an aiding and abetting claim. *Honickman*, 6 F.4th at 501 (citing *Siegel* v. *HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 220-21 (2d Cir. 2019)). The Complaint also lacks other important components of the multi-factor test for substantial assistance because no Defendant was "present at the time" of the attacks, there is no allegation that either Defendant had a "desire" to help the attackers succeed, and there is no allegation of any affiliation between a customer of any Defendant and the attackers. *Halberstam* v. *Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983).

*Fourth*, for similar reasons, the Complaint fails to establish that either Defendant's actions proximately caused Plaintiffs' injuries, which is required to plead an aiding and abetting claim (like any other statutory tort claim). *See Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("[W]e generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused."); *Rothstein* v. *UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) ("We are not persuaded that Congress intended to permit recovery under § 2333 on a showing of less than proximate cause."). Here, the Complaint alleges only that SCB and non-party SCB Pakistan provided financial services to Fatima and that terrorists were somehow getting their hands on a small percentage of Fatima's product to misuse in IEDs. This does not plead a "direct relation between the injury asserted and the injurious conduct alleged" to demonstrate proximate cause. *Holmes* v. *Sec. Inv. Prot. Corp.*, 503 U.S. 258, 259 (1992).

For all these reasons, the Complaint should be dismissed.

## BACKGROUND[1]

### A.    Defendants

SCB is a bank incorporated by Royal Charter in England and Wales, with its headquarters in London, England. (Compl. ¶ 29.) SCB operates worldwide through branches, including a licensed branch in New York, and according to the Complaint, "uses the NY Branch to conduct U.S. dollar clearing operations." (*Id.* ¶ 31.) The Complaint also alleges that a non-party subsidiary of SCB, SCB Pakistan, operates a bank in Pakistan and generally "conducted U.S. dollar clearing transactions through the NY Branch" of SCB. (*Id.* ¶ 33.) SC PLC, the ultimate parent company of SCB, is a publicly traded (though not on any U.S. stock exchange) bank holding

---

[1]    The facts stated herein are taken from the Complaint and the documents quoted therein. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (noting that when deciding a motion to dismiss, courts can consider documents incorporated into the complaint by reference).

company based in London.  (*Id.* ¶ 28.)  The Complaint does not allege that SC PLC engages in banking transactions for anyone or maintains any presence in New York or elsewhere in the United States.

There is no allegation that either Defendant ever interacted with, or provided any banking services to, any of the attackers who carried out the attacks at issue, or to any FTO that committed, planned, or authorized the attacks, or to any proxy or front for a FTO.  Nor does the Complaint allege that any transactions involving SCB or non-party SCB Pakistan directly facilitated the person(s) who committed the at-issue attacks.

**B.      Non-Party Fatima**

According to the Complaint, SCB and SCB Pakistan "provided financial services" to Fatima as early as 2001.  (*Id.* ¶ 139.)  Fatima is a Pakistan-based multinational company whose operations include "manufacturing plants" in Pakistan that produce fertilizer products.  (*Id.* ¶¶ 6, 9; Declaration of Andrew J. Finn ("Finn Decl."), Exhibit 1 at 2.)  Among those products is "CAN" fertilizer (calcium ammonium nitrate), "a common agricultural fertilizer" which "is legally produced and sold in Pakistan."  (Compl. ¶¶ 10, 143.)  Fatima allegedly used SCB Pakistan for "its daily banking business" and other services, such as "project financing, investment, and loans" in the period between 2013 and 2016.  (*Id.* ¶ 153.)  The Complaint alleges that SCB or SCB Pakistan provided financing around 2013 for factory infrastructure "to remove production bottlenecks," which helped Fatima to continue to manufacture fertilizer.  (*Id.* ¶¶ 24, 154.)

According to a 2012 report quoted in the Complaint, "[t]he vast majority of the fertilizer produced by the Fatima plants is used by small farmers in Pakistan who depend on it for their survival."  (Finn Decl., Exhibit 1 at 2.)  However, the Complaint alleges that terrorists also misused CAN fertilizer as an ingredient in IEDs, and that Fatima was a source of that fertilizer. (Compl. ¶¶ 9, 111.)  According to a December 13, 2012 congressional testimony quoted in the

Complaint, the U.S. government was at that time engaged in "coordinated efforts" with the "counter-IED community" that included discussions with the "global fertilizer community." *Id.* at 7-8.) U.S. officials were attempting to take measures "to disrupt threat networks employing IEDs against [coalition] forces," which included banning trade with certain companies." (Finn Decl., Exhibit 2 at 5-6.)

