UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIANA BONACASA, VINCENT BONACASA, RAQUEL BONACASA, BARBARA ROSENDAHL, JEFFREY MUNCY, GILBERT RUSSELL, ABIGAIL RUSSELL, SARAH RUSSELL, NOEMI RUSSEL, BENJAMIN RUSSELL, NATHANAEL RUSSELL, DEBBIE WILLIAMS, and CHELSE MANGANO<br><br>Plaintiffs,<br><br>-against-<br><br>STANDARD CHARTERED PLC and STANDARD CHARTERED BANK,<br><br>Defendants. | No. 1:22-CV-03320 (ER) (OTW) |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 4

A.    The al-Qaeda Terror Syndicate's Use Of Explosive Devices To Murder American Service Members ...................................................................... 4

B.    Fatima Supplies CAN to the al-Qaeda Terror Syndicate ....................................... 4

C.    The U.S. Government's Extraordinary Meeting With Defendants ............................... 7

D.    The Terrorist Attacks That Killed Plaintiffs' Family Members ........................... 8

ARGUMENT ............................................................................................................ 8

I.    SCB AND SC PLC ARE SUBJECT TO PERSONAL JURISDICTION ......................... 8

II.    PLAINTIFFS STATE A CLAIM FOR AIDING AND ABETTING AGAINST STANDARD CHARTERED ................................................................................. 12

    A.    Plaintiffs Satisfy The "Aiding Party Who Causes Injury" Element ..................... 13

    B.    Plaintiffs Satisfy The "General Awareness" Element ........................................... 15

    C.    Plaintiffs Satisfy The "Substantial Assistance" Element ....................................... 19

    D.    JASTA Does Not Contain A Separate "Proximate Causation" Requirement ............................................................................................. 24

CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atchley v. AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022) ....................................................................21, 22, 24

*Averbach v. Cairo Amman Bank*,
    No. 19-cv-0004, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022) .................................13, 16, 20

*Bartlett v. Société Générale de Banque Au Liban SAL*,
    2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020).................................................................10, 16

*Brown v. Nat'l Bank of Pakistan*,
    2022 WL 115905 (S.D.N.Y. Apr. 19, 2022)....................................................................12

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..........................................................................................11, 12

*Energy Brands Inc. v. Spiritual Brands, Inc.*,
    571 F. Supp. 2d 458 (S.D.N.Y. 2008).........................................................................12

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
    141 S. Ct. 1017 (2021).......................................................................................10

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011).........................................................................................3, 11

*Gordian Group, LLC v. Syringa Exploration., Inc.*,
    168 F. Supp. 3d 575 (S.D.N.Y. 2016)........................................................................12

*Halberstam v. Welch*,
    705 F.2d 474 (D.C. Cir. 1983) ..................................................................... *passim*

*Henkin v. Kuveyt Türk Katilim Bankasi A.Ş.*,
    495 F. Supp. 3d 144 (E.D.N.Y. 2020) ...........................................2, 15, 16, 22, 23

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ...................................................................... *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)..................................................................... *passim*

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984)..........................................................................................11

*Lelchook v. Islamic Republic of Iran*,
    393 F. Supp. 3d 261 (E.D.N.Y. 2019) ......................................................................16

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ........................................................................10

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013).........................................................................10

*Linde v. Arab Bank, PLC*,
    882 F.3d 314, 330 (2d Cir. 2018)...............................................................25

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..........................................................9

*Rothstein v. UBS*
    708 F.3d 82 (2d Cir. 2013)..........................................................................25

*Siegel v. HSBC North America Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)................................................................22, 23

*Singer v. Bank of Palestine*,
    No. 19-cv-006, 2021 WL 4205176 (S.D.N.Y Apr. 30, 2021) .................12

*Strauss v. Crédit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) .......................................................9, 10

*Walden v. Fiore*,
    571 U.S. 277 (2014)................................................................................3, 11

*Weiss v. Nat'l Westminster Bank PLC*,
    176 F. Supp. 3d 264 (E.D.N.Y. 2016) .........................................................9

*Wultz v. Islamic Republic of Iran*
    755 F. Supp. 2d 1 (D.D.C.2010) ...........................................................17, 22

**Statutes**

18 U.S.C. § 2331..............................................................................................17

18 U.S.C. § 2333..............................................................................................25

18 U.S.C. § 2334...........................................................................................9, 10

Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130
    Stat. ........................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 4(k) ...........................................................................................9

N.Y. C.P.L.R. § 302...............................................................................9, 10, 12

Plaintiffs respectfully submit this opposition to Defendants Standard Chartered PLC ("SC PLC") and Standard Chartered Bank's ("SCB," and collectively with SC PLC, "Standard Chartered" or "Defendants") motion to dismiss.

## PRELIMINARY STATEMENT

This is the rare Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331 *et seq.*, case in which Plaintiffs plead specific circumstances through which Defendants received actual knowledge that they were aiding and abetting terrorist attacks.  During the relevant time period, an al-Qaeda-led network (the "al-Qaeda Terror Syndicate") relied almost exclusively on a rogue Pakistani company called Fatima for explosives precursors used to manufacture improvised explosive devices ("IEDs") representing the "most significant threat" to U.S. troops in Afghanistan.  ECF No. 1 ("Compl.") ¶¶ 8, 18.  In January 2013, as part of their effort to disrupt the IED supply chain, U.S. government officials took the extraordinary step of convening a meeting in New York with Defendants' senior executives.  During that meeting, U.S. officials informed Defendants in clear and certain terms that they were providing material support to the company supplying al-Qaeda's bombs. U.S. officials pleaded with Defendants to stop providing financial services to Fatima. Despite these requests, Defendants continued their relationship unabated and, according to a top Pentagon official, were "utterly useless" in aiding U.S. efforts to combat terrorism in Afghanistan. Compl. ¶¶ 143, 150.  This conduct foreseeably led to the tragic terrorist attacks that killed five U.S. soldiers in Afghanistan, whose family members are Plaintiffs in this case.

In 2016, Congress amended the ATA to ensure that individuals such as Plaintiffs have the "broadest possible basis" to seek recovery against those who aid and abet terrorism, whether "directly or indirectly."  Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, § 2(b), 130 Stat. at 853.  The Second Circuit's decisions in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir.

2021), addressed the pleading requirements for JASTA aiding-and-abetting claims in cases involving banks that provided services to intermediaries for terrorist organizations.  Under these decisions, the elements of the claim are: (1) the act of international terrorism that injured the plaintiff must have been committed, planned, or authorized by a designated FTO; (2) the defendant must have assisted—either directly or indirectly—the principal tortfeasor; (3) the defendant must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was a foreseeable risk; and (4) the defendant must have substantially assisted that illegal activity.  *See Honickman*, 6 F.4th at 495-501.

Plaintiffs easily satisfy the four elements of a JASTA aiding and abetting claim.

*First*, Plaintiffs allege that an al-Qaeda-led network committed, planned, or authorized the attacks at issue.  Defendants do not challenge the sufficiency of the pleadings on this element.

