1155 AVENUE OF THE AMERICAS, NEW YORK, NY 10036-2711

JENNER&BLOCK LLP

January 23, 2023

Lee Wolosky
Tel +1 212 891 1628
LWolosky@Jenner.com

**VIA ECF**

The Honorable Edgardo Ramos
U.S. District Court Judge
U.S. District Court for the Southern District of New York
40 Foley Square
New York, New York 10007

Re:   *Bonacasa et al. v. Standard Chartered PLC et al.*, Case No. 22-CV-3320 (S.D.N.Y.)

Dear Judge Ramos:

We write on behalf of Plaintiffs in the above-captioned case in response to Defendants Standard Chartered PLC and Standard Chartered Bank's (collectively, "Standard Chartered") January 3, 2023 letter informing the Court of a recent decision issued by Judge Hector Gonzalez in the Eastern District of New York. *See Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-cv-04400, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022). Contrary to Standard Chartered's argument, *Wildman* does not support dismissal here both because of fundamental factual distinctions between the manner in which the facts are alleged in the two cases and because *Wildman*'s legal analysis is deeply flawed.

To begin, in stark contrast to Plaintiffs' narrowly-focused Complaint—which concerns direct evidence of Standard Chartered's actual knowledge that it was aiding and abetting terrorist attacks through its provision of financial services to Fatima—the plaintiffs in *Wildman* brought a sprawling 608-page complaint against nine corporate defendants that describes an exceedingly complex "international criminal network." *Wildman*, 2022 WL 17993076, at *3 (internal quotations omitted). "Despite its length," Judge Gonzalez explained in *Wildman*, "the Complaint is less a novel, and more a series of vignettes describing a wide range of criminal activity. While these vignettes often go into great detail about the complex interplay between different criminal players, and how those criminals or terrorists contributed to Plaintiffs' injuries, none of them sufficiently allege that any Defendant was ever aware of any of these connections, or that the alleged assistance Defendants provided 'substantially' helped these criminal players cause Plaintiffs' injuries." *Id.* at *5.[1]

---

[1] For example, the *Wildman* plaintiffs, in looking to make their case against Standard Chartered, describe in great depth the "existence of the Afghanistan-to-Russian Opium Pipeline," including detailing the way

January 23, 2023
Page 2

Indeed, the sweeping complaint in *Wildman* describes financial services provided to over 14 different organizations and individuals across the globe. *Id.* at *3-4. Not surprisingly, then, the portion of the *Wildman* complaint that focuses on Standard Chartered contains allegations that span far beyond Fatima. The *Wildman* plaintiffs allege that Standard Chartered transacted with the "VAT fraudster [Samir] Azizi," the "notorious Haqqani Network-aligned warlord in Afghanistan" Kikmatullah Shadman, the National Iranian Tanker Company, and the notorious Russian arms dealer Viktor Bout, among others. *Id.* at *18. None of these allegations has anything to do with Fatima.

As for the *Wildman* allegations that *do* concern Fatima, they comprise an exceedingly narrow sliver of the *Wildman* case, as evidenced by the fact that Judge Gonzalez devoted just over 2 pages of his 61-page decision to Fatima. *Id.* at *19.

*Wildman*'s limited discussion of Fatima was, in any event, based on an erroneous application of the Anti-Terrorism Act ("ATA"). Most fundamentally, *Wildman*'s analysis of the "general awareness" prong does not recognize the difference between the typical ATA case, in which the inquiry focuses on whether the defendant should have been aware of warning signs and red flags about its customers, *see* ECF No. 25 at 15-16, and this case, in which Plaintiffs allege that Standard Chartered was specifically informed of its role in aiding terrorists. In fact, *Wildman* never mentions *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010), which is perhaps the only other ATA case containing allegations that the defendant bank was apprised by government officials that accounts at the bank were being used to fund terrorism. *See Wultz*, 755 F. Supp. 2d at 51 (crediting allegations that Israeli officials provided actual knowledge that certain Bank of China ("BOC") accounts were for being used by the terrorist group PIJ and demanded their closure, "'but the BOC . . . ignored this demand and continued to carry out further PIJ Transfers'" (quoting operative complaint)). Here, government officials met directly with the bank to provide detailed information about specific bank accounts being used to facilitate acts of terrorism, but that warning remained unheeded and the accounts remained open. ECF No. 25 at 21.

