UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIANA BONACASA, VINCENT BONACASA,
RAQUEL BONACASA, BARBARA
ROSENDAHL, JEFFREY MUNCY, GILBERT
RUSSELL, ABIGAIL RUSSELL, SARAH
RUSSELL, NOEMI RUSSELL, BENJAMIN
RUSSELL, NATHANAEL RUSSEL, DEBBIE
WILLIAMS, and CHELSEA MANGANO,

              Plaintiffs,

– against –

STANDARD CHARTERED PLC and
STANDARD CHARTERED BANK,

              Defendants.

**OPINION & ORDER**

22 Civ. 3320

RAMOS, D.J.:

      Plaintiffs bring this action pursuant to the Anti-Terrorism Act ("ATA"), as amended by

the Justice Against Sponsors of Terrorism Act ("JASTA"), alleging that Standard Chartered PLC

("SC PLC")—through its subsidiary, Standard Chartered Bank ("SCB") (together with SC PLC,

"Standard Chartered")—aided and abetted al-Qaeda by providing banking services to the Fatima

Group ("Fatima"), a Pakistani fertilizer company that purportedly supplied al-Qaeda with

materials used to make improvised explosive devices ("IEDs").  Doc. 1.  Diana Bonacasa,

Vincent Bonacasa, Raquel Bonacasa, Barbara Rosendal, Jeffrey Muncy, Gilbert Russel, Abigail

Russel, Sarah Russel, Noemi Russel, Benjamin Russel, Nathaniel Russel, Debbie Williams, and

Chelsea Mangano are family members of service members killed by such explosive devices in

Afghanistan between 2013 and 2015.

Pending before the court is Standard Chartered's motion to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. Doc. 20. For the reasons set forth below, Standard Chartered's motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND[1]

In the early 2000s, during the American war in Afghanistan, members of al-Qaeda attacked U.S. service members to drive them out of Afghanistan.[2] ¶¶ 45, 52. To that end, al-Qaeda established bomb-making factories in the Federally-Administered Tribal Areas of Pakistan, where the Pakistani Taliban would manufacture explosives for al-Qaeda and the al-Qaeda Terror Syndicate.[3] ¶¶ 55, 109. The IED was one type of bomb these factories produced. ¶ 55. The main explosive ingredient in the vast majority of IEDs at that time was calcium ammonium nitrate ("CAN"), which is used in agricultural fertilizers.[4] ¶¶ 96, 101. These CAN-based IEDs were responsible for about ninety percent of American IED casualties in Afghanistan. ¶ 125.

In 2010, Afghanistan banned the importation, production, transportation, use, sale, and storage of CAN. ¶ 103. In 2011, Pakistan also adopted a policy to prevent the smuggling of CAN into Afghanistan, which included a counter-IED public awareness campaign, training, and

---

[1] The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F. 3d 141, 145 (2d Cir. 2012). Unless otherwise noted, citations to "¶ __" refer to the complaint, Doc. 1.

[2] Al-Qaeda is a Sunni Islamic terrorist organization originally founded during the Soviet occupation of Afghanistan in the late 1980s. ¶ 52. It was designated as a Foreign Terrorist Organization ("FTO") in 1999 and continues to be designated as an FTO today. ¶ 53. The al-Qaeda Terror Syndicate (the "Syndicate") was a "closely affiliated" group of organizations—led by al-Qaeda—that came together in the early 2000s to eliminate the U.S. presence in Afghanistan through violence. ¶¶ 45–46, 49–50. Al-Qaeda often planned, reviewed, approved, authorized, and participated in attacks carried out by members of the al-Qaeda Terror Syndicate; al-Qaeda and its sister organizations were so closely aligned that individual terrorists moved back and forth from organization to organization within the Syndicate with such fluidity that, during the relevant period, the terrorist organizations were no longer truly distinct. ¶¶ 49–50.

[3] The Pakistani Taliban is a designated FTO that is part of the Syndicate. ¶¶ 75, 79. The U.S. State Department considered the Pakistani Taliban to have a symbiotic relationship with al-Qaeda during the early 2010s; for example, the Pakistani Taliban provided al-Qaeda with a safe haven in areas along the Afghan-Pakistani border. ¶¶ 77, 80.

[4] This ingredient, however, was not widely used to support agriculture at the time, as "more suitable" and "less expensive" alternatives existed. ¶ 96. Indeed, CAN fertilizer then accounted for as little as five percent of all fertilizer used in the Afghani region. ¶ 98. And when Afghanistan banned the use of CAN fertilizer, other effective, nonexplosive fertilizers were available for agricultural purposes. ¶ 103.

strengthened legislation.  ¶¶ 106–07.  But the flow of CAN into Afghanistan did not stop.[5]  ¶¶
109–111.  Around this time, news organizations began to take notice of this problem.  On
September 1, 2011, for example, the *Associated Press* published an article, noting that the "main
in gradient in most of the homemade bombs [used by the Syndicate] . . . is fertilizer produced by
a single company in Pakistan," with one plant alone producing enough CAN "fertilizer for at
least 140,000 bombs" in a single year.  ¶ 141.

     In August 2011, the U.S. government began working to limit the access of al-Qaeda and
its allies to CAN.  ¶ 126.  Fatima, a Pakistani fertilizer company, supplied al-Qaeda with almost
all of its CAN.  ¶ 127.  That month, United States Army Lieutenant General Michael Barbero
discussed al-Qaeda's use of CAN with Fawad Mukhtar, Fatima's Chairman, on the phone.  ¶
127.  The two met in Virginia later in 2011, where General Barbero told Chairman Mukhtar that
the CAN fertilizer from Fatima's plants was responsible for most U.S. service member deaths
from IEDs in Afghanistan.  ¶ 129.  Fatima agreed to add dye to its fertilizer—so that U.S.
officials could more easily detect and seize CAN being smuggled across the Afghan border—and
to stop selling CAN to dealers near the Afghanistan-Pakistan border.  ¶ 130.  But Fatima never
added dyes to its fertilizer.  ¶¶ 130–31.  After giving a tour of one of its factories to U.S.
officials, Fatima cut off contact with the U.S. government, directing it to communicate with
Fatima through the Pakistani Foreign Ministry.  ¶ 131.

     In 2012, U.S. officials again attempted to convince Fatima to implement CAN-
preventative measures, such as using dye, but Fatima refused to do so.  ¶ 132; *see also* ¶ 143
(describing a May 5, 2012 article published by the *Khaama Press Agency*—at that time,
Afghanistan's largest online news service—which reported that "Fatima Group . . . ha[d] not
been cooperative" with U.S. officials) ¶¶ 144–45 (quoting an August 19, 2012 article published
by the Washington Post article, reporting that Pakistan's Inter-Services Intelligence Agency had

---

[5] Reported IED explosions increased from 9,300 in 2011 to 14,500 in 2012.  ¶ 119.  And in 2012, the United States
seized 440 tons of CAN in Afghanistan—up from 30 tons in 2009.  ¶ 110.

"put the clamps on" U.S. efforts with Fatima).[6]  On December 13, 2012, General Barbero testified before the U.S. Senate Committee on Foreign Relations, explaining that "no progress or minimal progress" had been made with Fatima, despite continued efforts on part of U.S. officials.  ¶ 143; Doc. 22-2 at 15.[7]  American requests continued into May 2013, when Fatima told U.S. officials that it was working on a new fertilizer formula that would make it harder for insurgents to turn its CAN fertilizer into explosives.  ¶¶ 135–36.  But Fatima's production of CAN fertilizer continued.

