May 31, 2023

Lee Wolosky
Tel +1 212 891 1628
lwolosky@jenner.com

**VIA ECF**

The Honorable Edgardo Ramos
U.S. District Court for the Southern District of New York
40 Foley Square
New York, New York 10007

**Re:** *Bonacasa v. Standard Chartered PLC*, 22-CV-3320 (ER); *Moore v. Standard Chartered PLC*, 23-CV-2834 (ER); *Smedinghoff v. Standard Chartered Bank*, 23-CV-2865 (ER)

Dear Judge Ramos:

We write on behalf of Plaintiffs in the above-captioned matters in response to Defendant Standard Chartered Bank's ("SCB") May 25, 2023 letter regarding the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023). ECF No. 53. Contrary to SCB's position, *Twitter* does not overrule or displace the binding Second Circuit precedent on which this Court relied in denying SCB's motion to dismiss. It therefore does not warrant reconsideration—an "extraordinary remedy" this Court has cautioned should be "employed sparingly." *Wiener v. AXA Equitable Life Ins. Co.*, 2020 WL 409785, at *2 (S.D.N.Y. Jan. 24, 2020) (Ramos, J.).[1]

In *Twitter*, plaintiffs alleged that "three of the largest social-media companies in the world" were liable for aiding and abetting an ISIS attack in Turkey because they failed to stop ISIS from using the "social-media platforms to recruit new terrorists and to raise funds for terrorism." 143 S. Ct. at 1215. The Supreme Court observed that "defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis," *id.* at 1227; indeed, "*for every minute* of the day . . . 347,000 tweets are sent on Twitter," *id.* at 1216. In the context of this massive global onslaught of activity, the Supreme Court described the alleged misconduct as mere "passive nonfeasance," *id.* at 1227, and it held that the allegations fell short of actionable aiding and abetting, including because plaintiffs did not claim that defendants "affirmatively gave aid" that assisted ISIS's acts, *id.* at 1228. Instead, as alleged, "defendants' relationship with ISIS and its supporters appears to have been the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent," *id.* at 1227, falling well short of the "essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor," *id.* at 1229.

Here, by contrast, the allegations are much narrower and much more specific: SCB ignored a U.S. government request to shut down its provision of financial services for <u>one specific</u> customer producing <u>one specific</u> chemical being used to kill U.S. soldiers through <u>one specific</u> modality of

---

[1] In the context of an intervening change in the law, reconsideration is warranted only if the change is "controlling"— that is, it would "reasonably be expected to alter" the outcome. *NEM Re Receivables, LLC v. Fortress Re, Inc.*, 187 F. Supp. 3d 390, 396 (S.D.N.Y. 2016).

attack in <u>one specific</u> region in which the United States was fighting a global war against al Qaeda and its affiliates. That conduct supports liability under *Twitter* for the IED attacks at issue here.

In reaching its conclusion in *Twitter*, the Court adopted the six-factor test set forth in *Halberstam v. Welch*, 705 F. 2d 472 (D.C. Cir. 1983), "viewed in context of the common-law tradition from which it arose," as the proper legal framework for evaluating whether an aider and abettor's assistance was "substantial." 143 S. Ct. at 1218. The Court cautioned, however (as did the D.C. Circuit in *Halberstam* itself), that the six factors "should not be accepted as immutable components," *id*. at 1220, but instead must be viewed as "working in tandem, with a lesser showing of one demanding a greater showing of the other," *id*. at 1222. Where plaintiffs allege that defendant "offered aid that is more direct, active, and substantial," for example, they may "be able to establish liability with a lesser showing of scienter." *Id.* at 1228. Conversely, if plaintiffs allege a greater nexus between the defendant's "state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)," a lower showing of substantial aid is required. *Id.* at 1229. The purpose of this fact-intensive balancing act is to ensure that "innocent bystanders" are not subject to aiding-and-abetting liability. *Id.* at 1220.

The Court also held that the defendant "must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong"—in this context, an act of international terrorism. *Id*. at 1224. But this does not necessarily require a "strict nexus" between the assistance and the attack. *Id*. at 1225. As in *Halberstam*, "people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort." *Id.* And while "a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, . . . even more remote support can still constitute aiding and abetting in the right case." *Id.* (quoting *Halberstam*, 705 F.2d at 488). Indeed, the defendant need not have known "all particulars" of the plan. *Id*. at 1224. And absent a close nexus, a secondary defendant's role "can be so systemic" that it becomes liable for all the terrorist group's acts, *id.* at 1225, or "some definable subset of terrorist acts"—for example, "where the provider of routine services does so in an unusual way or provides . . . dangerous wares." *Id*. at 1228.

