UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DIANA BONACASA, *et al.*,<br><br>Plaintiffs,<br><br>-v.-<br><br>STANDARD CHARTERED PLC and<br>STANDARD CHARTERED BANK,<br><br>Defendants. | No. 1:22-CV-03320 (ER) (OTW) |

## STANDARD CHARTERED BANK'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

Sharon L. Nelles (nelless@sullcrom.com)
Andrew J. Finn (finna@sullcrom.com)
Bradley P. Smith (smithbr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

June 23, 2023

*Attorneys for Standard Chartered Bank*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................5

    A.  The Complaint's Allegations ......................................................................................5

    B.  The Court's March 2023 Order...................................................................................8

    C.  The *Twitter* v. *Taamneh* Decision.............................................................................9

ARGUMENT ...........................................................................................................................11

I.   *Twitter* Set a New Standard for ATA Aiding-and-Abetting Liability ...............................12

II.  The Complaint Fails To Allege That SCB "Knowingly Provided
    Substantial Assistance" to Any Terrorist Attack That Injured Plaintiffs................................16

    A.  The Complaint Fails To Allege SCB Assisted Any Terror Attack
        That Injured Plaintiffs .............................................................................................16

    B.  The Complaint Fails To Allege the Required Level of Scienter ..................................18

    C.  None of the Indicia of Aiding and Abetting Found Relevant in
        *Twitter* Are Present Here .........................................................................................21

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Clinton* v. *Brown & Williamson Holdings, Inc.*,
  652 F. Supp. 2d 528 (S.D.N.Y. 2009)......................................................................11

*Gonzalez* v. *Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ........................................................................10, 19

*In re Gorsoan Ltd.*,
  2021 WL 240736 (S.D.N.Y. Jan. 25, 2021) ..........................................................12

*Halberstam* v. *Welch*,
  705 F.2d 472 (D.C. Cir. 1983).................................................................... *passim*

*Honickman* v. *BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ......................................................4, 12, 13, 15

*Iacovacci* v. *Brevet Holdings, LLC*,
  2019 WL 2992165 (S.D.N.Y. July 9, 2019) ..........................................................11

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021).....................................................................12, 13

*Landy* v. *F.D.I.C.*
  486 F.2d 139, 163 (3d Cir. 1973)......................................................................20, 21

*Linde* v. *Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)........................................................................15

*Monsanto* v. *United States*,
  348 F.3d 345 (2d Cir. 2003)........................................................................12

*Monsen* v. *Consolidated Dressed Beef Co.*,
  579 F.2d 793 (3d Cir. 1978).........................................................................20

*Moore* v. *Standard Chartered Bank*,
  23-CV-02834 (ER) (S.D.N.Y.) .....................................................................1

*Smedinghoff, et al.* v. *Standard Chartered Bank*,
  23-CV-02865 (ER) (S.D.N.Y.) .....................................................................1

*Twitter, Inc.* v. *Taamneh*,
  143 S. Ct. 1206 (2023) ..................................................................... *passim*

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Woodward* v. *Metro Bank of Dallas*,
    522 F.2d 84 (5th Cir. 1975) ................................................................24

## Statutes and Rules

15 C.F.R. § 744.16 ................................................................7

18 U.S.C. § 2333(d) ................................................................1

Fed. R. Civ. P. 54(b) ................................................................11

Local Civil Rule 6.3 ................................................................11

## PRELIMINARY STATEMENT

After this Court's March 7, 2023 Order denying Standard Chartered Bank's ("SCB") motion to dismiss aiding-and-abetting claims asserted under the Anti-Terrorism Act ("ATA"), the Supreme Court substantially limited the scope of those claims in its unanimous May 18 decision in *Twitter, Inc.* v. *Taamneh*, 143 S. Ct. 1206 (2023). In so doing, the Supreme Court recognized expressly that "mostly passive actors like banks" do not "become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 1222. Instead, liability for aiding and abetting requires some "conscious, voluntary, and culpable participation" in the crime that injured the plaintiffs. *Id.* at 1223. Plaintiffs' Complaint is based on allegations that SCB carried out routine banking transactions for a customer that were not linked in any concrete or definable way to any terrorist attack that injured Plaintiffs. In light of the holding in *Twitter*, this Court's March 2023 Order permitting this case to proceed should be reconsidered, and the Complaint should be dismissed.[1]

In *Twitter*, the Supreme Court rejected ATA claims premised on allegations that social media service providers had aided and abetted a terrorist attack by knowingly providing their services directly to the terrorist group that committed the attack and allowing that group to misuse their services to further its terrorist objectives. *Id.* at 1231. The Court held that to plead that a defendant "knowingly provid[ed] substantial assistance," as required under the ATA, 18 U.S.C. § 2333(d)(2), a plaintiff must allege facts demonstrating that a defendant has "aided and abetted the act of international terrorism that injured the plaintiffs," not merely the members of a

---

[1]     Per the May 8, 2023 Case Management Order entered by the Court, the instant action arises from "the same alleged conduct by SCB and/or its affiliates as is alleged" in *Moore* v. *Standard Chartered Bank*, 23-CV-02834 (ER) (S.D.N.Y.), and *Smedinghoff, et al.* v. *Standard Chartered Bank*, 23-CV-02865 (ER) (S.D.N.Y.). (ECF No. 52 at 2.) Should the Court reconsider its March 7, 2023 Order and dismiss the Complaint, it should dismiss those coordinated actions as well.

terrorist group, and must show a defendant "culpably associated [itself] with the [relevant] attack, participated in it as something that [it] wished to bring about, or sought by [its] action to make it succeed." *Twitter*, 143 S. Ct. at 1225–26.

