# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DIANA BONACASA, *et al*.,

        Plaintiffs,

        -v.-

STANDARD CHARTERED PLC and
STANDARD CHARTERED BANK,

        Defendants.

No. 1:22-CV-03320 (ER) (OTW)

MARIBEL MOORE, *et al*.,

        Plaintiffs,

        -v.-

STANDARD CHARTERED PLC and
STANDARD CHARTERED BANK,

        Defendants.

No. 1:23-CV-02834 (ER) (OTW)

ESTATE OF ANNE T. SMEDINGHOFF,
*et al*.,

        Plaintiffs,

        -v.-

STANDARD CHARTERED BANK,

        Defendant.

No. 1:23-CV-02865 (ER) (OTW)

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT STANDARD CHARTERED BANK'S MOTION FOR RECONSIDERATION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 4

LEGAL STANDARD............................................................................................... 9

ARGUMENT ........................................................................................................ 10

    I.    SCB Fails To Show "Exceptional Circumstances" That Merit Reconsideration
        Of This Court's Order................................................................................. 10

      A.    "Knowing And Substantial Assistance" Must Be Determined On A Sliding
            Scale Of Substantiality And Culpability................................................... 10

      B.    *Twitter* Does Not Require A "Direct Nexus" Between The Defendant's
            Conduct And A Particular Terrorist Act. ................................................. 13

    II.    Under Both *Twitter* And Undisturbed Second Circuit Law, Plaintiffs Have Stated
         A Plausible Claim Against SCB. ................................................................ 15

      A.    Plaintiffs Allege "Knowing And Substantial Assistance" Based On *Twitter*'s
            "Sliding Scale."..................................................................................... 16

        1.    Plaintiffs Allege "Affirmative Misconduct," Not Merely "Passive
               Nonfeasance."................................................................................. 16

        2.    Plaintiffs Allege That SCB Possessed An Unusually High Level Of "Actual
               Knowledge."................................................................................... 19

      B.    Plaintiffs Allege That The IED Attacks That Killed Their Family Members
            Were The Foreseeable Result Of SCB's Knowing Provision Of Services To
            Fatima. ................................................................................................ 21

CONCLUSION...................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Batte v. Hecla Mining Co.*,
No. 19-CV-4883 (ALC), 2021 WL 516546 (S.D.N.Y. Feb. 11, 2021) ...................................9

*Boone v. United States*,
No. 02-CR-1185 (JMF), 2017 WL 398386 (S.D.N.Y. Jan. 30, 2017)....................................9

*Canfield v. SS&C Techs. Holdings, Inc.*,
No. 18-CV-8913 (ALC), 2021 WL 1026128 (S.D.N.Y. Mar. 17, 2021) ................................9

*Halberstam v. Welch*,
705 F. 2d 472 (D.C. Cir. 1983) ..............................................................................................1

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ........................................................................................... *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021)...............................................................................1, 2, 12, 14

*Monsanto v. United States*,
348 F.3d 345 (2d Cir. 2003).................................................................................................10

*Monsen v. Consol. Dressed Beef Co.*,
579 F.2d 793 (3d Cir. 1978).................................................................................................15

*NEM Re Receivables, LLC v. Fortress Re, Inc.*,
187 F. Supp. 3d 390 (S.D.N.Y. 2016)....................................................................................9

*Rosner v. United States*,
No. 16-CV-7256 (JGK), 2019 WL 1451253 (S.D.N.Y. Mar. 18, 2019) ................................9

*Siegel v. HSBC North America Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019).................................................................................................20

*Sotloff v. Qatar Charity*,
2023 WL 3721683 (S.D. Fla., May 30, 2023) ......................................................................21

*Twitter, Inc. v. Taamneh*,
143 S. Ct. 1206 (2023)................................................................................................ *passim*

*United States v. Diaz*,
122 F. Supp. 3d 165 (S.D.N.Y. 2015)...................................................................................10

*United States v. Dupree*,
  No. 16-CR-84 (ARR), 2016 WL 10703796 (E.D.N.Y. Aug. 29, 2016), *aff'd*,
  767 F. App'x 181 (2d Cir. 2019) ........................................................................9, 10

*United States v. Wong*,
  40 F.3d 1347 (2d Cir. 1994).........................................................................................10

*Wiener v. AXA Equitable Life Ins. Co.*,
  No. 16-CV-4019 (ER), 2020 WL 409785 (S.D.N.Y. Jan. 24, 2020)....................................1, 9

*Woodward v. Metro Bank of Dallas*,
  522 F.2d 84 (5th Cir. 1975) .........................................................................................15

*Zoelsch v. Arthur Andersen & Co.*,
  824 F.2d 27 (D.C. Cir. 1987), *abrogated by Morrison v. Nat'l Australia Bank
  Ltd.*, 561 U.S. 247 (2010) ...........................................................................................15

## PRELIMINARY STATEMENT

Reconsideration is an "extraordinary remedy" to be "employed sparingly." *Wiener v. AXA Equitable Life Ins. Co.*, No. 16-CV-4019 (ER), 2020 WL 409785, at *2 (S.D.N.Y. Jan. 24, 2020) (Ramos, J.). Standard Chartered Bank ("SCB") does not come close to establishing that this Court should reconsider its well-reasoned decision denying SCB's motion to dismiss. As this Court recognized, this is the rare case in which "a plaintiff alleges that a defendant bank had *actual knowledge* of its role in aiding and abetting the harmful activities of a terrorist scheme." ECF No. 32 ("Order") at 22. SCB's provision of "significant financial services" was also "indisputably important" to the Fatima Group ("Fatima"), which supplied al-Qaeda with explosive chemicals used in improvised explosive devices ("IEDs"), including because SCB's loans "enabled Fatima to remove [calcium ammonium nitrate ('CAN')] production bottlenecks that were critical to expanding CAN production capacity." *Id.* at 24 (citations omitted).

