UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DIANA BONACASA, *et al.*,

                Plaintiff,

    *– against –*

STANDARD CHARTERED PLC *and*
STANDARD CHARTERED BANK,

                Defendants.

**OPINION & ORDER**

22-cv-3320 (ER)

---

RAMOS, D.J.:

    Plaintiffs brought this action pursuant to the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), alleging that Standard Chartered PLC ("SC PLC")—through its subsidiary, Standard Chartered Bank ("Standard Chartered")—aided and abetted al-Qaeda by providing banking services to the Fatima Group ("Fatima"), a Pakistani fertilizer company that purportedly supplied al-Qaeda with materials used to make improvised explosive devices ("IEDs"). Doc. 1. Plaintiffs are family members of service members killed by such explosive devices in Afghanistan between 2013 and 2015.

    Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim. Doc. 20. The Court dismissed Plaintiffs' claims against SC PLC for lack of personal jurisdiction but declined to dismiss the case against Standard Chartered on either basis. Doc. 32.

    Before the Court is Standard Chartered's motion for reconsideration of the Court's prior decision on its motion to dismiss in light of the Supreme Court's recent decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which clarified the standard for aiding and abetting liability under the ATA (as modified by JASTA). Doc. 60. For the reasons set forth below, Standard Chartered's motion is denied.

## I.    BACKGROUND[1]

In the early 2000s, during the American war in Afghanistan, members of al-Qaeda attacked U.S. service members to drive them out of Afghanistan.[2]  ¶¶ 45, 52.  To that end, al-Qaeda established bomb-making factories in the Federally-Administered Tribal Areas of Pakistan, where the Taliban would manufacture explosives for al-Qaeda and the al-Qaeda Terror Syndicate ("the Syndicate").[3]  ¶¶ 55, 109.  The IED was one type of bomb these factories produced.  ¶ 55.  The main explosive ingredient in the vast majority of IEDs at that time was calcium ammonium nitrate ("CAN"), which can be used in agricultural fertilizers.  ¶¶ 96, 101.  CAN fertilizer only accounted for as little as five percent of all fertilizer used in the Afghan region at the time, however, as "more suitable" and "less expensive" alternatives existed and were more widely used.[4]  ¶¶ 96, 98.  But CAN-based IEDs were responsible for about ninety percent of American IED casualties in Afghanistan.  ¶ 125.

In 2010, Afghanistan banned the importation, production, transportation, use, sale, and storage of CAN.  ¶ 103.  In 2011, Pakistan also adopted a policy to prevent the smuggling of CAN into Afghanistan, including a counter-IED public awareness

---

[1] Unless otherwise noted, citations to "¶ __" refer to the complaint (Doc. 1).

[2] Al-Qaeda is a terrorist organization originally founded during the Soviet occupation of Afghanistan in the late 1980s.  ¶ 52.  It was designated as a Foreign Terrorist Organization ("FTO") in 1999 and continues to be designated as an FTO today.  ¶ 53.

[3] The Syndicate was a "closely affiliated" group of organizations—led by al-Qaeda—that came together in the early 2000s to eliminate the U.S. presence in Afghanistan through violence.  ¶¶ 45–46, 49–50.  It includes al-Qaeda, the Taliban, and Tehrik-i-Taliban ("the Pakistani Taliban"), among others. ¶ 5, n.1.

Al-Qaeda often planned, reviewed, approved, authorized, and participated in attacks carried out by members of the Syndicate; al-Qaeda and its sister organizations were so closely aligned that individual terrorists moved back and forth from organization to organization within the Syndicate with such fluidity that, during the relevant period, the terrorist organizations were no longer truly distinct.  ¶¶ 49–50.

The Pakistani Taliban is a designated FTO that is part of the Syndicate.  ¶¶ 75, 79.  The U.S. State Department considered the Pakistani Taliban to have a symbiotic relationship with al-Qaeda during the early 2010s; for example, the Pakistani Taliban provided al-Qaeda with a safe haven in areas along the Afghan-Pakistani border.  ¶¶ 77, 80.

[4] Indeed, when Afghanistan ultimately banned the use of CAN fertilizer, other effective, nonexplosive fertilizers were available for agricultural purposes.  ¶ 103.

campaign, training, and strengthened legislation.  ¶¶ 106–07.  But the flow of CAN into Afghanistan did not stop.[5]  ¶¶ 109–11.

Around this time, news organizations also began to take notice.  On September 1, 2011, for example, the *Associated Press* published an article, noting that the "main ingredient in most of the homemade bombs" used by the Syndicate "is fertilizer produced by a single company in Pakistan," with one plant alone producing enough CAN "fertilizer for at least 140,000 bombs" in a single year.  ¶ 141.  Fatima, a Pakistani fertilizer company, supplied al-Qaeda with almost all of its CAN.[6]  ¶ 127.

In August 2011, the U.S. government began working to limit the access of al-Qaeda and its allies to CAN, and United States Army Lieutenant General Michael Barbero discussed al-Qaeda's use of CAN with Fawad Mukhtar, Fatima's Chairman, on the phone.  ¶ 128.  The two met in Virginia later in 2011, where General Barbero told Chairman Mukhtar that the CAN fertilizer from Fatima's plants was responsible for most U.S. service member deaths from IEDs in Afghanistan.  ¶ 129.  Fatima agreed to add dye to its fertilizer—so that U.S. officials could more easily detect and seize CAN being smuggled across the Afghan border—and to stop selling CAN to dealers near the Afghanistan-Pakistan border.  ¶ 130.  But Fatima never added dyes to its fertilizer.  ¶ 131.  After giving a tour of one of its factories to U.S. officials, Fatima cut off contact with the U.S. government, directing that any further communication with Fatima take place through the Pakistani Foreign Ministry.  ¶ 131.

