UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIANA BONACASA, *et al.,*<br><br>　　　　　　Plaintiffs,<br><br>　　-*against*-<br><br>STANDARD CHARTERED plc *and* STANDARD CHARTERED BANK,<br><br>　　　　　　Defendants. | **OPINION & ORDER**<br><br>22-cv-03320 (ER) |
| MARIBEL MOORE, *et al.,*<br><br>　　　　　　Plaintiffs,<br><br>　　-*against*-<br><br>STANDARD CHARTERED PLC *and* STANDARD CHARTERED BANK,<br><br>　　　　　　Defendants. | 23-cv-02834 (ER) |
| ESTATE OF ANNE T. SMEDINGHOFF, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　-*against*-<br><br>STANDARD CHARTERED BANK,<br><br>　　　　　　Defendant. | 23-cv-02865 (ER) |

RAMOS, D.J.:

Before the Court is Plaintiffs' motion to compel Standard Chartered Bank to produce unredacted versions of 25 redacted or withheld documents for *in camera* review, and to compel them to produce all nonprivileged communications. Docs. 65, 67 at 1. Pursuant to the Court's order in a conference held on January 21, 2025, Plaintiffs submitted unredacted versions of the documents for *in camera* review. For the reasons

set forth below, Plaintiffs' motion to compel the production of the 25 unredacted documents is GRANTED in part, and DENIED in part.

## I.    BACKGROUND

### A.  Factual and Procedural Background

Familiarity with the facts underlying this action is assumed, and these facts are discussed in more detail in this Court's decision granting in part, and denying in part Standard Chartered PLC and Standard Chartered Bank's (collectively, "SCB") motion to dismiss in *Bonacasa v. Standard Chartered PLC*, No. 22-cv-03320 (ER).[1] *See Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023), reconsideration denied, 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023).

The parties have engaged in discovery based on the central allegation that SCB aided and abetted terrorist attacks that killed or injured U.S. soldiers in Afghanistan, from 2013 to 2016, by providing banking services to a Pakistani-based fertilizer company, the Fatima Group ("Fatima"). Docs. 54 at 1, 59 at 1. SCB's provision of banking services to Fatima is alleged to have been contrary to specific requests from the U.S. Department of Defense's ("DoD") Joint Improvised Explosive Device Defeat Organization ("JIEDDO"). Doc. 27 ¶¶ 358–368.

This dispute arises out of a December 3, 2012 meeting between SCB and JIEDDO, and the 2019 publication of news articles in *The Mail on Sunday* and *Daily Mail*. Docs. 67 at 1; 72 at 5.

#### 1.  *JIEDDO Meeting & 2019 News Articles*

On December 3, 2012, Donna Daniels, SCB's General Counsel for the Americas, and other representatives of SCB, met with the JIEDDO at SCB's New York office. Doc. 67 at 7. According to Plaintiffs, at the meeting, JIEDDO presented evidence showing that: many of the improvised explosive device ("IED") attacks in Afghanistan used the

---

[1] Unless otherwise indicated, ECF citations refer to the docket in *Smedinghoff v. Standard Chartered Bank*, No. 23-cv-02865 (ER).

explosives precursor, Calcium Ammonium Nitrate ("CAN"); all of the CAN used in these IED attacks were produced by Fatima's fertilizer plants; and that Fatima had refused to put in place effective controls to prevent the use of their fertilizer in IEDS. *Id.* at 6, 7. Amongst other things, JIEDDO "indicated that they would like to see banks end their relationship with Fatima, in order to put pressure on them to change their behavior. *Id.* (quoting Doc. 68–7); *see also* Doc. 40–2 at 5 ("JIEDDO is therefore contacting banks with links to Fatima to urge them to reconsider their relationship with Fatima").

