

**SPARACINO**
PLLC

1920 L Street, NW, Suite 835, Washington, DC 20036
(202) 629-3530 | sparacinopllc.com

August 5, 2025

**BY CM/ECF**

The Honorable Ronnie Abrams, U.S.D.J.
U.S. District Court for the Southern District of New York
40 Foley Square
New York, NY, 10007

**RE:** *Fraenkel v. Standard Chartered Bank*, **No. 24-cv-4484;** *Brauner v. Standard Chartered Bank*, **No. 24-cv-5788**

Dear Judge Abrams:

SCB's reliance on *Ashley v. Deutsche Bank Aktiengesellschaft*, --- F.4th ----, 2025 WL 2025448 (2d Cir. July 21, 2025), is misplaced. Although *Ashley* found certain conduct by banks (including SCB) insufficient to support an aiding-abetting claim, *Ashley* reaffirmed the legal principles upon which Plaintiffs rely and dismissed fundamentally different allegations. Here, SCB provided illegal services directly to a terrorist front, helping it evade U.S. counterterrorism controls in defiance of warnings that such services systematically funded terrorist attacks. Those allegations bear little resemblance to *Ashley* and are more similar to *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), which *Ashley* reaffirmed.

In *Ashley*, the Second Circuit applied *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), for the first time. *Ashley* held that "the conclusions we have reached in the past are entirely consistent with" *Twitter*. 2025 WL 2025448, at *9. *Ashley* reaffirmed the following:

> (1) "JASTA permits recovery against those who aid and abet international terrorism 'directly or indirectly.'" *Id*. at *10 (quoting *Kaplan*, 999 F.3d at 856).

> (2) "[A] defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury," but instead "must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable." *Id*. This "foreseeability principle" requires "understanding, to some extent, the foreseeable consequences of the defendant's actions." *Id*. at *15.

> (3) Aiding "the act of international terrorism that injured the plaintiffs … does not always demand a strict nexus between the alleged assistance and the terrorist act." *Id*. at *10.

> (4) JASTA's "knowing" and "substantial" assistance requirements "work in tandem—a lesser showing of one demands a greater showing of the other." *Id*. at *10 (cleaned up). Thus, "absence of proof of intent is not fatal"—instead, the inquiry "necessitate[s] balancing scienter with the degree of assistance." *Id*. at *10 n.13 (cleaned up).

> (5) The assessment "is highly fact intensive; the analysis differs on a case-by-case basis." *Id*. at *14 (cleaned up).

These principles underpin Plaintiffs' opposition to SCB's motion to dismiss.

**1.** Applying those principles in *Ashley*, the Second Circuit dismissed aiding-abetting claims against SCB for providing banking services to the largest fertilizer companies in Pakistan, which "legally produce[d]" fertilizer that was "marketed by distributors to millions of Pakistani cotton, fruit and wheat farmers," but some of whose product was "smuggled into Afghanistan" by terrorists and "used to manufacture the IEDs that were employed in the bombings that injured Plaintiffs." 2025 WL 2025448, at *1-2. The court held that SCB did not "knowingly and substantially assist" the terrorists using fertilizer to make IEDs because the bank merely provided legitimate banking services to a legitimate third-party manufacturer; it had no relationship with the terrorists' enterprise and took no affirmative steps to assist the terrorists' operations. *Ashley* reaffirmed but distinguished *Kaplan*, which involved a bank that helped customers associated with terrorism evade sanctions. Unlike in *Kaplan*, the complaint in *Ashley* "conspicuously stop[ped] short of alleging that SCB knowingly violated U.S. sanctions or terrorist finance laws." *Id*. at *13 n.15. Instead, as in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025), the defendant broke no laws in selling lawful products to legitimate customers—but only failed to prevent downstream misuse of those products.

This case has exactly the features *Ashley* found wanting. *First*, SCB admitted it knowingly violated U.S. sanctions and anti-terrorism laws, and paid nearly $2 billion in penalties for what regulators described as "egregious" violations that made the United States "vulnerable to terrorists." ¶485. Far from providing routine banking services, SCB gave special treatment: It falsified CDD documents (¶583); omitted or misrepresented information in SWIFT payment messages (¶584); lied to OFAC (¶586); and even advised a company to change its name (¶588)—all to help its Iranian customers evade counterterrorism tracking and reporting (¶531). And SCB acted with knowing contempt for U.S. counterterrorism measures, an attitude summarized by a senior executive who complained, "You fucking Americans . . . ." (¶552).

