UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIANA BONACASA, *et al.*,<br>Plaintiffs,<br>– *against* –<br>STANDARD CHARTERED PLC, *et al.*,<br>Defendant. | **OPINION & ORDER**<br>22-cv-3320 (ER) |
| MARIBEL MOORE, *et al.*,<br>Plaintiffs,<br>– *against* –<br>STANDARD CHARTERED PLC, *et al.*,<br>Defendant. | 23-cv-2834 (ER) |
| THOMAS SMEDINGHOFF for the estate of ANNE T. SMEDINGHOFF, *et al.*,<br>Plaintiffs,<br>– *against* –<br>STANDARD CHARTERED BANK,<br>Defendant. | 23-cv-2865 (ER) |

RAMOS, D.J.:

Plaintiffs brought this action pursuant to the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), alleging that Standard Chartered PLC ("SC PLC")—through its subsidiary, Standard Chartered Bank ("Standard Chartered")—aided and abetted al-Qaeda by providing banking services to the Fatima Group ("Fatima"), a Pakistani fertilizer company that purportedly supplied al-

Qaeda with materials used to make improvised explosive devices ("IEDs"). Doc. 80. Plaintiffs are family members of service members killed by such explosive devices in Afghanistan between 2013 and 2016. *Id.*

Plaintiffs moved for leave to file an amended complaint in light of evidence produced in discovery and the Second Circuit's decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025). Doc. 226. For the reasons set forth below, Plaintiffs' motion is GRANTED.

## I. BACKGROUND

The facts underlying this case are described in detail in the Court's prior opinions, *Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718, (S.D.N.Y. Mar. 7, 2023) (*Bonacasa I*) and *Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774, (S.D.N.Y. Oct. 27, 2023) (*Bonacasa II*), familiarity with which is assumed. In *Bonacasa I*, the Court granted in part and denied in part Standard Chartered's motion to dismiss. *Bonacasa II* also declined to dismiss the claims, considering the then-recent case *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which clarified the standard for aiding and abetting liability under the ATA (as modified by JASTA).

Two relevant developments have occurred since *Bonacasa II.* First, on July 21, 2025, the Second Circuit decided *Ashley*, 144 F.4th 420, which, following *Twitter*, further clarified the standard for aiding and abetting liability under the ATA. Second, on April 17, 2026, discovery in the instant cases concluded. Doc. 172 at 5.

On October 7, 2025, Plaintiffs filed the instant motion, seeking leave to file an amended complaint.[1] Doc. 226 at 1. Along with the motion, Plaintiffs filed a proposed

---

[1] This case is coordinated for discovery and pretrial purposes with *Moore, et al. v. Standard Chartered PLC, et al.*, No. 23 Civ. 2834 (ER), and *Estate of Anne T. Smedinghoff, et al. v. Standard Chartered Bank*, No. 23 Civ. 2865 (ER), which also allege JASTA aiding and abetting claims against Standard Chartered. Plaintiffs have filed the same or substantially similar proposed amended complaints in the *Moore* and *Smedinghoff* cases as exhibits in *Bonacasa*. *Compare* Doc. 228-3 *with* Docs. 228-2, 228-4.

third amended complaint ("PAC").[2] Doc. 228-3. In the PAC, Plaintiffs seek to add claims related to (1) a $22 million loan Standard Chartered made to Fatima to remove bottlenecks in Fatima's production of ammonia ("Debottlenecking Loan"); (2) a link between Pakistan's Inter-Services Intelligence agency ("ISI") and Fatima ("ISI Link"); and (3) special treatment that Standard Chartered gave to Fatima.

Plaintiffs allege that Standard Chartered negotiated with Fatima to provide a $22 million Debottlenecking Loan that Standard Chartered "understood . . . was designed to (and did) increase Fatima's production of the ammonia fueling [calcium ammonium nitrate ("CAN")] fertilizer bombs in Afghanistan." ¶ 35; *see* ¶ 194. They allege that Standard Chartered also waived repeated breaches of the loan. ¶¶ 195–96.