The Complaint alleges that in August 2011, U.S. General Michael D. Barbero[2] met with Fatima executives "to discuss its role in supplying terrorists with fertilizer." (Compl. ¶¶ 128-29.) After a series of meetings, Fatima allegedly did not follow through on a proposal to "add colorants to its CAN production" that would help "track and identify CAN at the Pakistan-Afghanistan border." (*Id.* ¶ 130.) The Complaint alleges that Fatima "declined to dye its fertilizer on the advice of the Pakistan government," and ultimately referred U.S. officials to Pakistan's Foreign Ministry for further communications. (*Id.* ¶¶ 131-33.) According to the sources quoted in the Complaint, however, Fatima was never placed on the U.S. government's "Entity List," which would have "prohibit[ed] U.S. firms from doing business with" it, because U.S. officials could not show that Fatima was "knowingly selling its product to insurgent groups or terrorists."[3] (Finn Decl., Exhibit 1 at 2.)

Relying on a news article published in December 2019, the Complaint alleges that after finding Fatima "unresponsive" to requests for its assistance in combatting the misuse of its

---

[2]     According to the Complaint, during the relevant period General Barbero was "the head" of the Defense Department's Joint Improvised Explosive Device Defeat Organization. (Compl. ¶ 19.)

[3]     The "Entity List" is maintained by the Department of Commerce under Title 15, Part 744, Code of Regulations. It imposes trade restrictions on people and organizations that are "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.16.

CAN fertilizer, in January 2013 General Barbero met with unnamed "officials" of SCB and SC PLC in New York concerning Fatima.[4]  (Compl. ¶¶ 1, 148; Finn Decl., Exhibit 3 at 2-3.)  The Complaint claims at that meeting General Barbero and other U.S. officials showed Defendants that terrorists had historically managed to procure CAN fertilizer manufactured by Fatima for use in IEDs that harmed American troops, and "[u]rged Standard Chartered to stop providing financial services to Fatima."  (Compl. ¶¶ 1, 149.)  There is no allegation that General Barbero or anyone else identified anything illegal about Fatima's business activities (as opposed to the terrorists misusing one of Fatima's products).

The Complaint further establishes that only a small portion of Fatima's CAN fertilizer ended up in the hands of terrorist groups who illegally smuggled the fertilizer across the border to Afghanistan.[5]  (Finn Decl., Exhibit 1 at 2.)  Fatima allegedly produced "hundreds of thousands of metric tons of CAN" each year and sold "437,000 tons" of this product in 2013.  (Compl. ¶¶ 11, 152.)  The Complaint alleges that "almost two hundred tons of CAN"—*i.e.*, less than 1% of Fatima's total production—was estimated to have been misused in IEDs detonated in 2012 (*id.* ¶¶ 11, 112, 152) and that CAN fertilizer was not the only ingredient used by terrorists.  (*Id.* ¶¶ 55, 73.)  According to General Barbero's congressional testimony, on which the Complaint relies, terrorists in Afghanistan also used an entirely different chemical—potassium chlorate—as "the main charge in 23 percent of exploited IEDs" by the end of 2012 (Finn Decl., Exhibit 2 at 7),

---

[4]     The 2019 news article that is the apparent sole basis of this alleged meeting does not mention who was in attendance, let alone from which Standard Chartered entity.  (*See* Finn Decl., Exhibit 3.)

[5]     The Complaint alleges that as part of an effort to reduce IED attacks on coalition troops, the government of Afghanistan banned the "importation, production, transportation, use, sale and storage of CAN" in 2010.  (Compl. ¶ 103.)  In 2011, Pakistan similarly implemented a policy to stop the smuggling of CAN out of the country, among other counter-IED measures.  (*Id.* ¶ 107.)

and Plaintiffs allege no connection between Fatima and that chemical.  Following Defendants'

meeting with U.S. officials, Fatima issued statements "from 2013 onward" that it would "continue

to coordinate closely with Lt. Gen Barbero," and implement "a new formula to replace [CAN]

fertilizer." (Compl. ¶ 136.)  There is no allegation that either Defendant was aware that Fatima

was not doing so.