*Second*, Plaintiffs allege that by substantially assisting Fatima, Defendants thereby provided assistance to the principal tortfeasors who committed the attacks that murdered Plaintiffs' family members, over the strong objections of U.S. officials.  Defendants argue that indirect aid to terrorists is insufficient to state a JASTA claim, but the Second Circuit rejected this precise argument not once, but twice, last year.  *Kaplan*, 999 F.3d at 863; *Honickman*, 6 F.4th at 495.

*Third*, Plaintiffs allege that Defendants had far more than the "general awareness" required of their role in the tortious conduct from which Plaintiffs' injuries were a foreseeable risk.  *See Kaplan*, 999 F.3d at 863.  They allege that Defendants had actual knowledge of the foreseeable risk based on a direct government intervention.  Thus, this case differs dramatically from the typical ATA complaint, which focuses on whether the defendant was "aware of the various warning signs and red flags abouts its customer[]."  *Henkin v. Kuveyt Türk Katilim Bankasi A.Ş.*, 495 F. Supp. 3d 144, 155 (E.D.N.Y. 2020).  In arguing otherwise, Defendants ignore Plaintiffs' allegations.  For example, Defendants claim that the "Complaint is devoid of factual allegations

that SCB [was] aware of any connections between Fatima and anyone in the al-Qaeda Terror Syndicate," ECF No. 21 ("Mot.") at 15, even though Plaintiffs allege that Defendants were explicitly informed of Fatima's role in the IED supply chain.  Compl. ¶¶ 148-50 .

*Fourth*, Plaintiffs allege that Defendants "substantially assist[ed] the principal violation." *Kaplan*, 999 F.3d at 865-66.  Fatima's own financial reports identify SCB as one of Fatima's "MAJOR BANKERS," Compl. ¶ 140, and the U.S. government obviously would not have taken the highly unusual step of meeting with Defendants' senior executives if they did not believe that Defendants' provision of financial services to Fatima was a substantial factor that enabled the al-Qaeda Terror Syndicates' attacks on U.S. military personnel in Afghanistan.

Finally, Defendants' arguments against personal jurisdiction are based on a misreading of the Complaint and a misunderstanding of the law.  Both SCB's and SC PLC's contacts create a sufficient "affiliation between [New York] and the underlying controversy" to invoke specific personal jurisdiction.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  For its part, SCB "reached out beyond" its home in London to open a branch in New York, seeking to "exploit [the] market" for financial services uniquely available in this city.  *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (cleaned up).  As one of Fatima's key bankers, SCB provided Fatima with foreign exchange and export finance services through its New York branch.  These financial services provided Fatima with the money it needed to manufacture the explosives precursor Calcium Ammonium Nitrate ("CAN"), which is the key ingredient in a majority of IEDs and other homemade explosives it knew was being used by terrorists.  And importantly, New York is where U.S. officials presented both SCB and SC PLC with hard evidence of their role in attacks against Americans, and where SCB and SC PLC rebuffed those U.S. officials.  For the reasons discussed below, the Court should deny Defendants' motion to dismiss in its entirety or, in the alternative, grant Plaintiffs jurisdictional discovery into Defendants' contacts with New York.

## BACKGROUND

### A.    The al-Qaeda Terror Syndicate's Use Of Explosive Devices To Murder American Service Members

The al-Qaeda Terror Syndicate was formed in the early 2000s to advance Osama bin Laden's plan to unite the major terrorist groups in Pakistan and Afghanistan into a coordinated network.  Compl. ¶¶ 46-47.  Several of the terrorist groups within the al-Qaeda Terror Syndicate have been designated Foreign Terrorist Organizations ("FTOs") by the U.S. State Department, including al-Qaeda, the Pakistani Taliban, and the Haqqani Network.  *Id.* ¶¶ 53, 79, 88.[1]

To carry out their attacks on U.S. service members, the al-Qaeda Terror Syndicate relied heavily on explosive devices such as IEDs, suicide bombs, and other homemade explosive devices (collectively, "Explosive Devices").  *Id.* ¶ 6.  These Explosive Devices were extraordinarily deadly and, in 2012 alone, they resulted in 1,874 U.S. casualties in Afghanistan.  *Id.* ¶ 122.

Confirming the devastating impact of IEDs, Lt. General Michael D. Barbero—who served as "the Pentagon's top counter-IED official" as the former Director of the Joint Improvised Explosive Device Defeat Organization ("JIEDDO")—stated that "[t]he IED is the most significant threat to our troops in Iraq and Afghanistan."  *Id.* ¶¶ 118, 143.  Likewise, Homeland Security Investigations Deputy Assistant Director John P. Woods said that IEDs represent "the single greatest threat to coalition forces in Afghanistan."  *Id.* ¶116.

### B.    Fatima Supplies CAN to the al-Qaeda Terror Syndicate

The vast majority of the Explosive Devices that were deployed by the al-Qaeda Terror Syndicate in Afghanistan were made using CAN manufactured by Fatima.  *Id.* ¶ 101.  Fatima provided the al-Qaeda Terror Syndicate with an "unending supply" of this crucial chemical

---

[1] FTOs are organizations that the United States has determined engage in terrorist activity that threatens the security of U.S. nationals or the national security of the United States.  Compl. ¶ 53 n.2.

4

precursor despite a complete ban on CAN in Afghanistan and despite multiple interventions by the U.S. government. *Id.* ¶ 13.

To be clear, CAN is not widely used as an agricultural fertilizer in Afghanistan or Pakistan. It accounts for a small percentage of all legitimate fertilizer used in Afghanistan and Pakistan because it is expensive and not suitable for the terrain in Pakistan and Afghanistan. *Id.* ¶¶ 96, 98. But unlike other fertilizers, CAN's chemical properties make it particularly well suited for use in Explosive Devices. *Id.* ¶ 97. Thus, between 2011 and 2016, the al-Qaeda Terror Syndicate sourced tens of thousands of tons of the CAN it used to create Explosive Devices from Fatima's two fertilizer plants in Pakistan. *Id.* ¶ 111.

Senior U.S. officials have confirmed that Fatima is uniquely responsible for the supply of CAN for IEDs. General Barbero advised in 2012 that 70% of the IEDs used in Afghanistan were manufactured using CAN from Fatima. *Id.* ¶ 143.   In congressional testimony, General Barbero stated: "CAN is produced by two factories in Pakistan owned and operated by the Fatima Group. While CAN is produced in other regional countries, I've seen no evidence to indicate that CAN use for IEDS in Afghanistan comes from any other country in any significant amount." *Id.*  ¶ 147. Another source in 2012 estimated that about 90 percent of all casualties in Afghanistan came from Explosive Devices using CAN from Fatima. *Id.* ¶ 125.