In a single paragraph, *Wildman* dismisses the U.S. government's extraordinary decision to meet with Standard Chartered, claiming that Standard Chartered merely "was made aware of the fact that a small portion of Fatima and Pakarab's products was being misused." 2022 WL 17993076, at *19. That is not what Plaintiffs allege here. Rather, here Plaintiffs allege that U.S. officials informed Standard Chartered that Fatima supplied the ammonium nitrate used in 80% of the explosives used in Afghanistan; they provided Standard Chartered with detailed evidence and

---

in which "opium is grown by the Taliban in Afghanistan; exported by al-Qaeda, the Haqqani Network, and D-Company; smuggled into and through Iran with the help of General Gholamreza Baghbani of Iran's Islamic Revolutionary Guard Corps Qods Force; and ultimately winds up in the hands of the Russian mafia." 2022 WL 17993076, at *5 (internal citations omitted). But Standard Chartered and the other "Defendants only come in at the very end of this story," and without any "nexus" to the "alleged terrorist attacks that injured Plaintiffs." *Id.*

January 23, 2023
Page 3

casualty statistics; and they urged Standard Chartered to stop providing financial services to Fatima.  ECF No. 25 at 7, 16-17.  Thus, Plaintiffs allege that Standard Chartered was directly informed by the U.S. government that terrorist attacks on U.S. service members would be the inevitable consequence of its continued assistance to Fatima.  In concluding otherwise, *Wildman* cites to *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021), but in those cases, the plaintiffs failed to allege even circumstantial evidence establishing contemporaneous knowledge.  *See* ECF No. 25 at 22-23 (distinguishing *Siegel*); *Honickman*, 6 F.4th at 501 (affirming dismissal of complaint where plaintiffs' "general awareness" allegations were based on newspaper articles and other public sources that were undated or dated after the attacks at issue).

Along the same lines, *Wildman* summarily concludes that Standard Chartered's provision of "foreign exchange and export finance services" and "letters of credit" to Fatima were "routine banking services."  *Wildman*, 2022 WL 17993076, at *19.  Providing "routine services" to a terrorist organization, directly or indirectly, is not a defense.  *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858 (2d Cir. 2021) (holding that *Linde* did not establish a "routine" conduct defense as a matter of law).  But, in any event, there is nothing "routine" about continuing to provide financial services after the U.S. government advises that the customer is supplying al-Qaeda's bomb making factories that are responsible for the murder of Americans, and takes the highly unusual step of urging the bank to end the relationship.  Again, Plaintiffs are aware of only one other ATA case with similar extraordinary allegations concerning government intervention (*i.e.*, *Wultz*), which *Wildman* does not address, and which survived a motion to dismiss.

*Wildman* also makes much of the argument that "a small portion, around one percent" of Fatima's fertilizer was used by FTOs, 2022 WL 17993076, at *19, but that allegation is nowhere in the Complaint here and thus both distinguishes *Wildman* and surfaces a factual dispute, which must be resolved in Plaintiffs' favor at this stage.  *See Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016) (when evaluating a 12(b)(6) motion to dismiss, the court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor").  In any event, a bank's tortious or illegal conduct is not immunized simply because its "assistance went to [a] customer[] who also performed non-terrorist activities."  *Averbach v. Cairo Amman Bank*, No. 19-cv-0004, 2022 WL 2530797, at *15 (S.D.N.Y. Apr. 11, 2022) (R&R) (recommending denial of motion to dismiss aiding-and-abetting claims).

In this case, the key points for purposes of satisfying the ATA's "general awareness" prong are: (1) the U.S. government directly and specifically informed Standard Chartered that Fatima's product was used in the vast majority of the al-Qaeda Terrorist Syndicate's bombs; (2) Standard Chartered's  continued provision of financial services to Fatima would result in the death and dismemberment of American service members; and (3) despite being shown that its provision of financial services to Fatima was supporting terrorist activity, Standard Chartered rebuffed U.S. government warnings and continued providing financial services to Fatima.