SC PLC is an international bank based in London with more than 1,700 branches across 60 countries.  ¶ 28.  SCB is a wholly owned subsidiary of SC PLC, with a principal place of business is in London, England.  ¶ 29.  SCB was Fatima's "major banker" during this time.  ¶¶ 139–140.  SCB provided Fatima with various day-to-day banking services, such as dollar clearing, export financing, and foreign exchange services through SCB's New York branch; approximately $195 billion are processed daily through the New York branch, which is the overwhelming majority of SCB's transactions.  ¶¶ 31, 153.  SCB and Standard Chartered Pakistan Ltd. ("SCB Pakistan"), a wholly-owned subsidiary of SCB, also provided substantial project financing to Fatima, whose best-selling product by volume was CAN.  ¶¶ 152–53.  For instance, SCB provided Fatima with a $22 million "specially structured" loan to remove CAN production bottlenecks.  ¶¶ 154–55.  In addition, SCB Pakistan provided Fatima with other loans and investments that amounted to millions of dollars.  ¶¶ 156–57.

In January 2013, after unsuccessfully pressing Fatima to address the CAN issue, General Barbero and other officials met with SCB senior executives at SCB's New York office.  ¶ 148;

---

[6] Standard Chartered's declaration in support of its motion, Doc. 22, provides the Court with a copy of this article: Washington Post, *Afghan Insurgents Use Pakistan Fertilizer for Bombs*, CHICAGO DAILY HERALD (Aug. 19, 2012), https://www.dailyherald.com/article/20120818/news/708189833, Doc. 22-1.  The Court considers this document incorporated by reference in the complaint, because "the complaint [] make[s] 'a clear, definite, and substantial reference to the document[],'" by quoting from it.  *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)).

[7] Standard Chartered's declaration in support of its motion, Doc. 22, provides the Court with a copy of the December 13, 2022 U.S. Senate Foreign Relations Committee hearing transcript, Doc. 22-2.  The Court takes judicial notice of this document, as incorporated into the complaint by reference.  *DeLuca*, 695 F. Supp. 2d at 60.

*see* Doc. 22-3 at 3.[8]  U.S. officials sought to warn Standard Chartered that Fatima was supplying the Taliban with materials used to make IEDs.  *Id.*  Specifically, U.S. officials informed Standard Chartered that Fatima supplied the Taliban with vast quantities of CAN fertilizer, which was used in approximately 80% of the IEDs used against American service members in Afghanistan.  ¶ 149.  U.S. officials also told Standard Chartered that Fatima was unresponsive to U.S. efforts to curtail CAN availability and that it repeatedly refused to cooperate with American authorities.  *Id.*  U.S. officials presented Standard Chartered with a map of Fatima's plants and photographs, which included "bags of [CAN] fertilizer seized . . . from Taliban (including Haqqani Network) terrorists."[9]  *Id.*  U.S. officials urged Standard Chartered to stop providing financial services—including foreign exchange and export financing services through its New York branch—to Fatima and for Standard Chartered to end their relationship.  *Id.*  Such efforts proved "utterly useless," as General Barbero said, and Standard Chartered continued to provide financial services to Fatima.  Doc. 22-3 at 3.  Barbero said that Standard Chartered "enabled" the Syndicate, "or at least looked the other way" when "presented with the evidence" of its role in furthering terrorism.  *Id.*

Between July 2013 and December 2015, Plaintiffs' family members—U.S. servicemen Louis Bonacasa, Michael Cinco, Kurt Muncy, Jonam Russell, and Keith Williams—were killed by IEDs in Afghanistan.  ¶¶ 180–81, 188–89, 194, 198, 207.  In July 2013, Muncy was killed with a planted IED and Russell was killed by a suicide bomber.  ¶¶ 194, 198.  Williams was killed a year later, in July 2014, when he was riding in a U.S. military vehicle as it drove over an IED.  ¶ 207.  Bonacasa and Cinco were killed in December 2015.  ¶¶ 182, 189.  They were

---

[8] Standard Chartered's declaration in support of its motion, Doc. 22, provides the Court with a copy of the following December 8, 2019 article: Adam Luck, *US General Claims He Told Standard Chartered Its Client helped the Taliban – But the Bank Did Nothing*, THE MAIL ON SUNDAY (Dec. 7, 2019), https://www.thisismoney.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html, Doc. 22-3.  Because the complaint quotes directly from this article, *see, e.g.,* ¶ 148, the Court takes judicial notice of it as incorporated into the complaint by reference.  *DeLuca*, 695 F. Supp. 2d at 60.

[9] The Haqqani Network is a specially designated global terrorist organization that has operated in Afghanistan since the 1970s.  ¶¶ 82, 86.  It is part of the Taliban, closely affiliated with and integrated into al-Qaeda, and a part of the Syndicate.  ¶ 83, 90–91.

conducting human intelligence operations when a suicide bomber on a motorcycle approached their team.  ¶ 180.  Bonacasa moved in between himself and the bomber in an attempt to shield his team members from harm.  ¶ 181.  But the bomber detonated the explosives, killing them. ¶¶ 182, 189.

## II.   PROCEDURAL HISTORY

Plaintiffs filed the instant action on April 22, 2022:  they seek (1) judgment against Standard Chartered under the ATA, 18 U.S.C. § 2333; (2) an award of the maximum amount of compensatory damages, and treble any compensatory damages awarded under the ATA; (3) attorney's fees and costs incurred in this action; and (4) prejudgment interest.  Doc. 1.  On May 17, 2022, the parties sent a joint letter to the Court, asking the Court to adopt their proposed deadline for Standard Chartered's response to the complaint, provide deadlines in the filing of pre-motion letters, and ratify that Standard Chartered had waived the service of process.   Doc. 9. The Court adopted the proposed order on May 18, 2022.  Doc. 10.  Pending before the Court is Standard Chartered's August 3, 2022 motion to dismiss the complaint in its entirety for lack of jurisdiction or failure to state a claim.  Doc. 20.

## III.   LEGAL STANDARD

### a.   Rule 12(b)(2)

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."  *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) (internal quotation marks omitted).  As the Court evaluates a Federal Rule of Civil Procedure ("FRCP") 12(b)(2) motion, it must construe all of the plaintiff's allegations as true and resolves all doubts in his favor.  *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).  "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'"  *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan*

*Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).  As 12(b)(2) motions are "inherently . . . matter[s] requiring the resolution of factual issues outside of the pleadings," courts may rely on additional materials when ruling on such motions.  *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992 WL 26765, at \*1 n.1 (S.D.N.Y. Feb. 5, 1992); *accord Darby Trading Inc. v. Shell Int'l Trading and Shipping Co.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008).

### b. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to FRCP 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Christie's Int'l PLC*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## IV.   DISCUSSION

### a. Personal Jurisdiction[10]

---

[10] Standard Chartered asserts—and Plaintiffs do not contest—that this Court does not have general jurisdiction over Standard Chartered.  Doc. 21 at 6–7; Doc. 25 at 12–16.

Plaintiffs assert that the Court has personal jurisdiction over SC PLC and SCB pursuant to both FRCP 4(k)(1)(C), *i.e.*, service of process-based jurisdiction, and C.P.L.R. § 302(a)(1), New York's long-arm statute, and that personal jurisdiction comports with due process. For the reasons set forth below, the Court finds that it has jurisdiction over SCB but not SC PLC.