Contrary to SCB's suggestion, *Twitter* did not expressly or by implication overrule the Second Circuit cases on which this Court relied in denying SCB's motion to dismiss. Under Supreme Court and Second Circuit precedent, "knowingly providing material support to [a foreign terrorist organization], without more, does not as a matter of law" establish liability. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021); *see also Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021). By contrast, under *Halberstam*'s "fact-intensive" inquiry, a defendant can be held liable for foreseeable attacks where it "knowingly—and not innocently or inadvertently—gave [substantial] assistance, directly or indirectly," and "was 'generally aware' that it was playing a role in international terrorism." *Kaplan*, 999 F.3d at 860, 864; *see Twitter*, 143 S. Ct. at 1225 ("remote" support "can still constitute aiding and abetting in the right case").

But even if *Twitter* might have impacted some of this Court's analysis of SCB's motion to dismiss, it certainly would not have changed the outcome. Indeed, the allegations this Court found sufficient to state a claim against SCB match well the allegations *Twitter* described as stating a viable aiding-and-abetting claim. SCB aided and abetted the al-Qaeda Terror Syndicate in committing IED attacks in Afghanistan by—as this Court described—providing "significant financial services" of "at least twenty-five million dollars in loans" to Fatima, which produced the essential chemical

used in those attacks. ECF No. 32 at 24. SCB's services included "loans to Fatima" that "enabled Fatima to 'remove [CAN] production bottlenecks' that were critical to expanding CAN production capacity." *Id.* SCB's "significant" support "stimulated CAN production," and in turn, corresponded with a sharp uptick in deaths by IED. ECF No. 32 at 24-25; Compl. ¶¶ 102, 125. Moreover, SCB did all of this knowingly. This is a rare "actual knowledge" case in which U.S. officials (1) "met with senior executives of SCB," (2) "walked [SCB's] executives through the details of their investigation," (3) "explained that IEDs were the most common cause of service members' deaths," and (4) "asked [SCB] to end its business relationship with Fatima." ECF No. 32 at 17. SCB instead continued to provide Fatima with financial services, which, according to General Barbero, "enabled" the IED attacks. *Id.* Far from being an "innocent bystander[]," SCB "intentionally associated" with the al-Qaeda Terror Syndicate and "affirmatively gave aid that would assist each of [the Syndicate's IED] acts." *Twitter*, 143 S. Ct. at 1228.

SCB's arguments to the contrary are unavailing. To begin, SCB's relationship with Fatima was far from "passive," and Plaintiffs are not seeking to hold SCB liable for "crimes or torts committed by non-customer end users of a customer's product." ECF 53 at 3. Plaintiffs' claims are highly specific to SCB and its extraordinary meeting with U.S. officials, which makes the subsequent financial services provided by SCB to Fatima anything but "passive." Indeed, *Twitter* recognized that an aiding-and-abetting claim may be stated, even absent a close nexus to the terrorist acts, "where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." 143 S. Ct. at 1228. Following the January 2013 meeting with the U.S. government, it was both (1) highly "unusual" for SCB to continue servicing Fatima, and (2) extremely "dangerous" to do so. *Id.* The Court noted that "shar[ing] only $50" would not meet that standard—but SCB is alleged to have transferred many millions more. *Id.* at 1230. Moreover, SCB characterizes its aid as "attenuated" and insufficient to establish a link to the "commission of any relevant attack." ECF No. 53 at 3. As this Court credited, Plaintiffs allege that the Syndicate used CAN fertilizer manufactured and sold by Fatima in each of the relevant attacks. ECF No. 32 at 22. Regardless of whether SCB knew "all particulars" of the terrorists' plan, it is responsible for foreseeable risks of its conduct, and here, the death of U.S. service members was more than foreseeable following the January 2013 meeting—it was specifically known to SCB. In short, SCB is "not some hapless or even negligent actor[] that w[as] blindly roped into a terrorism funding scheme—[it] w[as] [an] active participant[]. If [SCB] ha[s] evidence to the contrary, [SCB] can raise it in later stages of this case." *Sotloff v. Qatar Charity*, 2023 WL 3721683 (S.D. Fla., May 30, 2023) (applying *Twitter* and denying motion to dismiss).

The Court should also reject SCB's alternative requests to certify an interlocutory appeal or allow SCB to move for judgment under Rule 12(c). SCB's request for certification of an interlocutory appeal was not requested within a reasonable time after the Court's decision on the motion to dismiss. 28 U.S.C. § 1292(b); *In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 49-50 (S.D.N.Y. 2002) (three-month delay unreasonable). And allowing SCB to move for judgment under Rule 12(c) would be duplicative of SCB's motion to dismiss in *Bonacasa* and would be inappropriate in *Moore* and *Smedinghoff* as the pleadings are not yet closed. Nor should the Court stay discovery because SCB has failed to make a "strong showing" that its motion for reconsideration will be successful. *Tankleff v. Cnty. of Suffolk*, 2010 WL 11432457, at *1 (E.D.N.Y. July 9, 2010).

We look forward to discussing these issues with Your Honor at the June 2 Pre-Motion Conference.

Respectfully submitted,

*/s/ Lee Wolosky*

Lee Wolosky


Cc: All Counsel of Record (via ECF)