The Supreme Court's requirement that a defendant "culpably associate" itself with an attack by participating in such a way as to evince that it "wished to bring it about" or sought to "make it succeed" is at odds with this Court's March 7, 2023 Order. (ECF No. 32, the "March 2023 Order" or "Order"). In denying SCB's motion to dismiss, the Court permitted Plaintiffs' aiding-and-abetting claims to proceed to discovery based on allegations that SCB provided lawful banking services to Fatima Group ("Fatima"), a banking customer that manufactured fertilizer products, and that SCB allegedly became aware that one of Fatima's products was misused by terrorists to make bombs in Afghanistan. The Complaint does not allege SCB's customer, Fatima, committed any crime, let alone that SCB culpably participated in or encouraged a terrorist attack. The conduct alleged here is thus far more attenuated from any terrorist attack than the conduct the Supreme Court found insufficient to plead a claim in *Twitter*, and the Complaint's theory of liability is no longer viable.

*First*, Plaintiffs have not alleged any cognizable nexus between the four terrorist attacks that occurred in a war zone in Afghanistan and anything SCB allegedly did to provide banking services to a customer in Pakistan. As the Supreme Court noted, "aiding and abetting is inherently a rule of secondary liability for *specific wrongful acts*," and an ATA aiding-and-abetting claim thus requires that a "defendant[] ha[s] aided and abetted *the act of international terrorism that injured the plaintiffs*." *Id.* at 1223–24, 1225 (emphasis added). An ATA complaint therefore must contain plausible allegations of a "concrete" or "definable" nexus between a defendant's services and the specific act of international terrorism that injured plaintiffs. *Id.* at 1228. It is not

enough "that a defendant have given substantial assistance to a transcendent 'enterprise'" of terrorists "separate from and floating above all the actionable wrongs that constitute it." *Id.* at 1224. In the March 2023 Order, this Court had relied on earlier Second Circuit decisions to hold that "knowing and substantial assistance to the actual injury-causing act" (the act of international terrorism) "is unnecessary" to plead an aiding-and-abetting claim. (Order at 24.) That is no longer the law.

Measured against *Twitter*'s call for a concrete or definable nexus to the specific terrorist attack, the Complaint here fails to state a claim. Plaintiffs' exclusive theory of liability is that SCB assisted an "overall illegal enterprise" of bomb-making "by knowingly providing financial and banking services to the Fatima Group." (Compl. ¶¶ 6, 216.) There is no factual allegation connecting SCB's banking services to any of the four attacks in Afghanistan that injured Plaintiffs here, none of which are actually alleged to have been carried out using SCB's banking services (or Fatima's fertilizer products).

*Second*, *Twitter* makes clear that the Complaint fails to allege the required scienter to support an aiding-and-abetting claim. Under *Twitter*, to establish that a defendant "culpably associated [itself] with the [relevant] attack, participated in it as something that [it] wished to bring about, or sought by [its] action to make it succeed," *Twitter*, 143 S. Ct. at 1226, a plaintiff is required to plead an "affirmative act" by the defendant "with the intent of facilitating" the "commission" of the relevant terror attacks, such as an "act of encouraging, soliciting, or advising the commission of the [injury-causing] attack." *Id.* at 1221, 1227. The Supreme Court recognized this scienter element as a crucial limit on the scope of aiding-and-abetting liability, "lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 1222. In its March 2023 Order, this Court applied a lower standard

based on pre-*Twitter* Second Circuit precedent holding that the only scienter required to plead a claim was a defendant's "general awareness" of a role in tortious or illegal activity from which terrorist groups benefitted. *Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 499–500 (2d Cir. 2021). *Twitter* now has clarified that the ATA requires a higher level of knowledge and intention than that precedent.

Under the *Twitter* standard, the Complaint does not adequately allege that SCB culpably associated itself with a terrorist attack that injured Plaintiffs, participated in an attack as something it sought to bring about, or took any action intending to make an attack succeed. Instead, as this Court found, the Complaint at most alleges that by providing lawful banking services, "Standard Chartered knew that it was playing a role in the IED-making operations of al-Qaeda and the Syndicate" because terrorists were misusing one of Fatima's products. (Order at 17.) This type of general awareness that a customer (here, Fatima) may be supporting terrorists in some way (wittingly or unwittingly) as part of an "overall illegal enterprise" (Compl. ¶ 216) is now insufficient as a matter of law.

*Third*, the other factors that Supreme Court highlighted as significant in assessing whether a defendant has "knowingly provide[d] substantial assistance" to a terrorist act demonstrate why dismissal is warranted here. Those factors all focus on how closely connected the defendant is alleged to have been to the attack and attackers. *Twitter*, 143 S. Ct. at 1227–28. SCB's connection to the terrorists is even more attenuated than the allegations found deficient in *Twitter*. Here, there is no allegation that the attackers were ever customers of SCB, much less that SCB had a relationship with them *and* treated them differently from anyone else. *See id.* at 1227. Indeed, in *Twitter*, the Supreme Court analyzed the relationship between the defendant and the terrorist group that carried out the attack to determine ATA liability; here, there is no relationship

between SCB and terrorists to analyze.  Indeed, on the facts alleged here, it is *Fatima* (SCB's customer) that is most akin to the defendants in *Twitter*, not SCB.  And looking at SCB's relationship with Fatima (which is *not* alleged to be part of any terrorist organization that carried out an attack) is equally fruitless: there are no plausible allegations that SCB treated Fatima any differently than other customers of the bank's more than 1,000 branches and affiliates operating in 57 countries, where it provides hundreds of billions of dollars in financial services daily.  Nor does the Complaint allege that SCB had an "independent duty in tort" to stop providing banking services to a fertilizer company simply because a military official allegedly asked it to do so.  *Id.* at 1227–28.  Similar allegations about governmental requests to a defendant made by Plaintiffs here also were made in *Twitter*.  But the Supreme Court held that a service provider generally has no duty "to terminate customers after discovering that the customers were using the service for illicit ends." *Id.* at 1227.  Here, it is not alleged that SCB's customer, Fatima, was engaging in any illegal act, even if Fatima allegedly knew that some of its customers were misusing one of its products.

Acts of international terrorism are abhorrent and those responsible should be held accountable.  But the Supreme Court has now made clear that the ATA does not impose boundless liability on service providers like banks for the wrongful acts of their customers or, as here, those who misused a product of its customer.  Under *Twitter*, Plaintiffs here have not sufficiently alleged that SCB aided or abetted any terrorist attack that injured them.  The Court should therefore reconsider its Order and dismiss the Complaint.