The Supreme Court's opinion in *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023)—notwithstanding SCB's misrepresentation and selective quotation of it—did not overrule or displace the Second Circuit precedent on which this Court relied in finding that Plaintiffs stated a valid Justice Against Sponsors of Terrorism Act ("JASTA") claim against SCB. And, in any event, the facts alleged here satisfy the *Twitter* standard in light of SCB's culpable participation in the explosives pipeline that killed and maimed Americans in Afghanistan.

Contrary to SCB's characterization, this Court's application of JASTA was not "at odds" with *Twitter*. *See* ECF No. 61 at 2. Instead, the Supreme Court in *Twitter*, consistent with Second Circuit precedent applied by this Court—*see Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021); *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021)—adopted the six-factor test set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "viewed in context of the common-law tradition from which it arose," as the proper legal framework for

evaluating whether an aider and abettor's assistance was "substantial," 143 S. Ct. at 1218. Also consistent with Second Circuit precedent, the *Twitter* Court counseled that *Halberstam*'s "exact phrasings and formulations" are not "inflexible codes." 143 S. Ct. at 1220, 1225. *Cf. Kaplan*, 999 F.3d at 856 (*Halberstam* factors are "variables"); *Honickman*, 6 F.4th at 500 ("[T]he weight accorded to each is determined on a case-by-case basis."). Rather, there is a sliding scale of substantiality and culpability: "[T]he knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Twitter*, 143 S. Ct. at 1229. This rule aligns with the Second Circuit law applied by this Court in denying SCB's motion to dismiss. *See Kaplan*, 999 F.3d at 857 (reasoning that "culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences").

SCB also misrepresents *Twitter* as requiring a direct connection between the defendant's conduct and the implicated terrorist attack(s). Actually, in line with Second Circuit precedent, *Twitter* held that no "strict nexus" is required, confirming instead that foreseeability is key to the JASTA analysis. 143 S. Ct. at 1223. "As *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were 'a *foreseeable* risk' of the intended tort." *Id.* at 1225 (emphasis added); *see also Honickman*, 6 F.4th at 496–97 ("Foreseeability is thus central to the *Halberstam* framework, and as a result, to JASTA aiding-and-abetting liability."). The Supreme Court makes clear that the "require[ment] that defendants have aided and abetted the act of international terrorism that injured the plaintiffs . . . does not always demand a strict nexus between the alleged assistance and the terrorist act"—they may have assisted other torts. 143 S. Ct. at 1225. Describing a case relied on in *Halberstam*, the Court noted that "a defendant might

be held liable for aiding and abetting the burning of a building if he intentionally helped others break into the building at night and then, unknown to him, the others lit torches to guide them through the dark and accidentally started a fire." *Id*. at 1224 (quoting *American Family Mutual Ins. Co. v. Grim*, 201 Kan. 340, 345–347 (1968)). The Second Circuit came to the same conclusions—relying on the same *Grim* case. *See Honickman*, 6 F.4th at 496 n.9.

Consistent with JASTA's legal framework, this Court held that Plaintiffs stated a valid claim against SCB, whereas the Supreme Court in *Twitter* held that the plaintiffs did not. The defendants in *Twitter* were "three of the largest social-media companies in the world" and had the same "relationship with ISIS and its supporters" as they had "with their billion-plus other users: arm's length, passive, and largely indifferent." 143 S. Ct. at 1215, 1227.  In this way, the *Twitter* defendants were "innocent bystander[s]" who engaged in "mere passive nonfeasance" with an alleged connection to the "transcendent 'enterprise'" of ISIS but not to any specific ISIS attacks. *Id.* at 1220, 1224, 1227. Here, by contrast, because SCB was warned by the U.S. government about a specific bank customer and its role in killing and maiming American service members, it is not an innocent bystander engaged in mere passive nonfeasance. SCB's misconduct instead had a foreseeable nexus to the explosive device attacks in Afghanistan that killed Plaintiffs' family members.

Plaintiffs allege that SCB ignored a U.S. government warning and continued providing millions of dollars of financial services for one specific customer producing one specific chemical being used to kill U.S. solders through one specific modality of attack in one specific region of the world—what the *Twitter* Court terms a "definable subset" of terrorist attacks. After being confronted with its central role in financing IED production, SCB continued to affirmatively provide "knowing and substantial assistance" to Fatima's production and provision

of CAN to the Syndicate for the manufacture of IEDs, which foreseeably led to the IED attacks that killed Plaintiffs' family members. SCB had "actual knowledge" that its "significant" support of Fatima had "stimulated CAN production," and in turn, corresponded with a sharp uptick in deaths by IEDs in Afghanistan. Order at 22, 24–25. This Court explained: "Standard Chartered's support of Fatima [was] *directly tied* to Fatima's ability to provide CAN to al-Qaeda." *Id.* at 26 (emphasis added). However, despite these warnings, SCB continued to provide necessary, high-value financial services to Fatima. In short, far from providing "routine," arm's-length banking, ECF No. 61 at 1, SCB "intentionally associated" with the al-Qaeda Terror Syndicate and "affirmatively gave aid that would assist each of [the Syndicate's IED] acts," *Twitter*, 143 S. Ct. at 1228. This is precisely the type of wrongdoing that *Twitter* described as "conscious and culpable conduct." *Id.* at 1229.

For the reasons set forth herein, this Court should deny SCB's motion for reconsideration.

## BACKGROUND

### A.    This Court's March 7, 2023 Order

This Court denied SCB's motion to dismiss, holding that Plaintiffs adequately alleged that SCB "aided and abetted al-Qaeda by providing banking services" to Fatima. Order at 1. In denying SCB's motion, the Court concluded that Plaintiffs properly pleaded both "general awareness" and "substantial assistance." *Id.* at 17–19, 24–25.