In 2012, U.S. officials again attempted to convince Fatima to implement CAN-preventative measures, such as using dye, but Fatima refused to do so.  ¶ 132; *see also* ¶ 143 (describing a May 5, 2012 article published by the *Khaama Press Agency*—at that

---

[5] Reported IED explosions increased from 9,300 in 2009 to 14,500 in 2012.  ¶ 119.  And in 2012, the United States seized 440 tons of CAN in Afghanistan—up from 30 tons in 2009.  ¶ 110.

[6] CAN was also Fatima's best-selling product by volume and accounted for 31% of its annual revenue in 2013.  ¶ 152.

time, Afghanistan's largest online news service—which reported that Fatima "ha[d] not been cooperative" with U.S. officials), ¶¶ 144–46 (quoting an August 19, 2012 Washington Post article, reporting that Pakistan's Inter-Services Intelligence Agency had "put the clamps on" U.S. efforts with Fatima). On December 13, 2012, General Barbero testified before the U.S. Senate Committee on Foreign Relations, explaining that "no progress or minimal progress" had been made with Fatima, despite continued U.S. efforts. ¶ 147; Doc. 22-2 at 15. American requests continued into May 2013, when Fatima told U.S. officials that it was working on a new fertilizer formula that would make it harder for insurgents to turn its CAN fertilizer into explosives. ¶¶ 135–36. But Fatima's production of CAN fertilizer continued. ¶ 137.

SC PLC is an international bank based in London with more than 1,700 branches across 60 countries. ¶ 28. Standard Chartered is a wholly owned subsidiary of SC PLC, with a principal place of business is in London, England. ¶ 29. Standard Chartered was one of Fatima's "major bankers" during this time. ¶¶ 139–40. It provided Fatima with various day-to-day banking services, such as dollar clearing, export financing, and foreign exchange services through Standard Chartered's New York branch; approximately $195 billion are processed daily through the New York branch, which is the overwhelming majority of Standard Chartered's transactions. ¶¶ 31, 153. Standard Chartered and Standard Chartered Pakistan Ltd. ("SC Pakistan"), a wholly-owned subsidiary of Standard Chartered, also provided substantial project financing to Fatima. ¶¶ 139–40, 153, 156.

In January 2013, after unsuccessfully pressing Fatima to address the CAN issue, General Barbero and other officials met with Standard Chartered senior executives at Standard Chartered's New York office. ¶ 148; *see* Doc. 22-3 at 2–3. U.S. officials warned Standard Chartered that Fatima was supplying the Syndicate with materials used to make IEDs, which the Syndicate was using to kill U.S. personnel and Afghan civilians. ¶¶ 19, 148. Specifically, U.S. officials provided Standard Chartered evidence that Fatima

supplied the Syndicate with vast quantities of CAN fertilizer, which was used in approximately 80% of the IEDs used against American service members in Afghanistan, and provided breakdowns of casualty statistics.  ¶¶ 21–22, 149.  U.S. officials also told Standard Chartered that Fatima was unresponsive to U.S. efforts to curtail CAN availability and that it repeatedly refused to cooperate with American authorities.  ¶ 149.  U.S. officials presented Standard Chartered with a map of Fatima's plants and photographs, which included "bags of Fatima CAN fertilizer seized . . . from Taliban (including Haqqani Network) terrorists."[7]  *Id*.  U.S. officials explained that Standard Charter's financial and banking services to Fatima enabled Fatima to supply CAN to the Syndicate and urged Standard Chartered to stop providing financial services—including foreign exchange and export financing services through its New York branch—to Fatima, and they asked Standard Chartered to end the relationship with Fatima.  ¶¶ 23, 149.

Such efforts proved "utterly useless," as General Barbero said, and Standard Chartered continued to provide financial services to Fatima.  Doc. 22-3 at 3.  Barbero said that Standard Chartered "enabled" the Syndicate, "or at least looked the other way" when "presented with the evidence" of its role in furthering terrorism.  *Id*.  Indeed, even after the January 2013 meeting, Standard Chartered continued to provide substantial project financing to Fatima.  For instance, Standard Chartered provided Fatima with a $22 million "specially structured" loan specifically for the purpose of removing CAN production bottlenecks and increasing Fatima's CAN production capacity.  ¶¶ 154–55.  In addition, SC Pakistan provided Fatima with other loans and investments that amounted to millions of dollars.  ¶¶ 156–57.

---

[7] The Haqqani Network is a specially designated global terrorist organization that has operated in Afghanistan since the 1970s.  ¶¶ 82–86.  It is part of the Taliban, closely affiliated with and integrated into al-Qaeda, and a part of the Syndicate.  ¶¶ 83, 90–91.

Between July 2013 and December 2015, Plaintiffs' family members, all of whom were U.S. servicemen, were killed by IEDs in Afghanistan.  ¶¶ 180–82, 188–89, 194, 198, 207.[8]

## II.   PROCEDURAL HISTORY

Plaintiffs filed the instant action on April 22, 2022, bringing a single JASTA claim for aiding and abetting the terrorist attacks that killed their family members.  Doc. 1. Defendants moved to dismiss the complaint in its entirety for lack of personal jurisdiction or failure to state a claim on August 3, 2022.  Doc. 20.  On March 7, 2023, the Court granted the motion as to SC PLC for lack of jurisdiction but otherwise denied the motion, holding that it had personal jurisdiction over Standard Chartered and that Plaintiffs had successfully stated an aiding and abetting claim.  Doc. 32 ("the March 2023 Order").

Standard Chartered answered the complaint on April 4, 2023.  Doc. 37.  The case was coordinated for all discovery and pretrial purposes with *Moore v. Standard Chartered PLC, et al.*, No. 23-cv-2834 (ER), and *Estate of Anne T. Smedinghoff v. Standard Chartered Bank*, No. 23-cv-2865 (ER), which also both allege JASTA aiding and abetting claims against Standard Chartered.  Doc. 52.