Subsequently, SCB's Wholesale Banking Legal & Compliance team (the "WBL&C") conducted an internal review of SCB's relationship with Fatima. Doc. 72 at 4. The WBL&C then relayed their findings to SCB's Wholesale Banking Responsibility and Reputational Risk Committee ("WBRRRC"), which was tasked with ultimately considering JIEDDO's request that SCB end its relationship with Fatima. *Id.* Four months later, on April 16, 2013, the WBRRRC adopted a recommendation to "maintain the client for a further review period," during which Standard Chartered (Pakistan) Ltd. ("SCB Pakistan")[2] allegedly continued to provide financial services to Fatima.[3] Doc. 67 at 8. On July 24, 2013, the WBRRRC provisionally "blessed" SCB Pakistan's efforts to expand the relationship by pursuing two new transactions with Fatima, and by early November 2013, SCB's relationship with Fatima was considered "business as usual." *Id.*

In December of 2019, a freelance author working for the UK tabloids *The Mail on Sunday* and *Daily Mail* published articles accusing SCB of failing to cooperate with the US government with regard to Fatima, including an article titled "US general claims he

---

[2] SCB Pakistan, who is not party to this action, is a wholly-owned subsidiary of SCB, with its main office in Karachi, Pakistan. Doc. 1 ¶ 34.

[3] SCB asserts that during this period, the WBRRRC also adopted a recommendation "to encourage [Fatima] to continue to engage with JIEDDO . . . seek solutions to counter the use of its fertilizers in IEDs in Afghanistan, and to follow up and engage with [Lieutenant General Michael D. Barbero, former head of JIEDDO], which they assert they did. Doc. 59 at 1, 2.

told [SCB] its client helped the Taliban - but the bank did nothing." Docs. 67 at 7; 77 at 9, 10.

### 2. Challenged Documents

Plaintiffs challenge two sets of documents that SCB has redacted or withheld. First, Plaintiffs seek disclosure of portions of 16 email communications and three internal draft reports from 2012 to 2013 concerning Daniel's advice to SCB regarding JIEDDO's inquiry into, and SCB's relationship with, Fatima. Docs. 67 at 3–4, 11–19; 72 at 11, 12. Second, Plaintiffs seek disclosure of portions of six email communications from 2019 to 2020, concerning SCB's response to the 2019 *Daily Mail* and *Mail on Sunday* articles, in which advice of SCB attorneys Jonathan Rothberg and Scott Corrigan is either requested or provided, or another employee reveals the substance of their advice. *Id.*

### 3. Procedural Background

On July 30, 2024, Plaintiffs requested a pre-motion conference for leave to file a motion to compel SCB to produce 21 documents that had been withheld or redacted due to attorney-client or work product privilege. Docs. 54, 56. At the conference, which was held on August 12, 2024, Plaintiffs stated that in addition to the 21 documents referenced in their letter, there may be other documents, "five or fewer," that implicate similar issues. Doc. 61 at 22. The Court granted Plaintiffs leave to file the motion to compel the initial 21 documents and stated that between then and the time of filing the motion, parties are to meet and confer regarding any additional documents. *Id.* at 22, 23. On September 5, 2024, Plaintiffs identified four additional documents that they intended to include in their motion. [4] Doc. 72 at 12. On January 21, 2025, the Court held a

---

[4] Parties dispute whether the Court should now consider the additional four documents. According to SCB, Plaintiffs did not meet and confer with SCB as instructed, and instead, waited until "4:00 p.m. on September 5[, 2024]—the day before their [m]otion was due [and filed] . . . and 24 days after the [August 12, 2024] conference" to inform SCB of the four additional documents included in the instant motion. Doc. 72 at 13. In response, Plaintiffs assert that SCB "rebuffed" their attempts to meet and confer regarding the four additional documents and claimed that the included redactions were correct. Doc. 77 at 14 n. 8. Additionally, they assert that SCB maintained that position in the opposition to the instant motion, further confirming that the parties are at an impasse with respect to the redactions. *Id.* In light of this impasse, the Court will consider the additional four documents.

conference where it directed Plaintiffs to submit the 25 documents to the Court for *in camera* review, which they did on January 23, 2025.