*Second*, far from serving a legitimate manufacturer, SCB here provided its unlawful services to customers controlled by terrorists. SCB's customers included Caspian Petrochemical FZE (a/k/a the Iranian Petrochemical Company), an IRGC-controlled front company in an IRGC-controlled industry that the IRGC systematically used to fund terrorist attacks. ¶¶435-51, 580-91, 738-805. SCB served such customers despite public warnings by the U.S. government that Iranian petrochemical fronts were controlled by the IRGC and used to fund IRGC-sponsored terrorism. ¶¶724, 768-769. As a Treasury Department official warned in 2007, "When corporations do business with IRGC companies, they are doing business with *organizations that are providing direct support to terrorism*." ¶570 (emphasis added). At the same time, after the industry's takeover by the IRGC, the U.S. government was warning in 2007 that the IRGC "ha[d] numerous economic interests involving . . . the oil industry," and the government was "making clear [its] opposition" to doing business in "Iran's oil and gas sector." ¶¶750, 752. *Ashley* reaffirmed that a plaintiff at the pleading stage "does not have to allege that the bank actually knew of or should have seen those public sources." 2025 WL 2025448, at *10. But in any event, SCB's *own due diligence files* showed the Iranian Petrochemical Company was beneficially owned by the Iranian government and operated in Iran's oil and gas sector. ¶¶580, 739-40. And the surname of the individual associated with the company in SCB's files ("Emamjomeh") was a religious title in Iran referring to an imam appointed by Ayatollah Khamenei to lead Tehran's Friday Prayers, which regularly included slogans condemning the United States. ¶589-90.

**2.** *Ashley* also dismissed aiding-abetting claims against banks that were engaged in "sprawling money laundering operations," some proceeds of which "ultimately reached the

2

terrorist organizations" that attacked the plaintiffs. 2025 WL 2025448, at *1. *Ashley* described this liability theory as "sweeping" because it was based on the banks' facilitation of vast global money laundering schemes, assuming that "because Defendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money must have gone to the terrorists' violent activities." *Id*. at *15. However, where it was only an incidental "possib[ility] that some of the Banks' transactions in the money laundering schemes produced money that was transferred to the [terrorists]," and where plaintiffs did not "plead with specificity allegations" to substantiate that "possible" nexus, a "theory based on money's fungibility" was insufficient to conclude that the Banks' conduct "results in substantial support to the [terrorists]." *Id*. Because "the endpoint of the laundered money was entirely amorphous," the plaintiffs' nexus allegations were implausible. *Id*. at *16. *Ashley*, in other words, was a needle-in-a-haystack case akin to *Siegel v. HSBC North Am. Holdings*, 933 F.3d 217 (2d Cir. 2019). *Id*.

As explained in Plaintiffs' opposition to SCB's motion to dismiss, this case is fundamentally different because SCB here provided services to terrorist fronts under IRGC control, and Plaintiffs here allege with specificity that the IRGC systematically used such fronts to finance the attacks that killed or injured Plaintiffs. *See* MTD Opp. at 7, 25-26; ¶¶828-31, 850, 861-71, 893-912, 921-34 (discussing the Logistics Policy Directive, mandatory donations (*khums*), attack incentive and reward payments, weapons, training, logistics, and tunnels construction). Because of the IRGC's systematic use of its commercial fronts to fund its terrorism, SCB's customers were "integral, constituent parts" of the IRGC's terrorist apparatus and "closely intertwined" with the IRGC's violent terrorist activities. *Kaplan*, 999 F.3d. at 848, 860. SCB's customers were similar to customers in *Kaplan*, which included a commercial front that "serv[ed] as a bank, creditor and investment arm for Hizballah" and another used "to secure loans and finance business deals for Hizballah companies." *Id*. at 849. *Kaplan* held that providing banking services to those types of companies had a sufficient nexus to Hezbollah rocket attacks where the complaint alleged a "permissible inference" that money in the companies' accounts "either belonged to Hizbollah, or would be received by Hizbollah, or would be paid out as directed by Hizbollah." Plaintiffs have alleged an even stronger nexus here to IRGC-sponsored terrorism.

**3.** *Ashley* also dismissed aiding-abetting claims based on allegations that banks "facilitat[ed] transactions in tax fraud schemes while knowing that such schemes were commonly used by terrorists." 2025 WL 2025448, at *1. These allegations established insufficient general awareness, absent a more certain link between the customers and the terrorists. *Id*. at *16-17.

Plaintiffs allege far greater awareness here that SCB's customers were connected to terrorism, and that illegally helping them evade U.S. counterterrorism controls was a wrongful activity from which terrorist attacks were foreseeable. While "no source" in *Ashley* connected VAT fraudster Azizi to terrorist organizations, *id*. at *17, Plaintiffs here detail numerous sources that connected Iranian petrochemical front companies like the Iranian Petrochemical Company to IRGC-sponsored terrorism, and SCB's own compliance staff identified multiple red flags that the company was an Iranian front. ¶¶580-91. The fact that public warnings did not single out the Iranian Petrochemical Company hardly matters when the U.S. government was warning about the IRGC's control of the entire sector. While not all VAT fraud was associated with terrorism, all Iranian petrochemical front companies were.

*Ashley* emphasized that "[s]imilar banking services in a different context may lead to a different result." *Ashley*, 2025 WL 2025448, at *14. This case exemplifies that caution.

3

Sincerely,

/s/ Adam J. Goldstein

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Jacob R. Loshin (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
Stacey L. Wilson (*pro hac vice*)
SPARACINO PLLC

*Counsel for Plaintiffs*