Regarding the ISI Link, Plaintiffs allege that Lieutenant General Barbero of the Defense Department's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") informed Standard Chartered in December 2012 about Fatima's role in the IED supply chain and ISI's control over Fatima. *See* ¶¶ 25, 30. They allege that Standard Chartered recognized JIEDDO's information was "toxic," and that Standard Chartered had dropped other clients "for less" egregious conduct, but after an internal review, expanded the relationship with Fatima. ¶¶ 29–34. They allege that JIEDDO also met with companies providing similar services to Standard Chartered and shared the same information. *See* ¶ 184. Plaintiffs allege that by the time of the December 2012 meeting with Barbero, Standard Chartered "knew that the U.S. government had verified [] ISI's role in Haqqani Network[3] and other terrorist attacks in Afghanistan" and "knew from the U.S. Government that Fatima's lack of cooperation with JIEDDO had been dictated by []

---

[2] The following facts are based on the allegations in the second amended complaint in *Bonacasa v. Standard Chartered PLC*, 22-cv-3320, Doc. 80, which the Court accepts as true for purposes of the instant motion. *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F. 3d 141, 145 (2d Cir. 2012). Unless otherwise noted, citations to "¶ _" refer to the PAC in the *Bonacasa* case, 22 Civ. 3320, Doc. 228-3.

[3] The Haqqani Network is a specially designated global terrorist organization that has operated in Afghanistan since the 1970s. ¶¶ 94–97. It is part of the Taliban, closely affiliated with and integrated into al-Qaeda, and a part of the al-Qaeda Terror Syndicate. ¶¶ 95, 102–04.

ISI." ¶ 108. Plaintiffs also add allegations concerning comments from U.S. government officials, including some made in congressional hearings, about ISI's role in attacks. ¶¶ 109–23; 164–65, 169–70. Finally, they add that a *Washington Post* article further confirmed the ISI Link, and that Standard Chartered knew about the article. ¶ 183.

Regarding the special treatment Standard Chartered gave to Fatima, Plaintiffs allege that in relation to the Debottlenecking Loan, Standard Chartered "recognized that it would not ordinarily" provide non-market terms, but "acceded to Fatima's demands for non-market pricing;" allowed Fatima to breach its credit limits; "dispensed with due diligence requirements;" and overlooked repeated breaches by Fatima of the terms of the loan." ¶ 195. They further allege that aside from the special treatment provided to Fatima in relation to the Debottlenecking Loan, throughout its relationship with Fatima, Standard Chartered "kept Fatima as a client despite repeated breaches of its policies, procedures, and contractual requirements," "repeatedly allowed Fatima to breach its credit limits and borrow in excess of those limits," "repeatedly accepted lower returns from Fatima and provided lower pricing to Fatima," "entered into unusual financial arrangements with Fatima," "provided special treatment to Fatima's officers and directors by allowing them to maintain private bank accounts" without following the proper procedures, and "accepted travel on Fatima's private jet in exchange for making donations to Fatima's preferred charities in Pakistan." ¶ 196.

## II. LEGAL STANDARD

"Rules 15 and 16 of the Federal Rules of Civil Procedure set forth the standards under which a party may amend a pleading." *Summerwind West Condominium Owners Association, Inc. v. Mt. Hawley Insurance Co.*, No. 22 Civ. 3165 (JPC), 2023 WL 8307561, at *3 (S.D.N.Y. Dec. 1, 2023). "Generally, '[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "Mere delay,

however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citations omitted). Absent some reason for doing so, denying leave to amend is an abuse of the district court's discretion. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

At the outset of litigation, "[a] party may amend its pleading once as a matter of course" within certain prescribed time limits. Fed. R. Civ. P. 15(a)(1). Outside those limits, a party may amend only with the written consent of the opposing party or with leave of the court. Fed. R. Civ. P. 15(a)(2). At that stage, the Second Circuit has explained, Rule 15 operates under a "permissive standard" that is "consistent with our 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted).

Where, as here, the deadline to amend their pleadings has passed, the lenient standard of Rule 15 must be balanced against the requirement of Rule 16(b) that the Court's scheduling order "shall not be modified except upon a showing of good cause." *Holmes*, 568 F.3d at 334–35 (quoting *Grochowski v. Phoenix Construction*, 318 F.3d 80, 86 (2d Cir. 2003)); *see also Sacerdote v. New York University*, 9 F.4th 95, 115 (2d Cir. 2021). Whether good cause exists depends primarily on the diligence of the party seeking amendment. *See Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007).