SCB and non-party SCB Pakistan are alleged to have continued to provide banking

services to Fatima following General Barbero's 2013 meeting.  (*Id.* ¶¶ 150, 157.)  In particular,

the Complaint alleges that in or around 2013, SCB provided Fatima a loan denominated in

U.S. dollars, and in 2016 (after all the attacks at issue) SCB Pakistan "invested 1 billion rupees"

(approximately USD $4.2 million today) in Fatima.  (*Id.* ¶¶ 154-157.)  However, the Complaint

does not allege that there was anything unlawful about those banking services or that they

contributed to or assisted terrorists who misused some of Fatima's products.

C.    **The Attacks**

Plaintiffs are family members of five U.S. servicemen who were killed in three

suicide bombings and an IED explosion that occurred in Afghanistan between 2013 and 2015.  (*Id.*

¶¶ 179-210.)  Without identifying specific organizations that carried out each of the four attacks,

the Complaint alleges that they were perpetrated by members of an "al-Qaeda Terror Syndicate,"

which includes "al-Qaeda, the Taliban, the Pakistani Taliban, the Haqqani Network, and other

affiliated organizations." (*Id.* ¶¶ 46-48.)  From 2013 to 2015, al-Qaeda, the Pakistani Taliban, and

the Haqqani Network were designated by the U.S. government as FTOs, and the Taliban was

designated as a Specially Designated Global Terrorist.  (*Id.* ¶¶ 53, 67, 79, 88.)  The Complaint

does not allege that CAN fertilizer was used for any of the four attacks.  Plaintiffs assert one count

of aiding and abetting acts of international terrorism under 18 U.S.C. § 2333(d). (*Id.* ¶¶ 211-21.)

**ARGUMENT**

I.    **THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE BASIS FOR PERSONAL JURISDICTION OVER EITHER DEFENDANT.**

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc.* v. *Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). Therefore, "to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Id.* at 34-35 (quotations omitted). Here, the Complaint relies on New York's long-arm statute to claim specific jurisdiction over both Defendants (SCB and SC PLC). (Compl. ¶¶ 37-41 (citing N.Y. C.P.L.R. § 302).) To assert personal jurisdiction over out-of-state entities like the Defendants under New York's long-arm provision, "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci II*") (citing N.Y. C.P.L.R. § 302(a)(1)). In addition, courts must consider whether each defendant "has certain minimum contacts with the relevant forum," such that "the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quotations omitted). "[T]he exercise of jurisdiction comports with due process only if the defendant's conduct and connection with the forum is such that [the defendant] should reasonably anticipate being haled into court there." *Contant* v. *Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292 (S.D.N.Y. 2019) (quotations omitted).

For claims arising under the ATA, courts in the Second Circuit have exercised personal jurisdiction over non-U.S. bank entities where those entities had New York branches that

were used to transfer funds to terrorists.[6]  However, as Judge Hellerstein recently recognized, it is

insufficient to assert "generalized allegations and speculations that some funds were transferred

through the New York branch" of a foreign bank without alleging "a frequent and deliberate use"

based on "key supporting facts such as number of transfers, dates, and monetary amounts."  *Brown*

v. *Nat'l Bank of Pakistan*, 2022 WL 1155905, at *3 (S.D.N.Y. Apr. 19, 2022) (quotations omitted).

Here, the Complaint fails to allege facts to meet the basic statutory and constitutional requirements

for personal jurisdiction even on a prima facie basis.

   *First*, the Complaint fails to plead any basis for exercising personal jurisdiction

over SC PLC, a London-based bank holding company with no U.S. presence.  (*See* Compl. ¶ 28.)

The Complaint does not allege that SC PLC "transacted business within the state" at all, let alone

that Plaintiffs' claims "arise from" business activity by SC PLC in New York.  *Licci II*, 732 F.3d

at 168.  The Complaint attempts to manufacture personal jurisdiction over SC PLC by lumping it

together with SCB and making general allegations about "Standard Chartered" as a combined

whole.  (Compl. ¶ 35; *see, e.g.*, *id.* ¶¶ 38, 138, 150, 153.)  But SCB and SC PLC are "actually two

distinct Defendants . . . that the complaint collapses into one," making it "impossible to determine

whether" the Court could properly exercise personal jurisdiction over each related entity.  *Charles

Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018).[7]  Moreover, the Complaint's

---

[6] *See Miller* v. *Arab Bank, PLC*, 372 F. Supp. 3d 33, 44 (E.D.N.Y. 2019) (bank "used its branch in New York to process millions of dollars for Hamas leaders"); *Licci II*, 732 F.3d at 165, 168-74 (bank executed wire transfers that "numbered in the dozens and totaled several million dollars" for Hizbollah); *Strauss* v. *Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 23 (E.D.N.Y. 2016) (bank executed "five New York Transfers through the New York Branch" to benefit Hamas); *Weiss* v. *Nat'l Westminister Bank, PLC*, 176 F. Supp. 3d 264, 279-80 (E.D.N.Y. 2016) (jurisdictional nexus established where "196 separate times" defendant bank "deliberately routed a transfer through New York in response to a specific request by [alleged terrorist front]").