Fatima's role in the killing of Americans was widely reported in the news.  For example, in September 2011, the *Associated Press* published an article explaining that the "main ingredient in most of the homemade bombs" responsible for the deaths of American troops "is a fertilizer produced by a single company in Pakistan." *Id.* ¶ 141.  Likewise, in August 2012, *The Washington Post* reported that "[a]lmost all of the ammonium nitrate used in the Taliban's bombs comes from two big fertilizer plants in Pakistan, both owned by the Fatima Group." *Id.* ¶ 144.

Since most Explosive Devices contained CAN from Fatima, General Barbero stated that the "Afghanistan IED threat cannot be defeated without addressing the flow of CAN-26" into Afghanistan. *Id.* ¶ 126. However, efforts to contain the flow of CAN from Fatima's plants were unsuccessful. In 2010, Afghanistan banned the importation, production, transportation, use, sale, and storage of CAN because of the danger CAN-based explosives created and because other effective non-explosive fertilizers were available. *Id.* ¶ 103. Thus, it was illegal for the CAN manufactured at Fatima's plants in Pakistan to cross the border into Afghanistan. Similarly, in 2011, Pakistan adopted a policy to stop CAN from being smuggled illegally into Afghanistan, including through enhanced training, a public awareness campaign, and stronger legislation regarding terrorism and explosives. *Id.* ¶¶ 106-07. Despite these efforts, the number of Explosive Device events in Afghanistan continued to increase dramatically, with 9,300 reported events in 2009 and 16,800 reported events in 2011. *Id.* ¶ 119.

Fatima was fully aware of its critical role in supplying terrorists with CAN. In August 2011, General Barbero had a call with Fatima's chairman to discuss the issue. *Id.* ¶ 128. Later that year, General Barbero had an in-person meeting with Fatima's chairman in Virginia during which he advised that the CAN from Fatima's two plants were responsible for most of the U.S. deaths in Afghanistan. *Id.* ¶ 129. To curb the flow of CAN into Afghanistan, the U.S. government on multiple occasions asked Fatima to add colorants to its CAN to help U.S. officials identify CAN at the Pakistan-Afghanistan border. *Id.* ¶¶ 130, 132, 135. The U.S. government even offered to pay for Fatima to include a colorant. *Id.* ¶ 134. Although Fatima represented to the U.S. government that it would assist in these efforts, Fatima never added any colorants to its CAN and or took any steps to address the smuggling of CAN into Afghanistan. *Id.* ¶¶ 131, 136-37.

**C.      The U.S. Government's Extraordinary Meeting With Defendants**

Having failed to stop Fatima from selling CAN to terrorists through direct intervention, U.S. government officials took an extraordinary next step:  they had a meeting with Fatima's key banker, Standard Chartered.  *Id.* ¶ 140 (explaining that Fatima has identified SCB in its financial reports as one of the "MAJOR BANKERS OF THE COMPANY").

In January 2013, General Barbero and other U.S. officials met with Standard Chartered's senior executives at SCB's New York office to inform them that Fatima "was helping to supply the Taliban with materials used in the manufacture of deadly homemade bombs."  *Id.* ¶ 148. During this January 2013 meeting, U.S. officials:

- Informed Standard Chartered executives that Fatima supplied vast quantities of the CAN fertilizer which was a vital ingredient in the CAN fertilizer bombs that accounted for approximately 80% of all IEDs used against American service members in Afghanistan.

- Presented Standard Chartered executives with "a map of Fatima plants, pictures of evidence, with bags of fertilizer seized." Additionally, General Barbero informed the Standard Chartered executives that Fatima had "been unresponsive" to U.S. efforts to curtail the supply of its CAN to terrorists, and had, in fact, "repeatedly refused to cooperate with coalition authorities."

- Briefed Standard Chartered executives about the casualty statistics, and specifically showed them statistics regarding "casualties from IEDs . . . category 1 – death or loss of limb."

- Presented photos of evidence derived from terrorist detentions in Afghanistan. These photos showed bags of Fatima CAN fertilizer that had been seized from Taliban (including Haqqani Network) terrorists.

- Informed Standard Chartered executives that Standard Chartered, including SCB's NY Branch and SCB Pakistan, provided critical foreign exchange and export finance services to Fatima, enabling it to produce the CAN responsible for the deaths of Americans.

- Urged Standard Chartered to stop providing financial services to Fatima to assist American efforts attempting to reduce IED and other Explosive Devices attacks against American and British service members in Afghanistan.

- Requested Standard Chartered change its practices and end relationships, specifically with Fatima, that enable terrorist attacks against Americans.

*Id.* ¶ 149.  Defendants, however, rebuffed the U.S. government's pleas and continued to provide financial services to Fatima even after the meeting.  For example, in 2013, SCB provided Fatima with a $22 million USD loan, which Fatima used to expand its CAN production capacity.  *Id.* ¶¶ 154-55.  Thus, General Barbero later said that he "did not see any action or response" from Defendants following the meeting, and he described them as "utterly useless" in aiding U.S. efforts to slow the flow of CAN to Afghanistan.  *Id.* ¶ 150.[2]

### D.    The Terrorist Attacks That Killed Plaintiffs' Family Members

As a result of Defendants' failure to take any steps to curb the flow of CAN into Afghanistan following the January 2013 meeting, the al-Qaeda Terror Syndicate continued to manufacture Explosive Devices on a massive scale using CAN manufactured by Fatima. Plaintiffs' family members—U.S. servicemen Louis Bonacasa, Michael Cinco, Kurt Muncy, Jonam Russell, and Keith Williams—were killed by these Explosive Devices in attacks that occurred in July 2013, July 2014, and December 2015.  *Id.* ¶¶ 179-210.

### ARGUMENT

## I.    SCB AND SC PLC ARE SUBJECT TO PERSONAL JURISDICTION

The personal jurisdiction inquiry asks whether a defendant's "suit-related conduct . . . create[s] a substantial connection with the forum" such that it can reasonably expect being haled into court here.  *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 413 (S.D.N.Y. 2021) (quoting *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 335 (2d Cir. 2016)).[3] To establish personal jurisdiction at the pleading stage, plaintiffs must allege a *prima facie* case—

---

[2] Defendants' decision to continue aiding terrorists in Afghanistan was part of a documented pattern of contempt for U.S. counter-terrorism sanctions and anti-money laundering laws and regulations. *Id.* ¶¶ 158-78.  In 2012, New York State's Department of Financial Services concluded that Defendants "operated a rogue institution" that "left the U.S. financial system vulnerable to terrorists." *Id.* ¶ 161.

[3] Congress found in enacting JASTA that "entities … that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States . . . *necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.*" JASTA § 2(a)(6) (emphasis added).

meaning facts that, if credited, would support personal jurisdiction.  Here, Plaintiffs assert specific personal jurisdiction for a federal claim, which requires them to show that their claim arises out of or relates to Defendants' contacts with the United States as a whole.  *See Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 285 (E.D.N.Y. 2016).  The answer to that question is easy:  SCB engaged in relevant conduct in the United States, including through its branch—it has "chose[n] to operate a branch in New York and benefit from New York's legal and economic infrastructure," *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 43-44 (E.D.N.Y. 2019)—and Defendants even participated in a meeting with government officials in New York City at that branch about the precise conduct at issue in this lawsuit.  These are squarely the types of "contacts" that establish personal jurisdiction.