January 23, 2023
Page 4

*Wildman* next determines that "Plaintiffs do not allege that Fatima and Pakarab directly supplied FTOs with fertilizer—they supplied fertilizer to Pakistani farmers and fertilizer dealers, some of which was eventually smuggled into Afghanistan to produce IEDs." 2022 WL 17993076, at *19. But even if that was what Plaintiffs alleged here (and it is not), this has no legal import. The Second Circuit has confirmed on multiple occasions that an ATA defendant may be liable for providing either direct or indirect assistance. ECF No. 25 at 13-14. Moreover, whether the aid was direct or indirect does not bear on the "general awareness" inquiry, but instead concerns the "aiding party who causes injury" element. *Id.* But perhaps more to the point, Plaintiffs here do not allege that Fatima merely supplied "Pakistani farmers and fertilizer dealers." Rather, Plaintiffs allege that "Fatima sold [ammonium nitrate] to entities it knew were fronts for the Taliban and the Haqqani Network and knew were involved in making Explosive Devices for use in terrorist attacks committed by the al-Qaeda Terror Syndicate." ECF No. 1 ¶ 127; *see id.* ¶ 148 ("In January 2013, Lt. General Barbero and other U.S. officials met with Standard Chartered's senior executives at SCB's New York office to 'warn that the Pakistani fertilizer firm was helping to supply the Taliban with materials used in the manufacture of deadly homemade bombs.'"). This is clearly sufficient under applicable Second Circuit law. *See, e.g.*, *Honickman*, 6 F.4th at 500 ("Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice.").

Similarly, *Wildman* concludes that "there is no allegation that either Fatima or Pakarab was 'controlled' by a FTO," 2022 WL 17993076, at *19, but there is no such requirement under the ATA. Rather, the crux of the "general awareness" inquiry is foreseeability, and there can be no serious dispute that, after Standard Chartered's January 2013 meeting with the U.S. government, future attacks on U.S. service members were a foreseeable—if not inevitable—consequence of Standard Chartered's conduct. ECF No. 25 at 18. Moreover, as a factual matter, Plaintiffs here have clearly pleaded that Fatima is a rogue entity, which (1) knew that its fertilizer was being used in explosive devices, (2) knew that its fertilizer was responsible for most of the U.S. deaths in Afghanistan, (3) repeatedly lied to the U.S. government about taking steps to curtail the flow of fertilizer to terrorists, and (4) continued to sell fertilizer to the al-Qaeda Terror Syndicate despite being aware that Afghanistan imposed a ban on the importation of its fertilizer. *Id.* *Wildman* does not consider any of these allegations.

*Wildman* also concludes that Fatima was not "closely intertwined" with the al-Qaeda Terror Syndicate, but that finding misconstrues the law and the facts. 2022 WL 17993076, at *19. Fatima was "closely intertwined" with the al-Qaeda Terror Syndicate's violent activities since "[a]lmost all of the ammonium nitrate used in the Taliban's bombs comes from two big fertilizer plants in Pakistan, both owned by the Fatima Group." ECF No. 1 ¶ 144. And as the quote from *Honickman* makes clear, the "closely intertwined" language does not require direct evidence of actual knowledge, as it asks whether the intermediary was "so closely intertwined with [the terrorist's] violent activities that one can *reasonably infer* that [the bank] was generally aware of its role." 6 F.4th at 501 (emphasis added). This standard makes sense in the context of a case involving warning signs and red flags because it provides a limitation on whether it is reasonable to *infer*

January 23, 2023
Page 5

general awareness. But where, as here, Plaintiffs allege direct evidence of actual knowledge, no such inferences are needed.

Finally, *Wildman* concludes that Standard Chartered did not provide "substantial assistance" under the *Halberstam* factors, but *Wildman*'s analysis hardly even mentions Fatima. 2022 WL 17993076, at *20. Instead, *Wildman* focuses on the plaintiffs' other "vignettes," such as Standard Chartered's "multi-year relationship with Hisawi, Bout, and Bari." *Id.*

For all these reasons and those discussed in Plaintiffs' opposition brief in this case, Plaintiffs satisfy the "general awareness" and "substantial assistance" elements here, and Standard Chartered's motion to dismiss should be denied. ECF No. 25 at 19-25.

Respectfully Submitted,

/s/ Lee Wolosky

Lee Wolosky


cc:     Counsel of Record (by ECF)