> i.   *Service of Process-based Personal Jurisdiction*

 "Filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by statute." FRCP 4(k)(1)(C). And the ATA provides that "[p]rocess in [] a civil action may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a); *see Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 26 (E.D.N.Y. 2016) (noting that the ATA "expressly authorizes nationwide service of process[.]"); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (acknowledging the ATA's nationwide service of process provision as a possible basis for personal jurisdiction). The parties have agreed that service of the summons and complaint on SC PLC's and SCB's agents in New York—their lawyers—was proper. Doc. 9. Accordingly, the procedural requirements to establish personal jurisdiction pursuant to FRCP 4(k)(1)(C) are satisfied.

However, the statutory basis for personal jurisdiction "does not answer the constitutional question of whether due process is satisfied." *Waldman v. PLO*, 835 F.3d 317, 343 (2d Cir. 2016). Rather, the Due Process Clause "requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's [ATA] claim." *Bernhardt v. Islamic Republic of Iran*, 2022 WL 4074415, at *4 (D.C. Cir. Sept. 6, 2022).

> ii.   *The Long-Arm Statute*

"Because the New York long-arm statute is more restrictive than the federal due process requirements, by virtue of satisfying the long-arm statute[,] the minimum contacts and reasonableness requirements of due process [will] similarly be[] met." *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 108 (S.D.N.Y. 2015).

C.P.L.R. § 302(a)(1) provides that [a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary .

. . who . . . transacts any business within the state . . . ." C.P.L.R. § 302(a)(1).  As the long-arm statute makes clear, the business subjecting the non-domiciliary must be "arguably connected" to the controversy to satisfy the statute's arising from prong.  *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 130 (2d Cir. 2022).  Transacting business is defined as purposeful activity, meaning "some act by which the defendant purposefully avails [itself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d. Cir. 2007).  Section 302(a)(1) is a "single act" statute, meaning "a single transaction of sufficient quality may invoke jurisdiction, provided that the transaction was purposeful, and the necessary relationship between the transaction and the claim asserted exists."  *Id.* at 248.

Here, Plaintiffs allege that certain actions taken by SCB constitute transacting business in New York.[11]  For decades, SCB has had its United States headquarters in New York.  ¶¶ 30, 39; *About*, STANDARD CHARTERED https://www.sc.com/us/about/ (last visited November 30, 2022) ("[e]stablished in New York in 1902" and [h]eadquartered in New York," Standard Chartered Americas is "a center of expertise for product groups").  Moreover, U.S. officials, including General Barbero, met SCB executives in its New York office, where the U.S. officials explained in detail how its client Fatima was aiding the Syndicate.  ¶¶ 41, 148.  In this meeting, U.S. officials told SCB that it was providing foreign exchange and export financing services to Fatima through its NY branch.  ¶ 149.  Moreover, the New York branch is where SCB provided Fatima with dollar clearing, foreign exchange, and trade financing services.  ¶¶ 31, 38, 138, 153, 155. And SCB processed the majority of its financial transactions through its New York branch.  ¶ 31.

Standard Chartered argues that this meeting "is insufficient as a matter of law" in satisfying the "arise from" prong of the long-arm statute.  Doc. 21 at 15–16; Doc. 26 at 6–7.

---

[11] Standard Chartered argues that the transactions between SCB Pakistan and Fatima are not relevant to the personal jurisdiction analysis, as SCB Pakistan is not a party to this suit and is a separate entity from Standard Chartered. Doc. 21 at 17.  The Court agrees.  *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary.").

That would be so if Plaintiffs relied exclusively on that allegation, but they do not. Instead, they rely on this meeting *in addition to* the services SCB's New York branch provided Fatima. *E.g.*, ¶¶ 31, 153, 155. The cases Standard Chartered cites illustrate this distinction. *Cf. Grp., LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 587, 589 (S.D.N.Y. 2016) (no personal jurisdiction where the defendant had no contractual relationship in New York and no physical presence in the state); *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 769 (S.D.N.Y. 2021) (dismissing complaint where the "vast majority" of the acts at issue occurred abroad, and the acts that did occur in New York occurred *after* the relevant time period).

*Licci v. Lebanese Canadian Bank* is controlling. 732 F.3d at 161. In that case, the Second Circuit concluded that "the use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful." *Id.* at 168 (quoting C.P.L.R. § 302(a)(1)). *Licci* also held that "repeated use" of such an account is sufficient to show purposeful availment of New York's commercial markets. *Id.* Moreover, "where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." *Id.* at 169. Because the allegations in *Licci* asserted that the defendant used the New York correspondent bank account "to funnel money to Shahid and Hizballah" on a recurring basis, the court had jurisdiction over the non-domiciliary bank defendant. *Id.* at 169, 171–72 n.7 ("[U]se of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct.").

Just as the complaint in *Licci* alleged that those defendants used financial transactions in New York to provide substantial assistance to Shahid and Hizballah, the instant complaint alleges that SCB's dollar clearing system—which processes payments in New York—provided Fatima (and, indirectly, the Syndicate) with substantial assistance in producing CAN. 732 F.3d at 168. While it is true that this complaint does not point to specific, Fatima-related transactions in New York, what follows from Plaintiffs' allegations is that Fatima used SCB's New York

office many times during its relationship with SCB.  Fatima became SCB's customer in 2001.  ¶ 139.  It received export financing, foreign exchange, and dollar clearing services through its New York branch.  ¶¶ 31, 149.  And SCB processed the "overwhelming majority" of its transactions through the New York branch.  ¶ 31.  It follows, therefore, that SCB used New York's banking system to facilitate significant transactions with Fatima many times over two decades, not "once or twice by mistake."[12]  *Licci*, 732 F.3d at 168.

       *iii.*    *Constitutional Due Process*

"To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances."  *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168–69 (2d Cir. 2015) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

Regarding minimum contacts, the Court must "evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test."  *Id.* at 169 (quoting *Licci*, 732 F.3d at 170).  Where specific jurisdiction is asserted, "minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Id.* (quoting *Licci*, 732 F.3d at 170)).

"If minimum contacts exist, the defendant has to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  *Id.* (quoting

---

[12] Cases in this Circuit applying *Licci* make clear that these allegations are sufficient to establish personal jurisdiction.  *See, e.g.*, *Averbach v. Cairo Amman Bank*, No. 19 Civ. 0004 (GHW) (KHP), 2020 WL 486860, at *6 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach for Est. of Averbach v. Cairo Amman Bank*, No. 19 Civ. 00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) (finding purposeful availment where the plaintiffs identified "fewer transfers through the [c]orrespondent [b]anks than identified by the plaintiffs in *Licci*"); *Alcon Lab'ys, Inc. v. Allied Vision Grp., Inc.*, No. 18 Civ. 02486 (MKB), 2018 WL 10550777, at *5–6 (E.D.N.Y. Dec. 22, 2018) (finding purposeful availment where the plaintiff alleged that "[d]efendants have shipped not a single but multiple orders of infringing Alcon products to customers in New York"); *cf. Waldman*, 835 F.3d at 342 (dismissing complaint where alleged connections to forum state related to "lobbying activities," not acts in support of terrorism); *Singer v. Bank of Palestine*, No. 19 Civ. 006 (ENV) (RML), 2021 WL 4205176, at *5 (E.D.N.Y. Apr. 30, 2021) (dismissing a complaint that failed to allege "a single transfer, dollar amount, transfer date, or the parties" involved in any New York banking activity).