## BACKGROUND

### A.    The Complaint's Allegations

The Complaint does not allege that SCB knowingly provided substantial assistance to the four acts of international terrorism that injured Plaintiffs.  Instead, Plaintiffs' theory is that SCB, through non-party subsidiary Standard Chartered Pakistan Ltd. ("SCB Pakistan"),

"knowingly provid[ed] financial and banking services *to the Fatima Group*," a multinational fertilizer manufacturer based in Pakistan, "and was generally aware of its role in Fatima's overall illegal enterprise."  (Compl. ¶¶ 6, 216 (emphasis added).)

According to the Complaint, SCB Pakistan had a longstanding customer banking relationship with Fatima.  (Compl. ¶ 139.)  The banking services SCB and its affiliate are alleged to have provided to Fatima are typical of any international bank—including "daily banking" needs and commercial loans.  (*Id.* ¶ 153.)  Plaintiffs do not allege that any of those banking services were unusual or illegal.

The alleged connection to terrorism arises solely from a lawful product that Fatima manufactured and sold in Pakistan:  calcium ammonium nitrate fertilizer ("CAN").  According to the Complaint, CAN is a "common agricultural fertilizer" that is "legally produced and sold in Pakistan" and elsewhere.  (Compl. ¶¶ 10, 143.)  However, like many other legitimate products (such as vehicles, pressure cookers, or timers), CAN fertilizer can be and was misused by various terrorist groups in Afghanistan (referred to in the Complaint as a "Syndicate") as an ingredient for improvised explosive devices ("IEDs").  (*Id.* ¶ 10.)  The Complaint alleges that the Syndicate obtained and used CAN fertilizer manufactured by Fatima to make explosives (*id.* ¶ 7), but does not allege that Fatima's CAN fertilizer (or CAN fertilizer in general) was used in any particular terrorist attack.

The Complaint claims that SCB is responsible for injuries from four bombings in Afghanistan between July 2, 2013 and December 21, 2015, based on a meeting with a U.S. military official in 2013.  Apparently relying on a news article published in 2019, the Complaint alleges that in January 2013, then-U.S. Army Lieutenant General Michael D. Barbero met with SCB officials in New York concerning Fatima.  (Compl. ¶¶ 1, 148; ECF No. 22-3, at 2.)  At the meeting,

according to the Complaint, General Barbero showed evidence demonstrating that terrorists were misusing Fatima's CAN product, "provided information" about "foreign exchange and export finance services" that SCB was supplying to Fatima, and "urged [SCB] to stop providing [those] financial services." (Compl. ¶¶ 2, 149.) General Barbero allegedly did not believe Fatima took sufficient steps to prevent terrorists from buying and misusing its CAN fertilizer product after U.S. military officials approached it beginning in 2011. (*Id.* ¶ 20.) However, Fatima was never identified as a terrorist group or a supporter of one. Fatima was never placed on the U.S. government's "Entity List," according to sources quoted in the Complaint, because there was no evidence it was "knowingly selling its product to insurgent groups or terrorists." (ECF No. 22-1, at 3.)[2]

The Complaint alleges that SCB did not stop banking Fatima after the 2013 meeting with General Barbero. (Compl. ¶ 150.) According to the Complaint, SCB provided a $22 million loan at some point in 2013, as well as lesser loans of unspecified amounts, and in 2016 (after the relevant attacks occurred) SCB Pakistan "invested 1 billion rupees" (approximately $3.5 million under currently prevailing exchange rates)[3] in an "investment device" related to the company. (*Id.* ¶¶ 154–57.) The Complaint does not allege that Fatima used proceeds from any bank loans for anything other than commercial purposes, or that it engaged in any illegal activity whatsoever. (*See id.* ¶ 154.) It also does not allege that any banking services SCB provided facilitated terrorist

---

[2]     The "Entity List" is maintained by the Department of Commerce. It imposes trade restrictions on people and organizations that are "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.16.

[3]     As of this writing, the prevailing exchange rate is 1 Pakistani Rupee to 0.003485 USD. *See* https://www.forbes.com/advisor/money-transfer/currency-converter/pkr-usd/.

attacks involving CAN fertilizer during or after 2013, or that CAN fertilizer was even used in any of the four attacks giving rise to Plaintiffs' claims.

### B. The Court's March 2023 Order

On March 7, 2023, the Court issued an Opinion & Order granting Defendants' motion to dismiss Standard Chartered PLC for lack of personal jurisdiction but otherwise denying the motion. In the Order, the Court considered the "three elements" of a JASTA aiding-and-abetting claim based on *Halberstam* v. *Welch*, 705 F.2d 472 (D.C. Cir. 1983), a case from the D.C. Circuit whose framework "Congress adopted . . . to decide JASTA claims." (Order at 14–15.) Those elements require a plaintiff to plead and prove: (i) "the party whom the defendant aids . . . perform[s] a wrongful act that causes an injury"; (ii) the defendant had a "general awareness" of its "role as part of an overall illegal or tortious activity," from which the relevant terrorist acts were foreseeable; and (iii) knowing and substantial assistance. (*Id.* at 15–17.)