As to "general awareness," the Court cited Plaintiffs' allegations that SCB "knew that it was playing a role in the IED-making operations of al-Qaeda and the Syndicate" because "U.S. officials explicitly told Standard Chartered executives at a meeting in New York" and because "the press covered Fatima's actions." *Id.* at 17. Specifically, the Court described Plaintiffs' allegations that in January 2013, officials from the U.S. government met with SCB executives in

New York to warn SCB that its client Fatima was supplying the Taliban with materials used to manufacture IEDs that were being deployed to kill U.S. service members in Afghanistan. *Id.* The officials explained that Fatima supplied vast quantities of CAN fertilizer, a key ingredient in IEDs, to the Taliban, and provided the executives with maps of the Fatima plants, along with pictures of bags of fertilizer seized from the Taliban and Haqqani network. The U.S. officials also explained that IEDs were the most common cause of service members' deaths and asked SCB to end its business relationship with Fatima. SCB ignored that request, instead choosing to "enable[]" the terrorists through its continued provision of financial services. *Id.* In addition to SCB being directly informed by the U.S. government, the Court also noted that "Plaintiffs point to several public sources to show that Standard Chartered knew that it was playing a role in Fatima's unlawful activities, which enabled the production of IEDs and attacks on American servicemen." *Id.* at 18 (describing articles and congressional testimony about Fatima from 2011 and 2012).

"Taken together," the Court reasoned, Plaintiffs' allegations of actual knowledge (from direct communications with the U.S. government) and general knowledge (from press reporting) "make it plausible that Standard Chartered was aware of Fatima's role—and thus its own role—in supplying the Syndicate with ingredients to IEDs." *Id.* The Court explained that both types of knowledge suffice to establish general awareness; but actual knowledge of the type SCB is alleged to have had is rare and clearly sufficient even to support a claim of primary liability under the ATA. *Id.* at 22–23 (citing *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010)).

The Court also held that Plaintiffs plausibly alleged "substantial assistance." *Id.* at 24–25. In considering this element, the Court explained that "the illegal activity that was assisted was

the provision of CAN to the Syndicate for the manufacture of IEDs. None dispute that the killing of U.S. service members is a foreseeable consequence of assisting in the creation of IEDs for al-Qaeda and the Syndicate during the war in Afghanistan." *Id.* at 24. Thus, the "question . . . is whether Standard Chartered provided *substantial* assistance to that venture." *Id.* The Court answered in the affirmative.

The Court determined that "the nature of Standard Chartered's support—significant financial services—was indisputably important to Fatima, including dollar clearing services, daily banking services, and loans." *Id.* at 24 (internal quotation marks omitted). "Indeed, some of Standard Chartered's loans to Fatima enabled Fatima to remove [CAN] production bottlenecks that were critical to expanding CAN production capacity." *Id.* (internal quotation marks omitted) (alteration in original). Moreover, the amount and duration of assistance were significant: SCB "provided Fatima with at least twenty-five million dollars in loans" and maintained an active "relationship with Fatima" starting in 2001 and continuing through the time "when the Syndicate killed Plaintiffs' family members." *Id.* at 24–25. The Court found it "clear that this support stimulated CAN production" because "from 2011 to 2016, the Syndicate sourced tens of thousands of tons of CAN to make IEDs from Fatima's two fertilizer plants in Pakistan." *Id.* (internal quotation marks omitted). And SCB was well "aware that its services provided Fatima and the Syndicate support—it was told as much in a face-to-face meeting with a U.S. Army General." *Id.* at 25.

### B.    The *Twitter* Decision

In *Twitter*, the Supreme Court considered two kinds of aiding-and-abetting claims by victims of the ISIS terrorist attacks on the Reina nightclub in Istanbul. 143 S. Ct. at 1215. The victims first alleged that three social media companies were liable for injuries caused by the Reina attack because they "fail[ed] to stop ISIS from using [their] platforms" to post recruiting

and propaganda videos. *Id.* at 1227. The victims also alleged that Google was liable because it "reviewed and approved ISIS videos on YouTube as part of its revenue-sharing system and thereby shared advertising revenue with ISIS." *Id.* at 1230.

The Court rejected liability under both theories—but for different reasons. With respect to ISIS's use of social media platforms, the Court observed that the allegations were based "less on affirmative misconduct" than on the failure to act, and that the law has "long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance." *Id.* at 1227. In the absence of affirmative misconduct, the Court explained, "a strong showing of assistance and scienter would . . . be required" to support liability. *Id.* The *Twitter* plaintiffs failed to make such a showing, particularly because the defendants' platforms were "public areas." *Id.* at 1228. "[T]he relationship between defendants and the Reina attack is highly attenuated" in that "defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis," and the plaintiffs did not "alleg[e] that defendants treated ISIS any differently from anyone else." *Id.* at 1227. Indeed, the plaintiffs "concede[d] that defendants attempted to remove at least some ISIS-sponsored accounts and content after they were brought to their attention." *Id.* at 1226 n.13. Given that the defendants' relationship to the terrorists was "the same as their relationship with their billion-plus other users"—"arm's length, passive, and largely indifferent"—there was no basis for concluding that the defendants acted culpably. *Id.* at 1227.

Moreover, the *Twitter* defendants' alleged support to ISIS was not just passive; the complaint did not identify any specific ISIS users defendants were specifically aware of and failed to remove from their platforms. Rather, the complaint alleged only the defendants knew that ISIS users were accessing and utilizing their platforms generally and failed to effectively

remove ISIS content from their sites. They made their services "generally available to the internet-using public with little to no front-end screening by defendants." *Id.* at 1226. In fact, the *Twitter* plaintiffs' allegations conceded that the social media defendants had no reason to know who was signing up for their platforms and they "attempted to remove at least some ISIS-sponsored accounts and content after they were brought to their attention." *Id.* at 1226 n.13.

Put differently, the plaintiffs' social-media claims failed in three separate respects: they failed to allege any "nexus between th[e] assistance and the Reina attack"; they failed to allege that "any defendant intend[ed] to assist ISIS"; and they failed to identify "any sort of affirmative and culpable misconduct that would aid ISIS." *Id.* at 1230. For those reasons together, the claims based on social media services fell short.