On May 18, 2023, the Supreme Court decided *Twitter v. Taamneh*, which clarified the appropriate standard for JASTA aiding and abetting liability.  Based on *Twitter*, Standard Chartered sought leave to move for reconsideration as to its arguments that Plaintiffs failed to state a claim, which the Court granted.  Doc. 58 (June 2, 2023 Hr'g Tr.).  Standard Chartered filed the instant motion on June 23, 2023.  Doc. 60.[9]

---

[8] On August 31, 2023, while the instant motion was pending, Plaintiffs amended the complaint to add 12 additional plaintiffs, all of whom are also family members of U.S. servicemen killed by IEDs in Afghanistan between May 2013 and August 2016.  Doc. 65, ¶¶ 213–44.  Plaintiffs' allegations as to Standard Chartered's actions remain the same.

[9] On October 5, 2023, Plaintiffs filed a notice of supplemental authority, *Zoba, et al. v. MTN Group Ltd., et al.*, No. 21-cv-3503 (CBA) (E.D.N.Y. Sept. 28, 2023), Doc. 129 (Mem. & Order), which decided a motion to dismiss claims for aiding and abetting pursuant to JASTA.  Doc. 68.  Like Plaintiffs here, the *Zobay* plaintiffs were the victims and family members of victims of terrorist attacks who brought claims against several corporate defendants alleged to have aided and abetted the foreign terrorist organizations that

### III.    LEGAL STANDARD

### A.  Motion for Reconsideration

"Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  "A motion for reconsideration should be granted only when the [movant] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

A motion for reconsideration is not a substitute for appeal, *Boart Longyear Ltd. v. Alliance Indus., Inc.*, 869 F. Supp. 2d 407, 418 (S.D.N.Y. 2012), nor is it a vehicle for a party dissatisfied with the Court's ruling to voice its disagreement with the decision, *R.F.M.A.S., Inc. v. Mimi So*, 640 F. Supp. 2d 506, 512–13 (S.D.N.Y. 2009).  "Courts have repeatedly been forced to warn litigants that such motions should not be made reflexively to reargue those issues already considered when a party does not like the way the original motion was resolved."  *Boart Longyear Ltd.*, 869 F. Supp. 2d at 418 (internal quotation marks omitted) (quoting *Makas v. Orlando*, No. 06-cv-14305 (DAB), 2008 WL 2139131, at *1 (S.D.N.Y. May 19, 2008)).  *See also, e.g., Anwar v. Fairfield Greenwich Ltd.*, 884 F. Supp. 2d 92, 96 (S.D.N.Y. 2012) ("The provision for reargument is not designed to allow

---

perpetrated the attacks.  *Zobay*, No. 21-cv-3503 (CBA), Doc. 129 at 1–2.  And, like Defendants here, several of the *Zobay* defendants moved to dismiss pursuant to rules 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to state a claim.  *Id.*  Among other things, the *Zobay* court held that the *Zobay* plaintiffs had sufficiently stated a claim against a multinational telecommunications company that provided supplies that could be, and were, used in terrorist attacks to companies known to be terrorist-affiliates.  *Id.* at 6–7, 57–66.

Plaintiffs represented that *Zobay* is the first post-*Twitter* decision in the Second Circuit concerning JASTA aiding and abetting liability.  Doc. 68 at 1.  On October 13, 2023, Standard Chartered responded that *Zobay* does not support Plaintiffs' arguments and submitted a letter detailing the ways in which *Zobay* differed from the instant case.  Doc. 69.

wasteful repetition of arguments already briefed, considered and decided." (citation omitted)); *Assoc. Press v. U.S. Dep't of Defense*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005) (motion for reconsideration is not "an occasion for repeating old arguments previously rejected").

Whether to grant or deny a motion for reconsideration is "within 'the sound discretion of the district court.'" *Premium Sports Inc. v. Connell*, No. 10-cv-3753 (KBF), 2012 WL 2878085, at *1 (S.D.N.Y. Jul. 11, 2012) (quoting *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009)).

**B.  Rule 12(b)(6)**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its

substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## IV.  DISCUSSION

Aiding and abetting liability pursuant to the ATA is governed by the framework of *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), which requires that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."[10]  Whether the third element is satisfied depends, in turn, on six factors:  (1) the nature of the act assisted, (2) the amount of assistance provided, (3) the defendant's presence or absence at the time of the tort, (4) the defendant's relation to the principal tortious actor, (5) the defendant's state of mind, and (6) the period of defendant's assistance. *Twitter*, 598 U.S. at 486 (citing *Halberstam*, 705 F.2d at 488).

Standard Chartered moves for reconsideration on the sole basis that the Supreme Court's decision in *Twitter* set a new standard for aiding and abetting liability under the ATA and that, pursuant to the new standard, Plaintiffs fail to state a claim. *See* Doc. 61

---

[10] In its prior motion to dismiss, Standard Chartered argued that Plaintiffs failed to plausibly allege any of the three elements in the *Halberstam* framework, but the Court found that each was sufficiently pled. March 2023 Order at 15.

(Standard Chartered Mem. of L.).  As *Twitter* focused on the third element of the *Halberstam* framework—what constitutes "knowing and substantial" assistance, *see* 598 U.S. at 490–96—the Court now need only revisit its analysis as to that third element.

### A.  The Prior Motion to Dismiss

In the March 2023 Order, as to the third *Halberstam* element, the Court held first that aiding and abetting liability extends to injuries foreseeable from illegal activity, and "[n]one dispute that the killing of U.S. service members is a foreseeable consequence of assisting in the creation of IEDs for al-Qaeda and the Syndicate during the war in Afghanistan."  March 2023 Order at 24 (citing *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021)).  It thereafter applied each of the six elements of *Halberstam*:

> First, the nature of Standard Chartered's support—significant financial services—was "indisputably important" to Fatima, including dollar clearing services, daily banking services, and loans.  *Halberstam*, 705 F.2d at 488; ¶¶ 152–57.  Indeed, some of Standard Chartered's loans to Fatima enabled Fatima to "remove [CAN] production bottlenecks" that were critical to expanding CAN production capacity.  ¶ 154.
>
> Second, the amount of assistance was significant:  Standard Chartered provided Fatima with at least twenty-five million dollars in loans.  ¶¶ 153–57.  And it is clear that this support stimulated CAN production:  from 2011 to 2016, the Syndicate sourced "tens of thousands of tons" of CAN to make IEDs "from Fatima's two fertilizer plants in Pakistan."  ¶ 111.  By 2011, 90% of IED casualties in Afghanistan came from CAN-based IED devices.  ¶¶ 102, 125.
>
> Third, Standard Chartered's relationship with Fatima was active when the Syndicate killed Plaintiffs' family members.  ¶ 150; *Siegel*, 933 F.3d at 226 (weighing this factor against substantial assistance where the defendant had no relationship with the intermediary).  Fourth, Standard Chartered was aware that its services provided Fatima and the Syndicate support—it was told as much in a face-to-face meeting with a U.S. Army General.  ¶¶ 148–49.  And lastly, Standard Chartered has assisted Fatima for a significant period, providing it with banking services since 2001.  ¶ 139.

*Id.* at 24–25.  By footnote, the Court also noted:

> While it is true that Standard Chartered was not present for the attacks, that alone does not defeat the prima facie showing of substantial assistance.  *See Kaplan [v. Lebanese Canadian Bank, SAL]*, 999

> F.3d [842,] 866 [(2d Cir. 2021)] (providing multimillion-dollar loans that avoided U.S. financial regulators constituted "qualitatively and quantitatively" substantial assistance); *Halberstam*, 705 F.2d at 488 (same, but as to an individual); *Bartlett [v. Société Générale de Banque Au Liban SAL*, No. 19-cv-7 (CBA)], 2020 WL 7089448, at *15 [(EDNY Nov. 25, 2020)].

*Id*. at 25 n.22.

Finally, the Court noted that Standard Chartered's reliance on *Siegel v. HSBC*, 933 F.3d, 217 (2d Cir. 2019), was "misplaced":

> *Siegel* involved an allegation that a defendant-bank's client, ARB (Saudi Arabia's largest bank at the time), had clients "linked to al-Qaeda." 933 F.3d at 220. *Siegel* found insufficient support for both the general awareness and substantial assistance elements. *Id.* at 224–25. "Crucial[]" to that decision was the fact that HSBC "ceased doing business with ARB altogether" ten months before the terrorist attacks. *Id.* at 224. That fact swayed the *Halberstam* test against the plaintiffs: At the time of the attacks, HSBC had no relationship with the terrorist entity and assumed no role in supporting the attacks. *Id.* at 225. Moreover, there was no non-conclusory allegation that al-Qaeda actually received the services HSBC provided to ARB. *Id.* And ARB was a bank with "vast operations"—many of which were perfectly legal—rather than being an entity that catered to a specific, terrorist-affiliated clientele (or a terrorist-affiliated product, like explosive fertilizer). *Id.* at 224. Here, we have quite different facts: Standard Chartered's support of Fatima is directly tied to Fatima's ability to provide CAN to al-Qaeda, and the U.S. Government put Standard Chartered on notice about Fatima's ties to al-Qaeda. ¶¶ 121, 125, 148–49.

*Id*. at 25–26. Accordingly, the Court concluded that Plaintiffs had adequately pled Standard Chartered's knowing and substantial assistance. *Id.*

## B. The Supreme Court's Decision in *Twitter*

Plaintiffs in *Twitter* were the family of a victim of a 2017 terrorist attack on the Reina nightclub in Istanbul, Turkey that was carried out on behalf of the Islamic State of Iraq and Syria ("ISIS"). 598 U.S. at 478–79. The plaintiffs sued social media platforms Facebook, Google (which owns YouTube), and Twitter for aiding and abetting ISIS, alleging that they were thus liable for the Reina attack. *Id.* Specifically, the plaintiffs alleged that ISIS used Facebook, YouTube, and Twitter for years to recruit, fundraise, and

spread their propaganda; and defendants knew ISIS was using their platforms but failed to detect or remove the accounts, posts, and videos, instead profiting from advertisements placed on ISIS' content. *Id.* at 480–82. Thus, plaintiffs alleged that defendants "aided and abetted ISIS by knowingly allowing ISIS and its supporters to use their platforms and benefit from their 'recommendation' algorithms, enabling ISIS to connect with the broader public, fundraise, and radicalize new recruits." *Id.* at 481–82. The district court dismissed the plaintiffs' complaint for failure to state a JASTA claim, but the Ninth Circuit reversed. *Id.* at 482. The Supreme Court then reversed the Ninth Circuit's decision. *Id.* at 507.

Because Congress identified *Halberstam* as the appropriate framework for aiding and abetting liability when it enacted JASTA, the Supreme Court began by analyzing that case. *Id.* at 485. The defendant in *Halberstam* was the live-in partner of a serial burglar who killed a man during a break-in. *Id.* at 485 (citing 705 F.2d at 474, 476). In a civil suit brought by the victim's estate, the D.C. Circuit found the live-in partner liable for aiding and abetting the murder because, even though she was not present at the murder or even allegedly aware of it, she had known of and facilitated the sale of stolen goods and burglary scheme generally, and "violence and killing" was a "foreseeable risk" of "personal property crime." *Id.* at 486–67 (citing 705 F.2d at 474–89). In setting forth the three elements and six factor test for civil aiding and abetting liability, the *Halberstam* court emphasized that "its formulations should 'not be accepted as immutable components'" but should instead be "'adapted as new cases test their usefulness in evaluating vicarious liability.'" *Id.* at 487 (quoting 705 F.2d at 489). Indeed, the Supreme Court emphasized in *Twitter* that "any approach that too rigidly focuses on *Halberstam*'s facts or its exact phraseology risks missing the mark." *Id.* at 493.