## II.    LEGAL STANDARD

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re County of Erie,* 473 F.3d 413, 418 (2d Cir. 2007) (citing *United States v. Construction Products Research, Inc.,* 73 F.3d 464, 473 (2d Cir. 1996)). The purpose of attorney-client privilege is "to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). "The availability of sound legal advice inures to the benefit not only of the client who wishes to know his options and responsibilities in given circumstances, but also of the public which is entitled to compliance with the ever growing and increasingly complex body of public law." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15*, 1983, 731 F.2d 1032, 1036–37 (2d Cir. 1984).

Courts should construe the attorney-client privilege narrowly, in light of its effect in making relevant information undiscoverable, applying it "only where necessary to achieve its purpose." *In re County of Erie*, 473 F.3d at 418 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

A party invoking the privilege bears the burden of establishing its applicability. *Id.* (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)). To invoke the attorney-client privilege, the proponent must establish the following three elements: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419 (citing *Construction Products Research, Inc.*, 73 F.3d at 473).

Under Fed. R. Civ. P. 26(b)(3), a document created "because of" the prospect of litigation "which tends to reveal mental impressions, conclusions, opinions or theories

concerning the litigation" receives limited protection from disclosure under the attorney work product privilege. *See United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998). However, documents that "are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" do not receive protection. *Id*. at 1202. Where the threat of litigation is also accompanied by a non-litigation purpose for the documents at issue, "[w]hether there is work product protection turns on whether the material would have been prepared irrespective of the expected litigation[.]" *William A. Gross Construction Association Inc. v. American Manufacturers Mutual Insurance Company*, 262 F.R.D. 354, 360 (S.D.N.Y. 2009) (quotation marks and citation omitted, brackets in original).

## III.   Discussion

### A.   2012-2013 Documents

The first set of challenged documents include 19 redacted or withheld email communications or internal draft reports from 2012 to 2013, which concern Daniel's advice to SCB regarding JIEDDO's inquiry into their relationship with Fatima  Docs. 67 at 3–4, 11–19; 72 at 11, 12.  They can be divided into three subcategories:  (1) one email concerning SCB's response following the December 3, 2012 meeting with JIEDDO (Plaintiffs' Exhibit A-01); (2) five emails regarding internal draft reports—and the three draft reports—concerning SCB's internal review (Plaintiffs' Exhibits A-02 to A-05, A-13, and A-17 to A-19); and (3) ten email communications concerning advice requested from, or provided by Daniels concerning reporting to the WBRRRC on the internal Fatima review, how to engage with JIEDDO in response to their allegations and investigations, and other discussions with SCB employees involved in the Fatima review (Plaintiffs' Exhibits A-06 to A-12 and A-14 to A-16).

A party invoking attorney-client privilege must establish that the challenged statements were a "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or

providing legal advice." *In re County of Erie*, 473 F.3d at 419 (citing *Construction Products Research, Inc.*, 73 F.3d at 473). Plaintiffs challenge all three elements in regard to Plaintiffs' Exhibit A-09. [5] Docs. 67 at 16; 72 at 10. With respect to the balance of the 18 documents, Plaintiffs only contest that the challenged statements and drafts were made for the purpose of obtaining or providing legal advice.

In determining the third element—that the statement was made for the purpose of obtaining or providing legal advice—"courts in this Circuit evaluate the predominant purpose of the communication." *In re County of Erie*, 473 F.3d at 419–20 (confidential communication is protected by the attorney-client privilege only if the predominant purpose of the communication is to render or solicit legal advice). The predominant purpose test, however, "does not require a showing that obtaining or providing legal advice was the *sole* purpose . . . or that the communications at issue would not have been made but for the fact that legal advice was sought." *In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 201) (quotation marks omitted) (emphasis in original). Rather, "[s]o long as obtaining or providing legal advice was one of the significant purposes of the ... investigation, the attorney-client privilege applies, even if there were also other purposes." *Id.* (quotation marks omitted). "The predominant purpose of a particular document" may "be informed by the overall needs and objectives that animate the client's request for advice." *In re County of Erie*, 473 F.3d at 421.