The Second Circuit has held that leave to amend may be denied on the basis of futility when it is "beyond doubt that the plaintiff can prove no set of facts in support of his amended claims." *Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999) (internal quotation marks and citation omitted). In determining whether an amendment is futile, the court evaluates the amended complaint "through the prism of a Rule 12(b)(6) analysis." *Henneberry v. Sumitomo Corp. of America*, 415 F. Supp. 2d 423, 433 (S.D.N.Y. 2006). Following this standard, the court accepts the plaintiff's factual

allegations as true and draws reasonable inferences in favor of the plaintiff. *Id.* Generally, courts will not deny leave to amend based on futility unless the proposed amendment is "clearly frivolous or legally insufficient." *See In re Ivan F. Boesky Securities Litigation*, 882 F. Supp. 1371, 1379 (S.D.N.Y. 1995) (citation omitted). Beyond these considerations, the court does not need to consider the substantive merits of the plaintiff's claim on a motion to amend. *Id.*

## III. DISCUSSION

Standard Chartered opposes this motion on the basis that the proposed amendments are futile—due to the standard clarified in *Ashley*, 144 F.4th 420, and *res judicata*—and would unduly prejudice them by delaying resolution of this action. Standard Chartered also requests that if the Court grants the motion, that it certify an appeal. Doc. 240 at 29.

Aiding and abetting liability pursuant to the ATA is governed by the framework of *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), which requires that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." Whether the third element is satisfied depends, in turn, on six factors: (1) the nature of the act assisted, (2) the amount of assistance provided, (3) the defendant's presence or absence at the time of the tort, (4) the defendant's relation to the principal tortious actor, (5) the defendant's state of mind, and (6) the period of defendant's assistance. *Twitter*, 598 U.S. at 486 (citing *Halberstam*, 705 F.2d at 488). Further, courts often treat the third element's "twin" requirements of knowing and substantial assistance as "working in tandem, with a lesser showing of one demanding a greater showing of the other to establish a conscious, culpable participation in the tort. In other words, less substantial assistance required more scienter before a court could infer conscious and culpable assistance. And, vice versa, if the assistance

were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Id.* at 491–92 (citations omitted). However, the "elements and factors should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'" *Id.* at 497 (internal quotation marks omitted) (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

The *Ashley* court clarified that in relation to the third element, the following principles guide the analysis: "[f]irst, whether the defendant rendered knowing assistance is distinct from a defendant's general awareness of its role in a terrorist scheme," and "[s]econd, the defendant must aid and abet 'the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act.'" 144 F.4th at 439–40 (citing *Twitter*, 598 U.S. at 497, 504). The *Ashley* court also stated that where a "concrete nexus" between the defendant's actions and a terrorist attack is lacking, it is possible for plaintiffs to "allege that the defendant aided and abetted 'a broad category of misconduct,' [but only where] the defendant's 'participation [is] correspondingly "pervasive, systemic, and culpable" such that we can say the defendant aided every wrongful act.'" *Id.* at 445 (citing to both *Twitter*, 598 U.S. at 502, and *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 292 (2025)).

Applying this standard, the *Ashley* court identified the following deficiencies in the plaintiffs' allegations that the defendant banks, including Standard Chartered, knowingly and substantially assisted terrorist activities. First, where the *Ashley* plaintiffs alleged that the defendants' supply of basic commercial banking services assisted terrorist attacks, the court found only a tenuous connection between the banking services and the attacks. *Id.* at 440–41. *Because* of this, the *Ashley* court applied a higher burden on the plaintiffs to allege that the defendants were consciously trying to participate in the

wrongdoing, and found that the plaintiffs failed to satisfy that higher burden. *Id.* at 443. However, the *Ashley* court left open the possibility that the allegations could satisfy the knowing and substantial assistance element where, for example, "they plausibly alleged that [the defendant] was treating the [organization with ties to terrorist organizations] differently than it treated its other clients. If [the defendant] routinely cut off those clients whom the U.S. military asked it to but then refused in the instant case, the context would more readily allow an inference that the failure to act was nonetheless culpable—that [the defendant] gave the [organization with ties to terrorist organizations] 'special treatment.'" *Id.* The *Ashley* court also suggested that the allegations would be stronger if the plaintiffs alleged that the U.S. government explicitly told the defendants that the companies to which they provided services were under a terrorist organization's control. *Id.* at 441.