[7] *See also Cenage Learning, Inc.* v. *Buckeye Books*, 531 F. Supp. 2d 596, 599 (S.D.N.Y. 2008) ("Lumping all the 'defendants' together for purposes of alleging connections to New York, is, however, patently insufficient."); *Rush* v. *Savchuk*, 444 U.S. 320, 331-32 (1980) ("[T]he

allegation that unnamed SC PLC executives participated in a single meeting with U.S. officials "at their New York branch in Manhattan" (Compl. ¶ 1) also is insufficient as a matter of law. *See Gordian Grp., LLC* v. *Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 587 (S.D.N.Y. 2016) (noting that "[c]ourts are skeptical of attempts to assert personal jurisdiction over a defendant based on a single meeting in New York," and finding a meeting in New York "insufficient to establish personal jurisdiction" when it "was apparently unsuccessful" and thus "did not substantially further" the parties' relationship) (quotations omitted); *Knight* v. *Standard Chartered Bank*, 531 F. Supp. 3d 755, 771-72 (S.D.N.Y. 2021) (dismissing a claim against Standard Chartered Bank for lack of personal jurisdiction because a "single act by a single person" is too "attenuated" to the underlying conduct giving rise to the claim.)[8]

*Second*, the Complaint does not allege sufficient facts to establish specific jurisdiction over SCB.  The Complaint asserts that SCB's services to Fatima must have been "facilitated by" its New York branch because of the New York branch's general "central role" in "dollar clearing, foreign exchange, and trade financing services" for "Standard Chartered's global operations." (Compl. ¶ 38.)  But without "key supporting facts," such as the "number of transfers, dates, and monetary amounts" involved in New York branch services, these "generalized allegations are insufficient to satisfy either New York's long-arm statute or the Due Process

---

assertion of jurisdiction over [one defendant] based solely on the activities of [another defendant] . . . is plainly unconstitutional.").

[8]     Apart from failing to satisfy the long-arm statute, the Complaint also fails to allege SC PLC has "sufficient contacts with the United States in general" such that it would be "reasonable under the circumstances" to exercise jurisdiction. *Siegel* v. *HSBC Holdings, PLC*, 2018 WL 501610, at *4 (S.D.N.Y. Jan. 19, 2018).  The Complaint does not meet this bar because it "does not allege that [SC PLC] itself actually engaged in conduct or activity directed at the United States, or that [SC PLC] had any direct dealings with the terrorists that perpetrated the [relevant] attacks, or that [SC PLC] specifically had any relationship with [the alleged customer]." *Id.* (finding no personal jurisdiction over foreign bank holding company).

Clause." *Brown*, 2022 WL 1155905, at *3.  Finally, the Complaint's allegations that SCB provided "a $22 million USD loan" around 2013 and "SCB Pakistan invested 1 billion rupees [approximately USD $4.2 million today] in a Fatima *sukuk*" in 2016 are irrelevant, because these activities are not tied to the New York branch.[9]  (Compl. ¶¶ 154-157); *see also Singer* v. *Bank of Palestine*, 2021 WL 4205176, at *7 (E.D.N.Y. Apr. 30, 2021) ("[C]ourts painstakingly identif[y] key supporting facts in the complaint about the quality and the quantity of the alleged transfers to determine whether defendants allegedly engaged in frequent and deliberate use of New York banks.") (quotations omitted).

    As a result, the Complaint fails to allege facts supporting the exercise of personal jurisdiction against either Defendant and should be dismissed for this reason alone.