Notwithstanding Defendants' assertion that Plaintiffs rely on "New York's long-arm statute to claim specific jurisdiction over both Defendants," Mot. at 9, Plaintiffs explicitly rely on Fed. R. Civ. P. 4(k), as well as C.P.L.R. § 302.  *See* Compl. ¶ 37.  Rule 4(k)(1)(C) is available where plaintiffs served a defendant "when authorized by a federal statute," and under the ATA, "[p]rocess in such a civil action may be served in any district where the defendant resides, is found, or has an agent."  18 U.S.C. § 2334(a).  Here, both Defendants have stipulated that service of the summons and Complaint on their agents in New York (their lawyers) was proper, ECF No. 10 at 1, ¶ 3,[4] thereby satisfying these procedural requirements and conferring personal jurisdiction. *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 26 (E.D.N.Y. 2016) (exercising personal jurisdiction in ATA case under Rule 4(k)(1)(C) where "Defendant expressly agreed to accept service of the Summons and Complaint by stipulation of the parties.").  And if SCB had not stipulated to proper service, Plaintiffs would have served it through the New York Department of Financial Services, SCB's registered agent for service of process in New York, *see* N.Y. Bnk. L.

---

[4] *See* ECF No. 10 ¶ 3 ("Each Defendant expressly reserves all rights, defenses, and other objections *other than insufficient service of process*." (emphasis added)).

§ 200(3)(a), satisfying 18 U.S.C. § 2334(a).  Thus, the Court may "exercise personal jurisdiction over Defendant[s], to the extent permitted by due process."  *Strauss*, 175 F. Supp. 3d at 26-27.

In *Licci*, the defendant bank had "no operations, branches, or employees in the United States," but it used correspondent accounts at banks in the United States to process some of the transfers at issue for the benefit of Hezbollah (an FTO).  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165-66 (2d Cir. 2013).  The Second Circuit held that this "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs," was purposeful availment.  *Id*. at 171.  "Since *Licci*, there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name."  *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (collecting cases).  This is so even when transfers flowing through New York constitute only "a part of" the offending activity.  *Licci*, 732 F.3d at 170.  Neither minimum contacts nor § 302 "require a causal link between the defendant's New York business activity and a plaintiff's injury," *id.* at 168, something the Supreme Court recently reaffirmed in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1022, 1026 (2021) (rejecting and holding that a suit may "relate to" a defendant's forum contacts even absent causation).

Here, Defendants chose to establish a branch in the United States, which helped it attract customers like Fatima that needed access to the U.S. dollar clearing system.  *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 340 (2012) (assuming that the use of a New York correspondent account provided benefits that "allowed the bank to retain [Hezbollah front] Shahid as a customer and to support its allegedly terrorist activities and programs."); *see* Compl. ¶ 31 ("During the relevant period, the overwhelming majority of SCB's transactions were denominated in U.S.

dollars and therefore cleared and settled in New York through the NY Branch.").  And, indeed, SCB provided those services to Fatima.

Decades ago, SCB proactively "reached out beyond" its home in London to open a branch in New York, aiming to "exploit [the] market" for financial services uniquely available in this city. *Walden*, 571 U.S. at 285 (cleaned up).  That is why U.S. officials chose to meet with Defendants in New York—rather than at SCB's subsidiary in Pakistan.  In New York, SCB "provided foreign exchange and export finance services to Fatima Group until at least 2014," *see* ECF No. 22-3, in its role as one of Fatima's "MAJOR BANKERS,"  Compl. ¶ 140; *see also id.* ¶ 38 (Defendants' financial services "facilitated by [] the NY Branch because of its central role in providing dollar clearing, foreign exchange, and trade financing services for Standard Chartered's global operations").  It used its New York branch to conduct dollar transactions with and for Fatima, including a $22 million USD loan to Fatima that enabled Fatima to expand production of IED components prior to the attacks on Plaintiffs' family members and likely went through the New York branch given the U.S. dollar-denomination .  *Id.* ¶ 154-55.  And it is in New York where both SCB and SC PLC received the most robust form of "fair warning" the personal jurisdiction inquiry could contemplate—knowledge of their past complicity in terrorism and notice that continuing down the same path would subject them to the jurisdiction of the United States.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

These contacts create a sufficient "affiliation between [New York] and the underlying controversy" to confer specific personal jurisdiction.  *Goodyear*, 564 U.S. at 919.  Indeed, there is nothing "random, isolated, or fortuitous" about these contacts.  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).  And even if SC PLC performed only a "single act" in New York— participation in the January 2013 meeting with the U.S. government—that single act created a "substantial connection" with New York because it relates directly to the cause of action pleaded.

*Burger King Corp.*, 471 U.S. at 476 n.18 ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction.").[5]

As Defendants admit, courts in the Second Circuit routinely exercise "personal jurisdiction over non-U.S. bank entities where those entities ha[ve] New York branches that were used to transfer funds to terrorists," Mot. at 9-10, including instances where the "contacts" pleaded are more attenuated than those detailed in the Complaint, *see id.* at 10 n.6 (citing cases)—a concession on C.P.L.R. § 302 that is all the more significant given that "the Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances [than] N.Y. C.P.L.R. § 302." *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008).

The two cases Defendants cite—*Brown v. National Bank of Pakistan*, 2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022), and *Singer v. Bank of Palestine*, No. 19-cv-006, 2021 WL 4205176 (S.D.N.Y Apr. 30, 2021), Mot. at 11-12—fall flat. In both, the courts directed the parties to engage in jurisdictional discovery, but unlike those cases, Plaintiffs here alleged a crucial meeting in New York constituting much of the scienter element supporting their claim. Compl. ¶¶ 148-49. And the defendant in *Singer* did not even maintain a New York branch. 2021 WL 4205176, at *1, *6.

## II.   PLAINTIFFS STATE A CLAIM FOR AIDING AND ABETTING AGAINST STANDARD CHARTERED

"Congress's stated purpose in enacting JASTA was 'to provide civil litigants with *the broadest possible basis*, consistent with the Constitution of the United States, to seek relief *against persons [and] entities . . . that have provided material support* . . . to foreign organizations or persons that engage in terrorist activities against the United States,'" whether "*directly or indirectly*." *Kaplan*, 999 F.3d at 855 (quoting JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at

---

[5] Defendants' reliance on *Gordian Group, LLC v. Syringa Exploration., Inc.*, 168 F. Supp. 3d 575 (S.D.N.Y. 2016), Mot. at 11, is misguided. *Gordian* did not concern the constitutional minimum required by the Due Process Clause but, rather, whether a meeting after the execution of a contract sufficiently amounts to "transact[ing] business" for purposes of N.Y. C.P.L.R. § 302(a). 168 F. Supp. 3d at 157-58.