*Licci*, 732 F.3d at 173). Ultimately, "[r]easonableness hinges on whether the assertion of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Chatwal*, 90 F. Supp. 3d at 107 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Court considers five factors in assessing reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Eades*, 799 F.3d at 169 (quoting *Chloe*, 616 F.3d at 164).

The five factors set out in *Eades* weigh in favor of exercising personal jurisdiction over SCB in this case. Even though this action is international in scope, the burden on SCB is minimal, as "the conveniences of modern communication and transportation" make evidence collection less costly—and SCB's headquarters and lawyers are in New York. *Licci*, 732 F.3d at 174. Moreover, "the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends" weighs strongly in favor of exercising jurisdiction. *Id.* The Plaintiffs also have a strong interest in obtaining relief.

And, importantly, exercising jurisdiction over SCB does not offend "traditional notion of fair play and substantial justice." *Chatwal*, 90 F. Supp. 3d at 107. *Licci* so found when the defendant controlled one bank account in New York—there are many more contacts in this case. SCB has maintained a branch in New York since 1902. *About*, Standard Chartered https://www.sc.com/us/about/ (last visited November 30, 2022). The New York branch runs dollar-clearing operations for SCB, which processes $195 billion a day. ¶ 31. That branch held about $40 billion in assets in 2012 and about $55 billion today. ¶ 32. And the New York branch is the "main corporate office" of SCB in the United States. ¶ 30. In light of SCB's "repeated"

and consistent use of New York's banking system, it can reasonably expect to be "haled into court" in New York.[13]  *Licci*, 732 F.3d at 171.

As to SC PLC, however, Defendants are correct that "due process demands that courts assess '[e]ach defendant's contacts . . . individually.'"  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)).  Complaints cannot "collapse" two entities into one for personal jurisdiction purposes.  *Id.*  And when it is "impossible to determine" which entity did what, a court cannot asses an individual entity's connection with the forum.  *Id.*  That was so in *Charles Schwab*, where the complaint only referred to the actions of the defendants as a group:  the complaint stated that the five entities, the "direct seller Defendants," "solicited and sold [billions of dollars in] debt instruments" to "Schwab in California."  *Id.* at 79.  It was thus impossible to discern what each entity did in California to make the exercise of jurisdiction reasonable.

The complaint here is similarly flawed in that it fails to state facts specific to SC PLC. All of the personal jurisdiction allegations discuss SCB or "Standard Chartered" collectively— none single out SC PLC's conduct, if any, in New York.  ¶¶ 19, 30–31, 140, 148–49, 154–55. For example, the complaint only mentions that SCB conducts dollar clearing operations in New York and has a branch in New York.  ¶¶ 30–31.  It says nothing about where SC PLC's dollar clearing operations are run, where it has branches, or what activity SC PLC's officers engage in.

---

[13] Standard Chartered's reliance on *Brown v. National Bank of Pakistan* is misplaced.  No. 19 Civ. 11876 (AKH), 2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022).  In *Brown*, the court dismissed the complaint because it only contained "generalized allegations and speculations that some funds were transferred through the New York branch based on an assumption that transactions from one currency to another are dollar transactions passing through Federal Reserve Banks in New York."  2022 WL 1155905, at *3.  Indeed, that complaint merely alleged that "many donations *likely* had at least some contact" with the New York financial system and that donations made in "local currencies, like Saudi Riyals, . . . *would have* been exchanged into U.S. dollars . . . ."  *Id.* (emphasis added).  Here, Plaintiffs allege more.  The complaint explains that the New York branch "processes approximately $195 billion per day on the Clearing House Interbank Payments System ("CHIPS")" and that "during the relevant period [] the *overwhelming majority* of SCB's transactions were denominated in U.S. dollars and therefore cleared and settled in New York through the NY branch."  ¶ 31 (emphasis added).  These statements provide sufficient specificity to draw the inference that the New York branch played a significant role in the conduct that Plaintiffs claim is illegal—the provision of financial services to support Fatima's CAN production.  *Cf. Singer*, 2021 WL 4205176, at *5–6 (allegations that the defendant used three correspondent bank accounts in New York—where it had no branch— "during the relevant period" were insufficient, as the allegations did not mention dates, amounts, or parties to the alleged transactions).

Accordingly, there are insufficient facts specific to SC PLC to establish personal jurisdiction over it.  The complaint states SCB's specific contacts with New York, however.  For instance, Plaintiffs allege that SCB is licensed in New York by the New York State Department of Financial Services and that it has been licensed in New York since 1976.  ¶ 30.  SCB operates a branch in New York—its main corporate office in the United States.  ¶ 30.  SCB uses the New York branch to conduct dollar clearing services, with the "overwhelming majority" of its transactions cleared and settled in New York.  ¶ 31.  These services are part of the support SCB provided Fatima.  ¶¶ 38, 153.  And SCB officials met with General Barbero and other U.S. officials about SCB's ties to Fatima in SCB's New York office.  ¶ 19.  Discounting the generalized allegations, the SCB-specific allegations are sufficient to establish personal jurisdiction over SCB.

### b.  12(b)(6)

The JASTA, which amended the ATA, provides that "[i]n an action . . . for an injury arising from an act of international terrorism committed, planned, or authorized by an organization . . . designated as a foreign terrorist organization . . . , as of the date on which such act of international terrorism was committed," liability accrues when a person "aids and abets" the act "by knowingly providing substantial assistance."  18 U.S.C. § 2333(d)(2).  Congress' stated intention in passing the JASTA was "to provide civil litigants with the broadest possible basis . . . to seek relief against persons [and] entities    . . . that have provided material support . . . to foreign organizations or persons that engage in terrorist activities against the United States," regardless of whether that assistance is provided "directly or indirectly."  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (quoting JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853).

By using the words "aid[ing] and abet[ting]," Congress adopted the framework articulated in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), to decide JASTA claims. Pub. L. No. 114-222, § 2(a)(5), 130 Stat. at 853; *Kaplan*, 999 F.3d at 856.  "[A]iding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who

give a degree of aid to those who do." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). The *Halberstam* framework is based on three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477. Standard Chartered argues that the complaint fails to plausibly allege any of these elements.

### i.   *Aid to Entity That Wrongfully Causes Injury*

The first *Halberstam* element is "satisfied when the party whom the defendant directly or indirectly aided performed the injury-causing act." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495 (2d Cir. 2021). Here, the Plaintiffs allege that their family members were killed by members of the Syndicate. ¶¶ 180, 189, 194, 198, 207. As discussed above, the Afghani Taliban, the Pakistani Taliban, the Haqqani Network, and al-Qaeda are all members of the Syndicate. ¶¶ 5, 71, 75, 83. The Pakistani Taliban, the Haqqani Network, and al-Qaeda were designated as FTOs at the time of the attacks.[14]   ¶¶ 53, 79, 88. Al-Qaeda led the Syndicate, providing it with training, supervision, resources, and technical-know-how. ¶ 50. The Syndicate's constituent organizations were so "closely affiliated" that they were "no longer truly distinct." ¶ 49. And members of the Syndicate used IEDs to kill Americans in the years preceding and post-dating the