To satisfy the third element, this Court found that "knowing and substantial assistance to the actual injury-causing act"—*i.e.*, the relevant act of international terrorism that injured Plaintiffs—"is unnecessary" as long as there is some "illegal activity" that the defendant assisted from which the terror attack was "foreseeable." (*Id.* at 24 (quoting *Honickman*, 6 F.4th at 499).) The Court then identified "the illegal activity that was assisted" as "the provision of CAN to the Syndicate for the manufacture of IEDs," and "[t]he question" was only whether SCB *substantially* assisted "that venture." (Order at 24.)[4]

The Court did not assess whether the Complaint alleged facts suggesting that SCB consciously or intentionally supported, encouraged, or helped commit the four terrorist attacks that

---

[4]     The Complaint nowhere alleges any law that Fatima broke by selling CAN fertilizer to "the Syndicate."

injured Plaintiffs.   Rather, the Court applied a six-factor test extracted from *Halberstam* to determine the level of "substantial assistance" SCB allegedly provided to Fatima as part of an overall "venture" of manufacturing CAN fertilizer that terrorists misused for bombs.   The Court ruled that five of the six *Halberstam* factors weighed in favor of knowing and substantial assistance.   In particular, the Court found that (i) "dollar clearing services, daily banking services, and loans" were "indisputably important *to Fatima*"; (ii) SCB "provided *Fatima* with at least twenty-five million dollars in loans," which "stimulated CAN production" by *Fatima*; (iii) SCB's "relationship *with Fatima* was active" at the time of the attacks; (iv) SCB was informed "that its services provided Fatima and the Syndicate support" generally; and (v) SCB had allegedly provided "banking services" to Fatima "since 2001."   (*Id.* at 24–25 (emphasis added).)   The Court also found the Complaint had sufficiently alleged the "aiding party who causes injury" and "general awareness" elements (*id.* at 16, 23), and therefore denied the motion.

      C.      **The *Twitter* v. *Taamneh* Decision.**

      On May 18, 2023, the Supreme Court issued its decision in *Twitter, Inc.* v. *Taamneh*, unanimously reversing a Ninth Circuit decision that had upheld an ATA aiding-and-abetting claim against social media companies whose services terrorists were misusing.

      In *Twitter*, plaintiffs injured by a terrorist attack in Turkey that was committed by a member of the terrorist group ISIS sued companies that allegedly "aided and abetted ISIS" by providing social media platform services that were "crucial to ISIS' growth, allowing it to reach new audiences, gain new members, and spread its message of terror."   143 S. Ct. at 1215–16. According to the complaint, the defendants in those cases were aware "that ISIS has used their platforms for years," and understood that ISIS benefitted from "'recommendation' algorithms" that allowed it to "connect with the broader public, fundraise, and radicalize new recruits."   *Id.* at 1216–17.   In other words, Twitter and the other defendant platforms were alleged to have

provided services *directly* to the Foreign Terrorist Organization ("FTO") that committed the attack (ISIS).  Plaintiffs further alleged that various U.S. government officials, from the White House to members of Congress, had met with or sent letters to the defendants urging them to take more aggressive measures to prevent terrorist groups, including ISIS, from using their services, which the defendants allegedly did not do.  (*See*, *e.g.*, Finn. Decl. Ex. 1 (*Taamneh* FAC) ¶¶ 26, 206, 208– 11; *id.* Ex. 2 (*Gonzalez* TAC) ¶¶ 495–97, 500.)  In upholding the sufficiency of the complaint, the Ninth Circuit applied a similar standard to the one this Court applied in the March 2023 Order, including by applying the six *Halberstam* factors to determine whether knowing and substantial assistance had been pled.  *Gonzalez* v. *Google LLC*, 2 F.4th 871, 909–10 (9th Cir. 2021).

The Supreme Court unanimously held that the complaint failed to state an aiding-and-abetting claim under the ATA, and that the Ninth Circuit had applied the wrong standard for assessing the claim.  143 S. Ct. at 1226.  In particular, the Court ruled that the allegations did not establish that the defendants "gave such knowing and substantial assistance to ISIS that they culpably participated in the [injury-causing] attack."  *Id.*  Because the claims for aiding and abetting were predicated largely on "passive nonfeasance"—*i.e.*, "an alleged failure to stop ISIS from using [defendants'] platforms"—liability would require "a strong showing of assistance and scienter."  *Id.* at 1227.  The plaintiffs there fell "far short" of making that showing, the Court explained, because of (i) the lack of any "act of encouraging, soliciting, or advising the commission of the [injury-causing] attack"; (ii) the "highly attenuated" "relationship between defendants and the [injury-causing] attack," including the lack of allegations connecting the specific attack with the use of defendants' services; (iii) the lack of allegations that defendants treated the terrorist-supporting customers "differently from anyone else"; (iv) the lack of any "independent duty in tort that would have required defendants" to act to stop ISIS from using its

services; and (v) the extremely expansive scope of plaintiffs' theory of liability that would hold

service providers liable for the tortious acts of their customers.  *Id.* at 1227–30.

## ARGUMENT

Motions for reconsideration are governed by Fed. R. Civ. P. 54(b), which provides

that interlocutory orders "may be revised at any time before the entry of a [final] judgment."  *Id.*[5]

The decision to grant reconsideration is "within the sound discretion of the trial court."  *Iacovacci*

v. *Brevet Holdings, LLC*, 2019 WL 2992165, at *2 (S.D.N.Y. July 9, 2019) (internal quotations

omitted).   One of the "major grounds justifying reconsideration" is "an intervening change of

controlling law," such as a new "United States Supreme Court decision" that is "relevant" to the

claims or defenses in the case.  *Clinton*, 652 F. Supp. 2d at 530.  There is no requirement that an

"intervening decision" expressly overrule an existing precedent; reconsideration is warranted "if

it either changes an old rule or announces a new one."  *In re Gorsoan Ltd.*, 2021 WL 240736, at

*4 (S.D.N.Y. Jan. 25, 2021).[6]

---

[5]        Local Civil Rule 6.3 also states in part:  "Unless otherwise provided by the Court or by statute
or rule . . . , a notice of motion for reconsideration or reargument of a court order determining a
motion shall be served within fourteen (14) days after the entry of the Court's determination of the
original motion."  Courts have confirmed that "[t]he court retains discretion to consider a motion"
outside the period set forth in Local Rule 6.3, and will "exercise this discretion when justice so
requires . . . when, for example, there is a change in controlling law, such as the issuance of a
relevant United States Supreme Court decision."  *Clinton* v. *Brown & Williamson Holdings, Inc.*,
652 F. Supp. 2d 528, 530 (S.D.N.Y. 2009).