The Court's analysis as to the allegations of revenue sharing was different. The Court never suggested that revenue sharing was mere "passive nonfeasance" or that the alleged misconduct was not sufficiently culpable. Instead, the Court faulted the plaintiffs for failing to allege that the assistance was "substantial"—and specifically for failing to allege anything "about the amount of money that Google supposedly shared with ISIS, the number of accounts approved for revenue sharing, or the content of the videos that were approved." *Id.* at 1230. As the Court explained, if "Google approved only one ISIS-related video and shared only $50 with someone affiliated with ISIS," liability would be inappropriate. *Id.* (explaining that because the plaintiffs' theory of liability required them to show that Google's assistance rendered it liable for *every* ISIS attack, a small amount of assistance was insufficient). This analysis plainly suggests that if the number of videos approved had been large, or the revenue sharing financially significant, Google would have been liable.

**LEGAL STANDARD**

"To succeed on a motion for reconsideration, the movant carries a heavy burden." *Rosner v. United States*, No. 16-CV-7256 (JGK), 2019 WL 1451253, at *1 (S.D.N.Y. Mar. 18, 2019). A "motion for reconsideration should be granted only when the defendant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Canfield v. SS&C Techs. Holdings, Inc.*, No. 18-CV-8913 (ALC), 2021 WL 1026128, at *1 (S.D.N.Y. Mar. 17, 2021) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013)). A movant asserting an intervening change in the law must show that the change is "controlling"—that is, it would "reasonably be expected to alter" the outcome. *NEM Re Receivables, LLC v. Fortress Re, Inc.*, 187 F. Supp. 3d 390, 396 (S.D.N.Y. 2016). "Courts narrowly construe and strictly apply these principles in order to avoid repetitive arguments on issues that have already been considered fully by the court." *Batte v. Hecla Mining Co.*, No. 19-CV-4883 (ALC), 2021 WL 516546, at *2 (S.D.N.Y. Feb. 11, 2021). As a result, granting a motion for reconsideration is an "extraordinary remedy" that this Court has cautioned should be "employed sparingly." *Wiener*, 2020 WL 409785, at *2 (Ramos, J.).

When, as here, a reconsideration motion urges a district court to ignore binding circuit precedent, the movant faces an even heavier burden. That is because this Court *must* follow Second Circuit precedent unless it has been overruled in a precedential Second Circuit decision, or "a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *Boone v. United States*, No. 02-CR-1185 (JMF), 2017 WL 398386, at *1 (S.D.N.Y. Jan. 30, 2017) (quoting *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015)); *see also United States v. Dupree*, No. 16-CR-84 (ARR), 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016), *aff'd*, 767 F. App'x 181 (2d Cir. 2019) ("[W]hether a Circuit

precedent has been overruled . . . should almost always be left to the Circuit to reconsider its prior decision."). Thus, even if this Court believes that *Twitter* is in "tension" with existing Second Circuit law, the Court must follow Second Circuit precedent unless the Second Circuit overrules it. *Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003); *United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir. 1994) ("[T]he district court would be obliged to follow our precedent, even if that precedent might be overturned in the near future."); *Diaz*, 122 F. Supp. 3d at 180–81 (holding that even when Supreme Court precedent "is indisputably in tension" with circuit precedent, the court must follow circuit precedent unless it can "unequivocally find that the Supreme Court or the Second Circuit would overrule" the circuit case).

## ARGUMENT

SCB's motion for reconsideration should be denied. *Twitter* does not represent a change in controlling law that could justify reconsideration and Plaintiffs' allegations, in any event, state a plausible JASTA claim under *Twitter*.

**I.    SCB Fails To Show "Exceptional Circumstances" That Merit Reconsideration Of This Court's Order.**

SCB has not shown that *Twitter* unequivocally overruled the Second Circuit's decisions in *Kaplan* and *Honickman*, on which this Court relied in denying SCB's motion to dismiss. To the contrary, *Twitter* is consistent with the JASTA framework articulated by the Second Circuit, under which aiding-and-abetting liability attaches to conduct that is "conscious and culpable"; and a "direct nexus" between the defendant's conduct and the terrorist attack is not required unless the accused conduct is insubstantial or non-culpable. *Twitter*, 143 S. Ct. at 1229–30.

**A.    "Knowing And Substantial Assistance" Must Be Determined On A Sliding Scale Of Substantiality And Culpability.**

The Supreme Court in *Twitter* adopted the legal framework for civil aiding-and-abetting and conspiracy liability articulated by the D.C. Circuit in *Halberstam* relevant to the third

element of such liability—whether a secondary defendant "knowingly and substantially assist[ed] the principal violation."[1] *Twitter*, 143 S. Ct. at 1221 (quoting *Halberstam*, 705 F.2d at 477).

Rejecting the Ninth Circuit's assertion that the "knowing" aspect of "knowing and substantial assistance" is interchangeable with the "general awareness" element, the Court in *Twitter* held that the "knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Id*. at 1229. The Court also embraced *Halberstam*'s delineation of six factors relevant to the substance-assistance prong, while clarifying that *Halberstam*'s "exact phrasings and formulations" are not "inflexible codes" but "should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably participate[] in a tortious act in such a way as to help make it succeed." *Id.* at 1220, 1225 (internal quotations omitted). The six factors are not "a sequence of disparate, unrelated considerations," but instead should be used to "capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id*. at 1229.

Applying this framework to the three social-media companies that failed to prevent ISIS from using their platforms, the Supreme Court held that the defendants' conduct—which essentially treated ISIS just like any one of their millions or billions of other users—was not sufficiently culpable to support liability. *Twitter*, 143 S. Ct. at 1229–30. However, with respect to the plaintiffs' allegations against Google, the Court never suggested that sharing revenues with

---

[1] The Court did not substantively address the first two *Halberstam* elements—a wrongful act and general awareness—finding both satisfied without analysis. *Twitter*, 143 S. Ct. at 1225.

ISIS was not culpable conduct. Instead, it shifted its analysis to the other axis on the sliding scale, substantiality, and concluded that absent allegations of the amount of the shared revenue, the plaintiffs could not state a plausible claim of "substantial" assistance. *Id*. at 1230.