Noting that "[t]he allegations [in *Twitter*] are a far cry from the facts of *Halberstam*," the Supreme Court undertook the suggestion in *Halberstam* to "adapt" the framework. *Id.* at 487. The Supreme Court emphasized that "mere omissions, inactions,

or nonfeasance" are generally not culpable absent an independent duty to act; rather, civil and criminal aiding and abetting liability generally requires an affirmative bad act. *Id.* at 489. And to ensure liability attaches only to "truly culpable" conduct, rather than a distantly attenuated merchant whose goods or services were misused, the law requires that the defendant act "with the intent of facilitating the offense's commission." *Id.* at 489–90. But both *Halberstam* and the common law it recounts call for courts to balance the "the nature and amount of assistance on the one hand and the defendant's scienter on the other." *Id.* at 492–93. Accordingly, where assistance is more substantial—*i.e.*, is "direct and extraordinary"—a court will "more readily infer conscious participation in the underlying tort." *Id.* at 492. Similarly, less substantial assistance will nonetheless establish aiding and abetting liability where there exists a greater showing of scienter. *Id*. *Halberstam*'s six factors remain good law as indicia as to whether a defendant's participation in another's wrongdoing is sufficiently significant and culpable to impose aiding and abetting liability, but courts should not rigidly apply the factors as "disparate, unrelated considerations without a common conceptual core." *See id.* at 504. Finally, aiding and abetting liability extends, not only to the intended wrongdoing, but also to that which is "a foreseeable risk" therefrom. *Id.* at 496.

Applying these principles to JASTA, the Supreme Court held that aiding and abetting liability may be imposed on a defendant who knowingly and substantially assisted another in the commission of an act of international terrorism. *Id.* at 494–95. Liability is not limited only to defendants who "directly" aid and abet, with a "strict nexus" between the assistance and the specific attack. *Id*. In certain circumstances, "a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise—as in *Halberstam* itself." *Id.* at 496. However, it is not enough to generally assist the terrorist organization without consideration of the specific attack that injured plaintiffs. *Id.* at 494.

13

Thus, the *Twitter* plaintiffs could have stated a claim if they plausibly alleged that defendants aided and abetted ISIS in carrying out the Reina attack. *Id*. at 497. They failed to do so. Plaintiffs failed to identify any affirmative conduct by defendants other than creating the platforms and passively allowing the algorithms to display relevant user content, and they also failed to allege that defendants culpably associated themselves with the Reina attack or otherwise intended to bring it about and make it succeed.[11] *Id.* at 498–99. The Supreme Court emphasized that the platforms are generally available to the public "with little to no front-end screening by defendants." *Id.* at 498. Furthermore, defendants' conduct vis-à-vis ISIS was no different than its "arm's length, passive, and largely indifferent" relationship with its billions of other users, and defendants' algorithms "appear[ed] agnostic as to the nature of the content" in that they did not promote ISIS' content over that of other users. *Id.* at 499–500. Thus, without any allegations that the defendants gave ISIS special treatment or otherwise were more than "bystanders" to the Reina attack, merely providing ISIS access to its platforms used is insufficient[12]—akin to a cellular telephone service provider providing their services to the public writ large, who would not be liable for aiding and abetting illegal drug deals brokered over the phones even if the provider's call features made the sales easier. *Id.* The Supreme Court stressed that the focus must be on the defendants' actions in aid of ISIS, not on the value of defendants' platforms to ISIS. *Id.* at 504.

---

[11] Plaintiffs did not argue that the defendants were liable under the "near-common enterprise" theory, which would have established liability for each of ISIS' attacks on the basis that the defendants' role in ISIS' illicit enterprise was "so systemic" that the defendants effectively aided and abetted each of ISIS' wrongful acts. *Id.* at 496, 502.

[12] Additionally, the *Twitter* plaintiffs failed to identify any independent tort duty that would have converted defendants' failure to remove ISIS' content from mere non-liable nonfeasance to actionably liable misfeasance. *Id.* at 501.

The Supreme Court clarified, however, that it "cannot rule out the possibility that some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for . . . terrorist acts."  *Id.* at 502.

> There may be, for example, situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack.  *Cf. Direct Sales Co. v. United States*, 319 U. S. 703, 707, 711–712, 714–715, 63 S. Ct. 1265, 87 L. Ed. 1674 (1943) (registered morphine distributor could be liable as a coconspirator of an illicit operation to which it mailed morphine far in excess of normal amounts).  Or, if a platform consciously and selectively chose to promote content provided by a particular terrorist group, perhaps it could be said to have culpably assisted the terrorist group.  *Cf. Passaic Daily News v. Blair*, 63 N. J. 474, 487–488, 308 A. 2d 649, 656 (1973) (publishing employment advertisements that discriminate on the basis of sex could aid and abet the discrimination).

*Id.*  It declined, however, to "consider every iteration" in which liability could attach, holding that, "[i]n this case, it is enough that there is no allegation that the platforms here do more than transmit information by billions of people, most of whom use the platforms for interactions that once took place via mail, on the phone, or in public areas."  *Id.* at 502–03.  Any contrary holding "would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them."  *Id.* at 503.

### C. Standard Chartered's Motion for Reconsideration is Denied

*1. Standard Chartered Overstates, and Plaintiffs Understate, the Consequences of Twitter*

Standard Chartered argues that *Twitter* set forth a "new standard" for aiding and abetting liability.  Doc. 61 at 16.  Specifically, Standard Chartered argues that *Twitter* requires a direct nexus between its assistance to al-Qaeda and the Syndicate with respect to the attacks that killed Plaintiffs' family members.  *Id.* at 16–17.  Accordingly, Standard Chartered argues that the March 2023 Order focused on whether Standard Chartered assisted Fatima in providing CAN to the Syndicate, but this can no longer serve as a basis

for liability.  *Id.*  Additionally, Standard Chartered contends that *Twitter* "ratcheted up" the scienter requirement, from being essentially duplicative of the general awareness element, to a requirement that defendants "culpably associated themselves with the [relevant] attack, participated in it as something that they wished to bring about, or sought by their action to make it succeed." *Id.* at 17–18 (alteration in original) (quoting 598 U.S. at 498).