At the outset, Plaintiffs contend that SCB has failed to demonstrate a predominate legal purpose of the 19 challenged communications from 2012-2013, which concern only "a business decision: whether SCB should exit its relationship with Fatima." Doc. 77 at 8. In response, SCB contends that their internal investigation by the WBL&C, and the corresponding legal advice to WBRRRC, which was tasked with the decision on whether

---

[5] Plaintiffs' Exhibit A-09 is a "continuation of the same email chain" as in Plaintiffs' Exhibits A-06 to A-08, with the subject line, "FATIMA update." Doc. 67 at 15.

SCB should discontinue their relationship with Fatima, concerned "multiple and often-overlapping purposes," including obtaining legal advice from Daniels.  Doc. 72 at 11 (quoting *In re General Motors*, 80 F. Supp. at 530).

In responding to JIEDDO's request to end its relationship with Fatima, SCB reviewed its relationship with Fatima, both through an internal review conducted by the WBL&C and with a final determination made by the WBRRRC.  Doc. 72 at 1, 5. Confronted with a client suspected of numerous legal violations by an agency of the DoD, WBL&C's internal investigation and WBRRRC would have considered not only the business or reputational implications of continuing its relationship with Fatima, but also the legal risks and consequences.  This would have "[i]nvolve[d] the interpretation and application of legal principles," and "require[d] a lawyer to rely on legal education and experience to inform judgment."  *In re County of Erie*, 473 F.3d 419 (2d Cir. 2007). Accordingly, the Court determines that while the ultimate decision regarding whether to end its relationship with Fatima may have been in substantial part "a business decision," the determination of that decision would have necessarily implicated legal considerations, for example, whether SCB's continued relationship with Fatima would itself be a violation of U.S. law.  However, regarding the challenged communications, the Court must individually determine whether the predominate purpose of each communication was to obtain or provide legal advice.  *See In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 323 (S.D.N.Y. 2020) ("In light of the two hats often worn by in-house lawyers, communications between a corporation's employees and its in-house counsel though subject to the attorney-client privilege must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or, alternatively, to obtain or provide legal advice."); *see also, e.g., National Day Laborer Organization Network v. U.S. Immigration & Customs Enforcement*, 486 F. Supp. 3d 669, 693 (S.D.N.Y. 2020) (explaining the "vital distinction between advice that

can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer").

### 1. *Plaintiffs' Exhibit A-01*[6]

After review of Plaintiffs' Exhibit A-01, the Court determines that the redacted statements are protected by the attorney-client privilege.  In A-01, Daniels provides legal advice regarding strategy following the December 2012 meeting with JIEDDO and her view on SCB's relationship with Fatima.  Daniels' legal advice was given at the request of Tim Miller, then director of property, research and assurance at SCB, who was working on separate enforcement actions against SCB resulting in regulatory settlements and criminal penalties.  Doc. 72 at 9.  Miller's request for advice was in regard to the Fatima relationship in light of those other regulatory actions and settlements, and involved legal advice that "required a lawyer to rely on legal education and experience to inform judgment." *In re County of Erie*, 473 F.3d at 419.