Second, where the *Ashley* plaintiffs alleged that Standard Chartered knowingly contributed to the terrorist organization's money laundering operations by performing U.S.-dollar transactions for entities that served as fronts for a well-known terrorist-affiliated money launderer, the allegation was based on a theory of "money's fungibility." *Id.* at *440–41. The theory, at best, was that because some of the money transacted went to entities with terrorist connections, that the money must have gone to terrorist activities. *See id.* at 444. The *Ashley* court found this theory insufficient to allege knowing and substantial assistance. The *Ashley* court left open the possibility, however, that money laundering allegations could satisfy the knowing and substantial assistance element where, for example, a "bank's clients [were] clearly and publicly identified as part of the terrorist organization, but the bank violated sanctions laws and granted exemptions to obscure the substance of deposits, including for a client known to provide financial support to suicide bombers' families." *Id.* at 445.

Standard Chartered argues that Plaintiffs' proposed amendments do not address the deficiencies identified in *Ashley*. Standard Chartered argues that Plaintiffs did not establish: (1) that Standard Chartered provided knowing and substantial assistance to

terrorist activities by way of a banking relationship, *id.* at 439; (2) that Standard Chartered "consciously and culpably" sought to make terrorist activities succeed, *id.* at 436; or (3) that they satisfy the higher burden to prove conscious assistance when they only allege "peripheral assistance," and attempt to attach liability "to an upstream financial institution of a company that itself produces a potentially dangerous ware," *id.* at 441–42. *See* Doc. 240 at 14–16. They further argue that Plaintiffs' proposed amendments do not address other deficiencies in *Ashley*: that plaintiffs didn't allege that Standard Chartered directly aided the attacks or took steps to help downstream actors, that Standard Chartered's customers were themselves terrorists, that the U.S. government sought to close Fatima's operations, that Standard Chartered sought to indirectly assist the terrorist activities by violating sanctions, or that Standard Chartered aided CAN production or smuggling. Doc. 240 at 16–18; *see Ashley*, 144 F.4th at 440–43.

Finally, Defendants cite the recent cases *Troell* v. *Binance Holdings Limited*, No. 24 Civ. 7136 (JAV), 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026); *Zobay* v. *MTN Group Limited*, 2026 WL 2434665 (E.D.N.Y. Mar. 20, 2026); and *Freeman* v. *HSBC Holdings, PLC*, No. 18 Civ. 7359 (PKC) (PCG), 2026 WL 880107 (E.D.N.Y. Mar. 31, 2026), which they argue establish that non-routine, unusual, or special services to a customer, even where unlawful, are insufficient to plead an aiding and abetting claim. Doc. 270 at 1–2. They further argue that the three cases reject the theory that an aiding and abetting claim only requires that a defendant knew or could have foreseen that services might indirectly benefit a rogue actor. *Id.* at 2.

In *Troell*, the plaintiffs were both victims of terrorist attacks which occurred between 2016 and 2024, and their families. 2026 WL 636849, at *1. They alleged JASTA aiding-and-abetting claims against a cryptocurrency exchange company for assisting terrorist organizations, including Islamic State of Iraq and Syria ("ISIS"), Hezbollah, and al-Qaeda. *Id.* Applying the *Twitter* and *Ashley* standards, the *Troell* court found that the plaintiffs failed to satisfy the third element—knowing and substantial

assistance—for two reasons. *Id.* at *16. First, the plaintiffs failed to establish a definable nexus between the defendants' conduct and support for specific terrorist attacks because they, among other things, relied on the theory of money's fungibility, did not include "allegations establishing the substance and timing of the assistance provided to" the terrorist organizations, did not allege that the defendants flouted regulations or reporting requirements for the benefit of the terrorist organizations, and did not grant them special accommodations. *Id.* at *20–22. Second, the court found that the plaintiffs failed to meet the "high bar" to sufficiently allege an alternative theory of knowing and substantial assistance that the defendants' support for the terrorist organizations was "so systemic and pervasive that they [could] be held liable for all foreseeable acts of these organizations" because plaintiffs "at most" alleged facts to indicate that the defendants "generally permitted and solicited illicit actors of all ilks to use its platforms." *Id*. at *22 (citing *Twitter*, 598 U.S. at 503). The *Troell* court allowed the plaintiffs an opportunity to amend their complaint, stating that "there are details that [p]laintiffs could potentially provide to correct the deficiencies identified regarding the [defendant's business] transactions with the [terrorist organizations], as well as [the defendant's] alleged knowledge of their associations with [terrorist organizations] that could establish the requisite nexus between [the defendant's] conduct and the terrorist attacks at issue." *Id.* at *25.