## II.    THE COMPLAINT ALSO FAILS TO STATE ANY PLAUSIBLE AIDING AND ABETTING CLAIM.

    The Complaint also should be dismissed because it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). To plead an aiding and abetting claim under Section 2333(d)(2) of the ATA, a complaint must plead facts establishing that: (1) each defendant was "'generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance' (the 'general awareness' element)"; (2) each defendant engaged in conduct to "'knowingly and substantially assist the principal violation' (the 'substantial assistance' element)," which under the ATA is an act of international terrorism; and (3) "'the party whom the defendant aids must perform a

---

[9]    The alleged investment in 2016 is also irrelevant because it clearly did not "provid[e] substantial assistance" to the "act[s] of international terrorism" detailed in the Complaint, the last of which took place in 2015.  18 U.S.C. § 2333(d)(2).

wrongful act that causes an injury' (the 'aiding party who causes injury' element)," namely the act of international terrorism. *Honickman*, 6 F.4th at 494 (quoting *Halberstam*, 705 F.2d at 477). The complaint must also establish that the services the defendant bank provided were a proximate cause of Plaintiffs' injuries. *Rothstein*, 708 F.3d at 95. As detailed below, beyond its mere "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "naked assertion[s] devoid of further factual enhancement," all of which are insufficient as a matter of law, *Pension Benefit Guar. Corp.* v. *Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (quotations omitted), the Complaint fails to allege facts that meet any of the above requirements.

### A.   The Complaint Fails to Allege That Defendants Aided Anyone Who Committed the Alleged Terrorist Attacks That Caused Plaintiffs' Injuries.

To satisfy the "aiding party who causes injury" element, Plaintiffs must allege facts demonstrating that "the defendant directly or indirectly aided [the party that] performed the injury-causing act," which may include aid to an "intermediary of the principal" attacker. *Honickman*, 6 F.4th at 495-96 (quotations omitted). Here, there is no allegation that either Defendant aided the attackers who carried out, planned or authorized any terrorist attacks in Afghanistan.

Nor does the Complaint plausibly allege that SCB's or non-party SCB Pakistan's customer, Fatima, acted as an "intermediary of the principal" that carried out the attacks that caused Plaintiffs' injuries. *Id.*; *see id.* at 490 (defendant bank "provid[ed] financial services to customers affiliated with Hamas"); *Kaplan*, 999 F.3d at 849-50 (defendant bank serviced "integral constituent parts of Hizbollah"). Instead, the Complaint alleges that SCB and non-party SCB Pakistan provided financial services to Fatima, and that a small percentage of one of Fatima's fertilizer products ended up in the hands of "al-Qaeda Terror Syndicate" members through unidentified means. (Comp. ¶¶ 6, 139.) There are no facts alleged suggesting Fatima was an al-

-13-

Qaeda front or acted as a go-between for terrorists.  To the contrary, the Complaint and the materials quoted therein concede that Fatima is a legitimate manufacturer of agricultural products. (Finn Decl., Exhibit 1 at 2.)  While "a defendant can be liable under JASTA for providing indirect aid to FTOs through intermediaries that are *closely intertwined* with those organizations," *Brown*, 2022 WL 1155905, at *1 (citing *Kaplan*, 999 F.3d at 855) (emphasis added), no court has held that banks aid and abet principal attackers or terrorist attacks by providing banking services to a manufacturer simply because a small portion of its legitimate commercial product is misused by terrorists.

> **B.**     **The Complaint Does Not Plausibly Allege That SCB Was Aware It Was Playing a Role in Unlawful Activity by Providing Routine Banking Services to Fatima in Pakistan.**

To plead the general awareness element of an aiding and abetting claim, the Complaint must set forth facts showing that: (1) "[the bank defendant] was aware of [its customers'] connections with [the terrorist organization that committed the attacks] before the relevant attacks" and (2) "the [customers] were so closely intertwined with [that terrorist organization's] violent terrorist activities that one can reasonably infer [the bank] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to [the relevant customers]." *Honickman*, 6 F.4th at 501.  The mere "knowledge of the organization's connection to terrorism" is insufficient to meet the general awareness element, and the provision of routine banking services—even to a foreign terrorist organization front (which is not alleged here)—does not render a bank liable for aiding and abetting all terrorist attacks committed, planned or authorized by that organization.  *Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 329-30 (2d Cir. 2018); *see also Keren Kayemeth Leisrael-Jewish Nat'l Fund* v. *Educ. for a Just Peace in the Middle E.*, 530 F. Supp. 3d 8, 10 (D.D.C. 2021) ("[T]o the extent plaintiffs allege that the [defendant] has ties to and has provided general support to Hamas

and other terrorist groups . . . those allegations do not establish that the [defendant] 'planned' or 'authorized' the attacks at issue [under JASTA].").