853) (emphasis added in *Kaplan*).  To plead an aiding and abetting claim under JASTA, Plaintiffs

must allege the elements set out in *Halberstam v. Welch*, 705 F.2d 474 (D.C. Cir. 1983):

> "(1) the party whom the defendant aids must perform a wrongful act that causes an injury" (the "aiding party who causes injury" element); "(2) the defendant must *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" (the "general awareness" element); "(3) the defendant must *knowingly and substantially assist* the principal violation" (the "substantial assistance" element).

*Honickman,* 6 F.4th at 494 (quoting *Halberstam*, 705 F.2d at 477) (emphasis added in *Honickman*).

Consistent with Congress's directive to provide plaintiffs with "the broadest possible

basis" to bring anti-terrorism cases, the Second Circuit's recent decisions in *Kaplan* and

*Honickman* clarified the law in this area and "lowered the bar to state a JASTA aiding-and-abetting

claim."  Mem. Order at 7, *Bartlett v. Société Générale de Banque au Liban*, No. 19-cv-0007

(E.D.N.Y. June 17, 2022) (No. 291); *id*. at 3 (explaining that *Kaplan* and *Honickman* "both alter

the law in Plaintiffs' favor"); *see also* R. & R., *Averbach v. Cairo Amman Bank*, No.19-cv-00004,

2022 WL 2530797, at *9 (Apr. 11, 2022) ("Since then, the Second Circuit clarified how a district

court should evaluate a pleading asserting such a claim and what allegations are sufficient to satisfy

both the knowledge and substantial assistance aspects of the claim.").

In arguing for dismissal, Defendants misconstrue the governing law and mischaracterize

Plaintiffs' allegations, which satisfy the three elements of an aiding and abetting claim.

### A.     Plaintiffs Satisfy The "Aiding Party Who Causes Injury" Element

The first element of an aiding and abetting claim is "straightforward."  *Honickman*, 6 F.4th

at 495.  "It is satisfied when the party whom the defendant directly or *indirectly* aided performed

the injury-causing act."  *Id.* (emphasis added).  By alleging that Defendants provided indirect aid

to the terrorists who committed the attacks that murdered Plaintiffs' family members, Plaintiffs

satisfy this element.  Compl. ¶¶ 180, 189, 194, 198, 207.

In describing this element, the Second Circuit has explained that "'[t]he language and purpose of JASTA are meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal' who committed the wrongful act 'even where [the defendant's] relevant substantial assistance was given to an intermediary' of the principal." *Honickman*, 6 F.4th at 495-496 (quoting *Kaplan*, 999 F.3d at 856). Thus, the Second Circuit in *Honickman* and *Kaplan* squarely rejected defendants' indirect assistance arguments. *See Honickman*, 6 F.4th at 495 (rejecting the defendant's argument that "Plaintiffs' complaint falls short because 'the only parties whom [the bank] allegedly aided are the [Three] Customers,' and 'JASTA limits aiding-and-abetting liability to those circumstances in which a defendant actually aided and abetted . . . the person who committed' the relevant 'act of international terrorism'"); *Kaplan*, 999 F.3d at 863. The plaintiffs in *Honickman* and *Kaplan* easily satisfied the first element. *Honickman*, 6 F.4th at 501 ("The first element, that the party whom the defendants aided performed the injury-causing act, merits little attention. Plaintiffs plausibly allege that the party whom BLOM Bank aided (indirectly), Hamas, committed attacks causing Plaintiffs' injuries."); *Kaplan*, 999 F.3d at 863.

Defendants recognize this controlling Second Circuit precedent and, in fact, do not cite any cases in which the plaintiff failed to allege the first element of an aiding and abetting claim. Nonetheless, Defendants maintain that Fatima did not act as an "'intermediary of the principal'" because "[t]here are no facts alleged suggesting Fatima was an al-Qaeda front or acted as a go-between for terrorists." Mot. at 13-14. Notably, Defendants do not cite anything in *Kaplan*, *Honickman*, or otherwise to support this manufactured pleading requirement. Far from requiring an allegation that Fatima was an "al-Qaeda front," *Honickman* makes crystal clear that the first element "is satisfied when the party whom the defendant directly or indirectly aided performed the injury-causing act." 6 F.4th at 495. Plaintiffs allege that Defendants were informed that their

assistance to Fatima was indirectly aiding terrorists targeting Americans in Afghanistan and therefore "aiding [the] party who causes injury."

### B.    Plaintiffs Satisfy The "General Awareness" Element

Plaintiffs also satisfy the second element of their JASTA claim because they allege far more than "general awareness"—they allege actual knowledge that their conduct was contributing to the foreseeable risk of the very attacks at issue here.

The "general awareness" element requires that the defendant "be generally aware of its role in an *overall illegal or tortious activity* at the time [it] provides the assistance." *Honickman*, 6 F.4th at 496 (quoting *Halberstam*, 705 F.2d at 477) (emphasis added in *Honickman*).   "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." *Id.* "'General awareness' is therefore "less demanding than a requirement that [plaintiffs] show awareness." *Kaplan*, 999 F.3d at 863.  This is because the "attachment of the 'generally' modifier imparts to the concept 'generally aware' a connotation of something less than full, or fully focused, recognition." *Id.*  Thus, the "knowledge component" "'is designed to avoid' imposing liability on 'innocent, incidental participants.'" *Id.* at 864 (quoting *Halberstam*, 705 F.2d at 485 n.14).  The "general awareness" standard "does not require proof that the defendant had a specific intent." *Id.* at 863.

In the typical JASTA case, the "general awareness" inquiry focuses on whether the defendant was "aware of . . . various warning signs and red flags about its customers." *Henkin*, 495 F. Supp. 3d at 155.  For example, in *Kaplan*, the plaintiffs "described a dozen published English-language articles that recounted the connection between Hizbollah" and the bank's customers.  999 F.3d at 850.  The Second Circuit held that the plaintiffs' allegations were "sufficient to permit the inference" of general awareness.  *Id.* at 866.  Likewise, in *Henkin*, the

court concluded that "there were plenty of warning flags providing [the bank] reason to know that the funds it transferred on its customers behalf would flow to Hamas and thus create a need to investigate the background of its customers."  495 F. Supp. 3d at 160.[6]

Here, the "warning signs" that could support an "inference" of general awareness are not inferential but direct.  Plaintiffs allege Defendants' actual knowledge of their role in tortious activity from which "violence and killing"—as the court in *Halberstam* put it—was not only a foreseeable risk of the enterprise. 705 F.2d at 488. Instead, Plaintiffs allege that Defendants were directly informed by the U.S. government that terrorist attacks on U.S. service members would be an inevitable consequence of their continued assistance to Fatima.