---

[14] At the time of the attacks, the Afghani Taliban was (and it remains) a Specially Designated Global Terrorist and a terrorist organization for purposes of section 212(a)(3)(B) of the Immigration and Nationality Act. ¶¶ 67–68. It was never designated as an FTO. *Foreign Terrorist Organizations*, BUREAU OF COUNTERTERRORISM, DEP'T OF STATE, https://www.state.gov/foreign-terrorist-organizations/ (last visited Mar. 6, 2023). And the JASTA requires a designation as an FTO, as 8 U.S.C. § 1189(a) provides. *See* 18 U.S.C. § 2333(d)(2); *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 164 (2d Cir. 2021); *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 216 (D.C. Cir. 2022) (noting that "[s]econdary liability under the ATA is confined to injuries arising from acts of terrorism committed, planned, or authorized by a designated Foreign Terrorist Organization, which is a special designation made by the Secretary of State under the Immigration and Nationality Act, 8 U.S.C. § 1189") (internal citations and quotation marks omitted). Accordingly, if the attacks were committed by individuals who were only members of the Afghani Taliban—and such attacks was not "planned" or "authorized" by an FTO member of the Syndicate, a JASTA claim would be inappropriate. 18 U.S.C. § 2333(d)(2); *Atchley*, 22 F.4th at 217–18 (finding liability under the JASTA when Hezbollah, an FTO, "both planned and authorized" the attacks, even though an FTO did not carry out the attacks). That possibility is not dispositive here, however, as it is plausible that al-Qaeda, the Pakistani Taliban, or the Haqqani Network carried out, planned, or authorized the attacks that killed Plaintiffs' family members. *Koch*, 699 F. 3d at 145.

deaths of Plaintiffs' family members.  ¶¶ 111, 117.  Put together, these facts make plausible the allegation that a designated FTO "committed, planned, or authorized" the killing of Plaintiffs' family members.  18 U.S.C. § 2333(d)(2).

Standard Chartered argues Plaintiffs cannot establish this element because the complaint does not allege that Fatima was a "mere terrorist intermediary."  Doc. 21 at 7, 18.  However, the JASTA "does not say that for aiding-and-abetting liability to be imposed a defendant must have given substantial assistance to the principal; it simply says the defendant must have given 'substantial assistance.'"  *Kaplan*, 999 F.3d at 855–56 ("Congress's use of the uncabined phrase 'providing substantial assistance' without adding the word 'to,' was intentional rather than inadvertent"); *accord Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018).  In that sense, the defendant's substantial assistance can flow to the FTO "indirectly," such as through an "intermediary," even if the entity directly aided is not an FTO.  *Honickman*, 6 F.4th at 495–96 (quoting *Kaplan*, 999 F.3d at 856) (rejecting the contention that a defendant must "actually" aid the FTO); *accord Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 n.5 (2d Cir. 2019) ("[T]he statute does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations."); *Atchley*, 22 F.4th at 225 ("Congress anticipated aiding-and-abetting liability of indirect funders.").  Accordingly, because Standard Chartered provided substantial assistance to Fatima, a major supplier of the Syndicate's IEDs, the first *Halberstam* element is met.

### ii.  *General Awareness*

"For the *Halberstam* general-awareness standard, a plaintiff must plead . . . that the defendant was 'generally aware of his role as part of an overall illegal or tortious activity.'" *Kaplan*, 999 F.3d at 863 (quoting *Halberstam*, 705 F.2d at 487–88).  To be "generally aware," a defendant "need not know of or intend to bring about the specific attacks at issue."  *Freeman v. HSBC Holdings PLC*, No. 18-cv-7359, 2021 WL 76925, at *5 (E.D.N.Y. Jan. 7, 2021).  Rather, the plaintiff must show that the defendant was so closely intertwined with the terrorist activities that "one can reasonably infer that [the defendant] was generally aware while it was providing

banking services to those entities that it was playing a role in unlawful activities from which [the] attacks were foreseeable." *Honickman*, 6 F.4th at 499 (quoting *Kaplan*, 999 F.3d at 860–61) (marks omitted).  The scienter requirement for aiding and abetting is higher than "the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities."  *Linde*, 882 F.3d at 329–30

Two sets of allegations in the complaint establish that Standard Chartered knew that it was playing a role in the IED-making operations of al-Qaeda and the Syndicate:  (1) U.S. officials explicitly told Standard Chartered executives at a meeting in New York, and (2) the press covered Fatima's actions.

Plaintiffs allege that Standard Chartered actually knew of Fatima's connection to the Syndicate at the time of the attacks.  In January 2013, General Barbero met with senior executives of SCB at their New York branch to "warn that [Fatima] was helping to supply the Taliban with materials used in the manufacture of deadly homemade bombs."  ¶ 148.  The U.S. officials walked Standard Chartered's executives through the details of their investigation, explaining that "Fatima supplied vast quantities of the CAN fertilizer" to the Taliban.  They gave the executives a map of the Fatima plants, along with pictures of bags of fertilizer seized from the Taliban and Haqqani network.  *Id.*  The U.S. officials further explained that IEDs were the most common cause of service members' deaths and that Fatima had refused to cooperate with U.S. authorities to curtail the supply of fertilizer to terrorists used to make IEDs.  *Id.*  The U.S. authorities also informed the executives that Standard Chartered's New York Branch and SCB Pakistan provided foreign exchange and export financing services to Fatima.  *Id.*  They therefore asked Standard Chartered to end its business relationship with Fatima.  But Standard Chartered did not.  ¶ 150.  As General Barbero later said, Standard Chartered "enabled" the Syndicate.[15] Doc. 22-3 at 3.

---

[15] Standard Chartered argues that the fact that Fatima's public statements that it was complying with U.S. efforts to curtail IED production makes the fact that Fatima was not complying irrelevant.  Doc. 26 at 10 n. 4.  In other words,

Additionally, Plaintiffs point to several public sources to show that Standard Chartered knew that it was playing a role in Fatima's unlawful activities, which enabled the production of IEDs and attacks on American servicemen.[16]  An Associated Press article from 2011 described the IED problem as one where "the main ingredient of the homemade bombs" was coming from "a single company in Pakistan."  ¶ 141.  A 2012 article published in the Khaama Press Agency, which was Afghanistan's largest online news source at the time, explicitly mentioned that the "Pentagon's top counter-IED official" explained that "70% of the IEDs used in Afghanistan were made from a common agricultural fertilizer produced in Pakistan."  ¶ 143.  The article went on to mention that Fatima was responsible for this production, and that the official thought Fatima had "not been cooperative."  ¶ 143.  Another 2012 article, published by The Washington Post, summarized the IED proliferation issue, stating "[a]lmost all [CAN] comes from two big fertilizer plants in Pakistan, both owned by the Fatima Group."  ¶ 144.  And in December 2012, General Barbero testified before the U.S. Senate's Foreign Relations Committee, explaining the problem and specifically mentioning Fatima's role in providing CAN to the Syndicate.  ¶ 147; Doc. 22-2.  Taken together, these allegations make it plausible that Standard Chartered was aware of Fatima's role—and thus its own role—in supplying the Syndicate with ingredients to IEDs.  *Averbach v. Cairo Amman Bank*, No. 19 Civ. 0004 (GHW) (KHP), 2022 WL 2530797, at *8–9 (S.D.N.Y. Apr. 11, 2022) (upholding complaint that contained "references to many . . . news articles, from both local and international news agencies, as well as references to other

because Fatima was outwardly alleging compliance, Standard Chartered says, there was no way it could have known of its role in supplying al-Qaeda and the Syndicate with IEDs.  But the complaint contains then-public allegations that cut against Fatima's statements:  the news articles from 2011 and 2012 reported on the proliferation of CAN and General Barbero's statements that Fatima had been "uncooperative"—both of which were discussed at a U.S. Senate hearing in 2012.  ¶¶ 141–45; Doc. 22-2 at 6, 15.  And SCB knew of Fatima's actions (or inactions) when it met with General Barbero and other U.S. officials in January 2013, which occurred prior to the deaths of Plaintiffs' family members.  ¶ 149.  In any event, this argument goes to the strength of Plaintiffs' evidentiary showing, which is "a matter more appropriate for discovery."  *Kaplan*, 999 F.3d at 865.