[6]        Plaintiffs argued during the June 2, 2023 pre-motion conference, based on *Monsanto* v.
*United States*, 348 F.3d 345, 351 (2d Cir. 2003), that "even if a Supreme Court case is in tension
with Second Circuit precedent, district courts must follow the circuit's precedent unless and until
the case is reconsidered by the Second Circuit itself."  (ECF No. 58 (6/2/2023 Tr.) at 13:2–7).)
That is not the law.  In *Monsanto*, the Supreme Court issued a decision, the Second Circuit applied
it, and the *Monsanto* Court explained that it was bound by that application.  348 F.3d at 351.  Here,
unlike in *Monsanto*, the Second Circuit has not addressed *Twitter*.

Under the standard newly announced in *Twitter*, the Complaint fails to state an aiding-and-abetting claim as a matter of law.  Accordingly, the March 2023 Order should be reconsidered, and this case should be dismissed.

## I. *TWITTER* SET A NEW STANDARD FOR ATA AIDING-AND-ABETTING LIABILITY

The Supreme Court's *Twitter* decision changed the landscape for pleading and proving ATA aiding-and-abetting claims in several important ways that were not considered in the March 2023 Order and are dispositive to this case:

*1.   There Must Be Assistance to Each Terrorist Act that Injured Plaintiffs, Not to the Terrorist Enterprise Writ Large.*  The Second Circuit had previously held in *Honickman* and *Kaplan* that to plead the knowing and substantial assistance element, allegations of "knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman*, 6 F.4th at 499; *see Kaplan* v. *Lebanese Canadian Bank, SAL*, 999 F.3d 842, 866 (2d Cir. 2021).  Instead, the "principal violation" only had to be "foreseeable from the illegal activity that the defendant assisted." *Honickman*, 6 F.4th at 499.  Thus, in *Kaplan*, the Second Circuit found this element met by allegations that a bank was aware that certain customers were affiliated with a terrorist group, and that it "knowingly gave the [c]ustomers assistance" that generally "aided" the terrorist group, rather than an actual attack.  *Kaplan*, 999 F.3d at 866.  This Court followed the *Honickman* and *Kaplan* framework in its March 2023 Order.  (Order at 24.)

The Supreme Court in *Twitter* rejected that framework, holding instead that "the question is whether defendants gave substantial assistance to [the FTO] with respect to the [relevant] attack," and a "failure to allege any definable nexus" between assistance and the actual attack "drastically increases" a plaintiff's burden to show conscious and culpable assistance. *Twitter*, 143 S. Ct. at 1229.  The March 2023 Order did not focus on the nexus between SCB's

alleged conduct and the actual attacks that injured Plaintiffs.  Instead, this Court framed "the question" for knowing and substantial assistance as whether the Complaint alleges that SCB assisted *Fatima* in "the provision of CAN to the Syndicate."  (Order at 24.)  *Twitter* has rendered that framing erroneous:  SCB's relationship to *the terrorist attacks* is what matters.

### 2.  The Defendant Must "Culpably Participate" in the Relevant Attacks.

*Twitter* also ratcheted up the ATA's scienter requirement.  Prior to *Twitter*, the Second Circuit held that the "knowing" component of "knowing and substantial assistance" was entirely redundant of the "general awareness" element.   In *Honickman*, for example, the Second Circuit held that a defendant need not know "anything more about" the "unlawful activities" at issue than what the defendant "knew for the general awareness element"—namely, that the defendant "be generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provides the assistance."  6 F.4th at 494, 500 (cleaned up).   In the March 2023 Order, this Court similarly found allegations of SCB's general awareness of terrorists' misuse of Fatima's fertilizer products to be sufficient for the "knowing" component of the knowing and substantial assistance element.  (Order at 24–25.)

The Supreme Court also rejected that approach, holding that courts should not "analyze[] the 'knowing' sub-element as a carbon copy of the antecedent element of whether the defendants were 'generally aware' of their role in [terrorists'] overall scheme."  *Twitter*, 143 S. Ct. at 1229.  Rather, the "knowledge" component is meant to pair with "substantial assistance" to form "a single inquiry designed to capture conscious and culpable conduct."  *Id.* The relevant "scienter," under *Twitter*, requires allegations that "suggest that defendants culpably associated themselves with the [relevant] attack, participated in it as something that they wished to bring about, or sought

by their action to make it succeed." *Id.* at 1226 (cleaned up).  The March 2023 Order did not apply this standard.

3.      ***Twitter Examined Other Factors Relevant To Knowing and Substantial Assistance in ATA Cases***.  *Twitter* also provided further guidance on factors that courts should consider for assessing the scienter and substantial assistance components specifically in the ATA context.  These include: (i) whether there are allegations that "defendants were consciously trying to help or otherwise 'participate in'" the relevant attack, including evidence of "encouraging, soliciting, or advising the commission of" the attack; (ii) how "attenuated" the relationship was between the defendant's conduct and the attack at issue, including whether the actual attackers used the defendant's services; (iii) whether the defendant treated relevant customers who were part of a terrorist group or supports of terrorists "differently from anyone else"; (iv) whether plaintiffs identified any "independent duty in tort" that the service provider had to stop providing services to known terrorists or their sympathizers; and (v) the scope of Plaintiffs' theory of liability, particularly when liability is premised on the acts of a defendant's customers.  *Id.* at 1227–28.

In considering these factors, the Supreme Court held that "the more attenuated the nexus to the tortious conduct, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort."  *Id.* at 1230.  Thus, even where a claim is premised on a service provider defendant's "failure to stop" a terrorist group it allegedly knows is "using" its services directly, "a strong showing of assistance and scienter would [] be required."  *Id.* at 1227.[7]  Culpability is necessary in such cases "lest mostly passive actors

---

[7]      The Court referred to this type of conduct as "passive nonfeasance." *Twitter*, 143 S. Ct. at 1227.  In using the term "passive," the Court did not suggest that the defendant must be *inactive*, as Plaintiffs seem to suggest (ECF No. 56 at 3), but merely indifferent to the motives of a given customer of the defendant's services.