Contrary to SCB's claim, none of this clearly overrules existing law. The Second Circuit recognized in *Kaplan* that "culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences." 999 F.3d at 857. And the court there did not consider the six "substantial" factors as a mechanical checklist, but rather applied them holistically. *See id.* at 866. Indeed, consistent with *Twitter*, the Second Circuit has repeatedly recognized that the *Halberstam* factors are "variables," *id.* at 856, and that "the weight accorded to each is determined on a case-by-case basis," *Honickman*, 6 F.4th at 500. SCB points out that *Honickman* said the "knowing" prong "did not require Hamilton to 'know' anything more about Welch's unlawful activities than what she knew for the general awareness element," *id.*, but that statement (in addition to being dictum) merely correctly described the holding of *Halberstam*; it did not suggest that such scienter was *always* sufficient to support liability in a JASTA case. The Supreme Court similarly recognized that defendants that provide systemic assistance to an illicit enterprise (as Hamilton did in *Halberstam*) can be liable on a lesser showing of scienter. *Twitter*, 143 S. Ct. at 1225.

In sum, the framework for JASTA liability set forth in *Twitter* is consistent with the key holdings of *Kaplan* and *Honickman*. To the extent any variation exists (*e.g.*, discussing a consideration under the rubric of the "knowing and substantial assistance" element as opposed to the "general awareness" element), those differences are either completely immaterial or

amount—at most—to "tension" that does not justify the extraordinary remedy of asking a district court to ignore binding circuit precedent.

**B.**   ***Twitter* Does Not Require A "Direct Nexus" Between The Defendant's Conduct And A Particular Terrorist Act.**

Consistent with Second Circuit precedent, *Twitter* also confirmed that foreseeability remains central to the JASTA analysis and that a "strict nexus" between the defendant's conduct and the terrorist attack is not required.

Instead, as the Supreme Court explained, while "a close nexus between the assistance and the tort," can constitute aiding and abetting, "more remote support can still constitute aiding and abetting in the right case"—and what makes a case the "right" one is the foreseeability of the ultimate tort from the wrongful act the defendant aided. *Twitter*, 143 S. Ct. at 1225. Thus, "[a]s *Halberstam* makes clear, persons who aid and abet a tort can be held liable for other torts that were 'a *foreseeable* risk' of the intended tort." *Id*. (emphasis added). A specific nexus is also unnecessary where a "secondary defendant's role in an illicit enterprise [is] so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise—as in *Halberstam* itself." *Id*.

In other words, *Twitter* recognizes another sliding scale: "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer . . . culpable assistance." *Id*. at 1230. The "more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id*. On the other hand, some "aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts." *Id*. at 1228. "There may be, for example, situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could

constitute aiding and abetting a foreseeable terror attack." *Id*. Or the aid may be so "pervasive and systemic" that it reaches all of an enterprise's torts. *Id*. at 1230. In other words, assistance to a terrorist organization does not *always* constitute aiding and abetting the organization's terrorist acts—but it can, depending on the amount, type, and circumstances of assistance.

That, too, is consistent with Second Circuit precedent. As the court explained in *Kaplan*, "knowingly providing material support to an FTO, without more, does not as a matter of law" create liability for aiding and abetting. 999 F.3d at 860. Instead, whether such support suffices "is a fact-intensive inquiry" that turns on whether the defendant "was playing a role in unlawful activities from which the . . . attacks were foreseeable." *Id*. at 860–61. Similarly, in *Honickman*, the court emphasized that aiding-and-abetting liability turns on foreseeability—but declined to accept the plaintiff's argument that the mere provision of fungible assistance to terrorist organizations suffices. *See* 6 F.4th at 498–99. That is the same legal framework the Supreme Court accepted in *Twitter*, and it is the one this Court applied in denying SCB's motion. *See* Order at 24–25.

Along the same lines, SCB misconstrues *Twitter* to require that "the defendant must 'culpably participate' in the relevant attacks." ECF No. 61 at 13 (cleaned up). Actually, *Twitter* requires conscious and culpable participation in wrongful activity from which acts of international terrorism are "a foreseeable risk." 143 S. Ct. at 1225 (citing *Halberstam*). Put another way, consciously and culpably providing substantial assistance to a wrongful act from which acts of terrorism are foreseeable is a form of "participation" in those acts. *See id*. at 1226 ("The key question, therefore, is whether defendants gave such knowing and substantial assistance to ISIS *that they culpably participated* in the Reina attack." (emphasis added)). Otherwise, the Court's examples of potentially liable conduct would make no sense: a defendant

who selectively promotes terrorist internet content, provides terrorists with "routine services . . . in an unusual way," or sells terrorists "dangerous wares" is not participating in terrorist acts in the narrow sense urged by SCB, *id*. at 1228; he is engaging in wrongful conduct from which terrorist acts are foreseeable.[2] And terrorist acts are undoubtedly a foreseeable risk of financing the terrorists' supply pipeline for explosives.

Because *Twitter* did not clearly overturn the Second Circuit precedents upon which this Court relied, this Court should deny SCB's motion for reconsideration.

## II. Under Both *Twitter* And Undisturbed Second Circuit Law, Plaintiffs Have Stated A Plausible Claim Against SCB.

Even if *Twitter* had impacted the law underlying the Court's analysis of SCB's motion to dismiss, it would not have changed the outcome here. The Supreme Court's overriding focus in *Twitter* was to ensure that JASTA aiding-and-abetting liability is reserved for defendants who act "consciously and culpably"—and not for "innocent bystanders as well as those who gave only tangential assistance." 143 S. Ct. at 1220, 1225, 1229–30.