Plaintiffs respond that *Twitter* does not require a direct nexus between a defendant's actions and the plaintiff's injuries in every circumstance.  Doc. 63 at 17–19. Rather, a more direct nexus, as compared to an attenuated one, merely makes it easier for courts to infer culpable assistance.  *Id.* at 17.  And *Twitter* continues to recognize that, where a defendant consciously and culpably aided wrongful acts, liability may attach to acts of terrorism that are foreseeable risks of those acts.  *Id.* at 18–19.  Plaintiffs thus argue that, because these principles are consistent with the pre-*Twitter* Second Circuit precedent that the Court applied in the March 2023 Order—namely, *Honickman* and *Kaplan*—reconsideration is not warranted.  *Id.* at 19.

The Court agrees with Standard Chartered that *Twitter* directs courts to focus on the *defendant's actions* vis-à-vis the specific attack that injured the plaintiffs, rather than *the terrorist enterprise's actions* vis-à-vis defendant's services or how valuable defendant's services were to the enterprise.  598 U.S. at 494, 504.  *Twitter* also prohibits courts from treating the "knowing" sub-element of "knowing and substantial assistance" as a "carbon copy" of *Halberstam*'s "general awareness" element.  *Id.* at 503.  Instead, the "knowing" sub-element is "designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)" to determine whether the defendant had "some degree of knowledge that [its] actions [we]re aiding the primary violator."  *Id.* at 491, 503.

But Standard Chartered "overstate[s] the nexus that [JASTA] requires between the alleged assistance and the wrongful act":  aiding and abetting "does not require the

defendant to have known 'all the particulars of the primary actor's plan.'" *Id.* at 495 (citation omitted).  Thus, the Supreme Court held "a close nexus between the assistance and the tort *might* help establish that the defendant aided and abetted the tort, but even more remote support" can still suffice alongside a greater showing of intent to assist the terrorist organization and/or misconduct to aid it.  *Id.* at 496, 505 (emphasis added). Indeed, the Supreme Court explicitly held that JASTA's requirement for "defendants [to] have aided and abetted the act of international terrorism that injured the plaintiffs . . . *does not always demand a strict nexus* between the alleged assistance and the terrorist act."  *Id.* at 497 (emphasis added).  Thus, this requirement can be satisfied even where the defendant did not intentionally aid the specific terrorist *attack* itself.  *See id.* at 496, 502 Liability may attach, for example, in "situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack."  *Id.* at 502.

Insofar, however, as Plaintiffs invite the Court to pronounce that Second Circuit precedent is entirely consistent with *Twitter* and no "tension" exists (Doc. 63 at 13–14, 19), the Court declines to do so.  Deciding the instant motion for reconsideration does not require that the Court pass judgment on the continued viability of *Honickman* and *Kaplan*, in their entirety, in the Second Circuit post-*Twitter*.  Rather, the Court need only determine whether those portions of the cases upon which the March 2023 Order relied remain good law after *Twitter*.  And the March 2023 Order cited *Honickman* and *Kaplan* only for two tangential propositions, both of which *Twitter* itself affirmed continue to be good law.  The Court cited *Honickman*, 6 F.4th at 499, solely for the proposition that aiding and abetting liability can extend to foreseeable consequences of intended torts. March 2023 Order at 24.  *Twitter* expressly affirmed that principle.  598 U.S. at 496.  And the Court cited *Kaplan*, 999 F.3d at 866—alongside *Halberstam*—simply for the proposition that a defendant's absence at the time of injury does not alone defeat a prima

facie showing of substantial assistance.  March 2023 Order at 25 n.22.  *Twitter* affirmed that *Halberstam* remains good law, and the *Halberstam* defendant was neither present for nor even aware of the murder which she was found liable for aiding and abetting.  *See Twitter*, 598 U.S. at 485 (citing *Halberstam*, 705 F.2d at 474–76).  Accordingly, the Court's reliance on *Honickman* and *Kaplan* for those propositions is unaffected by *Twitter*, and the Court need not consider the continued precedential value of those cases more generally.

  2.  *The Supreme Court Did Not Renounce the Six-Factor Test in Halberstam*

  Standard Chartered further argues that *Twitter* held that the six *Halberstam* factors "do not apply in most circumstances."  Doc. 61 at 19.  Instead, according to Standard Chartered, *Twitter* embraced five new factors to assess scienter and substantial assistance: (1) whether the defendant allegedly tried to consciously help, encourage, solicit, or advise the attack; (2) the level of attenuation between the defendant's conduct and the attack; (3) whether defendant treated the terrorists any differently from its other customers; (4) whether defendants had an independent tort duty to stop providing services to the terrorists or their sympathizers; and (5) whether plaintiffs' theory of liability is too broad in scope.  *Id.* at 18.

  Plaintiffs respond that *Twitter* "embraced *Halberstam*'s delineation of six factors" when applied as a framework to determine whether the defendant "consciously and culpably participate[d] in a tortious act in such a way as to help make it succeed."  Doc. 63 at 15 (quoting *Twitter*, 598 U.S. at 497).

  First, as the Court already noted, *Twitter* does not forbid courts from utilizing *Halberstam*'s six factors.  *Twitter*, 598 U.S. at 504; *see also Zobay*, No. 21-cv-3503 (CBA), Doc. 129 at 62–66 (applying the six *Halberstam* factors and affirming that they remain good law after *Twitter*).  Rather, it prohibits courts from applying the factors by rote without considering their "common conceptual core."  *See Twitter*, 598 U.S. at 504. In other words, courts should consider the six factors as a means to determine whether a

defendant's participation in another's wrongdoing is sufficiently significant and culpable to impose aiding and abetting liability.  *See id.*

Second, Standard Chartered is correct that the Supreme Court referenced those five considerations, but the Supreme Court did so to demonstrate the ways in which the *Twitter* plaintiffs failed to provide the "strong showing of assistance and scienter" required to convert the defendants' "mere passive nonfeasance" into tortious conduct. [13] *Id.* at 500–02.  The Supreme Court did not announce that it intended those five considerations to become a test for all future aiding and abetting cases, nor that the considerations would apply at all where plaintiffs allege affirmative misconduct rather than passive nonfeasance.  Indeed, the Supreme Court concluded by expressly stating that "[b]y their very nature, the concepts and aiding and abetting and substantial assistance do not lend themselves to crisp, bright-line distinctions."  *Id.* at 506.  That closing cautionary note only underscores the Supreme Court's admonitions throughout its opinion in *Twitter* that *Halberstam* must be adapted to fit new facts, and the Ninth Circuit's failure to do so was precisely the origin of its error.  *Id.* at 487, 503–05.