### 2. *Plaintiffs' Exhibits A-02 to A-05, A-13, and A-17 to A-19*

After review of Plaintiffs' Exhibits A-02, A-04, A-05, A-18, and A-19, the Court determines that some, but not all of the redacted statements are protected by the attorney-client privilege.  The redacted statements within these emails from January and July 2013 reflect Daniel's legal advice regarding JIEDDO and SCB's relationship with Fatima, particularly as it pertains to what information the WBL&C should communicate to WBRRRC through internal reports.  As discussed, the determination of how to respond to JIEDDO and how to advise WBRRRC regarding SCB's relationship with Fatima necessarily implicated both business and legal considerations.  Some of the redacted statements by Daniels reflect these legal considerations, including proposed edits to the internal draft, making line edits to language prosed by David Cracknell, then global head

---

[6] Plaintiffs Exhibits A-01, A-02, A-04 to A-12, A-14 to A-16, A-18, and A-19 refer to emails concerning Daniel's advice to SCB regarding JIEDDO's inquiry into, and SCB's relationship with, Fatima, and Plaintiffs' Exhibits A-03, A-13, and A-17, refer to internal draft reports concerning the same.  Docs. 67 at 3–4, 11–19; 72 at 11, 12.

of sanctions, and explaining the reasons for her edits, *e.g.*, Plaintiffs' Exhibits A-04 and A-19. Doc. 72 at 5. They are protected by the attorney-client privilege. However, some of the redacted statements do not include legal advice.

In Plaintiffs' Exhibit A-02, the fourth redaction from the bottom of the email chain, beginning with "At the end," is a question posed by Daniels regarding whether to make a minor substantive edit within an internal draft that does not implicate legal advice. This is not protected by the attorney-client privilege and should be produced in unredacted form.

In Plaintiffs' Exhibit A-05, the third and seventh redactions from the bottom of the email chain, beginning with "I too paused" and "[a]t the end," respectively, refer to the same non-legal question posed above and Cracknell's response to it. Neither contain legal advice nor "required a lawyer to rely on legal education and experience to inform judgment," *In re County of Erie*, 473 F.3d at 419, and should be produced in unredacted form.

In Plaintiffs' Exhibit A-18, the first sentence of the second redaction from the bottom of the email chain, which states " "Please find attached a copy of the WB RRRC submission with our proposed changes[,]" and the third redaction from the bottom of the email, beginning with "Please let us know if you would like to discuss," are not protected by the attorney-client privilege. Neither contain legal advice nor "required a lawyer to rely on legal education and experience to inform judgment," *In re County of Erie*, 473 F.3d at 419, and should be produced in unredacted form.

Plaintiffs' Exhibits A-03, A-13, and A-17 are draft reports, which include updates and suggestions concerning JIEDDO and SCB's internal review of Fatima, amongst other things. One purpose of the report is to assist WBRRRC regarding SCB's decision on whether to end its relationship with Fatima, which necessarily implicated legal considerations. Plaintiffs' Exhibits A-03 and A-17 were initially withheld from production in their entirety. Plaintiffs' Exhibit A-13 was initially produced to Plaintiffs

but then clawed back.  Plaintiffs' Exhibit A-17 was then produced with significant redactions.  Here, each of the challenged exhibits include edits by Daniels relating to WBL&C's internal investigation and SCB's response to JIEDDO's allegations.  Doc. 72 at 17.  As SCB argues, they include edits reflecting her legal judgment about what should and should not be included in the reports to WBRRRC.  The drafts also contain edits made by Daniel's that do not reflect legal advice or otherwise require her legal education, experience, or judgment.  *In re County of Erie*, 473 F.3d at 419.  However, the Court need not parse through which sections of the withheld documents contain legal or non-legal advice because, as the parties agree, later versions of each of the exhibits have been produced to Plaintiffs, including in final form.  Docs. 67 at 18; 68–17; 72 at 17, 18.[7]  Therefore, the only information contained within these exhibits that Plaintiffs do not already possess is the tracked changes showing the specific edits made by Daniels.  Accordingly, these exhibits are duplicative and the Court DENIES Plaintiffs' request to compel SCB produce them.  *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-07060 (CM) (KHP), 2019 WL 1259382, at *20 (S.D.N.Y. Mar. 19, 2019) (denying plaintiffs' request to compel portions of drafts, the final versions of which were already in plaintiffs' possession).