In *Zobay*, the plaintiffs were American citizens killed or injured by terrorist attacks in Iraq, Syria, and Afghanistan. 2026 WL 2434665, at *1. They alleged JASTA aiding-and-abetting claims against telecommunications companies for assisting terrorist organizations. *Id.* The *Zobay* court found that the plaintiffs failed to allege the defendants' scienter and nexus—the connection between plaintiffs' provision of services and the terrorist attacks themselves—and thus did not satisfy the knowing and substantial assistance element. *Id.* at *8. The court found that the plaintiffs did not establish scienter as the allegations were limited to, for example, "having a commercial relationship with

knowledge that money or goods will flow to terrorists." *Id.* at *5. The court found that the plaintiffs did not establish nexus as they alleged, at most, assistance to "a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it" and didn't meet the "high bar" of establishing pervasive, systemic, and culpable assistance. *Id.* at *9.

In *Freeman*, the plaintiffs were American citizens killed or injured by terrorist attacks between 2004 and 2011, and their families. 2026 WL 880107, at *1. They alleged JASTA aiding-and-abetting claims against various banks for assisting the government of Iran and terrorist organizations, including Hezbollah, in bringing about acts of terrorism. *Id.* at *9. The *Freeman* court applied the standards articulated in *Ashley*, especially that, to satisfy the knowing and substantial assistance element, the defendants needed to have "consciously and culpably 'participate[d]' in a wrongful act so as to help 'make [it] succeed.'" *Id.* at *10 (citing *Ashley*, 144 F.4th at 443). The court found that while the plaintiffs had adequately alleged the first two elements of an aiding-and-abetting claim—that of a wrongful act and general knowledge—they had not sufficiently alleged knowing and substantial assistance because they did not allege conscious and culpable participation. *Id.* at *10–11, *13. In particular, the court found that the defendants' connections with the terrorist organizations were too attenuated and the defendants' "provision of financial services [wa]s too widespread to impart the requisite intent to aid the specific terrorist acts at issue." *Id.* at *16. The court found that plaintiffs relied on a money fungibility theory—rejected by *Ashley*—that "because [d]efendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money must have gone to the terrorists' violent activities." *Id.* at *17 (citing *Ashley*, 144 F.4th at 444). However, the court also explicitly distinguished the alleged facts from those in *Bonacasa II*, noting that in *Bonacasa II*, Standard Chartered had alleged "carefully tailored financial instruments to fund production of a known IED ingredient known to be sold to terrorist groups known

to be attacking U.S. service members." *Id.* at *16 (*citing Bonacasa II*, 2023 WL 7110774, at *11).

Without considering the substantive merits of the claims, Plaintiffs' proposed amendments are not frivolous or legally insufficient; they directly address the potential deficiencies of proving the knowing and substantial assistance element of an aiding and abetting claim. *See In re Ivan F. Boesky Securities Litig.*, 882 F. Supp. at 1379. Neither *Ashley*, nor *Freeman*, *Troell*, *or Zobay* establish that Plaintiffs' claims are insufficient to establish an aiding or abetting claim on their face because "[a]n assessment of a defendant's knowing and substantial assistance under the JASTA framework is highly fact intensive." *Ashley*, 144 F.4th at 443. Plaintiffs' proposed amendments include allegations not considered in *Ashley* or its progeny, including details of the Debottlenecking Loan, the ISI Link, and Standard Chartered's special treatment of Fatima: that, for example, Standard Chartered understood that the Debottlenecking Loan was designed to and did increase the production of IEDs, and Standard Chartered knew that the U.S. government verified ISI's role in terror attacks and Fatima's connection to them. *See* Doc. 254 at 4; ¶¶ 35, 108, 194.