The Complaint is devoid of factual allegations that SCB or non-party SCB Pakistan were aware of any connection between Fatima and anyone in the "al-Qaeda Terror Syndicate" at the time of the relevant attacks.  At most, the Complaint alleges, based on public reports and a U.S. government official's briefing to unspecified persons at SCB and/or SC PLC, that as of 2013: (1) foreign terrorists had smuggled and then misused a relatively small portion of Fatima's CAN fertilizer to create IEDs, and (2) Fatima was aware of this fact and did not do enough to cooperate with the United States government to stop foreign terrorists from obtaining a small amount of its CAN fertilizer.  (Compl. ¶ 17.)  But there is no allegation that Fatima, a legitimate multinational fertilizer company, was doing anything illegal, nor are there any allegations in the Complaint that Fatima had any connections with terrorists whatsoever.  In fact, the Complaint alleges that after 2013, Fatima made public assurances that it was "continu[ing] to coordinate closely with Lt. Gen Barbero" and the U.S. government, and was implementing "a new formula to replace [CAN] fertilizer."  (*Id.* ¶ 136.)  These allegations do not support an inference that SCB was generally aware it played a role in acts of terror by continuing to provide ordinary banking services to Fatima.

The Complaint also lacks factual allegations that Fatima was "so closely intertwined with [the 'al-Qaeda Terror Syndicate's'] violent terrorist activities that one can reasonably infer [SCB (or SC PLC)] was generally aware of its role in unlawful activities from which the attacks were foreseeable." *Honickman*, 6 F.4th at 501.  The Complaint and sources quoted therein explain that a small portion of Fatima's CAN fertilizer ended up in the hands of terrorists and that Fatima was a company that manufactured legitimate agricultural products for Pakistani farmers.  (Finn Decl., Exhibit 1 at 2.)  The Complaint does not plead that Fatima

knowingly sold its CAN fertilizer to a member of the alleged "al-Qaeda Terror Syndicate" or that Fatima was even remotely affiliated with anyone in the "al-Qaeda Terror Syndicate."

Plaintiffs' reliance on *Wultz* v. *Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010)—a case that predates JASTA amendments to the ATA providing for an aiding and abetting cause of action—is unavailing. (ECF No. 15.) There, a district court held that plaintiffs alleged a plausible aiding and abetting claim against the Bank of China ("BOC") because BOC provided banking services directly to officers and agents of the Palestinian Islamic Jihad ("PIJ")—the FTO that injured the plaintiffs—after the Israeli government notified the Chinese government about previous transfers and demanded that China force BOC to cease any further transfers. *Id.* at 18-19, 52, 82. Unlike here, the *Wultz* complaint alleged that BOC transferred funds directly into accounts held by officers and agents of the PIJ, which were used "for the purpose of planning, preparing for[,] and executing terrorist attacks." *Id.* at 18. In reaching its decision that the plaintiffs alleged a viable claim against BOC under the ATA, the court reasoned that: "plaintiffs have alleged a flow of money *directly* into the coffers of the PIJ, []an organization entirely devoted to terrorist activity, and thus one that is unlikely to use wired moneys for any other purpose." *Id.* at 22. Here, unlike in *Wultz*, there is no allegation that any SCB customer was an officer or agent of an FTO or that SCB was aware that by allegedly providing banking services to Fatima—a legitimate multinational fertilizer company—it was putting money in the "coffers" of a terrorist organization or even doing anything illegal.

   C.    **The Complaint Fails to Plead That Either Defendant Knowingly and Substantially Assisted Acts of Terror.**

To determine whether a defendant knowingly and substantially assisted the relevant attacks, the Court must consider the following factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the

tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Honickman*, 6 F.4th at 499-500 (quoting *Linde*, 882 F.3d at 329). The Complaint lacks allegations that would satisfy the substantial assistance element.

*First*, the Complaint does not allege that Defendants encouraged any terrorist activity whatsoever. Nor is it alleged that the customer of SCB or non-party SCB Pakistan, Fatima, encouraged or supported terrorism. Instead, the Complaint alleges Fatima manufactured and sold CAN fertilizer among other products to purchasers in Pakistan and that terrorists somehow got their hands on a small portion of that fertilizer (at most 1%) to illegally smuggle it to Afghanistan, where "[a]l-Qaeda operated factories . . . made bombs using CAN and made those factories available to members of the al-Qaeda Terror Syndicate." (Compl. ¶ 100.)