As early as September 2011, numerous reputable news sources detailed Fatima's provision of CAN to the al-Qaeda Terror Syndicate, and General Barbero testified to the same in front of the U.S. Senate's Foreign Relations Committee shortly thereafter.  Compl. ¶¶ 141-47.  Rather than rely solely on this public information to sway private actors, however, the U.S. government undertook additional efforts to stem the flow of support from Fatima to the al-Qaeda Terror Syndicate, including proactively dispatching U.S. officials to personally meet with officials of Fatima's main bank—Standard Chartered—in January 2013.  There, Defendants were specifically told, among other things, about (1) the role of the chemical precursor CAN in the production of IEDs; (2) Fatima's production of that chemical precursor and unwillingness to curtail the supply of fertilizer to terrorists; (3) casualty statistics related to IEDs, including evidence related to loss of limb and death; (4) the al-Qaeda Terror Syndicate's possession and use of Fatima's product;

---

[6] *See also*, *e.g.*, *Bartlett*, 2020 WL 7089448, at *15 (finding "general awareness" and explaining that "[w]here Plaintiffs have plausibly alleged widespread public knowledge linking bank customers to a terrorist organization, there is no need to allege that the defendant necessarily read the specific media reports"); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 264, 267-68 (E.D.N.Y. 2019) (finding that a bank was "generally aware" of its "role" in Hezbollah's terrorist activities by transferring funds to its branch offices in Hezbollah-controlled regions); *Averbach*, 2022 WL 2530797, at *11("The SAC also contains sufficient factual allegations to support a plausible inference that CAB was generally aware that at least some of the charitable organization customers mentioned in the SAC were closely intertwined with Hamas's political and violent activities.").

and (5) SCB's own provision of financial services to Fatima.  *Id.* ¶¶ 148-49.   In these circumstances, the IED-based murder of U.S. servicemembers at the hands of the al-Qaeda Terror Syndicate was more than "foreseeable"—it was certain enough to warrant a personal visit from top U.S. military officials concerned with protecting servicemembers under their command. Defendants, however, elected not to course-correct but embraced their part in aiding terrorists.

The allegations here are thus similar to those in one of the only other actual knowledge ATA cases.  In *Wultz v. Islamic Republic of Iran*—which was decided before JASTA even created aiding and abetting liability—Israeli government officials provided actual notice of transfers through Bank of China that were being used to indirectly fund terrorism.  755 F. Supp. 2d 1, 50 (D.D.C. 2010).[7]   The Israeli officials "demanded that China stop the [Bank of China] from providing further services" to the customer, but Bank of China continued to provide those services. *Id.*  These allegations supported a claim for primary liability under the ATA because Bank of China "knowingly continued to carry out" financial transactions "after being expressly warned [by the Israeli government] of the consequences of its actions and asked to desist").  *Id.*  The similar allegations here plainly support a finding of "general awareness" under JASTA's aiding and abetting provisions, which require a lesser showing than under the ATA's primary liability provisions (which, among other things, required the plaintiffs in *Wultz* to establish apparent intent under 18 U.S.C. §2331(1)).  *Id.* at 48.

Faced with these allegations of actual knowledge, Defendants respond with a series of counter-factual assertions and misstatements of law.  To begin with, Defendants artfully recast the complaint to argue that it "is devoid of factual allegations that SCB or non-party SCB Pakistan

---

[7] Although the *Wultz* complaint alleged that the funds transferred by the defendant in that case were for the benefit of an FTO, the mechanism by which the funds were received were indirect.  For example, "[m]ost of the[] transfers were made to account number 4750401-0188-150882-6 at a BOC branch in Guanzhou, China, in the name of 'S.Z.R Alshurafa.'  The owner of the account, Said al-Shurafa ("Shurafa") [was] a senior operative and agent of the PIJ." First Am. Compl. ¶ 69, *Wultz v. Bank of China Ltd.*, No. 11-cv-01266 (SAS) (Jan. 13, 2009) (No. 12).

were aware of any connections between Fatima and anyone in the al-Qaeda Terror Syndicate." Mot. at 15.  In fact, Plaintiffs allege that, at the January 2013 meeting, "Standard Chartered executives were . . . presented with evidence of Fatima's direct involvement in supplying CAN to the al-Qaeda Terror Syndicate."  Compl. ¶ 21.

Similarly, Defendants argue that "there is no allegation that Fatima, a legitimate multinational fertilizer company, was doing anything illegal."  Mot. at 15.  As a factual matter, Plaintiffs have clearly pleaded that Fatima is a rogue entity, which (1) knew that its CAN was not being used as a fertilizer for agricultural purposes, Compl. ¶ 137; (2) knew that its CAN was responsible for most of the U.S. deaths in Afghanistan, *id.* ¶ 129; (3) repeatedly lied to the U.S. government about taking steps to curtail the flow of CAN to terrorists, *id.* ¶¶ 130-31, 136; and (4) continued to sell CAN to the al-Qaeda Terror Syndicate despite being aware that Afghanistan had imposed a ban on the importation of CAN as part of an effort by the Afghan government to reduce terror attacks using Explosive Devices,  *id.* ¶ 137.

Moreover, as a legal matter, JASTA does not require Plaintiffs to allege that Fatima was an "illegitimate" company or even that it was acting illegally.  Rather, the general awareness element focuses on whether Defendants were generally aware of their "role in an overall illegal or *tortious activity*."  *Honickman*, 6 F.4th at 496 (emphasis added).  The disjunctive "or" is conveniently ignored by Defendants.  Regardless, the crux of the inquiry is "foreseeability," *id.*, and there can be no serious dispute that, after the January 2013 meeting, future attacks on U.S. service members were a foreseeable—if not inevitable—consequence of Defendants' misconduct.

Nor can Defendants avoid liability by arguing that Plaintiffs do not allege that Fatima was "closely intertwined" with the al-Qaeda Terror Syndicate.  Mot. at 15-16 (quoting *Honickman*, 6 F.4th at 501).  As the quote from *Honickman* makes clear, the "closely intertwined" language deals with situations that do not involve *actual* knowledge, by asking whether the intermediaries were

18

"so closely intertwined with [the terrorist's] violent activities that one can *reasonably infer* that [the bank] was generally aware of its role."  6 F.4th at 501 (emphasis added).  This standard makes sense in the context of a case involving warning signs and red flags because it provides a limitation on whether it is reasonable to *infer* general awareness.  But where, as here, Plaintiffs allege specific circumstances giving rise to actual knowledge, no inferences are needed.  In any case, Fatima was "closely intertwined" with the al-Qaeda Terror Syndicate's violent activities since "[a]lmost all of the ammonium nitrate used in the Taliban's bombs comes from two big fertilizer plants in Pakistan, both owned by the Fatima Group."  Compl. ¶ 144.