[16] This form of establishing general awareness is accepted in this Circuit.  *Kaplan*, 999 F.3d at 864–65 (finding that repeated public statements by the FTO in its publications and in newspapers about its involvement in terrorist attacks established general awareness); *Honickman*, 6 F.4th at 501 (finding the general awareness element unmet where the complaint cited a "limited" number of news articles and the complaint failed to show that any of those articles were published prior to the attacks).

public information"); *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19 Civ. 7 (CBA) (VMS), 2020 WL 7089448, at *10 (E.D.N.Y. Nov. 25, 2020) ("Where Plaintiffs have plausibly alleged widespread public knowledge linking bank customers to a terrorist organization, there is no need to allege that the defendant necessarily read the specific media reports."); *cf. Honickman*, 6 F.4th at 501–02 (a complaint that relied on news articles that postdated the attacks or had no dates did not support an inference of general awareness).

Nevertheless, Standard Chartered argues the Court cannot draw a plausible inference of general awareness because the complaint does not offer any non-conclusory facts suggesting that Fatima knowingly supplied fertilizer to terror groups. Doc. 26 at 11. The Court disagrees. It may be reasonably inferred from the complaint that Fatima was knowingly supplying the Syndicate with CAN. *Honickman*, 6 F.4th at 496. According to the complaint, CAN was "not widely used to support agriculture in either Pakistan or Afghanistan," as "[o]ther fertilizers were less expensive, more widely used, and more suitable to the terrain and agriculture profile of the region." ¶¶ 96, 103. As U.S. officials said in 2009, "banning CAN would have a minimal effect on [a]griculture" in the region.[17] ¶ 98. Yet CAN sales constituted 31% ($183 million) of Fatima's annual revenues in 2013. ¶ 152.

Fatima's actions after meeting with U.S. officials also support this inference. In August 2011, Fatima initially told U.S. officials that it would help curb the spread of CAN by no longer dealing in the border regions of Pakistan; it also promised to add dyes to its fertilizers. ¶¶ 128, 130. However, CAN seizures in Afghanistan increased after this meeting, ¶¶ 119, 121, and Fatima never added the dyes. ¶¶ 131–33. After again meeting with U.S. officials, Fatima cut off

[17] Standard Chartered argues that this statement should be disregarded, pointing to a statement in the Washington Post article that quotes U.S. officials: "[t]he vast majority of the fertilizer produced by the Fatima plants is used by small farmers in Pakistan who depend on it for their survival." Doc. 26 at 11; Doc. 22-1 at 3. But the two statements are not inconsistent. The above statement talks about *all* of the fertilizer Fatima produces. Plaintiffs seem to agree on that—they only allege that about a third of Fatima's business focuses on CAN fertilizer. ¶ 152 ("In 2013, CAN constituted 31% of Fatima's annual revenues."). The referenced statement says nothing about what CAN fertilizer is used for in Pakistan, and so it is irrelevant to probing the plausibility of the complaint. And, even if it were, this is hardly the situation where a complaint's *own allegations* (which the second statement is not) hopelessly contradict one another to the point of making the assertion "absolutely impossible" or "absurd[.]" *Mingues v. Nelson*, No. 96 Civ. 5396 (GBD), 2004 WL 324898, at *3 (S.D.N.Y. Feb. 20, 2004).

communications; Pakistan's intelligence agency purportedly then got involved, putting "the clamps" on U.S. efforts to curtail Fatima's sale of CAN.[18]  ¶¶ 131, 146.

Standard Chartered, moreover, analogizes to *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21 Civ. 4400 (HG) (RML), 2022 WL 17993076, at *7, *19 (E.D.N.Y. Dec. 29, 2022).  *See* Standard Chartered's January 3, 2023 Notice of Supplemental Authority, Doc. 28.  In contrast to the instant action, *Wildman* involved numerous defendants and a wide range of alleged criminal activity, spanning an approximately 600-page complaint.  *See* 2022 WL 17993076, at *5 ("Despite its length—173,603 words spread out over 596 pages and 2,045 paragraphs—the [c]omplaint is less a novel, and more a series of vignettes describing a wide range of criminal activity.")  The allegations pleaded by the plaintiffs in *Wildman* with respect to Standard Chartered and Fatima are, however, similar to those alleged by Plaintiffs here.  In relevant part, the *Wildman* complaint alleged that Standard Chartered aided and abetted terrorism by providing financial services to Fatima who, in turn, deliberately sold CAN to actors that it knew were agents of terrorism.  *See Wildman* Operative Complaint ("*Wildman* Compl."), No. 21 Civ. 4400 Doc. 38, ¶ 1075 (pleading that Fatima "deliberate[ly] suppl[ied] CAN fertilizer to Syndicate agents, operatives, and fronts from 2009 through 2016"); *see also id.* ¶ 519 (It was the "widespread U.S. government view [in 2012] that Fatima . . . had joined [a] conspiracy with the Haqqani Network to support CAN fertilizer bomb attacks against Americans in Afghanistan"); ¶ 529 (Lt. General Barbero "met in person with senior executives at [Standard Chartered] . . . to communicate . . . how [it was] directly facilitating CAN fertilizer bomb attacks against

---

[18] Some courts have considered a defendant's past actions in assessing claims under the ATA.  *See, e.g.*, *Atchley*, 22 F.4th at 227 ("Defendants' alleged support here was similarly a substantial factor in plaintiffs' injuries.  They gave both cash and cash equivalents to the terrorist organization that harmed plaintiffs, which allowed that organization to grow. . . . And the plausibility of these major global corporations giving such bribes and gifts is bolstered by allegations that these same companies or their affiliates had previously participated in essentially the same kind of corruption.").  Standard Chartered's alleged past actions in financing international terrorism further bolsters the plausibility of the complaint's showing of its general awareness of its role in providing al-Qaeda and the Syndicate with IEDs.  Standard Chartered provided financial services to the Khanani MLO, a transnational criminal organization that funded, among other things, terrorist organizations like al-Qaeda, the Taliban, Lashkar-e-Tayyiba, Dawood Ibrahim, and Jaish-e-Mohammed.  ¶ 176.  It also agreed to forfeit hundreds of millions of dollars to federal and state law enforcement entities because it illegally moved money through the U.S. financing system on behalf of sanctioned Iranian entities.  ¶¶ 162–67.

Americans in Afghanistan" by providing financial services to Fatima, a leading producer of the "vital ingredient" in IEDs that accounted for "approximately 80% of all American bomb causalities in Afghanistan").

In finding that that Standard Chartered was not generally aware that it was aiding and abetting a terrorist scheme that caused harm to American servicepeople, the *Wildman* court reasoned:

> Plaintiffs do not allege that Fatima . . . directly supplied FTOs with fertilizer—they supplied fertilizer to Pakistani farmers and fertilizer dealers, some of which was eventually smuggled into Afghanistan to produce IEDs. . . .[19]

> The [c]omplaint alleges that in 2013 a senior U.S. military official informed Standard Chartered about how Fatima['s] product was being used by FTOs. [But e]ven if Standard Chartered was made aware of the fact that a small portion of Fatima['s] products was being misused—not by Fatima [], but by other individuals after it had been purchased—that in and of itself is insufficient to establish that Standard Chartered was generally aware of the role it was playing in terrorist activities.[20] Fertilizer may be a key material component of terrorist attacks, but that does not mean that providing routine banking services to fertilizer companies necessarily establishes that Standard Chartered was generally aware of the role it was playing in those terrorist attacks.