*like banks* become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 1222 (emphasis added) (citing *Monsen* v. *Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978)).  This Court did not consider any of these factors in its March 2023 Order, though they are now clearly applicable where, as here, the Complaint is premised on a service provider's alleged failure to stop providing services to a customer who sells a product ultimately used by a terrorist group.

>    **4.**     ***The Six Halberstam Factors Do Not Apply in Most Circumstances.***

Finally, *Twitter* rejected the approach previously followed by the Ninth Circuit to apply a six-factor test that courts had extracted from *Halberstam* as the *sine qua non* of "knowing and substantial assistance."  *Twitter*, 143 S. Ct. at 1220, 1223–25, 1229.  The Second Circuit also has required rigid adherence to those same six factors in earlier decisions.  *Honickman*, 6 F.4th at 501 ("For the final element of substantial assistance, the complaint must contain sufficient factual allegations relating to the six factors identified above."); *Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 330 (2d Cir. 2018) ("[W]hether a defendant's assistance is 'substantial enough' to constitute aiding and abetting requires consideration of [*Halberstam's* six] factors. . .").  This Court followed those precedents in its March 2023 Order.  (*See* Order at 24 ("The question, then, is whether Standard Chartered provided *substantial* assistance to that venture. Courts look to six factors to determine whether that is so.").)

>    The Supreme Court clarified that this is not what courts should do in an ATA case. The Court explained that "hew[ing] tightly to the precise formulations that *Halberstam* used" led the Ninth Circuit to improperly "focus[] . . . primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants' culpably associated themselves with ISIS' actions." *Twitter*, 143 S. Ct. at 1223, 1229.  The March 2023 Order took this even a step further by training its

analysis on the value of SCB's services *to Fatima* (a fertilizer manufacturer, not a terrorist group) (Order at 24–25), rather than whether there are any allegations that SCB culpably associated itself with any of the attacks upon which the Complaint is based.[8]  *Twitter* rejects that approach.

## II.   THE COMPLAINT FAILS TO ALLEGE THAT SCB "KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE" TO ANY TERRORIST ATTACK THAT INJURED PLAINTIFFS.

Applying the *Twitter* standard here, the Complaint fails to state a claim.  There are no allegations that SCB was "consciously trying to help or otherwise 'participate in'" any terrorist attack that injured Plaintiffs.  *Twitter*, 143 S. Ct. at 1227.  Rather, the Complaint alleges that after learning about terrorists' misuse of Fatima's CAN products, SCB did not discontinue its pre-existing banking relationship with Fatima, a long-standing customer, which involved lawful commercial loans and other typical banking services that SCB provides through more than 1,000 branches and affiliates in 57 countries around the world, totaling hundreds of billions of dollars a day.  (*See* Compl. ¶¶ 28, 31.)  Indeed, SCB's alleged relationship to the attacks at issue is even more "attenuated" than in *Twitter*, and SCB had no "independent duty in tort" to stop providing services to a fertilizer manufacturer based on the fact that bad actors were misusing that manufacturer's lawful products.

### A.   The Complaint Fails To Allege SCB Assisted Any Terrorist Attack That Injured Plaintiffs.

To plead an aiding-and-abetting claim under *Twitter*, there must be some plausible "concrete" or "definable" nexus between the knowing assistance a defendant provides and each of the relevant terrorist attacks that harmed the plaintiffs.  143 S. Ct. at 1228–29.  It is not sufficient

---

[8]     For example, the Court found that SCB's alleged "significant financial services" were "'indisputably important' *to Fatima*."   (Order at 24 (quoting *Halberstam*, 705 F.2d at 488) (emphasis added).)

to allege that a defendant gave "substantial assistance to a transcendent [terrorist] 'enterprise' separate from and floating above all the actionable wrongs that constitute it."  *Id.* at 1224.  The Complaint fails to meet even this threshold test.

Crucially, the Complaint does not allege that anything SCB allegedly did assisted any of the four attacks at issue.  In fact, the Complaint does not allege that the terrorists who committed the attacks actually acquired and misused Fatima's CAN fertilizer product for those attacks.  Rather, the Complaint is premised on a theory that "Standard Chartered knowingly provided *substantial assistance to Fatima*," and that Fatima was involved in an "overall illegal enterprise" of "supplying CAN fertilizer" to a "Syndicate" of terrorist groups who misused that otherwise lawful product for explosives.  (Compl. ¶ 216 (emphasis added); *see also* Compl. ¶ 219 ("The al-Qaeda Terror Syndicate attacks that killed Plaintiffs' family members were a reasonably foreseeable risk of Standard Chartered's *substantial assistance to Fatima*, including the provision of financial and banking services.") (emphasis added).)  This is precisely the type of "transcendent enterprise" theory of liability explicitly rejected in *Twitter* by the Supreme Court.  143 S. Ct. at 1224 ("[I]t is not enough, as plaintiffs contend, that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it.").  By making high-level allegations of assistance to an "overall illegal enterprise" of a "Syndicate" of numerous terrorist groups using CAN and other compounds from various sources to make IEDs (Compl. ¶ 216), the Complaint has fallen short of pleading "any definable nexus between the defendants' assistance and the attack."  *Twitter*, 143 S. Ct. at 1229.  This deficiency alone requires dismissal and, at a minimum, "drastically increases [Plaintiffs'] burden to show that [SCB] somehow consciously and culpably assisted the attack[s]" at issue.  *Id.*  As discussed below, the complaint falls far short of meeting any such burden.

**B.      The Complaint Fails To Allege the Required Level of Scienter.**

To plead an aiding-and-abetting claim, the Complaint needs to allege that defendants "culpably associated themselves with the [terrorist] attack, participated in it as something that they wished to bring about, or sought by their action to make it succeed." *Twitter*, 143 S. Ct. at 1226 (cleaned up).  A defendant's mere knowledge that a customer may be providing some form of support to terrorists and their criminal acts is insufficient to satisfy this scienter requirement.  *Id.*  Rather, the complaint must point to some "affirmative act" by the defendant that demonstrates "the intent of facilitating" the "commission" of the terrorist attacks at issue, such as "encouraging, soliciting, or advising the commission of the [injury-causing] attack." *Twitter*, 143 S. Ct. at 1221, 1227.   Invoking the traditional limitations on secondary liability in tort law, the Supreme Court emphasized the importance of culpability with respect to the provision of routine services, "lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Twitter*, 143 S. Ct. at 1222.