The *Twitter* plaintiffs' allegations were undermined in large part by their vagueness and expansive scope. In stark contrast, the allegations in Plaintiffs' Complaint are specific and

---

[2] SCB seizes upon the Supreme Court's observation in *Twitter* that "'mostly passive actors like banks' do not 'become liable for all of their customers' crimes by virtue of carrying out routine transactions.'" ECF No. 61 at 5 (quoting *Twitter*, 143 S. Ct. at 1222). But SCB fails to mention that one of the bank-related cases cited in *Twitter* advances Plaintiffs' position, not SCB's. In *Monsen v. Consol. Dressed Beef Co.*, the Third Circuit held that the record supported the bank's aiding-and-abetting liability, noting in particular that "the Bank had knowledge of the promissory note program and should have known of its illegality" and that it "had the authority . . . to discontinue the note program." 579 F.2d 793, 801 (3d Cir. 1978); *see also id.* at 799 ("Culpability of some sort is necessary to justify punishment of a secondary actor and mere unknowing participation in another's violation is an improper predicate to liability."). In the two other cited cases, there was insufficient evidence to support aiding-and-abetting liability. But unlike SCB's affirmative misconduct, those banks' sole misconduct was the failure to disclose, and in both cases, the appellate courts suggested the outcome might have been different with more evidence of scienter. *See Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 36 (D.C. Cir. 1987), *abrogated by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ("[P]assive failure to disclose . . . cannot create liability [without] . . . an independent duty to act or . . . a conscious intention to further the principal violation, . . . none of which has been alleged here."); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 99 (5th Cir. 1975) (holding that the bank official's failure to disclose was not "knowing and substantial assistance" but rather was a "normal business practice"). The allegations here are far different.

narrow. Plaintiffs allege that SCB ignored an express U.S. government request to shut down its provision of financial services to one specific customer (Fatima) producing one specific chemical (CAN) being used to kill U.S. soldiers through one specific modality of attack (IEDs) in one specific region (Afghanistan) in which the United States was then fighting a global war against terrorism. Those allegations state a claim under *Twitter*.

### A.   Plaintiffs Allege "Knowing And Substantial Assistance" Based On *Twitter*'s "Sliding Scale."

As discussed above, the Supreme Court clarified that courts should evaluate "knowledge" and "substantiality" by considering those factors "relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Twitter*, 143 S. Ct. at 1229 (internal citation omitted). Consistent with the common law approach crystallized in *Halberstam*, the "knowledge" and "substantial" subparts operate as "twin requirements . . . [,] working in tandem, with a lesser showing of one demanding a greater showing of the other." *Id*. at 1222. Here, Plaintiffs allege both scienter and substantial assistance sufficient to state a claim.

### 1.   Plaintiffs Allege "Affirmative Misconduct," Not Merely "Passive Nonfeasance."

The allegations of "affirmative misconduct" here bear no resemblance to the "passive nonfeasance" in *Twitter*, where the plaintiffs "essentially portray[ed] defendants as bystanders, watching passively as ISIS carried out its nefarious schemes." *Twitter*, 143 S. Ct. at 1227. As this Court already determined, Plaintiffs allege active, affirmative, and extraordinary conduct: SCB continued to provide specialized, individualized financial services to Fatima even after it was specifically informed by senior U.S. government officials—in person—that those services were enabling Fatima's production and distribution of a chemical whose primary use was in the IEDs responsible for the deaths of U.S. service members.

Several aspects of the analysis in *Twitter* underscore the difference between the social media defendants' "passive nonfeasance" and SCB's "affirmative misconduct." In *Twitter*, the Court emphasized that the defendants' failure to prevent ISIS from using their respective social media platforms was not "active, substantial assistance" in part because (1) the platforms were "global in scale," "generally available to the internet-using public," and "allow[ed] hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis"; (2) ISIS used the platforms "just like everyone else"; (3) there was "little to no front-end screening by defendants" of content ISIS posted; and (4) defendants' "recommendation algorithms" were "agnostic as to the nature of the content." *Id.* at 1226–27. Indeed, while the *Twitter* plaintiffs alleged that the defendants "knowingly failed to do 'enough' to remove ISIS-affiliated users and ISIS-related content," *id*. at 1230, they also "concede[d] that defendants attempted to remove at least some ISIS-sponsored accounts and content after they were brought to their attention," *id*. at 1226 n.13. Notably, SCB failed to do even that much here; in fact, it did the opposite by continuing to provide critical financial services *and even substantial new loans* after it was made aware of its indispensable role in the Syndicate's explosive pipeline.  Thus, the U.S. military's description of SCB's response as "utterly useless" was, if anything, overly charitable.

The Court suggested that plaintiffs might have satisfied their burden by alleging that defendants gave ISIS "special treatment," "selected or took any action at all with respect to ISIS' content," or "carefully screened any content before allowing users to upload it onto their platforms." *Twitter*, 143 S. Ct. at 1226. The Court reasoned that holding the defendants liable for ISIS's activities on their platforms would be as illogical as holding cell service providers liable for aiding and abetting "illegal drug deals brokered over cell phones" simply because "the provider's conference-call or video-call features made the sale easier." *Id*.

17

By contrast, here, Plaintiffs allege precisely the "affirmative misconduct" that was missing in *Twitter*. Whereas the *Twitter* defendants provided an identical infrastructure to billions of users each day without giving ISIS any "special treatment," SCB was one of the "MAJOR BANKERS" of Fatima; had a lengthy multi-year business relationship with Fatima; and provided individualized banking products to Fatima, including a $22 million loan that "enabled Fatima to 'remove [CAN] production bottlenecks' that were critical to expanding CAN production capacity." Order at 24. In this regard, the allegations against SCB are more like the revenue-sharing allegations against Google (which the Supreme Court analyzed separately from allegations of passive nonfeasance against the other defendants)—except Plaintiffs do not allege only a small amount of assistance to unspecified recipients, but instead millions of dollars in assistance that facilitated terrorist access to explosive materials.