3.  *Applying Twitter, Plaintiffs Have Stated a JASTA Aiding-and-Abetting Claim*

As a preliminary matter, the Court notes that Standard Chartered mischaracterizes the nature of Plaintiffs' claims by representing that the complaint solely alleges passive nonfeasance and no affirmative acts.  *See* Doc. 61 at 22.  It does not.  Plaintiffs allege that "[Standard Chartered] continued to provide specialized, individualized financial services to Fatima even after it was specifically informed by senior U.S. government officials—in person—that those services were enabling Fatima's production and distribution of a

---

[13] Standard Chartered argues that *Twitter*'s use of the term "passive nonfeasance" does not mean inaction, but, rather, actions taken while "indifferent to the motives of a given customer of the defendant's services." Doc. 61 at 18 n.7.  The Court disagrees.  *Twitter* juxtaposes "passive nonfeasance" with "affirmative misconduct" in the context of the *assistance* prong of "knowing and substantial assistance," not the entire element or the knowledge element.  *See* 598 U.S. at 489, 500.  This is because the Supreme Court repeatedly distinguished between action and inaction, as inactions and omissions are generally insufficient to impose liability without an independent duty to act, whereas affirmative action may more regularly give rise to liability because actions inherently carry basic tort duties of care.  *See id.* at 489.

chemical whose primary use was in the IEDs responsible for the deaths of U.S. service members." Doc. 63 at 20. Standard Chartered's loan to remove CAN production bottlenecks was essential to Fatima's continued CAN production—and therefore Fatima's continued provision of CAN to al-Qaeda and the Syndicate. *See* ¶¶ 152–57 (alleging that, even after the January 2013 meeting at which U.S. officials urged Standard Chartered to stop serving Fatima because its CAN was being used in IED attacks against service members, Standard Chartered continued to provide Fatima millions of dollars in "specially structured" loans *specifically* to facilitate CAN production). In other words, the gravamen of Plaintiffs' claims is not that Standard Chartered simply failed to discontinue its prior ongoing financial or banking services to Fatima after the January 2013 meeting, but that it thereafter affirmatively funded Fatima with the specific intent of removing barriers to CAN production. *See id.*; *see also* Doc. 63 at 26 (specifying that Plaintiffs only seek to hold Standard Chartered liable for post-January 2013 al-Qaeda and Syndicate CAN-based IED attacks on U.S. service members). Thus, because Plaintiffs allege affirmative misfeasance, rather than merely passive nonfeasance, *Twitter* requires a much less significant showing of scienter and assistance, and it does not require as close a nexus between Standard Chartered's actions and the attacks against Plaintiffs' family members.[14] 598 U.S. at 496–97, 500–02, 505.

Standard Chartered also argues that it merely provided "routine services," and *Twitter* therefore prohibits liability. Doc. 61 at 22. But the Court is not persuaded that granting loans of the type at issue here are the sort of "routine services" the Supreme Court meant in *Twitter*. The Supreme Court expressed concern that "ordinary merchants"

---

[14] Allegations of affirmative misfeasance also obviate the need for a showing of an independent duty in tort. *See Twitter*, 598 U.S. at 501; *contra* Doc. 61 at 27.

Likewise, while Standard Chartered is correct that inaction is generally not tortious even when coupled with overwhelming actual knowledge (*Twitter*, 598 U.S. at 503; Doc. 61 at 23), because Plaintiffs here are not alleging mere inaction, that argument is besides the point. Plaintiffs allege that Standard Chartered's actual knowledge that Fatima's CAN was being used for IEDs supports a plausible inference that Standard Chartered provided conscious and culpable assistance. Doc. 63 at 24.

providing routine services to the public writ large should not be held liable for a defendant's misuse of those platforms when the service provider did not preapprove, authorize, or otherwise endorse that misuse.  598 U.S. at 489, 499–500; *see also id.* at 498 (emphasizing that defendants' platforms were available with "little to no front-end screening by defendants").  Thus, social media platforms that allow anyone to use their platforms to disseminate content without any sort of preauthorization or approval of that content's message, or cell service providers who allow anyone to make calls without any sort of preauthorization or approval of the call's content or message, should not be held liable for users' misuse of their services.  *Id.*  Indeed, even where the Supreme Court cited a case expressing concern that an element of culpability is required to prevent "mostly passive actors like banks [from] becom[ing] liable for all of their customers' crimes by virtue of carrying out routine transactions," the Court emphasized that the key concern was the bank's passivity and inaction.  *Id.* at 491 (citation omitted).  And while banks do provide such routine services that involve little to no preauthorization or front-end screening—such as debit card transactions or cashing checks, which are completed when and how the user decides with limited oversight only after-the-fact—granting loans for specific business uses is not one of those services.  Because Standard Chartered allegedly specifically tailored and preauthorized a financial instrument for Fatima's production of CAN, not as limited oversight after-the-fact (¶¶ 152–57), it is readily distinguishable from *Twitter*'s examples of social media platforms and cell service providers.  For similar reasons, although Standard Chartered is correct (Doc. 61 at 25–28) that *Twitter* expressed concern over too expansive theories of liability "tak[ing] aiding and abetting far beyond its essential culpability moorings" by attributing liability to routine service providers for users' misuse (598 U.S. at 503), the unique allegations as to Standard Chartered's actions assuage the Court's concerns that any potential liability here would be too unmoored or expansive.