3. *Plaintiffs' Exhibits A-06 to A-12 and A-14 to A-16*

After review of Plaintiffs' Exhibits A-06 to A-12 and A-14 to A-16, the Court determines that the redacted statements within each of the emails are protected by the attorney-client privilege, except for those within Plaintiffs' Exhibits A-14 and A-15.  The redacted statements within these email communications from February, March, April and June 2013 concern advice requested of and provided by Daniels concerning reporting to the WBRRRC on the internal Fatima review, how to engage with JIEDDO in response to

---

[7] In their motion papers, Plaintiffs do not indicate whether later versions of Plaintiffs' Exhibit A-03 have been produced, however, SCB represents that they have produced over 40 versions of the report reflected therein, "including the final version."  Doc. 72 at 17.

their allegations and investigations, and other issues with SCB employees involved in the Fatima review. Each of these emails reflect a communication between client and counsel that was indented to be, and was in fact, kept confidential.[8] For the reasons discussed above, each of these conversations, with the exception of Plaintiffs' Exhibits A-14 and A-15, contain legal advice, or communications reflecting such, and are therefore protected by the attorney-client privilege.

Plaintiffs' Exhibits A-14 and A-15, however, do not reflect legal advice. In Plaintiffs' Exhibit A-14, David Wilson, then head of strategy, government & frameworks, and member of the WBL&C, "turn[s]" to Daniels and Cracknell, because "David Howes is away," to ask if they reviewed the Fatima "note" and are "OK with the final draft.[9]" *Id.* The email makes clear that the advice sought was directed at non-lawyers and lawyers, alike. Additionally, that Daniels stated that she may have been ok with the final draft, generally, does not implicate legal advice, as opposed to general non-legal advice. Likewise, Plaintiffs' Exhibit A-15 asks if Daniels' "requests were incorporated," to which she responds "Yes, this version incorporates my requests and I am ok with this version." *Id.* However, while the requests themselves may be privileged, this discussion is not. Accordingly, the redactions in neither exhibit are protected by the attorney-client privilege, and the exhibits must be produced in unredacted form.

### B. 2019-2020 Documents

The second set of challenged documents includes six email communications, Plaintiffs' Exhibits A-20 to A-25, from 2019 to 2020, concerning SCB's response to the 2019 *Daily Mail* and *Mail on Sunday* articles, in which SCB attorneys Jonathan Rothberg and Scott Corrigan are either asked for or provide advice, or another employee reveals the substance of their advice. Doc. 72 at 11, 12. SCB claims that the challenged

---

[8] In the memorandum in support of the instant motion Plaintiffs assert that SCB redacted a discussion "among non-lawyers" in Plaintiffs' Exhibit A-09. Doc. 67 at 16. However, in Plaintiffs' Exhibit A-09, Daniels is included throughout the email thread, including when asked for her legal advice.

[9] David Howes was the Global Head of Financial Crime Risk for Wholesale Banking.

statements are protected by the attorney-client privilege and that Plaintiffs' Exhibits A-20, A-23, and A-25 are protected work product. *Id.* at 20, 21. Plaintiffs dispute that the challenged statements were made for the purpose of obtaining or providing legal advice or constitute protected work product.

After review of Plaintiffs' Exhibits A-20 to A-25, the Court determines that redacted statements within the emails are protected by the attorney-client privilege. The redacted statements within these emails from 2019 and 2020 reflect legal advice requested of or provided by Rothberg and Corrigan regarding SCB's internal review of Fatima and Julian Knight, an individual engaged in a *qui tam* lawsuit against SCB at the time. Knight "was connected to and explicitly referenced" by the author of the 2019 *Daily Mail* and *Mail on Sunday* articles, which are the subject of the emails. In conveying their advice regarding SCB's decision about if and how to respond to the articles or their reporters, Rothberg and Corrigan were relying on their legal education and experience to consider the legal risks of a response, in addition to any reputational risks. *See Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585 596 (S.D.N.Y. 2015) ("The mere fact that business was one purpose of the advice . . . does not vitiate any legal nature). Testimony by Julie Gibson, former head of group media relationships, bolsters this conclusion. Doc. 72 at 19. Gibson, who was including on each of the emails, testified that she always included Rothberg on emails for his comments "if a legal matter was involved," particularly any matter related to "Julian Knight's litigation n against the bank." *Id.*