In fact, the proposed amendments directly address the suggestions in *Ashley* of how pleading deficiencies could have been cured. Unlike the plaintiffs in *Ashley*, Plaintiffs "*do* [] allege that Lieutenant General Barbero told Standard Chartered that the U.S. Government believed [Fatima] w[as] under [ISI's] control," thus attempting to establish Standard Chartered's intent to assist. *Ashley*, 144 F.4th at 442 (emphasis added). Unlike the plaintiffs in *Ashley*, Plaintiffs do not rely on an allegation that Standard Chartered's basic commercial banking services establish that it was consciously trying to help or otherwise participate in Fatima's wrongdoing, *id.* at 441, but instead allege that Standard Chartered provided special treatment to Fatima by providing the Debottlenecking Loan on non-market terms, waiving repeated breaches of the loan, fronting payments, and disregarding due diligence. ¶¶ 195–96. These allegations are not

clearly frivolous or legally insufficient. As was appropriate in *Troell*, with the benefit of the Court's analysis post-*Ashley*, it is appropriate that Plaintiffs are afforded the opportunity to amend to correct any deficiencies, including to prove knowing and substantial assistance, and any attendant requirements of conscious and culpable assistance, nexus, scienter, and otherwise. *Troell*, 2026 WL 636849, at *25.

Aside from the above, Standard Chartered argues that Plaintiffs' claims are barred by *res judicata*. Doc. 240 at 26. The Court finds that Plaintiffs' claims are not barred. The first set of plaintiffs Standard Chartered raises—estates, heirs, and survivors of U.S. nationals killed in Afghanistan, *id.*—were not plaintiffs in *Ashley*, as in *Ashley* they were, for example, named plaintiffs, but in the instant case they are representatives for estates of others. *Conte v. Justice*, 996 F.2d 1398, 1403 (2d Cir. 1993) ("litigation in one capacity, individual or representative, does not preclude relitigation in a different capacity, individual or representative" (citing 18 Charles A. Wright, et al., Federal Practice and Procedure § 4454, at 465 (1981)). As for the second set of plaintiffs Standard Chartered raises—those who claim their own injuries indirectly resulting from attacks on their relatives, Doc. 240 at 27—the plaintiffs are alleging different harms. *See TechnoMarine SA v Giftports, Inc.*, 758 F3d 493, 499 (2d Cir 2014) ("a course of conduct . . . may frequently give rise to more than a single cause of action").

Finally, the Court finds that there is otherwise good cause to grant leave to amend. Plaintiffs acted diligently in seeking amendment soon after the *Ashley* decision. Doc. 227 at 15; *Brous v. Eligo Energy, LLC*, 2025 WL 2643987, at *4 (S.D.N.Y. Sept. 12, 2025) (permitting amendment three weeks after relevant decision). Standard Chartered would not be unduly prejudiced by the amendments because the amendments rely on discovery already conducted, and do not require additional discovery.[4] *See Partner Reins. Co. Ltd.*

---

[4] Standard Chartered states that additional expert discovery will be needed, but does not state why. Doc. 240 at 29. Even if additional expert discovery is needed, the Court does not see how it would be so extensive as to unduly prejudice Standard Chartered. *See Olaf Sööt Design, LLC v. Daktronics, Inc.*, 299 F. Supp. 3d 395, 399–400 (S.D.N.Y. 2017).

*v. RPM Mortgage, Inc.*, 18 Civ. 5831 (PAE), 2020 WL 6690659, at *13 (S.D.N.Y. Nov. 13, 2020).

As the Court has found that Plaintiffs are granted leave to amend, it turns to Standard Chartered's request to certify an appeal. Pursuant to 28 U.S.C. § 1292(b), "[w]hen a district judge, . . . shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." Here, the Court's analysis has turned on the new factual allegations included in the PAC, and specifically how they apply to the deficiencies identified in *Ashley*, 144 F.4th 420. As such, the Court declines to certify an appeal.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motions are GRANTED. The Clerk of the Court is respectfully directed to terminate the motions, **Doc. 226** in *Bonacasa, et al. v. Standard Chartered PLC, et al.*, 22-cv-3320; **Doc. 65** in *Moore, et al. v. Standard Chartered PLC, et al.*, 23-cv-2834; and **Doc. 146** in *Estate of Anne T. Smedinghoff, et al. v. Standard Chartered Bank*, 23-cv-2865. Plaintiffs are directed to file the third amended complaint by October 5, 2026.

It is SO ORDERED.

Dated: September 30, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.