*Second*, the Complaint does not identify any actual assistance Defendants provided for the at-issue attacks, let alone specify the amount and the degree of that assistance. Instead, the Complaint asks the Court to infer that Fatima's CAN fertilizer could have been an ingredient in the IEDs that allegedly were used for the at-issue attacks and SCB's or non-party SCB Pakistan's banking services must have helped Fatima produce that fertilizer. There is no allegation, however, that SCB or non-party SCB Pakistan was aware its loans or other banking services were assisting terrorists. Furthermore, providing routine banking services to a customer (even if that person is allegedly a front for or supporter of terrorist groups, which is not alleged here) does not equate to substantial assistance *to the principal violation* (the attacks in Afghanistan). *See Honickman*, 6 F.4th at 501 (citing *Siegel*, 933 F.3d at 220-21).[10]

---

[10]     The Second Circuit explained in *Honickman* that the plaintiffs' allegations were sufficient where allegations permitted a reasonable inference that the defendant bank "recognized the money it transferred to its customers would be received by [Hamas]."  6 F.4th at 500.  Here, in stark contrast, there is no suggestion that "the money transferred by [SCB] to its customer[] would be received by the FTO," but only that SCB provided "services" to Fatima that ultimately had the

*Third*, the Complaint does not allege that Defendants were present at the time of the attacks in Afghanistan.  At most, the Complaint alleges SCB or non-party SCB Pakistan was providing lawful banking services to a legitimate fertilizer business in Pakistan.

*Fourth*, the Complaint fails to allege a direct or close relationship between Defendants and the "al-Qaeda Terror Syndicate" that allegedly carried out the attacks.  As set forth above, *see* Part II.B, the Complaint does not even allege the "al-Qaeda Terror Syndicate" had a relationship with Fatima, let alone with the financial institution that provided routine banking services to Fatima.

*Siegel* is illustrative on this point.  There, the Second Circuit affirmed the district court's dismissal of a complaint alleging aiding and abetting for failure to state a claim.  933 F.3d at 219.  The *Siegel* plaintiffs sued HSBC based on banking services it provided to Al Rajhi Bank ("ARB"), a prominent Saudi bank alleged to have links to al-Qaeda in Iraq, and al-Qaeda was the terrorist organization that claimed responsibility for the relevant attacks that harmed the plaintiffs in that case.  *Id.*  The plaintiffs argued that HSBC's willingness to do business with ARB, despite HSBC's knowledge of ARB's links to terrorism, was sufficient to expose HSBC to aiding-and-abetting liability under JASTA.  *Id.*  The Second Circuit disagreed and found that there was an attenuated relationship between HSBC and the principals that committed terrorist attacks, such that the plaintiffs could not meet the knowing and substantial assistance element.  *Siegel*, 933 F.3d at 219-21, 225; *see also Honickman*, 6 F.4th at 501.  The Second Circuit explained that the defendant-bank's "relation to the principal" attackers was "several steps removed: it allegedly had a commercial relationship with another bank that was linked to various terrorist organizations

---

alleged effect of allowing the FTO access to CAN fertilizer.  No court that Defendants are aware of has found that this form of "aid" constitutes knowing and substantial assistance.

including the FTO that caused the plaintiffs' injuries." *Honickman*, 6 F.4th at 501 (citing *Siegel*, 933 F.3d at 220-21) (emphasis omitted).

Here, the Complaint alleges an even more attenuated connection between the commercial relationship with Fatima and the at-issue attacks in Afghanistan, which are not alleged to have been financed or supported by any banking services provided by SCB or non-party SCB Pakistan.  (Compl. ¶ 153.)  Moreover, the Complaint does not allege *any* facts that Fatima had any involvement with the "al-Qaeda Terror Syndicate" in any capacity, other than an awareness that terrorists were misusing one of Fatima's products.  Such an attenuated relationship between Defendants and the at-issue attacks belies any claim of aiding and abetting.  *See Siegel*, 933 F.3d at 220-21; *Honickman*, 6 F.4th at 501.

*Fifth*, the Complaint fails to allege what Defendants' "state of mind" was.  This is unsurprising because neither Defendants nor Fatima are alleged to have been involved with the relevant attacks.  The Complaint does not suggest that SCB or non-party SCB Pakistan provided banking services to Fatima intending to support the "al-Qaeda Terror Syndicate" so that they could commit the at-issue attacks.