### C.      Plaintiffs Satisfy The "Substantial Assistance" Element

Finally, Plaintiffs satisfy the third element of their aiding and abetting claim, which asks the Court to consider "six 'factors' that may help in the assessment of whether the amount of encouragement or assistance proven is sufficient to constitute substantial assistance." *Kaplan*, 999 F.3d at 856 (quotation marks omitted).  As discussed below, these factors favor Plaintiffs.[8]

Nature of the Act Encouraged or Assisted.  This factor "requires assessing whether the alleged aid . . . would be important to the nature of the injury-causing act." *Honickman*, 6 F.4th at 500.  In *Halberstam*, the "act" was "a long-running burglary enterprise," and the defendant Linda Hamilton's back-office assistance "was indisputably important" to it (not to the eventual, unplanned murder).  705 F.2d at 488. Even though Hamilton's actions were "neutral standing alone," they were culpable "in the context of the enterprise they aided." *Id*.  Here, Defendants provided "vital and substantial project financing, investment, and loans for Fatima," Compl. ¶ 153, at a time when CAN "was Fatima's best-selling product by volume," *id.* ¶ 152.   Fatima could not produce its principal product for terrorists without the financial services from its "MAJOR

---

[8] The only factor that favors Defendants is "defendant's presence or absence at the time of the tort," *Kaplan*, 999 F.3d at 856, which was not met in *Kaplan*, *Honickman*, or *Halberstam* itself.

BANKER[]," *id.* ¶ 140, which is precisely why the U.S. government directly intervened and asked Defendants to cut off their relationship with Fatima, *id.* ¶ 148.

Defendants' argument that their hands are clean because Plaintiffs do not allege that Defendants affirmatively "encouraged" terrorism "misunderst[ands]" the first factor, as Defendants blindly commit the same error as the district court in *Honickman. See* 6 F.4th at 500 (rejecting district court's formulation of the first *Halberstam* factor as a requirement that the defendant "knowingly encouraged [the terrorist group's] violent activities, such as those which caused Plaintiffs' injuries"). Likewise, Defendants' claim that "terrorists somehow got their hands on a small portion" of CAN (Mot. at 17) mischaracterizes the Complaint, which alleges "Fatima sold CAN to entities it knew were fronts for the Taliban and Haqqani Network" and that "[a]lmost all of the CAN used in the al-Qaeda Terror Syndicate's IEDs was produced at Fatima's two fertilizer plants." Compl. ¶ 127. But the Second Circuit has explained:

> Plaintiffs did not need to allege the funds actually went to [the FTO]. Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice. In other words, if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should focus on the amount and type of aid the defendant provided.

*Honickman*, 6 F.4th at 500 (cleaned up). The "amount and type of aid the defendant provided" here was substantial to the enterprise and Defendants were directly so informed.[9]

Amount of Assistance. "[I]f a plaintiff plausibly alleges the general awareness factors"— which Plaintiffs have, *see supra* § II.B.—the "amount of assistance" factor focuses on "the amount and type of aid the defendant provided." *Honickman*, 6 F.4th at 500 (citing *Halberstam*, 705 F.2d

---

[9] Relatedly, Defendants claim that "at most 1%" of Fatima's CAN fertilizer was smuggled into Afghanistan (Mot. at 17), but that raises a factual dispute which must be resolved in Plaintiffs' favor at this stage. In any event, Defendants are not innocent simply because Fatima may have simultaneously performed legitimate business while it supported terrorists. Where a bank's "assistance went to [a] customer[] who also performed non-terrorist activities," the Court must consider the importance of the assistance rendered to the attacks alleged. *Averbach*, 2022 WL 2530797, at *15. As discussed below, Plaintiffs allege here that Defendants' assistance was critical.

at 488).   As detailed in the Complaint, SCB was Fatima's "MAJOR BANKER," Defendants provided foreign exchange and export finance services to Fatima for many years, and Defendants provided Fatima with a favorably structured $22 million USD loan, enabling Fatima to increase its maximum production capacity prior to the attacks on Plaintiffs' family members.  Compl. ¶¶ 154-55.   These financial services continued during the period in which the al-Qaeda Terror Syndicate "sourced tens of thousands of tons of the CAN it used to create Explosive Devices from Fatima's fertilizer in Pakistan," *id.* ¶ 111, and after General Barbero's attempted intervention.   As the D.C. Circuit has noted, "[f]inancial support is 'indisputably important' to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 222 (D.C. Cir. 2022) (quoting *Gonzalez v. Google LLC*, 2 F.4th 871, 905 (9th Cir. 2021)).

In arguing otherwise, Defendants first claim that Plaintiffs do not allege "any actual assistance Defendants provided for the at-issue attacks."  Mot. at 17.   *Honickman*, however, rejected this very argument, explaining that "knowing and substantial assistance to the actual injury-causing act—here, Hamas's attacks—is unnecessary."   6 F.4th at 499.   Likewise, Defendants argue that Plaintiffs ask "the Court to infer that Fatima's CAN fertilizer could have been an ingredient in the IEDs" that killed Plaintiffs' family members, Mot. at 17, but this inference is plainly reasonable given that "almost all" of the al-Qaeda Terror Syndicate's IEDs used CAN from Fatima,  Compl. ¶ 127.

Defendants also argue that "providing routine banking services to a customer . . . does not equate to substantial assistance to the *principal violation*."  Mot. at 17.  As an initial matter, there is nothing "routine" about continuing to provide "banking services to a customer" after the U.S. government makes clear that the customer is supplying al-Qaeda's bomb making factories and takes the extraordinary step of urging the bank to cut off the relationship.  Plaintiffs are aware of

only one other ATA case that pled this type of extraordinary government intervention.  *See Wultz*, 755 F. Supp. 2d at 50.  Moreover, Defendants again rely on *Honickman* (Mot. at 17 & n.10), but there the Second Circuit made clear that "[f]actual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice."  6 F.4th at 500.  Here, Defendants were explicitly warned that the financial services they were providing to Fatima would help finance the manufacture of CAN explosives precursors that would be received by the FTO and used to kill Americans.

Relation to Principal.  The Second Circuit has confirmed that "a direct relationship between the defendant and the FTO is not required to satisfy" the "relation to the principal" factor. *Honickman*, 6 F.4th at 501.  Instead, this factor focuses on "the defendant's capacity to assist"— whether directly or indirectly.  *Id.*  Here, given that the U.S. government directly intervened and pleaded with Defendants to stop providing financial services that were assisting the al-Qaeda Terror Syndicate, Plaintiffs have sufficiently alleged that Defendants had the "capacity to assist" the FTO.  *See also Atchley*, 22 F.4th at 225 (holding that plaintiffs sufficiently alleged a JASTA claim against an "intermediary" and explaining that "substantial assistance to the ultimate deed— whether provided directly or indirectly—is enough"); *Henkin*, 495 F. Supp. 3d at 159 n.11 (rejecting defendant bank's argument that "the three gunmen responsible for the killings were not actual customers" of the bank because "[e]ven indirect support to a terrorist organization is actionable under JASTA").