---

[19] In support of the statement that Fatima supplied fertilizer dealers and farmers, and not FTOs directly, the *Wildman* court cited to paragraphs 513 and 514 of the *Wildman* complaint. Paragraph 513 provided: "Notwithstanding [Afghan President Hamid Karzai's banning of possession, production, and importation of CAN fertilizer in Afghanistan,] CAN fertilizer was continuously purchased in Pakistan and smuggled across the border into Afghanistan, where it was used to make homemade bombs." *Wildman* Compl. ¶ 513. Paragraph 514 provided: "Fatima and Pakarab's role in the Syndicate's bombmaking knowledge was a matter of widespread public knowledge no later than September 1, 2011, when the Associated Press published a long report regarding Fatima's and Pakarab's key role in the Syndicate's fertilizer bomb campaign." *Id.* ¶ 514. Paragraph 514 also contains an excerpt from the AP article, which does not reference Fatima by name. *See* Chris Brummitt, AP Asia, *AP IMPACT: Pakistani Fertilizer Fuels Afghan Bombs* (Sept. 1, 2011), *available at* https://www.sandiegouniontribune.com/sdut-ap-impact-pakistani-fertilizer-fuels-afghan-bombs-2011aug31-story.html. The content of neither of these paragraphs contradicts the *Wildman* plaintiffs' additional pleading that Fatima "deliberate[ly] suppl[ied] CAN fertilizer to Syndicate agents, operatives, and fronts from 2009 through 2016[.]" *Id.* ¶ 1075.

[20] The *Wildman* complaint emphasizes that only "a small portion, around one percent," of Fatima's fertilizer was "transferred to insurgents, who easily turned the CAN fertilizer into inexpensive explosives[.]" *Wildman* Compl. ¶ 515 (internal marks and citation omitted). Here, however, Plaintiffs make no representation with respect to how much of Fatima's fertilizer was used by FTOs. *See generally* Doc. 1. Moreover, a bank's tortious or illegal conduct is not immunized simply because its "assistance went to [a] customer who also performed non-terrorist activities." *Averbach v. Cairo Amman Bank*, No. 19 Civ. 4, 2022 WL 2530797, at *15 (S.D.N.Y. Apr. 11, 2022) (R&R); *see* Doc. 29, Plaintiffs' January 23, 2023 Response to Standard Chartered's Notice of Supplemental Authority.

*Wildman*, 2022 WL 17993076, at *19.  In support of its finding, the *Wildman* court cited two

cases.  First, it cited to *Siegel*, 933 F.3d at 224, noting that there, the court found that the

defendant-bank had "little reason to suspect that it was assuming a role in [al Qaeda's] terrorist

activities," 933 F.3d at 224, "because [the defendant-bank's] customer was a legitimate business

and was never publicly identified as a terrorist affiliate to al-Qaeda," *Wildman*, 2022 WL

17993076, at *19.  Second, the court cited to *Honickman* for the proposition that "allegations

showing defendant *might* have known about a *possible* nexus between its customer and the FTO

that caused plaintiffs' injuries insufficient to establish general awareness."  *Id.* (emphasis added)

(quoting *Honickman,* 432 F. Supp. 3d at 268).

   Although Plaintiffs' allegations are generally similar to those pleaded by the *Wildman*

plaintiffs, Plaintiffs here do not allege that Standard Chartered knew of a mere "possible" and/or

"indirect" relationship between Fatima and al Qaeda.  Rather, Plaintiffs claim that "Fatima sold

[ammonium nitrate] to entities it knew were fronts for the Taliban and the Haqqani Network and

knew were involved in making Explosive Devices for use in terrorist attacks committed by the

al-Qaeda Terror Syndicate," and that Standard Chartered knew as much.  ¶ 127 (emphasis

added); *see also* ¶ 148 ("In January 2013, Lt. General Barbero and other U.S. officials met with

Standard Chartered's senior executives at SCB's New York office to 'warn that the Pakistani

fertilizer firm was helping to supply the Taliban with materials used in the manufacture of deadly

homemade bombs.'").  When, as here, a plaintiff alleges that a defendant-bank had *actual*

knowledge of its role in aiding and abetting the harmful activities of a terrorist scheme—because

government officials told it so—courts have deemed the general awareness prong satisfied.  In

*Wultz v. Islamic Republic of Iran*, for example, Israeli government officials informed a

defendant-bank that it was providing services to a customer who was the agent of a terrorist

group and requested that the bank stop.  755 F. Supp. 2d 1, 50 (D.D.C. 2010).  The bank

nonetheless continued to provide those services.  *Id.*  The court deemed such allegations

sufficient to support a claim for primary liability under the ATA because the defendant-bank

"knowingly continued to carry out" the financial transactions "after being expressly warned . . .

of the consequences of its actions and asked to desist[.]"[21]  *Id.* at 49–50.

Standard Chartered attempts to distinguish *Wultz* from the instant case by highlighting the

fact that the account serviced by the bank in *Wultz* was owned by the agent of a terror group,

while here, Standard Chartered's client, Fatima, is a legally operating agricultural company "not

alleged to be affiliated with any terror group."  *See* Doc. 26 at 10 n. 5.  The Court finds this

argument unavailing.  As noted, the complaint *does* allege that Fatima is affiliated with terror

groups by selling CAN to entities that it knew were fronts for terrorist enterprises.  ¶ 127.

Moreover, the question of whether a defendant-bank's aid was direct or indirect is wholly

distinct from the question of whether the defendant-bank had general knowledge.  Indeed, and as

discussed in greater detail herein, in evaluating the "aiding party who causes injury" element, the

Second Circuit has confirmed that an ATA defendant may be liable for providing either direct *or*

indirect assistance.  *See, e.g.*, *Honickman*, 6 F.4th at 495 (rejecting a defendant-bank's argument

that the "plaintiffs' complaint [fell] short because the only parties whom the bank allegedly aided

were three customers," and noting that "JASTA [does not limit] aiding-and-abetting liability to

[only] those circumstances in which a defendant actually aided and abetted the person who

committed the act of terrorism") (internal marks omitted).

For foregoing reasons, the Court concludes that one could reasonably infer from the

complaint that by providing banking services to Fatima, Standard Chartered was generally aware

---

[21] The *Wildman* opinion in does not discuss *Wultz*.  *See generally* 2022 WL 17993076.

of its role in the terrorist bomb-making enterprise and could have foreseen the attacks on Plaintiffs' family members.

### iii.   *Substantial Assistance*

"As the analysis in *Halberstam* reveals, the 'principal violation' must be foreseeable from the illegal activity that the defendant assisted; knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman*, 6 F.4th at 499 (quoting *Halberstam*, 705 F.2d at 477). Here, the illegal activity that was assisted was the provision of CAN to the Syndicate for the manufacture of IEDs. None dispute that the killing of U.S. service members is a foreseeable consequence of assisting in the creation of IEDs for al-Qaeda and the Syndicate during the war in Afghanistan. The question, then, is whether Standard Chartered provided *substantial* assistance to that venture. Courts look to six factors to determine whether that is so: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Id.* at 500 (quoting *Linde*, 882 F.3d at 329).