Here, there is no allegation that SCB took any steps to affirmatively encourage, solicit or advise the commission of any of the four attacks in Afghanistan upon which the Complaint is based.  In fact, the Complaint alleges the opposite:  As this Court found in the March 2023 Order, when "presented with the evidence" of terrorists misusing Fatima's CAN product and Fatima's alleged failure to prevent it, SCB allegedly "looked the other way" and "continued to provide financial services to Fatima," which allegedly "'enabled' the Syndicate" generally.  (Order at 5 (internal quotations omitted).)  Those financial services involved routine banking services to a long-standing customer.  (Compl. ¶¶ 148–57.)  And while Plaintiffs argue that "people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' *of the intended tort*" (ECF No. 56 at 2 (emphasis added) (internal quotations omitted)), the Complaint does not allege that SCB intended to help commit any tort.

Plaintiffs have attempted to distinguish *Twitter* by pointing to an "extraordinary meeting with U.S. officials," which they claim makes this a "rare 'actual knowledge' case." (ECF No. 56 at 3.)  This misconstrues *Twitter*, as the complaints in that case were awash in allegations that government officials around the world—including members of Congress and officials from the White House—had specifically warned defendants about terrorists' use of their platforms and urged them to do more to curb the ability of terrorist organizations to use them.  *See Twitter*, 143 S. Ct. at 1230 ("[D]efendants failed to stop ISIS despite knowing it was using those platforms."); *see also, e.g.*, Finn Decl. Ex. 1 (*Taamneh* FAC) ¶¶ 26, 206, 208–211; Finn Decl. Ex. 2 (*Gonzalez* TAC) ¶¶ 495–497, 500.  Such allegations did not provide the relevant scienter to show a defendant "knowingly provided substantial assistance" as the ATA requires.  *Twitter*, 143 S. Ct. at 1230.

Instead, the Court in *Twitter* held that allegations that a business continued to provide services to customers it knew were members of a terrorist group that misuses those services for terroristic ends "rest[] less on affirmative misconduct and more on an alleged failure to stop [terrorists] from using [the services]."  *Twitter*, 143 S. Ct. at 1227.  In such cases, an especially strong showing of culpability is required lest "ordinary merchants" be held "liable for any misuse of their goods and services."  *Id.* at 1221.  In other words, continuing to provide ordinary commercial services to customers, even after alleged warnings by government officials that those services are being misused in some way, does not suddenly render those ordinary services actionable.  As particularly relevant here, the Supreme Court expressly recognized that "passive nonfeasance" includes "mostly passive actors like banks," who do not "become liable for all of their customers' crimes by virtue of carrying out routine transactions."  *Id.* at 1222.  This principle applies with even more force here, where there is no factual allegation suggesting SCB's customer (Fatima) was committing any crime or even misusing SCB's banking services.

This limitation is well-illustrated by the bank-related cases specifically discussed by the Court in Twitter as forming the aiding-and-abetting "framework" that *Halberstam* applied. *Id.* For example, in *Monsen* v. *Consolidated Dressed Beef Co.*, plaintiffs sued a bank for aiding and abetting a customer that issued fraudulent promissory notes. 579 F.2d at 795. The Third Circuit held that "knowledge alone of the [fraudulent program] would have been an insufficient predicate for aiding and abetting liability against the [b]ank." *Id.* at 802. Rather, it was essential for aiding and abetting liability that the bank "actively encouraged" the customer to continue the fraud by "attempt[ing] to extract a promise from [the company] that the program would continue." *Twitter*, 143 S. Ct. at 1221. Here, Plaintiffs have not alleged *any* tortious conduct by SCB's customer (Fatima), or that SCB had the "intent of facilitating" or "wished to bring about" a terrorist attack by continuing to provide banking services to that customer. *Id.* at 1221.

Similarly, in *Landy* v. *F.D.I.C.*, a case involving a bank president's misuse of funds to engage in market manipulation, the plaintiffs brought claims against brokerage firms that provided services to the bank president, "alleg[ing] that the brokerage firms knew from the volume of trading, the improper manner in which the account was handled, the instructions as to secrecy, and from personal and direct knowledge of the affairs of the bank, that said accounts were part of a device and scheme to defraud the shareholders." 486 F.2d 139, 163 (3d Cir. 1973) (internal quotations omitted). The *Landy* court held that "knowing and substantial assistance" was not met by allegations of "a business transaction (stock purchases and sales), which foreseeably permits one of the parties to it [the bank president] to independently engage in illegal action as to other parties." *Id.* What was necessary, but missing, was any allegation "that the brokers proposed to bring about the publication of the false financials and the consequent fraud upon the stock

purchasers." *Id.* at 164.  Here too, there are no allegations that SCB proposed or sought to bring

about a terrorist attack by continuing to bank Fatima.

> ### C.    None of the Indicia of Aiding and Abetting Found Relevant in *Twitter* Are Present Here.

In determining whether the *Twitter* defendants had culpably aided and abetted the

act of international terrorism that injured the plaintiffs, the Supreme Court considered several

additional factors, including:  (i) how "attenuated" the relationship was between the defendant's

conduct and the attack at issue, including whether the actual attackers used the defendant's

services; (ii) whether the defendant treated relevant customers who were part of a terrorist group

or supports of terrorists "differently from anyone else"; (iii) whether plaintiffs identified any

"independent duty in tort" for the service provider to stop providing services to known terrorists

or their sympathizers; and (iv) how expansive the scope of Plaintiffs' theory is.  *Id.* at 1227–28.