SCB makes much of the Supreme Court's observation that "'mostly passive actors like banks' do not 'become liable for all of their customers' crimes by virtue of carrying out routine transactions,'" but that statement does not advance SCB's position. ECF No. 61 at 5 (quoting *Twitter*, 143 S. Ct. at 1222). This Court has already determined that there is nothing routine about a bank ignoring a specific request from the U.S. government to stop "enabl[ing]" terrorists. Order at 5. In any event, Plaintiffs do not seek to hold SCB "liable for all of their customers' crimes," *id.*, but rather for a narrow subset of terrorist attacks that foreseeably resulted from SCB's continued provision of financial services to one specific customer—whose involvement in supplying terrorists with explosive chemicals was discussed extensively in the media, in congressional hearings, and in a face-to-face meeting with SCB executives, *id.* at 3–4.

Similarly, SCB argues that "the Complaint does not 'identify some independent duty in tort'" that would have required SCB to terminate its commercial relationship with Fatima as U.S.

military officials requested. ECF No. 61 at 23 (quoting *Twitter*, 143 S. Ct. at 1227). However, *Twitter*'s discussion of an independent duty in tort is relevant only where liability is predicated on a "failure to act." *Twitter*, 143 S. Ct. at 1227. Here, Plaintiffs' allegations are not based on SCB's failure to act, but rather its affirmative provision of financial services to Fatima, including after it was specifically warned by the U.S. government of the consequences of its affirmative conduct.

In short, the facts here fundamentally differ from those in *Twitter* because SCB affirmatively assisted one specific customer while the social media defendants were passive platforms—*i.e.*, "public areas"—for their billions of users to post content. *Id.*

### 2. Plaintiffs Allege That SCB Possessed An Unusually High Level Of "Actual Knowledge."

In *Twitter*, the Court said that even cases alleging a "failure to act" could support liability, but only with "a strong showing of assistance and scienter," which the *Twitter* plaintiffs "ha[d] not made." *Twitter*, 143 S. Ct. at 1227. *Twitter* did not define a precise amount of "knowledge" required to support liability; as explained above, the opinion emphasized that courts should not analyze "knowledge" in isolation but instead should consider it "as part of a single inquiry designed to capture conscious and culpable conduct." *Id.* at 1229. In its description of common-law principles crystallized in *Halberstam*, the Court cited criminal cases requiring "some degree of knowledge that [a defendant's] actions are aiding the primary violator" for aiding-and-abetting liability to attach. *Id.* at 1222. And during its discussion of the proper application of *Halberstam*'s six substantiality factors, the Court implied that the "knowledge" inquiry should focus on "whether defendants culpably associated themselves with ISIS' actions." *Id.* at 1229.

To be sure, the defendants in *Twitter* also allegedly had general knowledge that ISIS had been using their platforms. *See Twitter*, 143 S. Ct. at 1216. But there are two critical distinctions between the knowledge at issue in *Twitter* and the knowledge in this case. First, the plaintiffs in *Twitter* conceded that the defendants removed specific ISIS-related accounts of which they were actually aware. *See id.* at 1226 n.13. In that sense, *Twitter* was similar to the Second Circuit's decision in *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019), which held that liability was inappropriate when the defendant ceased doing business with a terrorist intermediary ten months before the relevant attack. Here, by contrast, SCB continued doing business with Fatima even after it learned of Fatima's ongoing role in the al-Qaeda Syndicate's supply chain for explosives.

Second, Plaintiffs' allegations go far beyond the press coverage directly linking Fatima to the production of CAN and the incorporation of CAN into IEDs used against American service members. Order at 18. As this Court observed, this is a rare "actual knowledge" case, *id.* at 22, in which U.S. officials (1) "met with senior executives" of SCB, (2) "walked Standard Chartered's executives through the details of their investigation," (3) "explained that IEDs were the most common cause of service members' deaths," and (4) "asked Standard Chartered to end its business relationship with Fatima." *Id.* at 17. SCB was therefore not an "innocent bystander." *Twitter*, 143 S. Ct. at 1220. Rather, SCB "intentionally associated" with the al-Qaeda Terror Syndicate and "affirmatively gave aid that would assist each of [the Syndicate's IED] acts." *Id.* at 1228. This extraordinary level of knowledge would plausibly support an inference of "conscious and culpable assistance" based on even less substantial assistance than Plaintiffs have alleged. *See Twitter*, 143 S. Ct. at 1222.

SCB's arguments that "a request from a U.S. military official to stop banking a customer does not impose a legal obligation on a bank to do so," that "banks like SCB take their cues" from regulators such as the Treasury and Commerce Departments, and that Fatima was not placed on the U.S. government's "Entity List," ECF No. 61 at 24, are inapposite. Liability for aiding and abetting terrorism under JASTA does not turn on whether an intermediary party is placed on the Treasury or Commerce Departments' Entity List, and SCB fails to explain why guidance or direction from a regulatory agency should carry more weight than a direct warning from U.S. military officials.  Rather, the information conveyed by the U.S. military in its conversation with SCB was so specific that SCB *must* have known of the consequences of its continued servicing of Fatima.

For these reasons, SCB is "not some hapless or even negligent actor[] that w[as] blindly roped into a terrorism funding scheme—[it] w[as] [an] active participant[]. If [SCB] ha[s] evidence to the contrary, [SCB] can raise it in later stages of this case." *Sotloff v. Qatar Charity*, No. 22-CV-807262023, WL 3721683, at *31 (S.D. Fla., May 30, 2023) (applying *Twitter* and denying motion to dismiss).

### B.  Plaintiffs Allege That The IED Attacks That Killed Their Family Members Were The Foreseeable Result Of SCB's Knowing Provision Of Services To Fatima.

In *Twitter*, the Supreme Court confirmed that JASTA imposes liability for aiding and abetting the acts of terrorism that injure plaintiffs. However, the Supreme Court emphasized that this "requirement does not always demand a *strict* nexus between the alleged assistance and the terrorist act." *Twitter*, 143 S. Ct. at 1225 (emphasis added). Indeed, the defendant need not have known "all particulars" of the plan. *Id*. at 1224. That is because as in *Halberstam*, "people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort." *Id.* at 1225.