Accordingly, Plaintiffs' claims fundamentally differ from those in *Twitter*. The *Twitter* defendants merely provided terrorists and terrorist sympathizers, alongside billions of other users, a platform but were "agnostic" as to how those platforms were used, effectively rendering the defendants no more than inactive, passive "bystanders." *Twitter*, 598 U.S. at 498–500. By contrast, Standard Chartered carefully tailored financial instruments to fund production of a known IED ingredient known to be sold to terrorist groups known to be attacking U.S. service members. ¶¶ 152–57. Standard Chartered was neither "agnostic" as to how its financial instruments would be used, nor a bystander in the creation and implementation of those instruments. *See id.*

In this sense, Standard Chartered's conduct much more closely resembles the Supreme Court's illustrations of examples where secondary defendants *could* be liable for aiding known terrorist groups. Although Standard Chartered may argue its loans were merely "routine services," it provided those routine services "in an unusual way," which thus enabled the provision of "dangerous wares,"[15] such that those services "could constitute aiding and abetting a foreseeable terror attack," like a morphine distributor who mailed morphine far in excess of normal amounts. *See Twitter*, 598 U.S. at 502 (citing *Direct Sales Co.*, 319 U.S. at 707, 711–12, 714–15). Likewise, Standard Chartered's actions to deliberately fund Fatima's production of CAN are akin to "consciously and selectively ch[oosing] to promote content provided by a particular terrorist group," such that "it could be said to have culpably assisted the terrorist group," like a newspaper that published discriminatory employment advertisements. *Id.* (citing *Passaic Daily News*, 63 N.J. at 487–88).

Moreover, as previously noted, Plaintiffs only seek to hold Standard Chartered liable for "CAN-based IED attacks committed by the al-Qaeda Terror Syndicate against

---

[15] The analogy is particularly apt here, as CAN fertilizer accounted for as little as five percent of all fertilizer used in the Afghan region at the time for agricultural purposes, and "more suitable" and "less expensive" alternatives existed. ¶¶ 96, 98

U.S. service members in Afghanistan that occurred after Standard Chartered was specifically warned by the U.S. government that it was helping Fatima provide CAN to terrorists" but nonetheless affirmatively helped remove CAN production bottlenecks. Doc. 63 at 26.  This is thus not, as Standard Chartered argues, the same as the "transcendent enterprise" theory of liability that *Twitter* rejected.  Doc. 61 at 21 (citing 598 U.S. at 495).  Consequently, insofar as *Twitter* calls for a nexus between Standard Chartered's actions and Plaintiffs' injuries, the Court finds that such requirement has been sufficiently alleged.

Standard Chartered also argues on reply that imposing liability on it would stretch the bounds of foreseeability too far because *Twitter* only allows such liability to extend where a defendant "engages in another intentional tort and Plaintiffs' injuries were 'a foreseeable risk of the intended tort,'" but Standard Chartered committed no underlying tort.  Doc. 64 at 11 (quoting *Twitter*, 598 U.S. at 496).[16]  But such an interpretation would be inconsistent with the Supreme Court's endorsement of aiding-and-abetting liability for a morphine distributor or a newspaper printing advertisements.  In neither circumstance is the defendant's underlying intended conduct—distributing morphine or printing news and ads—tortious, but where the conduct foreseeably caused injuries, liability may still

---

[16] On reply, Standard Chartered also argues that foreseeability should be circumscribed only to the foreseeable uses of a defendant's aid *by the actor directly aided* and cut off as to any individual to whom the actor directly aided passes along the aid.  Doc. 64 at 7, 13; *see also* Doc. 61 at 25–26 (making a similar argument to assert that Standard Chartered's conduct is too attenuated to find a sufficient nexus between its acts and Plaintiffs' injuries).  In other words, Standard Chartered argues that *Twitter* would have allowed secondary but not tertiary liability; so, because Standard Chartered did not provide any goods or services directly to al-Qaeda and the Syndicate, only to Fatima (who then provided goods to terrorists), Standard Chartered is not liable for the terrorist attacks.  *See id.*  But *Twitter* never distinguished between secondary and tertiary liability in its holding that liability attaches to foreseeable consequences of one's actions.  *See* 598 U.S. at 496.  Moreover, at least one other court has allowed precisely this kind of tertiary liability.  In *Zobay*, the court held that plaintiffs could state a JASTA aiding-and-abetting claim against a multinational telecommunications company that provided civilian companies, which were known to be affiliated with terrorists, supplies that could be and were used in terrorist attacks (there, cell phones, which could be used as triggers for weapons) because it was foreseeable that the "goods and funds would flow [from the civilian companies] to proxy groups and that acts of terror would result."  No. 21-cv-3503 (CBA), Doc. No. 129 at 6–7, 59–61.

attach.  *See Twitter*, 598 U.S. at 502 (citing *Direct Sales Co.*, 319 U.S. at 707, 711–12,
714–15; *Passaic Daily News*, 63 N.J. at 487–88).  Therefore, Plaintiffs need not allege
that Standard Chartered's underlying provision of banking and financing services was, in
itself, tortious in order to state a claim.  The Court thus reaffirms its prior holding that,
aiding and abetting liability extends to foreseeable injuries, and "[n]one dispute that the
killing of U.S. service members is a foreseeable consequence of assisting in the creation
of IEDs for al-Qaeda and the Syndicate during the war in Afghanistan."  *See* March 2023
Order at 24.

Accordingly, the Court holds that, under *Twitter*, Plaintiffs have sufficiently stated
a JASTA aiding-and-abetting claim against Standard Chartered.

## V.    CONCLUSION

For the reasons stated above, Standard Chartered's motion is DENIED.  The
Clerk of Court is respectfully directed to terminate the motion, Doc. 60.

It is SO ORDERED.

Dated:    October 27, 2023
          New York, New York

_____
    EDGARDO RAMOS, U.S.D.J.