Plaintiffs' cited cases are inapposite. For example, Plaintiffs cite *Fox News Network* for the proposition that "'discussing how to respond to . . . an anticipated news report' is not privileged." Doc. 67 at 19 (quoting *Fox News Net*work, *LLC. V. U.S. Department of Treasury*, 739 F. Supp. 2d 515, 561 (S.D.N.Y 2010)). However, unlike here, in *Fox News Network*, the purported legal discussion of how to respond to an anticipated news report centered around "an unresolved accounting issue" and not an

"internal policy issue," as was alleged.  *Id.* at 547.  Accordingly, the court determined that the discussion was not protected by the attorney-client privilege.  *Id.* at 561.  Here, as discussed, SCB's lawyers were specifically included for their legal input due to the contemporaneous *qui tam* suit against them by the articles' source.  Accordingly, Plaintiffs' Exhibits A-20 to A-25 are protected by the attorney-client privilege.

Additionally, Plaintiffs' Exhibits A-20 and A-25 contain protected work product. In response to Knight's *qui tam* lawsuit, SCB conducted an internal review regarding Knight and any potential connection to the Fatima-related articles.  Doc. 72 at 11, 21. Based on that review, SCB created the legal work product contained within Plaintiffs' Exhibits A-20 and A-25, that would not have been created but for the contemporaneous *qui tam* lawsuit, as supported by Gibson's testimony.  *See United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998) (holding that "[w]here a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation," it is protected work product).  Additionally, the redactions therein clearly reflect Rothberg's mental impressions and opinions regarding the possible connection between the *qui tam* lawsuit and the Fatima-related articles.  *See American Civil Liberties Union v. United States Department of Justice,* 252 F. Supp. 3d 217, 223 (S.D.N.Y 2017) (citations omitted) ("[A] document created because of anticipated litigation, which tends to reveal mental impressions, conclusions, opinions or theories concerning the litigation, does not lose work-product protection merely because it is intended to assist in the making of a business decision influenced by the likely outcome of the anticipated litigation.").

Accordingly, Plaintiffs' motion to compel the production of Plaintiffs Exhibits A-20 to A-25 is DENIED.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion to compel SCB to produce unredacted copies of the 25 challenged documents is GRANTED in part, and DENIED in part.  Specifically, Plaintiffs' Exhibits A-02, A-05, A-14, A-15, and A-18 currently contain redacted statements that are not privileged or otherwise protected, and thus SCB shall:

- Produce Plaintiffs' Exhibit A-02, with the following unredacted:  the fourth redaction from the bottom of the email chain, beginning with "At the end;"

- Produce Plaintiffs' Exhibit A-05, with the following unredacted:  the third and seventh redactions from the bottom of the email chain, beginning with "I too paused" and "[a]t the end;"

- Produce Plaintiffs' Exhibit A-14, with no redactions;

- Produce Plaintiffs' Exhibit A-15, with no redactions; and

- Produce Plaintiffs' Exhibit A-18, with the following unredacted:  the first sentence of the second redaction from the bottom of the email chain, which states " "Please find attached a copy of the [WBRRRC] submission with our proposed changes[,]" and the third redaction from the bottom of the email, beginning with "Please let us know if you would like to discuss."

Plaintiffs' Exhibits A-01, A-03, A-04, A-06–A-13, A-16, A-17, and A-19–A-25 are privileged, contain protected work product, or are otherwise duplicative, and thus Plaintiffs' motion to compel production of them is DENIED.  The Clerk of Court is respectfully directed to terminate Doc. 65.


It is SO ORDERED.

Dated:    May 12, 2025
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.