*Sixth*, the Complaint fails to allege the period of Defendants' "assistance" because the Complaint does not allege that Defendants  "assisted" the at-issue attacks or even the "al-Qaeda Terror Syndicate" in any capacity.  An aiding and abetting claim requires the "aider-abettor" to "assist" the "tortfeasor."  *Halberstam*, 705 F.2d at 484.  Here, Plaintiffs have not alleged any facts of Fatima's wrongdoing aside from the fact that Fatima allegedly did not sufficiently assist the U.S. government at times in the fight against terrorism.  The Complaint does not allege that Fatima's doing so, or the continued provision of banking services by SCB or SCB Pakistan, in any way "assisted" the attackers.  (Compl. ¶ 216.)

### D.   The Complaint Does Not Plead That Defendants Proximately Caused Plaintiffs' Injuries.

Plaintiffs' theory also fails to meet the baseline proximate causation requirements for an ATA claim, as defined by the Second Circuit.  In *Rothstein* v. *UBS*, the Second Circuit held that the ATA requires a showing that the defendant's activities proximately caused the plaintiff's harm.  708 F.3d at 95.  Because the plaintiffs in *Rothstein* did not plausibly plead "a proximate causal relationship" between the defendant bank's services and "the terrorist attacks by Hizbollah and Hamas that injured plaintiffs," the court rejected their ATA claims.  *Id.* at 97-8.  Since *Rothstein*, the Supreme Court has confirmed "that a statutory cause of action" is "presume[d]" to be "limited to plaintiffs whose injuries are proximately caused."  *Lexmark*, 572 U.S. at 132.  This is because Congress is "familiar with the common-law rule" that "all cases of loss" should be "attribute[d] to the proximate cause, and not to any remote cause," and "does not mean to displace it *sub silentio*."  *Id.*  In the context of aiding and abetting claims, courts have explained that "the alleged substantial assistance" provided by a defendant "must be the proximate cause of plaintiffs' harm."  *Aetna Cas. & Sur. Co.* v. *Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) (quoting *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1495 (8th Cir. 1997)).[11]

None of the alleged "financial services" provided by SCB or non-party SCB Pakistan proximately caused Plaintiffs' injuries.  To establish proximate causation, plaintiffs must show "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes* v. *Sec. Inv. Prot. Corp.*, 503 U.S. 258, 259 (1992).  The proximate cause standard is not satisfied with "foreseeability alone."  *Bank of Am. Corp.* v. *City of Miami, Fla.*, 137 S. Ct. 1296, 1305

---

[11]      JASTA did not purport to alter the baseline proximate causation requirements as defined by *Rothstein*.  *See Freeman* v. *HSBC Holdings PLC*, 413 F. Supp. 3d 67, 84 n.24 (E.D.N.Y. 2019).

(2017); *see Laborers Loc. 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, 191 F.3d 229, 235-36 (2d Cir. 1999) ("other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are *additional elements*, not substitutes for alleging . . . a direct injury") (emphasis added).  Here, Plaintiffs allege that SCB's and non-party SCB Pakistan's financial services helped Fatima operate its business; Fatima's business included the production of CAN fertilizer; a small portion of CAN fertilizer was appropriated by members of the "al-Qaeda Terror Syndicate;" the CAN fertilizer was smuggled across the Pakistan-Afghanistan border; terrorist operatives misused the CAN fertilizer as an ingredient for IEDs; and terrorists used IEDs in attacks against coalition forces and civilian contractors.[12]   (Compl. ¶¶ 17-24.)   Beyond provision of alleged ordinary banking services to Fatima by SCB or SCB Pakistan, none of this was alleged to have been controlled or influenced by any Defendant.   In short, the alleged banking services provided to Fatima are simply "too remote a distance" from the alleged injuries to support an aiding and abetting claim.  *See Laborers Loc. 17 Health & Benefit Fund*, 191 F.3d at 235.

---

[12]     The Complaint does not allege that SCB's or non-party SCB Pakistan's financial services were even a "but for" cause of the relevant attacks, and the Complaint never claims that the attacks at issue actually utilized Fatima's CAN fertilizer.

## CONCLUSION

For all the foregoing reasons, the Complaint fails to plead a basis for personal jurisdiction over Defendants and fails to state a claim. Accordingly, the Complaint should be dismissed in its entirety as a matter of law.

Dated:  New York, New York
         August 3, 2022

Respectfully submitted,

/s/ Andrew J. Finn
Andrew J. Finn (finna@sullcrom.com)
Bradley P. Smith (smithbr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Standard Chartered Bank
and Standard Chartered PLC*