Defendants' reliance on *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), is inapposite.  Mot. at 18.  There, the defendant bank, HSBC, had a relationship with another bank, ARB, which allegedly had "links to terrorist organizations," including al-Qaeda in Iraq ("AQI").  *Siegel*, 933 F.3d at 219.  The Second Circuit recognized that JASTA "does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist

organizations," *id.* at 223 n.5, but held that plaintiffs' allegations against HSBC were insufficient for several reasons. First, "plaintiffs' allegations themselves suggest[ed] that in providing banking services to ARB, HSBC had *little reason to suspect* that it was assuming a role in AQI's terrorist activities" because the bank was "Saudi Arabia's largest private bank, holding $80 billion in assets." *Id.* at 224 (emphasis added). Second, "and crucially, the plaintiffs concede[d] that, in January 2005—ten months before the November 9 Attacks—HSBC ceased doing business with ARB altogether." *Id.* Thus, HSBC's "conscious decision to cut off ARB well before the terrorist bombings at issue made it 'implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks.'" *Henkin*, 495 F. Supp. 3d at 159 (quoting *Siegel*, 933 F.3d at 224). Third, the plaintiffs "did not advance any non-conclusory allegations that AQI received any of [the funds provided to the bank] or that HSBC knew or intended that AQI would receive the funds." *Siegel*, 933 F.3d at 225.

Plaintiffs allege the opposite facts here. Far from having "little reason to suspect" they were playing a role in the al-Qaeda Terror Syndicate's activities, U.S. officials explicitly informed Defendants that they were enabling terrorist attacks against Americans. Compl. ¶ 149. Likewise, instead of making a "decision not to provide banking services to" Fatima before the attacks that killed Plaintiffs' family members, Defendants continued to provide financial services to Fatima after their January 2013 meeting. *Id.* ¶ 150, § III.B. Finally, whereas there were no allegations in *Siegel* that the defendant ever processed even a single transaction that specifically went to an FTO (as opposed to processing transactions for a bank that may have separately provided assistance to an FTO), here the Defendants' linkage to the attacks perpetrated by the al-Qaeda Terror Syndicate after January 2013 is clear. *Id.* ¶¶ 31, 38, 151-58.

<u>State of Mind</u>. Defendants argue that the "Complaint fails to allege what Defendants' 'state of mind' was," Mot. at 19, but Plaintiffs allege that Defendants acted with actual knowledge of the

specific risks of violence inherent in their continued assistance to Fatima.  Defendants also argue

that Plaintiffs do not allege that Defendants "provided banking services to Fatima intending to

support" terrorists, *id.* at 19, but as discussed above, *see supra* at 15-16, JASTA does not require

a showing of intent.  Rather, the "state of mind" factor "favors aiding-and-abetting liability because

defendants' assistance was knowingly provided with a general awareness that it supported the

terrorist acts of a notoriously violent terrorist organization."  *Atchley*, 22 F.4th at 223.

> Period of Assistance. With respect to the "period of defendant's assistance," Plaintiffs

allege that SCB provided financial services to Fatima since 2001—and continued to provide

services that directly enabled CAN production well after the January 2013 meeting with U.S.

officials.  Compl. ¶ 150-58; *see also* ECF No. 22-3 ("Documents seen by The Mail on Sunday

show that the British bank provided foreign exchange and export finance services to Fatima Group

from 2009 until at least 2014").  Consistent with this lengthy relationship, Fatima's own financial

reports identified SCB as one of the "MAJOR BANKERS OF THE COMPANY," Compl. ¶ 140,

and the SCB network continued to serve Fatima until at least 2016, *id.* ¶ 157.  This decades-long

relationship is more than sufficient to satisfy Plaintiffs' burden at the pleading stage.

### D.    JASTA Does Not Contain A Separate "Proximate Causation" Requirement

> The Court should swiftly reject Defendants' argument that "Plaintiffs' theory also fails to

meet the baseline proximate causation requirements for an ATA claim."  Mot. at 20.  Most

importantly, Defendants do not cite any JASTA cases in support of this proposition because an

aiding and abetting claim does not contain an independent proximate causation requirement.

Secondary liability, by definition, makes a secondary actor liable for injuries *proximately caused*

*by a primary actor's conduct.  See Halberstam*, 705 F.2d at 477 (defining causation as whether "the

party whom the defendant aids . . . perform[s] a wrongful act that causes an injury"). As the

Second Circuit explained in *Linde v. Arab Bank, PLC*, "[c]ausation focuses on the relationship

24

between an alleged act of international terrorism and a plaintiff's injury. . . . By contrast, aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct." 882 F.3d 314, 330 (2d Cir. 2018).

Defendants rely on *Rothstein v. UBS*, but that case was addressing primary liability and was decided three years before JASTA formally codified secondary liability into the ATA. 708 F.3d 82 (2d Cir. 2013). In *Rothstein*, the Second Circuit addressed an ATA primary liability claim under § 2333(a), holding that the "by reason of" language in the statute requires a showing of proximate causation. *Id.* at 89.

Plaintiffs' claim here is predicated solely on JASTA's secondary liability right of action under § 2333(d). They therefore are not required to plead that Defendant's conduct itself constituted "an act of international terrorism" which proximately caused Plaintiffs' injuries. As discussed in detail above, "the proper legal framework for assessing JASTA claims is that set out in" *Halberstam. Kaplan*, 999 F.3d at 856. None of the *Halberstam* elements relate to proximate causation, and Defendants do not dispute here that the al-Qaeda Terror Syndicate was responsible for the attacks that caused Plaintiffs' injuries. Therefore, because "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct," rather than "the relationship between an alleged act of international terrorism and a plaintiff's injury," *Linde*, 882 F.3d at 331, Plaintiffs need only plausibly plead—as they have—that the al-Qaeda Terror Syndicate proximately caused the attacks at issue and that Defendants knowingly and substantially assisted Fatima's tortious enterprise.

## CONCLUSION

For all these reasons, Defendants' motion to dismiss should be denied in its entirety or, in the alternative, the Court should grant Plaintiffs jurisdictional discovery.

Dated: New York, New York
August 24, 2022

Respectfully Submitted,

JENNER & BLOCK LLP

By:      /s/ *Lee S. Wolosky*
   Lee S. Wolosky
   Andrew J. Lichtman
   Thomas J. Bullock
   JENNER & BLOCK LLP
   1155 Avenue of the Americas
   New York, NY 10036
   Telephone: (212) 891-1628
   Fax: (212) 891-1699
   lwolosky@jenner.com
   alichtman@jenner.com
   tbullock@jenner.com

   Doug A. Mitchell
   JENNER & BLOCK LLP
   1099 New York Ave NW # 900
   Washington, DC 20001
   Telephone: (202) 639-6090
   dmitchell@jenner.com

   OSEN LLC

By:      /s/ *Gary M. Osen*
   Gary M. Osen
   Ari Ungar
   Michael J. Radine
   OSEN LLC
   190 Moore Street, Suite 272
   Hackensack, New Jersey 07601
   Telephone: (201) 265-6400
   Fax: (201) 265-0303
   gosen@osenlaw.com
   aungar@osenlaw.com
   mradine@osenlaw.com

   *Attorneys for Plaintiffs*