The complaint alleges Standard Chartered substantially assisted the Syndicate in creating IEDs. First, the nature of Standard Chartered's support—significant financial services—was "indisputably important" to Fatima, including dollar clearing services, daily banking services, and loans. *Halberstam*, 705 F.2d at 488; ¶¶ 152–57. Indeed, some of Standard Chartered's loans to Fatima enabled Fatima to "remove [CAN] production bottlenecks" that were critical to expanding CAN production capacity. ¶ 154.

Second, the amount of assistance was significant: Standard Chartered provided Fatima with at least twenty-five million dollars in loans. ¶¶ 153–57. And it is clear that this support

stimulated CAN production:  from 2011 to 2016, the Syndicate sourced "tens of thousands of tons" of CAN to make IEDs "from Fatima's two fertilizer plants in Pakistan."  ¶ 111.  By 2011, 90% of IED casualties in Afghanistan came from CAN-based IED devices.  ¶¶ 102, 125.

Third, Standard Chartered's relationship with Fatima was active when the Syndicate killed Plaintiffs' family members.  ¶ 150; *Siegel*, 933 F.3d at 226 (weighing this factor against substantial assistance where the defendant had no relationship with the intermediary).  Fourth, Standard Chartered was aware that its services provided Fatima and the Syndicate support—it was told as much in a face-to-face meeting with a U.S. Army General.  ¶¶ 148–49.  And lastly, Standard Chartered has assisted Fatima for a significant period, providing it with banking services since 2001.[22]  ¶ 139.

Standard Chartered's reliance on *Siegel v. HSBC* to show that the substantial assistance test is not met is misplaced.  Doc. 21 at 23.  *Siegel* involved an allegation that a defendant-bank's client, ARB (Saudi Arabia's largest bank at the time), had clients "linked to al-Qaeda."  933 F.3d at 220.  *Siegel* found insufficient support for both the general awareness and substantial assistance elements.  *Id.* at 224–25.  "Crucial[]" to that decision was the fact that HSBC "ceased doing business with ARB altogether" ten months before the terrorist attacks.  *Id.* at 224.  That fact swayed the *Halberstam* test against the plaintiffs:  At the time of the attacks, HSBC had no relationship with the terrorist entity and assumed no role in supporting the attacks.  *Id.* at 225.  Moreover, there was no non-conclusory allegation that al-Qaeda actually received the services HSBC provided to ARB.  *Id.*  And ARB was a bank with "vast operations"—many of which were perfectly legal—rather than being an entity that catered to a specific, terrorist-affiliated

---

[22] While it is true that Standard Chartered was not present for the attacks, that alone does not defeat the prima facie showing of substantial assistance.  *See Kaplan*, 999 F.3d at 866 (providing multimillion-dollar loans that avoided U.S. financial regulators constituted "qualitatively and quantitatively" substantial assistance); *Halberstam*, 705 F.2d at 488 (same, but as to an individual); *Bartlett*, 2020 WL 7089448, at \*15.

clientele (or a terrorist-affiliated product, like explosive fertilizer).  *Id.* at 224.  Here, we have

quite different facts:  Standard Chartered's support of Fatima is directly tied to Fatima's ability

to provide CAN to al-Qaeda, and the U.S. Government put Standard Chartered on notice about

Fatima's ties to al-Qaeda.  ¶¶ 121, 125, 148–49.

       *iv.*   *Proximate Cause*

Finally, Standard Chartered argues that Plaintiffs must plausibly allege that Standard

Chartered's support for Fatima and al-Qaeda proximately caused the deaths of their family

members.  Doc. 21 at 25.  Standard Chartered is mistaken.  While direct claims under the ATA

require a showing of a proximate causation, that is so because the ATA uses the words "by

reason of" in the primary liability section.  *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013).

But the section creating the secondary liability cause of action exists in a separate subdivision

from the primary liability section.  18 U.S.C. § 2333(a), (d); *Jama v. Immigr. & Customs Enf't*,

543 U.S. 335, 344 (2005) ("Each clause is distinct and ends with a period, strongly suggesting

that each may be understood completely without reading any further.").  And Congress enacted

the JASTA to provide parties victimized by terrorism with "the broadest possible basis" for

relief, regardless of whether that support was "direct[] or indirect[.]"[23]  JASTA, Pub. L. No. 114-

222, § 2(b), 130 Stat. at 853.

Case law in this Circuit supports a distinct interpretation of § 2333(d)(2).  *Kaplan*, *Siegel*,

*Honickman*, and *Halberstam* did not mention proximate cause.  999 F.3d at 854–56; 933 F.3d at

222–23; 6 F.4th at 495–501; 705 F.2d at 481–84, 481.  *Linde* called the JASTA an "alternative

theory" that "expands" ATA primary liability—in line with Congress' own view of the text it

---

[23] In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme Court held that new loss-based causes of action—when silent on a proximate cause—must be construed to contain a proximate cause requirement.  572 U.S. at 132 ("Congress, we assume, is familiar with the common-law rule and does not mean to displace it *sub silentio*.").  Standard Chartered argues this principle applies here.  Doc. 21 at 25.  It does not. Congress explicitly disclaimed any proximate cause requirement when it passed the JASTA, explaining that liability could flow "directly or indirectly."  JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853; *accord Kaplan*, 999 F.3d at 855.  Congress' directive that JASTA liability can flow "indirectly" disclaims any proximate cause requirement, which demands quite the opposite—that an injury flow "*directly* from" the tortious act.  JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853; *Lexmark*, 572 U.S. at 133 (emphasis added).

enacted.[24]  882 F.3d at 320, 331.  And when district courts in this Circuit have considered ATA and JASTA claims, they discussed proximate cause in regard to the ATA claims but not to the JASTA claims.  *See, e.g.*, *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 93–94, 97–98 (E.D.N.Y. 2019); *O'Sullivan v. Deutsche Bank AG*, No. 17 Civ. 8709 (LTS) (GWG), 2019 WL 1409446, at *5–7, *10 (S.D.N.Y. Mar. 28, 2019); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 46, 47–48 (E.D.N.Y. 2019); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 266–67 (E.D.N.Y. 2019).  Accordingly, the JASTA imposes no proximate cause requirement on Plaintiffs.

## V.    CONCLUSION

For the reasons stated above, Standard Chartered's motion is GRANTED in part and DENIED in part.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 20.

The parties are further directed to appear for a telephonic status conference on April 5, 2023 at 12:00 p.m.  The parties are directed to dial (877) 411-9748 and to enter access code 3029857.

It is SO ORDERED.

Dated:  March 7, 2023
        New York, New York

_____

EDGARDO RAMOS, U.S.D.J

---

[24] While *Linde* did mention proximate causation, it did so in deciding whether *the terrorist organization* responsible for the attacks proximately caused the alleged injury:  "Arab Bank does not—and cannot—dispute the sufficiency of the evidence to *prove that the Hamas terrorists who committed the three attacks at issue* caused plaintiffs' injuries, whether as a matter of proximate or but-for causation."  882 F.3d at 331 (emphasis added); *id.* ("Arab Bank argues that . . . we should reverse the challenged judgment because the trial evidence was legally insufficient to prove causation under either the proximate cause standard charged to the jury or the but-for causation standard that (the bank contends) should have been charged.  The argument merits little discussion in light of JASTA.").  So, if anything, the proximate cause requirement only applies to the FTO's actions in harming Plaintiffs' family members, and Standard Chartered does not dispute that al-Qaeda proximately caused the deaths of Plaintiffs' family members. Doc. 21 at 25–26.