*First*, SCB's alleged conduct is even more attenuated from the four terrorist attacks

at issue here than the conduct alleged in *Twitter*.  Plaintiffs do not allege that the terrorist

"Syndicate" that committed the attacks used SCB's services at all.  Instead, the Complaint alleges

SCB was a provider of routine banking services to a manufacturer of an agricultural product.  (*See*

Compl. ¶¶ 151–57.)  The Complaint alleges that by banking Fatima, SCB generally helped Fatima

to continue and grow its fertilizer business, which, in turn, made CAN fertilizer more available for

a Syndicate of terrorist groups operating in Pakistan and Afghanistan to misuse that product for

bombs.  Plaintiffs further allege that the attacks at issue involved some sort of explosive (*see id.*

¶¶ 180, 194, 198, 207), but there is no allegation those explosives used Fatima's fertilizer product

as an ingredient.  By contrast, the "attenuated" theory that the Supreme Court rejected in *Twitter*

involved the defendants providing services directly to ISIS, the FTO that committed the attack that

injured the plaintiffs.  In other words, SCB's alleged conduct here far more attenuated than what

was alleged in *Twitter*.  If anything, here it is *Fatima* (SCB's customer) that is more akin to the defendants in *Twitter*.  The Complaint alleges that Fatima was made aware that one of its products, CAN fertilizer, was being misused by terrorist groups to further terrorist attacks generally but did not do enough to prevent that misuse (Compl. ¶¶ 17–18), and thus "was knowingly supplying the Syndicate with CAN" (Order at 19).  This is precisely the type of "passive nonfeasance" that the Supreme Court was clear would require "a strong showing of assistance and scienter" even to render *Fatima* liable for aiding and abetting.  *Twitter*, 143 S. Ct. at 1227.  SCB's conduct is even further removed, and thus plainly falls short of what the Supreme Court now requires.

*Second*, the Complaint does not allege that SCB "treated [Fatima] differently" from any other banking customer.  *Id.*  It cannot be credibly argued that the services SCB provided to Fatima—namely loans and dollar clearing—were anything other than routine.  Indeed, the central allegation relied upon in Plaintiffs' May 31 letter is that SCB provided a commercial loan that was used by Fatima to "remove production bottlenecks," some of which allegedly helped the production of CAN.  (ECF No. 56 at 2–3; *see* Compl. ¶¶ 154–55.)  But a commercial loan to facilitate a company's investment in its infrastructure is among the most typical and routine transactions in banking, and even more so when provided to a longstanding customer.  Accordingly, this is far from a case "where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack."  (ECF No. 56 at 3 (quoting *Twitter*, 143 S. Ct. at 1228).)

Moreover, Plaintiffs' contention that "following the January 2013 meeting with the U.S. government, it was both (1) highly 'unusual' for SCB to continue servicing Fatima, and (2) extremely 'dangerous' to do so," misses the mark.  (ECF No. 56 at 3.)  When a bank is informed

that a customer might be helping terrorists (wittingly or unwittingly), its continued banking services are not rendered unusual or uniquely dangerous.  If that were the case, Twitter's services—which provide terrorists with a global public communications platform to plan, authorize and glorify terrorist attacks—would certainly have qualified as "unusual" and "dangerous," but the Supreme Court made clear they were not.  Like Twitter, SCB did not deal in "dangerous wares" and was not engaged in "selling those goods to a terrorist group."  *Twitter*, 143 S. Ct. at 1228.  Rather, SCB's "wares" were traditional banking services—no more dangerous than social media services—and its customer was a major fertilizer company, not a terrorist organization.

Nor is there anything "unusual" about a bank's decision not to terminate its customer simply because it was asked by a government official to consider doing so.  Indeed, the *Twitter* complaint contained allegations that high-level officials from the U.S. government— including officials from the White House and members of Congress—"encouraged [the defendants] to do more to block terrorists from using their services" but that defendants "had consistently failed to respond sufficiently to pleas to shut down clear incitements to violence by terrorists" and "resisted some requests by law-enforcement leaders to take action."  (Finn Decl. Ex. 1 (*Taamneh* FAC) ¶¶ 209, 211.)

*Third*, the Complaint does not "identify some independent duty in tort" that would have required SCB to terminate their commercial relationship with Fatima as one U.S. military official requested.  *Twitter*, 143 S. Ct. at 1227; *see Woodward* v. *Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) ("When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved.").  Regardless of how "extraordinary" Plaintiffs allege General Barbero's 2013 visit to

SCB's New York Branch to have been, a request from a U.S. military official to stop banking a customer does not impose a legal obligation on a bank to do so.  By contrast, banks are heavily regulated in the U.S. by a host of government agencies, including the Treasury Department and Commerce Department, which decided *not* to designate Fatima on the so-called "Entity List" because it could not establish Fatima was "knowingly selling its product to insurgent groups or terrorists."  (ECF No. 22-1 at 2.)  Multinational banks like SCB take their cues from these regulators and act accordingly.

*Fourth*, Plaintiffs' theory of liability is impermissibly broad under *Twitter*.  Given the lack of any concrete nexus between SCB's banking services and the four alleged attacks, Plaintiffs' theory would hold liable any service provider if it is alleged to be aware that a company to which it proves services produces products that are misused by terrorists.  Under Plaintiffs' theory, that liability would extend to any bombing attack that *might* have involved that particular product.  That theory would cover banks or other service providers (including accounting, payroll, shipping), as well as manufacturers of products that terrorists are known to frequently misuse—from vehicle manufacturers and dealers to suppliers of pressure cookers, or even timers.  The Supreme Court rejected a similarly "boundless" theory of liability in *Twitter*, 143 S. Ct. at 1221–22, and the Court should do so here.

## CONCLUSION

For the foregoing reasons, the Court should reconsider its March 7, 2023 ruling in light of the Supreme Court's intervening decision in *Twitter* and dismiss the Complaint in its entirety.


Dated: June 23, 2023
      New York, New York

Respectfully submitted,

*/s/ Sharon L. Nelles*
Sharon L. Nelles (nelless@sullcrom.com)
Andrew J. Finn (finna@sullcrom.com)
Bradley P. Smith (smithbr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Standard Chartered Bank*