21

This Court has already concluded that "the killing of U.S. service members is a foreseeable consequence of assisting in the creation of IEDs for al-Qaeda and the Syndicate during the war in Afghanistan," which meets the *Twitter* standard (already embodied in Second Circuit precedent). Order at 24. And even though a "strict nexus" is not required, Plaintiffs have alleged a close one here. The Court explained that "the illegal activity that was assisted was the provision of CAN to the Syndicate for the manufacture of IEDs," and "it is clear" that SCB's provision of millions of dollars of loans to Fatima "stimulated CAN production." *Id*. at 24–25 (concluding that SCB's support was "indisputably important" to Fatima). Thus, this Court concluded, "Standard Chartered's support of Fatima is *directly tied* to Fatima's ability to provide CAN to al-Qaeda," which inevitably resulted in the terrorist attacks that killed Plaintiffs' family members. *Id.* at 26 (emphasis added). Whereas the *Twitter* plaintiffs merely alleged a connection between the defendants and the "transcendent 'enterprise'" of ISIS, 143 S. Ct. at 1224, Plaintiffs here have alleged a direct nexus between SCB and the specific "actionable wrongs" that killed Plaintiffs' family members. And unlike in *Twitter*, here, Plaintiffs identified a "definable subset" of attacks that were foreseeable from SCB's provision of services to Fatima: CAN-based IED attacks committed by the al-Qaeda Terror Syndicate against U.S. service members in Afghanistan that occurred after SCB was specifically warned by the U.S. government that it was helping Fatima provide CAN to terrorists.

SCB's arguments to the contrary misstate both the law and the facts. SCB claims that "the Complaint does not allege that the terrorists who committed the attacks actually acquired and misused Fatima's CAN fertilizer product for those attacks." ECF No. 61 at 17. But Plaintiffs allege that Fatima's CAN was used in the vast majority of IED attacks—which is a far stronger nexus than the plaintiffs alleged in *Twitter*. Nothing in *Twitter* requires plaintiffs to go further,

for example, by tracing specific molecules of fertilizer from their origin to their use in specific explosives; instead, the decision requires Plaintiffs to show that IED attacks were one foreseeable consequence of SCB's affirmative decision to fund and therefore enable the supply of CAN to al-Qaeda. As the Supreme Court explained, liability properly attaches when a "provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." *Twitter*, 143 S. Ct. at 1228. That is exactly what SCB did by funding Fatima's production and sales of CAN despite knowing that this same chemical was being used by al-Qaeda to kill Americans.

SCB argues that the alleged conduct "is even more attenuated from the four terrorist attacks at issue here than the conduct alleged in *Twitter*" because Plaintiffs do not allege that SCB provided services "directly" to the Syndicate. ECF No. 61 at 21. But nothing in *Twitter* supports this statement, and JASTA's text explicitly refutes it. Order at 14 (explaining that assistance can be provided "directly or indirectly" (quoting *Kaplan*, 999 F.3d at 855) (quoting JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853)). Relatedly, SCB claims that it cannot be liable because "its customer was a major fertilizer company, not a terrorist organization." ECF No. 61 at 23. But this is just a rehash of SCB's prior argument, which the Court found "unavailing" because "the complaint *does* allege that Fatima is affiliated with terror groups by selling CAN to entities that it knew were fronts for terrorist enterprises." Order at 23.

Finally, SCB mischaracterizes the Complaint when it insists that "Plaintiffs' theory would hold liable any service provider"—including manufacturers and suppliers of vehicles, pressure cookers, and timers—"if it is alleged to be aware that a company to which it proves [*sic*] services produces products that are misused by terrorists." ECF No. 61 at 24. Not so. First, this

case does not involve generic products and services available to every consumer; instead, it involves bespoke banking services that are heavily regulated, in part, precisely because of their potential to fuel terrorist violence. Second, Plaintiffs' theory is far from "boundless." Rather, it seeks to hold SCB liable for terrorist attacks that occurred in a specific region of the world, during a narrow timeframe, and that involved IEDs containing CAN produced by Fatima. The theory of liability in *Twitter* contained none of these parameters.

## CONCLUSION

The Court has already considered SCB's arguments for dismissal, holding in a well-reasoned decision rooted in binding circuit precedent that Plaintiffs can proceed with their case against SCB for aiding and abetting the attacks that killed their family members. Because *Twitter* neither overrules the relevant circuit precedents nor compels a different result, Plaintiffs respectfully request that the Court deny SCB's motion for reconsideration.

Dated:        July 14, 2023

Respectfully submitted,

 */s/ Lee Wolosky* _____
Lee Wolosky (lwolosky@jenner.com)
Andrew J. Lichtman (alichtman@jenner.com)
Jenner & Block LLP
1155 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 891-1628
Fax:  (212) 891-1699

Doug A. Mitchell (dmitchell@jenner.com)
Jenner & Block LLP
1099 New York Avenue, NW, # 900
Washington, D.C.  20001
Telephone:  (202) 639-6090

 */s/ Eli J. Kay-Oliphant* _____
Eli J. Kay-Oliphant
   (eli.kay-oliphant@sparacinopllc.com)
Adam J. Goldstein
   (adam.goldstein@sparacinopllc.com)
Tejinder Singh
   (tejinder.singh@sparacinopllc.com)
Ryan R. Sparacino
   (ryan.sparacino@sparacinopllc.com)
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C.  20036
Telephone:  (202) 629-3530

Gary M. Osen (gosen@osenlaw.com)
Ari Ungar (aungar@osenlaw.com)
Michael J. Radine (mradine@osenlaw.com)
Osen LLC
190 Moore Street, Suite 272
Hackensack, New Jersey  07601
Telephone:  (201) 265-6400
Fax:  (201) 265-0303

*Counsel for Bonacasa and Moore Plaintiffs*

Ian M. Gore (igore@susmangodfrey.com)
Susman Godfrey L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone:  (206) 516-3880
Fax:  (206) 516-3883

*Counsel for Smedinghoff Plaintiffs*